# EXHIBIT LL

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------x
ALONZO GRANT and STEPHANIE GRANT,

                         Plaintiffs,

vs.                      Civil Action No. 5:15-CV-445

CITY OF SYRACUSE, SYRACUSE POLICE DEPARTMENT,
POLICE OFFICERS DAMON LOCKETT and PAUL MONTALTO,
POLICE OFFICER BRIAN NOVITSKY, CHIEF OF
POLICE FRANK FOWLER and Does 1-100,

                         Defendants.

----------------------------------------------x

      Videotaped Deposition of FRANK L. FOWLER, held on

January 11, 2016, at the Offices of Precision Reporters,

P.C., One Lincoln Center, Suite 310, Syracuse, New York,

before Amanda L. Theleman, Registered Professional Reporter,

Certified Realtime Reporter, and Notary Public in and for the

State of New York.

A P P E A R A N C E S

For Plaintiffs:      THE LAW OFFICES OF BONNER & BONNER
                     Attorneys at Law
                     475 Gate Dive Road
                     #212
                     Sausalito, California  94965
                        BY:  CHARLES A. BONNER, ESQ.
                             CABRAL BONNER, ESQ.

                     RYDER LAW FIRM
                     Attorney at Law
                     121 East Water Street
                     Syracuse, New York  13202
                        BY:  JESSE RYDER, ESQ.

For Defendants:      CORPORATION COUNSEL
                     Attorneys at Law
                     Department of Law
                     233 East Washington Street
                     Syracuse, New York  13202
                        BY:  AIMEE M. PAQUETTE, ESQ.

Also Present:        Alonzo Grant
                     Stephanie Grant
                     Ilse Wolf

                     Video Vision
                     13 Chestnut Street
                     Clinton, New York  13323
                        By:  Corrine Gates, Videographer

REPORTERS PAPER & MFG. CO., LOUISVILLE, KY.

LAWYER'S NOTES

3

1                    I N D E X   O F   T E S T I M O N Y

2     EXAMINATION OF FRANK F. FOWLER                    Pages

3        By Mr. Charles Bonner:                       8 - 187

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X   O F   E X H I B I T S

|  |  | Page Marked | Page Identified |
|---|---|---|---|
| Exhibit 2 (Constitutional Law, Part 2 Section A (2 Hours), 5 pages) | | 30 | 30 |
| Exhibit 3 (Ethical Awareness, Section 1 Handout, two pages) | | 33 | 34 |
| Exhibit 4 (New York State Domestic Incident Report Reference Manual, two pages) | | 36 | 37 |
| Exhibit 5 (Use of Physical Force Policy, Bates stamped 000307 through 000312) | | 50 | 50 |
| Exhibit 6 (Letter to Alonzo Grant from Frank L. Fowler, dated 7/3/2014, Bates stamped 000312) | | 63 | 63 |
| Exhibit 7 (Syracuse Police Department Office of Professional Standards, Case Report 14-93, Bates stamped 000313 through 000334) | | 64 | 64 |
| Exhibit 8 (Screenshots, 19 pages) | | 118 | 118 |
| Exhibit 9 (Fourteen photographs) | | 125 | 126 |
| Exhibit 10 (Criminal Court of the City of Syracuse Misdemeanor Information, three pages) | | 130 | 131 |
| Exhibit 11 (Letter to Charles A. Bonner, Esq. from William J. Fitzpatrick, dated 11/20/2014) | | 134 | 134 |

| | | Page Marked | Page Identified |
|---|---|---|---|
| Exhibit 12 (Letter to Alonzo Grant from Joseph L. Lipari, dated 10/16/2014) | | 136 | 136 |
| Exhibit 13 (Six letters) | | 140 | 140 |
| Exhibit 14 (Upstate University Hospital at Community Campus medical records for Alonzo Grant, two pages) | | 142 | 145 |
| Exhibit 15 (Medical record signed by John A. Charles, MD, one page) | | 147 | 147 |
| Exhibit 16 (Syracuse city councilors to investigate police policy on use of force, dated 8/15/2014, two pages) | | 153 | 154 |
| Exhibit 17 (Discipline recommended in 21 complaints against Syracuse Police, dated 3/24/2015, two pages) | | 165 | 166 |
| Exhibit 18 (Syracuse Citizen Review Board Annual report, January 1 to December 31, 2012, two pages) | | 171 | 171 |
| Exhibit 19 (Syracuse Citizen Review Board Annual Report for 2013, three pages) | | 174 | 174 |
| Exhibit 20 (Syracuse Citizen Review Board Annual Report for 2014, two pages) | | 177 | 177 |
| Exhibit 21 (Professional Standards of Conduct & Ethics, Bates stamped 000384 through 000408) | | 180 | 180 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

1                          FEDERAL STIPULATIONS

2

3            IT IS HEREBY STIPULATED AND AGREED by and between

4    the attorneys for the respective parties that the presence of

5    the Referee be waived;

6            IT IS FURTHER STIPULATED AND AGREED that the

7    witness shall read and sign the minutes of the transcript,

8    and that the filing of the transcript be waived;

9            IT IS FURTHER STIPULATED AND AGREED that all

10   objections, except as to form, are reserved until the time of

11   trial;

12           IT IS FURTHER STIPULATED AND AGREED that this

13   Deposition may be utilized for all purposes as provided by

14   the Federal Rules of Civil Procedure;

15           AND FURTHER STIPULATED AND AGREED that all rights

16   provided to all parties by the Federal Rules of Civil

17   Procedure shall not be deemed waived at the appropriate

18   sections of the Federal Rules of Civil Procedure shall be

19   controlling with respect thereto.

20

21

22

23

24

25

1         THE VIDEOGRAPHER:  My name is

2    Corrine Gates for Video Vision, 13 Chestnut

3    Street in Clinton, New York.  Today's date is

4    January 11, 2016, and the time is 11:57.  This

5    testimony is being taken at One Lincoln Center

6    in Syracuse, New York.

7         For the United States District Court,

8    Northern District of New York, the caption of

9    the case is Alonzo Grant and Stephanie Grant

10   versus City of Syracuse, Syracuse Police

11   Department, Police Officers Damon Lockett and

12   Paul Montalto, Police Officer Brian Novitsky,

13   Chief of Police Frank Fowler and Does 1

14   through 100.  This witness is Frank Fowler.

15   This testimony is being taken on behalf of the

16   plaintiffs, Mr. and Mrs. Alonzo Grant.  This

17   testimony is being recorded in the digital

18   format at the standard play mode.

19        Would counsel please announce appearances

20   for the record?

21        MR. CHARLES BONNER:  Yes.  Charles Bonner

22   on behalf of Mr. and Mrs. Alonzo Grant, both

23   are whom present in court -- are present at

24   this deposition.

25        MS. PAQUETTE:  Aimee Paquette for City

8

FOWLER - CHARLES BONNER

1    defendants.

2         MR. CHARLES BONNER:  And also for the

3    record, I'm with also cocounsel, and if you

4    can make your announcement.  Can you use her

5    mic?

6         MR. CABRAL BONNER:  Sure.  I'll just

7    speak up.  It's Cabral Bonner of the Law

8    Office of Bonner & Bonner appearing on behalf

9    of the plaintiffs.

10        MR. RYDER:  And I am Jesse Ryder for the

11   plaintiffs, cocounsel with Bonner & Bonner.

12   EXAMINATION BY MR. CHARLES BONNER:

13   Q    Good afternoon, Chief.

14        THE REPORTER:  I just have to swear him

15   in.  Sorry.

16        MR. CHARLES BONNER:  Oh, I'm sorry.

17   F R A N K  F.  F O W L E R, called as a

18   witness and being duly sworn, testifies as follows:

19   EXAMINATION BY MR. CHARLES BONNER:

20   Q    Good afternoon, Chief.

21   A    Good afternoon.

22   Q    How are you doing?  Chief, would you please

23   state -- state and spell your full name for the record?

24   A    Sure.  My name is Frank L. Fowler.  F-R-A-N-K

25   F-O-W-L-E-R.

FOWLER - CHARLES BONNER

1      Q      And I -- I believe you probably have had your

2   deposition taken before; is that true?

3      A      Yes, that's correct.

4      Q      And you know we lawyers go through a certain

5   amount of ground rules, admonitions we call them at the

6   beginning of the deposition.  Are you aware of that?

7      A      Yes.

8      Q      Okay.  Even though you probably have heard

9   them on several occasions, I will go through them briefly

10   with you so that you will understand what is required of you

11   today.  First of all, you have been placed under the oath as

12   the court reporter here is duly authorized to administer you

13   the oath; do you understand that?

14      A      Yes.

15      Q      And you understand that oath requires you to

16   tell the truth?

17      A      Yes.

18      Q      Okay.  And also you know that this is a

19   question and answer proceeding where I will ask you questions

20   and you will give answers under oath which will be recorded

21   into a booklet form; you understand that?

22      A      I do.

23      Q      Okay.  At the conclusion of the deposition

24   here, your testimony will be presented to you through your

25   attorney for you to review, and you can make any changes,

FOWLER - CHARLES BONNER

1   additions, deletions.  If you should make a material change,

2   such as changing a yes answer to a no answer, then either

3   party, either your attorney or I can comment on those

4   changes; do you understand that?

5          A    Okay.

6          Q    And if I were to make a comment, it would be a

7   comment to say your testimony's not being truthful because

8   you made a material change; do you understand that?

9          A    Understood.

10         Q    Okay.  In the course of human events,

11  sometimes we will not remember a precise fact, and we don't

12  want you to guess.  We are entitled to your best estimate; do

13  you understand that?

14         A    Best estimate or the truth?

15         Q    Well, both.  But first of all, let me be a bit

16  clearer.  If I were to ask you a date or an event and you

17  can't remember the precise event, I can ask you your best

18  estimate.

19         A    Sure.  I see -- I see where you are now.

20         Q    Okay.  But I don't want you to guess.  Okay.

21  So let me give you the distinction between an estimate or the

22  guess.

23         A    Oh, I know the difference between an estimate

24  or a guess --

25         Q    Okay.

FOWLER - CHARLES BONNER

1          A     -- for sure.

2          Q     Very good.  Okay.  So the law allows us to use

3     your estimate as -- as some evidence; whereas, a guess is

4     pure speculation.  The law does not permit that.

5          A     Sure.

6          Q     You understand that?

7          A     Yes.

8          Q     Okay.  And of course, being a professional

9     police officer, you've testified on numerous occasions and

10    you understand that the court reporter here as talented as

11    she is can only take down your verbal responses.  She can't

12    take down nods of the heads, shrugs of the shoulders, hand

13    gestures; you understand that?

14         A     Yes, sir.

15         Q     Okay.  At any time that you'd like to break

16    and speak with your attorney, please let us know, and we'll

17    take a break; okay?

18         A     Okay.  Thank you.

19         Q     Now, did you review any documents, Chief,

20    before you appeared here -- you appeared here today in

21    preparation for your deposition?

22         A     I did.

23         Q     Okay.  What did you review?

24         A     I just reviewed the -- our Office -- Office of

25    Professional Standards investigation concerning this case.

FOWLER - CHARLES BONNER

1          Q     Your Office of Professional Investigations?

2          A     Office of Professional Standards.

3          Q     Professional Standards?

4          A     Yes.

5          Q     Okay.  Was there any particular provision of

6     that document that you paid particular attention to?

7          A     No, no, no, it was just the investigation.

8     It -- it chronicles the investigation centered around this

9     case.

10         Q     Okay.  Any other documents that you reviewed

11    other than the Office of Professional Standards?

12         A     Yeah, yes, our rules and regulations

13    concerning the use of force.  I think that's it.

14         Q     Okay.  And any particular rule regarding your

15    rules and regulations pertaining to the use of force that you

16    focused on?

17         A     No.

18         Q     Okay.  And why did you review these two

19    documents?

20         A     Because I know I was going to appear here at

21    the deposition and I knew -- I -- I assumed that the

22    questions that would be asked of me would be centered around

23    both of those documents or have something to do with either

24    of those two documents.

25         Q     Okay.  Have you been deposed in other cases

FOWLER - CHARLES BONNER

1    involving a case like this one where -- where there were

2    allegations of excessive force?

3              A    Yes.

4              Q    Okay.

5              A    Yes.

6              Q    And can you give me the name of the cases

7    where you appeared in since you've been the chief pertaining

8    to issues of excessive force?

9              A    I can only recall one case.

10             Q    Okay.

11             A    And that's the Hulett case.

12             Q    Is that the case involving the European

13   American man who was tased while he was on the bus, the

14   disabled man?

15             A    Yes, that's correct.

16             Q    Okay.  And did that case resolve?

17             A    No, still pending.

18             Q    Is it set for trial?

19             A    I'm not sure what the status is.

20             Q    And do you know whether that case is venued in

21   federal court or state court?

22             A    I'm not aware -- I'm not sure of that either.

23             Q    And when did you give a deposition in that

24   case?

25             A    I don't recall the date.

FOWLER - CHARLES BONNER

1      Q    This is one of those occasions where I need
2  your best estimate.  What is your best estimate of the date
3  that you gave a deposition in the Hulett case?

4      A    It was a few months ago.  That's the best I
5  could tell you.

6      Q    So it was in 2015?

7      A    It was indeed in 2015.

8      Q    And that case -- in that case there was
9  allegation of excessive force by some of your officers?

10     A    Yes.

11     Q    Okay.  Can you recall any other cases in which
12 you have given deposition where the issue was excessive force
13 by some of your officers?

14     A    I cannot.

15     Q    Okay.  During the course of this deposition, I
16 may refer to an incident, and if I do, I want you to know
17 that I'm referring to an incident of the arrest of
18 Mr. Alonzo Grant on June 28, 2014 and the surrounding
19 circumstances of that arrest including his injuries so that
20 you understand that; is that fair enough?

21     A    That makes sense, yes.

22     Q    Okay.  Now, just briefly, you were born in
23 Missouri, I understand?

24     A    Yes, sir.

25     Q    Okay.  And you went to college in Missouri?

FOWLER - CHARLES BONNER

1          A    Yes.

2          Q    Okay.   What's the name of the college you went

3     to?

4          A    Forest Park Community College, just briefly,

5     yes.

6          Q    Okay.   Did you get a degree?

7          A    I did not.

8          Q    Okay.   And then you went into the -- into the

9     Army?

10         A    Yes, sir.

11         Q    What year?

12         A    '84.

13         Q    Okay.   And you did, what, three, four years in

14    the Army?

15         A    I did three years active, an additional 17 in

16    the reserves.

17         Q    Okay.   And you became a police officer in

18    Syracuse in what year?

19         A    '89.

20         Q    Okay.

21         A    1989.

22         Q    And then I understand you were appointed chief

23    in 2010?

24         A    That's correct.

25         Q    Okay.   Congratulations.

FOWLER - CHARLES BONNER

1          A     Thank you.

2          Q     When you were appointed chief, did the City

3     provide you with any training on how to protect the

4     constitutional right of American citizens?

5          A     No.

6          Q     Okay.  And since you have become chief -- in

7     what -- what month incidentally in 2010 did you become chief?

8          A     January.

9          Q     January.  Okay.  So essentially you've been

10    chief now approximately six years?

11         A     Sure, yes, about that.

12         Q     Okay.  At any time during your tenure as

13    chief, has the City ever provided you with any training on

14    how to protect the constitutional rights of American

15    citizens?

16         A     During my time as chief?

17         Q     Yes.

18         A     No.

19         Q     Okay.  Now, during your time as chief, have

20    you sought any kind of training for yourself on how to

21    educate your subordinates as to how to protect the

22    constitutional rights of American citizens?

23         A     I don't believe so.

24         Q     Okay.  When you were appointed chief, did you

25    have to raise your hand and take an oath?

FOWLER - CHARLES BONNER

1        A    Yes.

2        Q    Okay.  And what did the oath say?

3        A    I don't remember the oath verbatim.

4        Q    This is another occasion for your best

5    estimate.  We don't -- not going to hold you to the accuracy

6    of it, but what is your best recollection?

7        A    To uphold -- uphold and enforce the laws of,

8    well, the United States Constitution, State of New York, City

9    Charter.

10        Q    Did you have to put your hand on the Bible?

11        A    I'm not required to put my hand on the Bible,

12    but I believe that I did.  I put -- I did put my hand on the

13    Bible, but that's not required.

14        Q    I understand.  And why did you do it?

15        A    Why did I do it?

16        Q    Uh-huh.

17        A    Because I happen to be a practicing christian.

18        Q    And was that a way of affirming that you are

19    committed to the truth in the -- in carrying out your job?

20        A    Yes, indeed, yes.

21        Q    As well as your commitment to carrying out the

22    mandates of the United States Constitution and the laws of

23    the State of New York?

24        A    Yes.

25        Q    Including the New York Constitution?

FOWLER - CHARLES BONNER

1          A     Yes.

2          Q     And that's what you've done since you've

3    become chief?  And you've done that since you've become

4    chief?

5          A     Yes, yes.

6          Q     So in John where they say the truth shall set

7    you free, I take it you practice that?

8          A     Yes.

9          Q     Okay.  Now, I understand that you are the

10   chief executive officer for the Syracuse Police Department?

11         A     Yes, sir.

12         Q     And you are the final authority in all matters

13   of department policies; is that true?

14         A     Yes, sir.

15         Q     You are the final authority in all matters of

16   the department operations?

17         A     Yes, sir.

18         Q     And you are the final authority in all matters

19   pertaining to discipline of your subordinates?

20         A     Yes, sir.

21         Q     And you are accountable to the mayor; is that

22   true?

23         A     That's correct, sir.

24         Q     And you're also accountable to the Common

25   Council?

FOWLER - CHARLES BONNER

1          A     That's correct, sir.

2          Q     And in effect, you're accountable to the

3     citizens of Syracuse?

4          A     Absolutely.

5          Q     Okay.  And part of your duties is to ensure

6     that the department mission is executed efficiently and

7     effectively?

8          A     That's correct.

9          Q     Okay.  And what does this word "ensure"

10    connotes to you?  What does it mean?

11         A     To make sure that it -- that it happens as --

12    as a part of daily practice.

13         Q     Would it be fair to say that you have to have

14    a zero tolerance for violation of constitutional rights?

15               MS. PAQUETTE:  Objection.  You can

16               answer.

17         A     Could you go with the question again?

18         Q     Yeah.  I'm trying to understand your

19    understanding of the word "ensure."

20         A     Sure.

21         Q     That you are to ensure that the department

22    mission is executed efficiently and effectively, and that is

23    your responsibility; correct?

24         A     It is.

25         Q     Okay.  And I'm trying to understand what the

FOWLER - CHARLES BONNER

1   word ensures --

2           A    Excuse me.

3           Q    Bless you.

4           A    Thanks.

5           Q    What does the word "ensure" mean to you?

6           A    I think I've answered that question.

7           Q    Well, I understand there was an objection that

8   was vague.

9           A    Well, it wasn't to that -- it wasn't to my

10  answer to that question.  It was an objection to a different

11  question that you had asked, and I asked that you repeat that

12  particular question.

13          Q    Well --

14          A    But --

15          Q    Fair enough.  What -- does the word ensure

16  means that you have to make sure that there's a zero

17  tolerance for violation of constitutional rights of the

18  citizens of Syracuse?

19               MS. PAQUETTE:  Objection.  You can

20               answer.

21          A    Yes.

22          Q    Okay.  And also part of your responsibility is

23  to empower and lead your subordinates; is that true?

24          A    Yes.

25          Q    Okay.  And what is your mission as the chief

FOWLER - CHARLES BONNER

1    of the Syracuse Police Department?

2            A    My mission is -- is to -- reduction of crime

3    and to protect life and property of the citizens of the City

4    of Syracuse.

5            Q    Okay.

6            A    Not necessarily in that order.

7            Q    I understand.  I understand.  Well, would you

8    say that part of your mission is -- just to repeat -- is to

9    protect all lives in the City of Syracuse?

10           A    Absolutely.

11           Q    And your mission is to protect all property in

12   the City of Syracuse?

13           A    Yes, sir.

14           Q    And is part of your mission -- in fact, it is

15   your mission to maintain the feeling of security in -- in the

16   community?

17           A    Yes, sir.

18           Q    And it's a part of your mission to enforce all

19   laws, federal, state, and local; is that true?

20           A    That's correct, sir.

21           Q    And I understand that you have a philosophy of

22   policing through the principals of community policing; is

23   that true?

24           A    That's correct, sir.

25           Q    And what is that?

FOWLER - CHARLES BONNER

1          A    Well, community policing is -- there's --

2    there's various components to it, but community policing

3    is -- is -- is a philosophy of empowering the community

4    and -- well, to show a stronger presence within the community

5    for law enforcement in advance of a problem or an issue,

6    to -- to make a connection with the community, to make

7    themselves a part of their -- of their community or their

8    surrounding community, and -- and then to engage in long-term

9    problem solving through communication, feedback, and -- yeah,

10   through communi -- communication, feedback, and education.

11         Q    You find that by engaging the community in --

12   in what you call the community policing, you get cooperation

13   from the community to help you do your job which is to

14   protect lives and protect property and to keep the citizens

15   safe?

16         A    That -- that's the -- that's the goal, yes.

17         Q    Okay.  So it's very important that the police

18   officers respect the people in the community so that the

19   community and the police become one unit towards carrying out

20   your mission; is that a fair statement?

21         A    That's fair.

22         Q    Okay.  Now, part of making sure that the

23   people in the community feel safe is to make sure that police

24   officers protect their constitutional rights; is that true?

25         A    Sure.

FOWLER - CHARLES BONNER

1          Q    Okay.  When you were sworn to uphold the

2    Constitution as you told us, when you put your hand on the

3    Bible and you swore to tell the truth, you had an

4    understanding what the Fourth Amendment is about; true?

5          A    Sure.

6          Q    And what is your understanding of the Fourth

7    Amendment rights of American citizens?

8          A    Unlawful -- unlawful arrest, search, and

9    seizure, so it's basic rights of American citizens.

10          Q    Okay.  And is -- you understand that it's the

11    basic right of American citizens to be secure in their

12    persons?

13          A    Yes.

14          Q    The Fourth Amendment provides the basic right

15    of American citizens to be secure in their houses?

16          A    Yes.

17          Q    In fact, you have an understanding that the

18    Fourth Amendment's premise on the basis or on the principal

19    that your house is your castle; did you have that kind of

20    general philosophical understanding that that was one of the

21    foundations of the Fourth Amendment?

22          A    Yes, yes, it is.  Yes.

23          Q    Okay.

24          A    Yes.

25          Q    And you had an understanding that the Fourth

24

FOWLER - CHARLES BONNER

1    Amendment provides that you cannot be -- any American citizen

2    cannot be subjected to any unreasonable searches of their

3    person or houses; is that your understanding?

4           A    Yes, yes.

5           Q    And likewise, is your understanding the Fourth

6    Amendment provides and prevents any unreasonable seizures of

7    the person; is that true?

8           A    Sure, sure.

9           Q    Such as a false arrest?

10          A    Sure, sure.

11          Q    Okay.

12          A    Yes.

13          Q    And you understand that these rights are

14   stated in the Fourth Amendment that they shall not be

15   violated; you understand that?

16          A    I do, sir.

17          Q    And you understand the word "shall" that means

18   that it's mandatory, that there's no discretion?

19          A    Yes.

20          Q    Okay.  It's not like a word "may be violated."

21   When it says shall, it means it's absolutely shall not be

22   violated?

23          A    Yes, sir.

24          Q    And thus, the language in the Fourth Amendment

25   based on your understanding?

FOWLER - CHARLES BONNER

1          A     Yes, sir.

2          Q     Okay.  And do you further understand that no

3    person shall be seized or searched except by warrant or based

4    on probable cause; is that your understanding?

5          A     Not necessarily.

6          Q     Okay.  What is your understanding about the

7    requirements of warrant or possible cause to search or seize

8    an American?

9          A     Well, to -- to -- to seize a person --

10   New York State has an area of law that's called the levels of

11   intrusion.  You -- you probably heard to stop and frisk but

12   to stop, question, and frisk and the levels of intrusion.

13   And -- and at Level 3, which is based on reasonable

14   suspicion, we can seize a person based on reasonable

15   suspicion, and that is that the presence of a crime and the

16   person in which we are -- are engaging, the burden is that a

17   reasonable person under the same set of facts or

18   circumstances would conclude that -- that yes, a crime has

19   occurred or is occurring or is about to occur and that that

20   particular person is involved or has -- or is the person that

21   has committed such crime.  We can seize a person at that

22   point.

23         Q     Well, isn't it true that your -- New York

24   Supreme Court ruled that -- your highest appellate court

25   ruled that you could detain a person as opposed to seize, you

26

FOWLER - CHARLES BONNER

1  could detain them --

2  　　　　A　　Well --

3  　　　　Q　　-- detain them for investigation?

4  　　　　A　　Right, and -- yes, detain them for

5  investigation, and when you -- when you talk about the

6  seizure of a person, are you speaking of arrest?  Maybe I

7  should have -- maybe I'm -- maybe I have a misunderstanding

8  of seizure because --

9  　　　　Q　　Well, yes.  Well, there is detention; true?

10 　　　　A　　Yes.

11 　　　　Q　　And then there is custody?

12 　　　　A　　Yes.

13 　　　　Q　　Taking a person --

14 　　　　A　　Yes.

15 　　　　Q　　-- into custody?

16 　　　　A　　Yes, sir.

17 　　　　Q　　When you take a person into custody, is that

18 your understanding when the person has been seized?

19 　　　　　　　　THE REPORTER:  Can you just slow down and

20 　　　　　　　　say that again?

21 　　　　　　　　MR. CHARLES BONNER:  I'm sorry.

22 　　　　Q　　When a police officer takes an American

23 citizens into custody, is that your understanding that that

24 person now has been seized?

25 　　　　A　　No.  Actually I was -- my understanding is

FOWLER - CHARLES BONNER

1   that a seize -- a person has been seized prior to that when a

2   police officer engaged them in contact.

3           Q    Okay.

4           A    And at the point of that contact, that person

5   is no longer -- that person is not free to go, that we have

6   the legal authority to detain them for the purposes of our

7   investigation.  They're no longer free to go; so therefore,

8   the Fourth Amendment that you made reference to earlier is --

9   is for the purposes of -- given this explanation, it's now

10  suspended because we have a legal authority to detain this

11  person so that they are no longer free to go.  So to me,

12  that's -- that's a seizure, that the person can't just simply

13  turn and walk away.

14          Q    Fair enough.  Must that seizure though be

15  based on some probable cause?

16          A    Reasonable suspicion.

17          Q    Okay.  And what is your understanding of

18  reasonable suspicion?

19          A    As I explained earlier, the presence of a

20  crime, the fact that a crime is happening, has happened, or

21  is about to happen, and that the person that the police are

22  engaging at that time is -- is involved in that crime.

23          Q    Okay.  And the test is based on what a

24  reasonable police officer would conclude at the scene that --

25  that a crime was being committed; is that the test?

28

FOWLER - CHARLES BONNER

1       A    Yes.

2       Q    Okay.

3       A    It is -- is -- is, has, or about to.

4       Q    Okay.  Now, and so you believe that New York

5   State laws allows the Fourth Amendment to be suspended in

6   that context?

7       A    That's -- that's -- that's not -- that's not

8   what I'm -- no, no, no.  That's not what I'm saying.  I -- I

9   did use that language in my explanation regarding a question

10  that you asked me earlier.  But it's -- that's what New York

11  State -- New York State allows a police officer in the

12  performance of -- in the performance of their job.

13      Q    Well, let me read you the Fourth Amendment,

14  and -- and then I'll ask you the question.  The Fourth

15  Amendment provides "The right of the people to be secure in

16  their person, houses, papers, and effects, against

17  unreasonable searches and seizure, shall not be violated, and

18  no warrants shall issue but upon -- but upon probable cause

19  supported by oath or affirmation and particularly describing

20  the place to be searched, and the person or things to be

21  seized."

22           Now, is there any New York law that has

23  suspended that --

24      A    No, no --

25      Q    Okay.

FOWLER - CHARLES BONNER

1        A      -- because -- because our reasonable

2    suspicion, that's -- it's -- that the -- the reasonable

3    suspicion is presence when the police officers are engaging

4    the citizen with that power and that authority.   The

5    reasonable suspicion is presence; so therefore, the

6    Constitution is intact.

7        Q    Okay.   Now, since your appointment as chief of

8    the Syracuse Police Department, have you personally conducted

9    any meetings with your police officers regarding how to

10   protect the citizen constitutional rights during an arrest or

11   detention?

12                   MS. PAQUETTE:   Objection.   You can

13             answer.

14       A     Individual or -- I communicate to my police

15   officers in various ways, through training bulletins,

16   through -- through training itself, and then through mass

17   e-mail, mass video communications, or communicating to them

18   directly one-on-one or in group settings, so -- and -- and

19   through -- and -- and I guess my direct answer to your

20   question is that I'm not sure because we issue a number of

21   training bulletins throughout the year and -- and -- and as

22   stated earlier, I -- I've been the chief for over six years

23   now, so I'm not sure if I've issued a training bulletin in

24   that regard.

25       Q    Well, this is one of those occasions again of

FOWLER - CHARLES BONNER

1    your best recollection.  Do you have a recollection where

2    you, the chief, assembled your entire police force together

3    and say "I'm going to personally have a discussion with you

4    all about the Fourth Amendment and the importance of the

5    Fourth Amendment for American citizens on how to protect

6    citizens -- Americans -- the American citizen rights under

7    the Fourth Amendment"; have you done that?

8            A    I have not done that.

9            Q    Okay.  I want to show you a document --

10               MR. CHARLES BONNER:  Give me Exhibit 1

11          here.

12               That would be --

13               THE REPORTER:  Two.

14               MR. CHARLES BONNER:  Two, Exhibit 2, next

15          in order.

16          (Whereupon Exhibit 2 was marked for

17          identification, 1/11/16, ALT)

18          Q    Chief, I'm giving you a document and ask you

19    if you can tell the jury whether or not you recognize this

20    document.

21          A    Yes, I recognize it.

22          Q    Okay.  Would you please identify this document

23    to the jury?

24          A    This -- this is -- this is a training outline,

25    a curriculum for constitutional law.

FOWLER - CHARLES BONNER

1          Q     Okay.  And the very -- if you would be so

2     kind, would you just read the very first paragraph to the

3     jury there, then I'll ask you a question.

4          A     Sure.  "Instructions provided [sic] an

5     understanding of the United States Constitution and the [sic]

6     relationship to our criminal justice system."

7          Q     You may slow down so she can --

8          A     Okay.  Can -- do I have to repeat that?  "This

9     segment included -- included a discussion about the

10    constitutional basis for civil rights, civil liabilities

11    [sic], rights of accused, and legal basis for and limitations

12    on police actions."

13         Q     Okay.  And this is a course that you have your

14    police officers take; is that true?

15         A     I'm not certain.

16         Q     Okay.  So you're not certain whether during

17    the course of your tenure as the chief you've required your

18    officers to take this course?

19         A     That's correct.

20         Q     Okay.  Fair enough.  And again -- one of your

21    best recollection, do you have any recollection of having

22    required your officers to take this course in 2010?

23         A     Well, I -- here's what I know or what I

24    recall:  In looking at this, this is the basic course for

25    police officers.  When our police officers are hired and

FOWLER - CHARLES BONNER

1  trained, part of their training is constitutional law.  This

2  is a curriculum that -- that's -- that comes from the

3  Department of Criminal Justice Services, and Criminal Justice

4  Services -- the Department of Criminal Justice Services

5  provides the outline and the requirement for our basic police

6  training.  So based on -- on that, I -- I -- I would think

7  that this was a part of our police academy curriculum.

8          Q    I understand.

9          A    But you're asking me for my personal

10 knowledge --

11         Q    Yes.

12         A    -- of this?

13         Q    Yes.

14         A    I have no personal knowledge of this

15 particular document.

16         Q    That is what I wanted to know.  Now, you see

17 on the second page it states that "Upon completion of the

18 instruction, the student will be able to 1, identify the

19 rights guaranteed to citizens by the 1st, 4th, 5th, 6th, 8th,

20 and 14th amendments"; do you see that?

21         A    Yes, sir.

22         Q    Okay.  And based on your knowledge since

23 you've been chief, you don't know whether -- you don't have

24 any personal knowledge that any of your police officers who

25 are your subordinates since you've been chief have, in fact,

FOWLER - CHARLES BONNER

1    gone through this course; is that a fair statement?

2           A    This course here specifically?

3           Q    Yes.

4           A    I would have to say that no, because I told

5    you that I -- this -- I'm not famil -- I know what this

6    document is, but as I sit here under oath, I cannot tell you

7    that our -- our -- that this is -- that this particular

8    course of instruction here is a part of -- of our curriculum.

9           Q    That's fair enough.  That's all I'd like for

10   you to do is what you've just done, and that's the whole

11   purpose of putting your hand on the Bible.

12                  MR. CHARLES BONNER:  Oh, did I give you

13              the copy of that?

14                  MS. PAQUETTE:  No, that's okay.

15                  MR. CHARLES BONNER:  Okay.  Here's a copy

16              for you.

17          Q    And of course your counsel produced these

18   documents to me.

19          A    I understand.

20                  MR. CHARLES BONNER:  May I have

21              Exhibit 3?

22                  Document marked as plaintiffs' next in

23              order.

24              (Whereupon Exhibit 3 was marked for

25              identification, 1/11/16, ALT)

34

FOWLER - CHARLES BONNER

1       Q    Can you review what has been marked now -- is

2 that Exhibit 3 -- and let us know when you've finished

3 reviewing it, Chief.

4       A    Okay.

5       Q    Okay.  Are you familiar with this document?

6       A    I am not.

7       Q    Okay.  So this document, it states at the top

8 Ethical Awareness, Grounds Rules for Dialogue, and on page 1,

9 it says "Listening:  We must be willing to listen.  We must

10 be -- we must learn to listen" and has several headings such

11 as Honesty and Frankness, "We must be open with utter

12 honesty.  We must be frank, even brutally frank."  The second

13 category is Courage to Show Feelings.  There's a category on

14 the second page, Presume We Can [sic] Be Wrong, "We must be

15 willing to assume that we're not always right, for it could

16 be that we do not have all the facts and are not aware of

17 something [sic].  And the last category that I will reference

18 here is No Insults or Violence, "We must, if possible, avoid

19 cat-calling, shouting, insults" and "never should be -- never

20 should there ever" -- strike that, "never should there be

21 even the semblance of physical violence."

22           You have never read any of these handouts

23 regarding ethical awareness in the police department?

24       A    Have I read them?

25       Q    Yes.

FOWLER - CHARLES BONNER

1          A     Yes, yes.

2          Q     Okay.  Have you required any of your police

3    officers to read these since you've been chief?

4          A     Yes.

5          Q     Okay.  And so -- but this particular document

6    you've indicated you were not aware of?

7          A     I'm -- not this one, no.

8          Q     Okay.  So these same principals in some other

9    documents you're aware of?

10         A     Yes.

11         Q     Okay.  And since you've been chief, have you

12   instructed your officers that they should be willing to

13   listen when they go out to an American citizen before they

14   act?

15         A     Any citizen, yes.

16         Q     Okay.  And have you instructed them that they

17   should be honest and frank in their interactions with the

18   citizens of Syracuse?

19         A     Yes.

20         Q     And they reference here even this -- "even

21   brutally frank," that means again the gospel truth is what I

22   like to call it.  Did you -- do you instruct your officers

23   that they should tell the gospel truth particularly in

24   writing police reports?

25         A     Brutally honest -- honest, yes.

FOWLER - CHARLES BONNER

1      Q    Okay.  And likewise, when they go out to

2  investigate, do you instruct them that they should gather all

3  the facts before they make any conclusions that a -- an

4  American citizen's freedom should be taken away with an

5  arrest?

6      A    Yes.

7      Q    Okay.  And what do you do to assure yourself

8  that your officers are carrying out that policy of yours, to

9  make sure that they are gathering all the facts before they

10  take away an American citizen's freedom?

11      A    Well, through management and supervision.  The

12  managers oversee the supervisors.  The supervisors oversee

13  our line personnel that are the most likely to encounter a

14  citizen when an arrest or some type of a police encounter

15  takes place to making sure that the supervisors are properly

16  trained and have an understanding of what the policies and

17  procedures are and what's required of them.

18      Q    Okay.  I'd like to show you another document.

19  It will be exhibit next in order, I think, 4.

20            THE REPORTER:  Yes.

21            MR. CHARLES BONNER:  Keep track of these.

22            (Whereupon Exhibit 4 was marked for

23            identification, 1/11/16, ALT)

24      Q    Can you just review that, Chief, and let me

25  know when you've finished, and then I'll ask you a question.

FOWLER - CHARLES BONNER

1          A     Okay.

2          Q     Are you familiar with this document?

3          A     I am.

4          Q     Would you please identify this document to the

5     jury?

6          A     This is a New York State Domestic Incident

7     Report Reference Manual.

8          Q     Okay.  And in this particular case that we're

9     dealing here with today, did you learn that there was a

10    domestic incident report filed by your officers?

11         A     Not certain if this was -- this particular

12    form was filed.

13         Q     Okay.  Before coming to testify, did you

14    review any of the police reports, police depositions that

15    were filed by your officers who -- who came out to

16    Mr. Grant's house regarding this incident?

17         A     Yes, I did.  I -- it was our basic incident

18    reports.

19         Q     Okay.  And did you see that one of the reports

20    was a domestic incident report?

21         A     I've answered you already.  No, I -- I -- I

22    am -- I don't -- I didn't see this particular report --

23         Q     Okay.

24         A     -- or review this particular report as it

25    relates to this case, no.

FOWLER - CHARLES BONNER

1      Q    What is your understanding as to the incident

2  that occurred here?  What is your factual understanding of

3  what occurred, given rise to an incident that has now

4  resulted in this federal action?

5                   MS. PAQUETTE:  Objection.  You can

6              answer.

7      A    My understanding is that we were called out to

8  an address on Hudson Street.  I forget the street number.

9  Our officers responded, and subsequent to their response, an

10 arrest was made.

11     Q    Okay.  Did you learn that Mr. Alonzo Grant

12 here had called the police to come and diffuse a domestic --

13 not a domestic but a verbal argument between his then

14 pregnant adult daughter and a neighboring lady, did you learn

15 that?

16     A    Yes.

17     Q    Okay.  And did you learn that Mr. Alonzo Grant

18 had never been arrested, put in handcuffs at any time prior

19 to calling the police to remove his daughter?

20     A    I -- I learned that at what -- yes, I did

21 learn that.

22     Q    Okay.

23     A    But I mean, are we -- are -- so can you

24 just -- in order for me to answer your question properly,

25 can -- are -- when you're asking me this particular line of

FOWLER - CHARLES BONNER

1   question, we're talking about overall throughout --

2          Q    Yeah.

3          A    -- the entire investigation; right?

4          Q    Right.

5          A    Or not what I -- okay.  Great.

6          Q    Okay.

7          A    Then -- then --

8          Q    I think we're on the same page.  Okay.

9          A    Okay.

10         Q    Now, if I can turn your attention to the

11  second page of this Exhibit 3, down in the middle of the

12  page, there's an italicized portion that says "Officers shall

13  respond to all -- respond to and document all domestic

14  incidents reported to the police"; do you see where I read --

15  I'm reading?

16         A    Yes.

17              MS. PAQUETTE:  Exhibit 4 or Exhibit 3?

18              MR. CHARLES BONNER:  Exhibit --

19              MS. PAQUETTE:  I think we're on 4; right?

20              MR. CHARLES BONNER:  Exhibit 4, yes.

21         Okay.  This is Exhibit 4.

22         Q    And continuing on, it states "In the course of

23  their investigation, officers must determine whether or not

24  domestic violence is occurring"; do you see that?

25         A    Yes.

40

FOWLER - CHARLES BONNER

1        Q     Okay.  In other words, that word must is used

2   again, and you understand that word means there's no

3   discretion, that the officers must determine whether or not

4   domestic violence is occurring?

5        A     Yes.

6        Q     Okay.  So you were a police officer for some,

7   what, 23 years or so before you became chief?

8        A     No.

9        Q     How many years?

10       A     A little under 15.

11       Q     Fifteen years.

12       A     Then I was a deputy chief for seven or eight

13  years and then the chief.

14       Q     Okay.  So you've had occasion to go out and

15  respond to domestic incidents --

16       A     I have.

17       Q     -- when -- as a police officer?

18       A     Yes.

19       Q     And would it be fair to say that a reasonable

20  officer would go to a house where there's been a domestic

21  call and ring a doorbell, knock on the door and announce

22  themselves?

23                    MS. PAQUETTE:   Objection.

24                    You can answer.

25       A     That's fair.

FOWLER - CHARLES BONNER

1        Q     Yeah.  And that was a reasonable thing for an
2   officer to do?
3        A     It's -- it's reasonable under most
4   circumstances, but under some circumstances that the door in
5   question could be open and the officers would -- would likely
6   enter at that point.
7        Q     Well, let's assume in this case that the
8   door's closed and there are two door bells and the reasonable
9   thing to do would be to ring one of the two door bells or
10  knock on the door and announce that I'm a police officer with
11  the Syracuse Police Department.  Would that be a reasonable
12  thing for an officer to do?
13                    MS. PAQUETTE:  Objection.
14       A     Yes.
15       Q     Okay.  And -- and then you would then carry
16  out this particular mandate in Exhibit 4 to investigate facts
17  to determine whether domestic violence is occurring; would
18  that be the thing for a reasonable officer to do?
19       A     Yes.
20       Q     Okay.  And that's what you did?
21       A     Yes.
22       Q     You were a reasonable officer?
23       A     Yes.
24       Q     Okay.  Now, in your review of the documents in
25  preparation to testify today or at any time, did you ever

FOWLER - CHARLES BONNER

1    learn whether or not your officers determined whether there

2    was any domestic violence occurring at 105 Hudson Street,

3    Mr. Alonz -- Mr. and Mrs. Alonzo Grant's home at the time

4    that they went?

5           A    If they determined that domestic violence was

6    occurring.

7           Q    Do you know, do you have any personal

8    knowledge, have you seen any documents as to whether or not

9    they made that determination before they entered the home?

10          A    Before -- if they made that determination

11   before they entered the home?

12          Q    Yes.

13          A    Well, you would determine -- it's -- a lot of

14   times it's almost impossible to determine if domestic

15   violence is occurring or has occurred without conducting an

16   investigation.

17          Q    I understand.  My question though is just

18   specifically regarding your officers.  Do you know whether

19   your officers who responded learned as to whether there was

20   any domestic violence occurring at Mr. and Mrs. Grant's home

21   before they entered the home?

22          A    I don't know.

23          Q    Okay.  Did you learn whether or not your

24   officers determined whether any domestic violence was

25   occurring after the officers entered the home?

FOWLER - CHARLES BONNER

1          A     Yes, it -- it -- yeah, based on -- based on

2     their investigation, I would have to respond yes to that.

3          Q     Okay.  And what did you learn in that regard?

4          A     What I learned in that regard is that at some

5     point during their investigation, Mr. Grant engaged in

6     violent and -- or tumultuous behavior which required the

7     officers to respond or react to that behavior.

8          Q     Okay.  And -- and we'll come back to that

9     tumultuous behavior for a second.  You -- imagine you own

10    your home?

11         A     Excuse me?

12         Q     Your own your house; correct?  You own your

13    home?

14         A     Yes, I do.

15         Q     Okay.  Are you married?

16         A     I am indeed, yes.

17         Q     Okay.  In talking inside of your house,

18    have -- have you ever waved your hand inside of your house?

19         A     Indeed, yes.

20         Q     Okay.  Is that illegal?

21         A     It is not.

22         Q     Okay.  Have you ever had an argument -- you

23    probably have, unlike me.  Have you ever had an argument with

24    your wife inside of your house?

25         A     Oh, yes.

44

FOWLER - CHARLES BONNER

1       Q    Okay.

2       A    Yes.

3       Q    Is that illegal?

4       A    It is not.

5       Q    Does that violate any law of Syracuse or any

6   law at all?

7       A    No, it does --

8       Q    Okay.

9       A    -- not.

10      Q    Have you ever walked down your stairs -- do

11  you have stairs in your house?

12      A    I do.

13      Q    Okay.  Have you ever walked down your stairs

14  and opened your door forcefully in the course of living at

15  your home?

16      A    Not that I can recall, but I -- it's not

17  outside of the question --

18      Q    Yeah.

19      A    -- I mean, under the circumstances.

20      Q    And if you had, it wouldn't be illegal, would

21  it?

22      A    No.

23      Q    All right.  It would certainly not give

24  probable cause under the Fourth Amendment that we read for

25  your person to be seized, would it?

FOWLER - CHARLES BONNER

1        A    No.

2        Q    Okay.

3        A    No.

4        Q    And if we take those things in combination,

5   waving your hands in your house, having an argument or spat

6   with your wife, going outdoor -- opening your door

7   forcefully, it still would not give rise to probable cause

8   for the Fourth Amendment to be violated, would it?

9        A    It all depends, so it depends on the person

10  observing the behavior and if -- from their observation, if

11  they identify it as escalating behavior.  See, because for

12  us, when we're dealing with this situation, one -- one of the

13  officer's obligations is scene safety, to make sure things do

14  not get worse that, you know, that no -- they themselves and

15  the people that we're there to provide the service to is not

16  injured while they're there and no further injury occurs,

17  right.

18       Q    Well, that's fair enough.  And so let's assume

19  as to the facts of this case is that the police were called,

20  that Mr. Grant called the police --

21       A    Sure.

22       Q    -- to come and provide a service and that

23  service was to diffuse a verbal spat between his then

24  pregnant adult daughter in the front yard and a neighboring

25  lady who was about 10 yards to his left of his house facing

FOWLER - CHARLES BONNER

1    his front door who was sitting on her porch.  That's what the

2    service was called.  Nothing pertaining to Mr. and

3    Mrs. Grant.

4              Now, would it be a fair statement to say

5    that -- for Mr. Grant to wave his hand in his -- top of his

6    stairs, say -- have a few words with his wife about cleaning

7    the house and walk down the stairs and opened his door

8    pursuant to a police officer's direction, would it be fair to

9    say that nothing there violated or gave probable cause to

10   seize him under the Fourth Amendment; isn't that fair?

11             MS. PAQUETTE:  Objection.

12        A    That's not --

13             THE WITNESS:  I'm sorry.

14             MS. PAQUETTE:  Go ahead.

15        A    No, that's not fair at all.

16        Q    Why?

17        A    Well, because you're leaving a lot of things

18   out for -- for -- for -- for us.  One of the things that

19   you're leaving out that I find most important is that

20   regardless to what a police officer's told by a dispatcher or

21   the reason why they're called into the situation, the police

22   officers are required to do an assessment of that situation

23   for themselves, because the dispatcher -- someone can call

24   the police and say hey, one thing is occurring, but once the

25   police officers get there, they have an obligation to do an

47

FOWLER - CHARLES BONNER

1  assessment to determine is that indeed what -- what has taken
2  place.
3        Q    Yeah.  And they do that assessment by talking
4  and listening?
5        A    Sure, sure.
6        Q    And that's part of their ethical obligation;
7  true?
8        A    That's correct, yes, sir.
9        Q    And they make that assessment, investigation
10 by asking all the parties involved questions to determine
11 whether or not there's any domestic violence occurring; isn't
12 that true?
13       A    Well -- well, to answer your question, yes,
14 but please understand that your -- you started asking me that
15 question after I had made a statement, and -- and -- and it's
16 the -- they're trying to determine if any crime is occurring
17 at all, not just specific to domestic violence, but I do
18 understand that today we're talking about one particular
19 case, and in light of that, yes.
20       Q    Okay.  Very good.  Now, certainly the officers
21 must determine whether or not there's probable cause to seize
22 Mr. Grant before they lay hands on him; isn't that true?
23       A    If it's the -- well, before they lay hands on
24 him?
25       Q    Yes.

FOWLER - CHARLES BONNER

1          A    Well, there's a number of reasons why a police

2     officer would -- would -- would put their -- well, it -- I'm

3     sorry, not a number of reasons but a police officer can

4     handcuff a person to -- that's -- they identify that has

5     escalating behavior to for -- for their safety and the safety

6     of others.

7          Q    Certainly.  That's under certain

8     circumstances?

9          A    Under certain circumstances.

10         Q    Now, you told us that you are a reasonable

11    police officer; correct?

12         A    Yes, I am, sir.

13         Q    Okay.  Did you ever in your tenure as a police

14    order someone out of their house who had called you to come

15    to their house -- first let's take it there.  Did you ever

16    order someone out of the house who called you to come and

17    breakup a spat between a daughter -- anyone in the front

18    yard?

19         A    I don't know if I have, because that's been

20    quite some time ago, but --

21         Q    Okay.

22         A    -- I don't find that unreasonable.

23         Q    Okay.  Well, did you order -- did you as a

24    reasonable police officer ever stand behind someone that

25    you've ordered out of the house with one of your partners in

FOWLER - CHARLES BONNER

1    front of him after you told him to come out of the house who

2    was doing nothing but standing there and grab him in a bear

3    hug and have your partner take his feet and fling him to the

4    ground and start pounding him with your fist?

5                    MS. PAQUETTE:  Objection.

6         Q    Did you ever do that when you were an officer?

7                    MS. PAQUETTE:  Answer that if you can.

8         A    No, I've never -- no, no.

9         Q    Okay.  And -- and based on that fact, that

10   would be a violation of the Fourth Amendment, wouldn't it?

11                   MS. PAQUETTE:  Objection.

12        A    The scenario that you've just described to me?

13        Q    Yeah.

14        A    Yes, sir.

15        Q    Yes, sir.  And certainly that would be

16   excessive force; isn't that true?

17                   MS. PAQUETTE:  Objection.

18        A    This scenario that you just described to me,

19   yes, sir.

20        Q    Now, if we add to that scenario that one of

21   the officers then choked the man he's ordered out of the

22   house around the neck while the other officer put his knee

23   into his back and they pound and pound him into a state of

24   brain damage, concussion, you would agree that would be

25   excessive force; wouldn't it?

FOWLER - CHARLES BONNER

1          MS. PAQUETTE:  Objection.  Answer if you
2     can.
3     A     The scenario you just described to me, yes,
4 sir.
5     Q     Yeah.  Okay.  Now, you mentioned that you had
6 reviewed your use of physical force policy; is that true?
7     A     Yes, sir.
8     Q     Okay.  Let me show you, I think, Exhibit 5.
9          (Whereupon Exhibit 5 was marked for
10          identification, 1/11/16, ALT)
11    Q     Now, Chief, could you just briefly review that
12 policy and tell me if this is what you made reference to
13 earlier as to one of the two documents that you reviewed.
14    A     Yes, yes, yes, sir, it is.
15    Q     Okay.  And as the final authority of the
16 police department, this is one of the policies that you have
17 to enforce?
18    A     Yes, sir.
19    Q     Okay.  Could you please read to the jury the
20 purpose of the policy, the very first paragraph?
21    A     Sure.  "The purpose of this policy is to
22 establish a policy [sic] and procedures for the use of
23 physical force by sworn officers of the Syracuse Police
24 Department and establish procedures for the reporting and
25 evaluation -- and" -- I'm sorry, "the reporting and

FOWLER - CHARLES BONNER

1    evaluating the use of such force."

2         Q    Okay.  So this policy essentially established

3    the use of force and also it governs what your officers must

4    do to report when they use force; is that a fair statement?

5         A    Yes.

6         Q    Okay.  Now, could you read, if you would,

7    please for the jury the first sentence of the next paragraph?

8         A    Where it says sworn officers shall?

9         Q    Yes.

10        A    "Sworn officers shall use only that -- that

11   level of physical force necessary in the performance of their

12   duties within the limitations [sic] established by Article 35

13   of the New York State Penal Law and" --

14        Q    Continue.

15        A    Continue?  " -- and consistent with the

16   training and policies of the Syracuse Police Department."

17        Q    Okay.  And again that word shall is used; do

18   you see that?

19        A    Yes.

20        Q    Okay.  So this policy is mandatory --

21        A    It is.

22        Q    -- correct?

23        A    It is, indeed.

24        Q    In other words, you can -- the officers can

25   only use the force necessary in the performance of their

FOWLER - CHARLES BONNER

1   duty; true?

2          A    Yes, yes.

3          Q    They cannot use force greater than is

4   necessary?

5          A    That's correct.

6          Q    And if they use force greater than is

7   necessary, that's a violation of this policy?

8          A    That's correct, sir.

9          Q    Okay.  And now, can you go down to 3.10 of

10  this exhibit, the definition?

11         A    Yes, sir.

12         Q    Okay.  And this describes physical force?

13         A    It does.

14         Q    Could you read that to the jury?

15         A    "Physical Force - A degree of force --  a

16  degree of physical contact that includes but not limited to,

17  striking, kicking, pushing, biting, or disabling action by

18  means of chemical agent capable of causing discomfort or

19  pain, when such contact is unlikely to result in serious

20  physical injury or death."

21         Q    Okay.  Now, does that mean that your officers

22  can engage in these particular kinds of force?

23         A    Yes.

24         Q    Okay.  So your office -- officers can

25  strike -- they can engage in striking and kicking and pushing

53

FOWLER - CHARLES BONNER

1   and biting, all that kind of conduct?

2        A    Yes, yes, sir.

3        Q    And in order to do that, they must have

4   probable cause under the Fourth Amendment to do that?

5        A    Yes.

6        Q    They can't do that without probable cause; is

7   that true?

8        A    That's --

9             MS. PAQUETTE:  Objection.  Go ahead.

10       A    Yes.

11       Q    And if they do it without probable cause, it

12  violates this policy; is that true?

13       A    Yes.

14       Q    Okay.  Now, if you can turn to page 3 of your

15  policy.  Down at the bottom, it's Bates stamp 000309, under

16  the heading subject resistance documentation; do you see

17  that?

18       A    Yes, sir.

19       Q    Could you read A, Section A?

20       A    Section A, "In addition to ensuring all

21  involved officers complete the necessary reports when

22  possible, the investigating supervisor shall be responsible

23  for creating a new use of force entry in the Blue Team when,"

24  and it --

25            Q    And it indicates -- first of all, what is the

FOWLER - CHARLES BONNER

1    Blue Team?

2           A    A Blue Team is a -- it's -- it's a tracking

3    system or -- or our way of documenting uses of force in an

4    automated fashion, and it creates -- it creates a management

5    tool for the Syracuse Police Department management teams.

6           Q    Okay.  And so -- and then it lists a number of

7    incidents where this kind of reporting must be made; is that

8    correct?

9           A    That's correct, sir.

10          Q    And can you read the first one -- the first

11   one?

12          A    The first one?

13          Q    Yes.

14          A    "Anytime physical force is used."

15          Q    And then A?

16          A    "A.  The use of physical force involving acts

17   such as striking, punching, kicking, biting, choking or the

18   use of pressure points controls must be described in the Blue

19   Team entry."

20          Q    Okay.  Now, is -- are your officers allowed to

21   choke people?

22          A    Are they allowed to choke people?

23          Q    Well -- well, let me -- let me back up.  I

24   know from my review of the New York City use of force policy

25   choking is not permissible.  Are you aware of that?

FOWLER - CHARLES BONNER

1       A    No.

2       Q    Okay.  Well --

3       A    It -- it makes sense, but I'm -- I'm not

4  familiar with New York --

5       Q    Okay.

6       A    -- City's.

7       Q    Did you read anything recently that the

8  officer who choked Eric Garner has been suspended --

9  terminated because of a violation of their choking policy in

10 New York City; did you read anything about that?

11               MS. PAQUETTE:  Objection to the relevance

12               of any of these questions, but go ahead.

13      A    I -- I didn't read up --

14      Q    Okay.

15      A    I didn't read that, no.

16      Q    Well, are your officers under your policy

17 allowed to choke suspects?

18      A    Only in deadly physical force situation.

19      Q    Okay.  Can you give me a scenario when that

20 would be?

21      A    It's when there's an imminent threat to that

22 officer's life or the life of a third person.

23      Q    Okay.  And are those the only two scenarios

24 where choking would be permissible?

25      A    Yes.

56

FOWLER - CHARLES BONNER

1        Q    Okay.  And if an officer were to choke a

2   detainee or suspect other than in those two scenario, that

3   would be a violation of this policy; is that true?

4        A    Yes.

5        Q    Okay.  Now -- and then could you go to page 4,

6   please?

7        A    (Witness complies.)

8        Q    And directing your attention to 3.15,

9   evaluating the use of force; do you see that?

10       A    Yes.

11       Q    Okay.  Could you read the first paragraph

12  there, sir?

13       A    "All supervising [sic] officers are

14  responsible for monitoring subordinate's behavior relative to

15  the use of physical force employed by the subordinates in the

16  performance of duty, to ensure that Departmental [sic]

17  policies and procedures are followed."

18       Q    Okay.  And again there's this word to ensure?

19       A    Yes.

20       Q    Do you take away from that word that that

21  means to guarantee that the policies and procedures are

22  followed?

23       A    Yes, yes, sir.

24       Q    Okay.  And it says all supervisor --

25  supervisory officers, that include you?

FOWLER - CHARLES BONNER

1        A    That's correct.

2        Q    Okay.  And so you then have the direct

3   responsibility to guarantee that the use of force policies

4   that we are reading here is followed?

5        A    Yes, sir.

6        Q    Okay.  And that's what you do?

7        A    Yes, sir.

8        Q    Okay.  And would you read Number 1, sir?

9        A    Number 1, "Supervisors must take immediate

10  corrective actions when a subordinate's [sic] behavior is

11  observed to be inconsistent with Departmental [sic] policies

12  and procedures regarding any facet of the use of force."

13       Q    Okay.  And what does the range of corrective

14  actions involve in your department?

15       A    Corrective actions -- all depends on the

16  circumstances.  They range from verbal -- a verbal

17  corrective -- verbal corrective action meaning that the

18  supervisor directs an officer on the spot to change or adjust

19  a behavior, and it can range from -- from that to a formal

20  discipline.

21       Q    Okay.  And what does the formal discipline

22  involve?

23       A    A formal discipline involves some type of a

24  punitive action from -- from me, the chief.

25       Q    Okay.  And what is the range of possible

FOWLER - CHARLES BONNER

1   punitive action that you take against officers who violate

2   your policy?

3           A       That range of actions is -- is from a -- it

4   ranges from writ -- written counseling to termination.

5           Q       Okay.  I'm going to direct your attention down

6   to Item C on that same page.

7           A       Yes.

8           Q       It says "The Training Division is responsible

9   for the design and implementation of training programs

10  relative to the use of physical force."  What training

11  programs have you implemented since you came on as chief six

12  years ago to implement the use of force policy?

13          A       And -- I'm not sure.  My -- my training

14  division -- the purpose of having a training division is --

15  is for -- for the training division to identify best

16  practices and to -- to assure that our officers have that

17  training in -- in -- in order to -- to make sure that they're

18  up to standard on what the Syracuse Police Department

19  requires and up to standards as to what the law requires of

20  them.  So our -- our training -- our training division, their

21  role and their responsibility is to identify those trainings

22  and to make sure that they are conducted.  I don't get

23  directly -- I'm not directly involved in that.

24          Q       And so is it fair to say you don't know what

25  training has been implemented -- that's been put in place

FOWLER - CHARLES BONNER

1   since you've been the chief to implement the use of force

2   policy?

3                    MS. PAQUETTE:  Objection.  You can

4            answer.

5        A    Specifically, no.  I just issue an overall

6   directive, and then it's the job of my subordinates to carry

7   out those directives.

8        Q    Okay.  Let me direct your attention to Item E,

9   and then we'll take a break.  We've been going for a while.

10  Could you read Item E, sir?

11       A    "The Chief of Police, or his -- or his

12  designee, shall review all investigations and administrative

13  reports regarding the use of physical force and [sic] ensure

14  that the force is used -- the force used was justified,

15  necessary, reasonable, and in accordance to Departmental

16  [sic] policy."

17       Q    Okay.  And so have you, sir, reviewed any of

18  the evidence in this case to determine whether or not the use

19  of force against Mr. Grant was justified, necessary, and

20  reasonable?

21       A    Yes, sir.

22       Q    You have reviewed?

23       A    I have, yes.

24       Q    What have you reviewed in that regard?

25       A    I've -- I've reviewed the police reports and

FOWLER - CHARLES BONNER

1   the use of force itself, yes.

2         Q   Okay.  The use of force itself?

3         A   Yes, I've reviewed the en -- the -- the

4   investigation, the Office of Professional Standards

5   investigation.

6         Q   You mean that's by Captain Thomas Galvin?

7         A   Yes.

8         Q   Okay.  So other than Captain Thomas Galvin's

9   report and the police report, have you reviewed anything else

10   to determine whether the force against Mr. Grant was

11   justified, necessary, and reasonable?

12         A   Yes.  And I reviewed everything that was in

13   the -- in the investi -- investigative file, so yes, I have

14   reviewed other documents, but I don't know -- I don't recall

15   everything that was inside those -- inside the file.

16         Q   Give us your best recollection what you did

17   review.

18         A   I reviewed statement -- I'm sorry.  I reviewed

19   a number of police reports.  I reviewed a number of police

20   reports.  There's some video, still photos, and -- and a

21   number of documents in the files.

22         Q   Okay.  Did you review the police report of

23   Officer Lockett?

24         A   Yes.

25         Q   Did you see where Officer Lockett stated that

FOWLER - CHARLES BONNER

1   he struck Mr. Grant ten times?

2          A     Ten times, I -- my count was six, but my

3   numbers could be off.

4          Q     Well, we'll look at the report, and we'll

5   count them --

6          A     Sure, sure.

7          Q     -- later on.

8          A     Sure.   That's -- but -- but I guess I would

9   have to answer you directly no, but if my number -- my count

10  could be off.

11         Q     Now, regarding choke in here, according to

12  that page we looked at earlier about the Blue Team, if an

13  officer chokes someone, they have to document that for the

14  Blue Team; true?

15         A     That's correct.

16         Q     And did you see anything -- first of all, did

17  you review the police report of Officer Montalto?

18         A     Yes.

19         Q     And you reviewed the police report of

20  Sergeant Brian Novitsky?

21         A     Yes.

22         Q     Did you see anywhere in either the reports

23  where there was an -- a report that Officer Lockett choked

24  Mr. Grant?

25         A     No.

FOWLER - CHARLES BONNER

1      Q    Okay.  And if that was not included, that
2  would be a violation of the policy if, in fact, Officer
3  Lockett choked Mr. Grant; is that true?
4      A    That's correct, yes, sir.
5      Q    Okay.  Would you like to take a break now,
6  sir, just because --
7      A    Sure, sure.
8      Q    -- we've been going --
9      A    Sure.
10     Q    -- about an hour.
11     A    That's fine.
12     Q    And when you're ready to resume, we will.
13          THE VIDEOGRAPHER:  We'll go off record at
14          1306.
15          (A discussion was held off the record.)
16          THE VIDEOGRAPHER:  We're back on record
17          at 1315.
18     Q    Chief, we're back on the record, and of course
19  as a professional, you know you're still under oath?
20     A    Yes, sir.
21     Q    I'd like to show you this document.
22          MR. CHARLES BONNER:  Give her a copy.
23          Give me a copy, then give her a copy.  Don't
24          give them my marked copies.  Okay.  I just
25          want the top sheet.  Look in here.

FOWLER - CHARLES BONNER

1           MS. PAQUETTE:  I can just look on.

2           MR. CHARLES BONNER:  Okay.  We have

3      plenty of copies.

4           MS. WOLF:  Yeah.

5           MR. CHARLES BONNER:  Just look down at

6      any -- give -- give Jesse -- give Jesse a copy

7      too.  Okay.

8      (Whereupon Exhibit 6 was marked for

9      identification, 1/11/16, ALT)

10      Q    Let us know when you've finished reviewing

11  this exhibit, and that's Exhibit --

12           THE REPORTER:  Six.

13      Q    -- 6.

14      A    Okay.  All set.

15      Q    Okay.  Would you please identify this document

16  for the jury, Chief?

17      A    This is a letter from me addressed to

18  Mr. Alonzo Grant.

19      Q    And what is the subject of the letter?

20      A    It's -- the subject is -- it's response to

21  receiving the complaint, his complaint.

22           MR. CHARLES BONNER:  Okay.  And now I'd

23      like to have this document marked as next in

24      order, would be Number 7.

25           Where is that?  Do you have another copy?

FOWLER - CHARLES BONNER

1              Should be here.

2              (Whereupon Exhibit 7 was marked for

3              identification, 1/11/16, ALT)

4         Q    Would you do -- have you seen this document

5    before, Chief?

6         A    Yes, sir.

7         Q    Okay.  Could you please identify this document

8    for the jury?

9         A    This is the Office of Professional Standards

10   report that was prepared by Captain Galvin, Thomas Galvin for

11   my review.

12        Q    Is this one of the documents you told us you

13   reviewed earlier?

14        A    Yes, sir.

15        Q    Okay.  And is Dr. -- strike that.

16             Is Captain Thomas Galvin retired now?

17        A    He is indeed, yes.

18        Q    Okay.  And in reviewing this document, could

19   you determine whether he had ever interviewed several

20   witnesses including a Ms. Sharon Hayes?  Do you know whether

21   he ever interviewed Ms. Sharon Hayes?

22        A    I -- in reviewing it, I don't recall

23   Ms. Sharon Hayes' name mentioned, no.

24        Q    And I think you told us it is the objective of

25   investigation -- police investigation to gather all the facts

FOWLER - CHARLES BONNER

1    before they -- you make any conclusions; is that true?

2            A    That's correct, sir.

3            Q    And in order to gather all the facts, you have

4    to interview all the witnesses who have pertinent information

5    that will bear on the truth; is that --

6            A    That's correct, sir.

7            Q    Okay.  And in your review of Captain Thomas

8    Galvin's report, you didn't see where he interviewed one of

9    the witnesses named Sharon Hayes; is that true?

10           A    That -- that's correct.

11           Q    Okay.  Do you see where he interviewed a

12   witness named Shakeal Stirrup?

13           A    I don't recall that name.

14           Q    Okay.  Do you see where he interviewed a

15   Ms. Brenda Wright?

16           A    Don't recall that name either, sir.

17           Q    Do you see where he -- whether he interviewed

18   Alonzo Grant, Jr.?

19           A    No.

20           Q    Do you see whether he interviewed a

21   Ms. Sherrell Grant who's the daughter of Mr. and

22   Mrs. Alonzo Grant?

23           A    No.

24           Q    Okay.  Did you see whether he interviewed

25   Mrs. Grant, Stephanie Grant?

FOWLER - CHARLES BONNER

1      A    No, I don't see where he interviewed her, no.

2      Q    Okay.  All right.  And so do you see where he

3   interviewed -- personally interviewed Mr. Corey McMullin?

4      A    No, I don't.

5      Q    Okay.

6      A    I don't recall that name.

7      Q    And so all of the information you have at this

8   point to base your decision on as chief is the information

9   that is in Captain Thomas Galvin's report here and the police

10  reports of the officers; is that a fair statement?

11     A    That's correct, sir.

12     Q    Okay.  You don't have any knowledge of what

13  these other witnesses said about what occurred on June 28,

14  2014 at 105 Hudson Street regarding this incident that we're

15  about here today?

16     A    That's correct, sir.

17     Q    Okay.  Now, if you turn over to page -- the

18  last page.  It's the signature page.  It's Bates stamped

19  page 000317.

20     A    Just making my way to it.

21     Q    Okay.

22     A    Got it.

23     Q    And you see your signature on that page?

24     A    Yes, sir.

25     Q    Okay.  And you see signatures of bureau chief?

FOWLER - CHARLES BONNER

1        A    Yes.

2        Q    And what's that name?  I can't read the

3    signature.

4        A    This has to be Deputy Chief Thompson's

5    signature.

6        Q    Okay.  And what was -- Deputy Chief Thompson,

7    that's his name?

8        A    Her.

9        Q    Her?

10       A    Yes.

11       Q    And what would be -- what was her involvement

12   in the investigation of Mr. Alonzo Grant's incident?

13       A    What happens -- once the Office of

14   Professional Standard conduct an investigation, the

15   investigation is reviewed by -- by everyone, all the people

16   that are undersigned in the --

17       Q    So --

18       A    -- investigation.

19       Q    I see.  So is it fair to say she reviewed this

20   packet, the same as you?

21       A    Yes.

22       Q    Did she talk to any of those witnesses I just

23   mentioned earlier to your knowledge?

24       A    To my knowledge, no.

25       Q    Okay.  And then there's another investigating

FOWLER - CHARLES BONNER

1  officer's signature.  I can't read his signature either.
2  Could you tell us who that is?
3          A     The one to the left of mine at the very bottom
4  of the page?
5          Q     Let's start with the bottom, and then we'll go
6  to the top.  Well, the top -- the top is the investigating
7  officer's signature?
8          A.    Got it.
9          Q     Is that Mr. Galvin?
10         A     That's correct.
11         Q     Okay.
12         A     To the -- to the right of his is
13 Chief Thompson.
14         Q     Yes.  And --
15         A     Right underneath the -- Captain Galvin's
16 signature is retired First Deputy Chief Dave Barrette.
17         Q     Okay.  Now, what was Mr. Barrette's
18 involvement in the investigation of this incident pertaining
19 to Mr. Grant?
20         A     Similar to -- similar to Deputy
21 Chief Thompson.
22         Q     Okay.  Again did that first deputy chief
23 interview any of the witnesses that I mentioned earlier?
24         A     No.
25         Q     Okay.  They just reviewed this report?

FOWLER - CHARLES BONNER

1          A      Yes, that's correct.

2          Q      And you've told us you didn't review any other

3   documents other than this report and the police officer's

4   report?

5          A      Yes.

6          Q      Okay.  And this report concludes "Mr. Grant's

7   complaint has not been substantiated"?

8          A      Yes.

9          Q      And when you signed your signature to this,

10  what are you indicating?

11         A      That I concur with the -- with the -- with the

12  recommendation or the conclusion.

13         Q      Okay.  Which is that the complaint has not

14  been substantiated?

15         A      That's correct, sir.

16         Q      And again you base that solely on the

17  information in this report and the police officers' police

18  reports?

19         A      Yes, sir.

20         Q      Okay.  Now, those police reports are also

21  called police depositions, aren't they?

22         A      No, they're called police reports.

23         Q      They're called police reports, but they are

24  sworn documents?

25         A      They are sworn documents, yes, sir.

FOWLER - CHARLES BONNER

1          Q    Okay.  And information in there are to be
2    truthful?

3          A    Yes, sir.

4          Q    And consistent with the law and the
5    Constitution?

6          A    Yes, sir.

7          Q    And any false information in there could be
8    prosecuted as perjury; is that true?

9          A    That's true --

10                   MS. PAQUETTE:  Objection.

11         A    -- sir.

12         Q    Okay.

13         A    Sorry.  Yes.

14         Q    Okay.

15         A    Yes, sir.

16         Q    Now, let me direct your attention to Bates
17   stamp page 000316.

18         A    Okay.

19         Q    Okay.  The second sentence -- actually the
20   first sentence on that page reads "The home was a split level
21   and Officer Lockett could not see Mrs. Grant ..."  Do you see
22   that?

23         A    I do.

24         Q    Okay.  Now, did you ever talk to
25   Officer Lockett about his involvement in this incident?

FOWLER - CHARLES BONNER

1        A     No.

2        Q     But you read that when he was at the home, he

3   could not see Mrs. Grant, Mrs. Stephanie Grant?

4        A     Yes.

5        Q     Okay.  So there -- was there any indication

6   that you were able to determine as to whether Officer

7   Montalto could actually see Mrs. Grant when he was at the

8   house?

9        A     Not that I can recall.

10       Q     Okay.  And did you see where Officer Montalto

11  said that he went into the house in his police report, that

12  he went into the Grant's house?

13       A     Do I see that here?

14       Q     Or do -- do you have a recollection of having

15  read that in Mr. -- in Officer Montalto's report?

16       A     I'm not saying that it -- that he didn't have

17  it in his report.  I don't recall reading it.

18       Q     Fair enough.  Fair enough.  Do you recall

19  Officer Lockett stating that he went in and stood at the

20  bottom stairs and ordered Mr. Grant outside; do you recall

21  that?

22       A     Not specifically.

23       Q     Okay.  Very good.  Well, let me ask you this:

24  If Officer Montalto wrote in his report that he went into

25  Mr. Grant's house and that was willfully false, that would

FOWLER - CHARLES BONNER

1    violate your policy; true?

2                      MS. PAQUETTE:  Objection.

3                      You can answer.

4         A    Okay.  Could you give me the question --

5         Q    Yes.  If Officer Montalto wrote in his police

6    report under oath that he entered Mr. and Mrs. Grant's home

7    and that proved to be false, that would be a violation of

8    your policy; isn't that true?

9         A    Yes.

10        Q    In fact, that would be perjury; isn't that

11   true?

12                     MS. PAQUETTE:  Objection.

13                     You can answer.

14        A    Yes, under --

15        Q    Yeah.

16        A    Yeah, under -- yes, under the circumstances,

17   sir.

18        Q    Okay.  Now, I would like to at this point show

19   you a video.  Have you seen any videos of the incident that

20   took place here?

21        A    I do recall seeing a video.

22        Q    Okay.

23        A    One video, yes.

24        Q    What do you recall seeing?

25        A    It -- it -- it -- it appears to be that --

FOWLER - CHARLES BONNER

1   toward the end of the incident where his -- and I believe

2   they're getting up off the ground and Mr. Grant is -- is --

3   is being escorted by the officers.

4           Q    Okay.  I don't want to know anything you

5   talked about with your attorney, but did you see that video

6   in the course of the investigation by Captain Thomas Galvin

7   before you signed this document?

8           A    I'm not sure when I saw the --

9           Q    Is --

10          A    -- video first.

11          Q    Is it in fairness and is truth, is your best

12  your recollection you saw that video after this litigation

13  started?

14          A    I'm not sure, sir.

15          Q    Okay.  What is your best recollection?

16          A    My best recollection is that I'm not sure when

17  I saw the video.  I do recall seeing the video.

18          Q    Do you recall seeing it recently?

19          A    No.

20          Q    Okay.  When -- what is your best estimate of

21  the date that you saw it?

22          A    I -- I -- sir, I really don't know.  I don't

23  recall.

24          Q    Do you recall seeing it before you signed

25  Captain Galvin's report of Office of Professional Standards?

FOWLER - CHARLES BONNER

1          MS. PAQUETTE:  Objection.  I think he's
2          answered this many times at this point.
3     A    I don't recall, sir.
4     Q    Okay.  All right.
5          MR. CHARLES BONNER:  I'm sorry.  I can't
6          see way over there.  You come over here and
7          show it to me.
8          (A discussion was held off the record.)
9     Q    Yeah, let me direct your attention to page
10   315.  You see in the second paragraph from the bottom, it --
11   the short video is referenced in this document.  Do you
12   recall whether or not you reviewed it at the time that you --
13   in about the time you signed the document?
14          MS. PAQUETTE:  Objection.  I think he's
15          already answered this again but --
16   A    My answer is still the same, sir.
17   Q    Okay.  Okay.  And we'll show you that video.
18   Now, what we'd like to do though is show you -- first I'd
19   like to show you a couple of witnesses' videos that you have
20   not seen, and then we'll ask a few questions, and then we'll
21   see the short video.
22          MR. CHARLES BONNER:  Can you show Sharon?
23          Would it show?
24          Yeah.  Off -- off the record for a
25          second.

FOWLER - CHARLES BONNER

1       (A discussion was held off the record.)

2       (Whereupon a video was played.)

3       Q    Back on the record.  Chief, I appreciate your

4  attentiveness.  Had you ever seen that video before?

5       A    No, no, sir.

6       Q    Would that information have been helpful in

7  your evaluation of this case, evaluation of whether or not

8  the force used was reasonable in this case?

9       A    That video would have been helpful in this

10  investigation, yes, indeed, because I'm interested in that

11  the -- the lady was -- as -- she described herself a witness.

12  She gave some accounts of the incident that unless she was

13  thoroughly briefed beforehand, she would have had to have

14  firsthand knowledge of so ...

15       Q    Did she appear to be creditable?

16            MS. PAQUETTE:  Objection.  You can

17            answer.

18       A    Yeah, in my opinion, yes.

19       Q    Okay.  We're going to now show you another

20  video.

21            MR. CHARLES BONNER:  Do Corey.

22            MS. PAQUETTE:  I'm just going to note my

23            objections to any recordings of these videos.

24            These videos are not going to be admissible at

25            trial so --

FOWLER - CHARLES BONNER

1          MR. CHARLES BONNER:  She's not recording

2     that.

3          MS. PAQUETTE:  Okay.  Okay.  I just want

4     to make sure.

5          MR. CHARLES BONNER:  Yeah, she's not

6     recording.

7          THE VIDEOGRAPHER:  Yeah, I'm not

8     recording the video.

9          MS. PAQUETTE:  Okay.

10          MR. CHARLES BONNER:  And whether they're

11     admissible at trial is going to be up to of

12     course the judge to make a determination.

13          MS. PAQUETTE:  I think there's a pretty

14     good chance these will never come in.

15     (Whereupon a video was played.)

16          MR. CHARLES BONNER:  Okay.  Back on the

17     record.

18     Q     Again, Chief, would that information have been

19     helpful to you in evaluating your officers' conduct in this

20     case before you signed this document?

21     A     You're talking about that video?

22     Q     Yes.

23     A     No, I would have stopped that video about

24     midway through and -- and stopped watching it.

25     Q     And why would that not have been helpful to

FOWLER - CHARLES BONNER

1   you?

2        A    Well, you did an outstanding job of testifying

3   and leading the witness, so I -- unlike the first lady -- the

4   first lady, yes.  This here, no, no.

5        Q    Okay.  Did you find his testimony to be

6   incredible -- that's not credible?

7        A    Did I -- could you rephrase the question?

8        Q    Yeah.  Let me ask you, was there anything that

9   Corey McMullin -- first of all, let me direct your attention

10  to -- to the -- Chief -- Captain Galvin's report again.  Do

11  you see on page 315 up in the first paragraph says "Sergeant

12  Novitsky interviewed a Corey McMullin --"

13       A    Okay.

14       Q    -- "who stated he was standing near the edge

15  of Mr. Grant's driveway and saw everything that happened."

16  Do you see that?

17       A    Yes.

18       Q    And did you read that before you signed this

19  report?

20       A    Yes, I did.

21       Q    Did you go out yourself and talk to

22  Mr. Corey McMullin?

23       A    No.

24       Q    Did you send any of the officers out to talk

25  to him?

FOWLER - CHARLES BONNER

1          A    No.

2          Q    Do you know --

3          A    Well, I'm sorry.   Sergeant Novitsky does work

4     for me.

5          Q    I understand, but after you read this report

6     aside from Sergeant Novitsky, did you, yourself, send someone

7     else out to get a statement from Mr. McMullin?

8          A    That would have been the job of

9     Captain Galvin, but I'm not aware if he -- I don't recall

10    seeing --

11         Q    Okay.

12         A    -- a statement from him.

13         Q    And you heard that Mr. McMullin said that his

14    statement was not recorded when he was interviewed by

15    Sergeant Novitsky; you heard that?

16         A    I did.

17         Q    Did you ever see -- before you signed this

18    statement, did you ask someone to go out and take a video

19    statement just like we did and ask the non-leading questions

20    of Mr. McMullin so you could get to the truth?

21         A    No.

22         Q    Okay.  Now, in listening to Mr. McMullin's

23    statement -- first of all, did you read his statement in

24    Mr. Novitsky's report?

25         A    Yes.

FOWLER - CHARLES BONNER

1          Q    Okay.  And you watched this statement here?

2          A    Yes.

3          Q    Okay.  Aside from the leading questions, is

4    there anything about his statement you find to be false?

5          A    About his statement that I find to be false?

6          Q    Yes.

7          A    I don't -- I don't know.  I wasn't -- I wasn't

8    there so ...

9          Q    Okay.  But is it -- but just based on what you

10   watched, do you see anything that appear to be false aside

11   from the leading questions?

12         A    Yeah, yeah, yeah, he -- he conveniently

13   changed his vantage point, and then he -- after -- at one

14   point when Mr. Grant was on the ground and there was some

15   conversation between you and him, Mr. Mc -- McMullin

16   became -- he -- he began to provide additional details

17   from -- from the vantage point -- from the vantage point that

18   he was standing in the video versus where he told you he was

19   prior to you guys giving him the illustration, so he became

20   increasingly more educated about the incident as you all were

21   guiding him through.

22         Q    Well, I appreciate that, but you saw that

23   Mr. McMullin was guiding the scene, he was telling us where

24   he was and where --

25         A    That wasn't --

FOWLER - CHARLES BONNER

1     Q     -- everybody was?

2     A     That wasn't my observation.

3     Q     That was not --

4     A     In --

5     Q     -- your observation?

6     A     -- fact -- in fact, I -- in the beginning,

7  Mr. McMullin -- Mr. McMullin was -- was guiding you all

8  through, but at several points I -- I believe it was this

9  gentleman here, I didn't see him, but I recognized his voice

10 from earlier.

11    Q     Mr. Ryder?

12    A     Yeah, earlier.  He was guiding him initially,

13 and then -- then at one point you took over to in my opinion

14 guide him through --

15    Q     Okay.

16    A     -- the incident.

17    Q     Now, in reading the police reports of

18 Officer Lockett, you did see where Officer Lockett indicated

19 in his report that he ordered Mr. Grant out of the house?

20    A     Yes.

21    Q     Okay.  And you saw that Mr. Lockett then was

22 standing behind Mr. Grant after he ordered him out the house?

23    A     I ...

24    Q     Well, in this report, did you learn from

25 Sergeant -- from Officer Lockett's report that

FOWLER - CHARLES BONNER

1    Officer Lockett came out of the house behind?

2            A    Yes, yes, sir.

3            Q    Okay.  So then Officer Lockett then would have

4    been positioned behind Mr. Grant when he is out on the

5    landing there, on the steps; is that your understanding?

6            A    Yes, sir.  Yes, sir.

7            Q    And did you read in Officer Lockett's report

8    that he told Mr. Grant to go out and talk to my partner?

9            A    Yes, sir.

10           Q    You did read that?

11           A    Yes, sir.

12           Q    So your understanding then is that

13   Mr. Lockett -- Officer Lockett was standing behind Mr. Grant;

14   is that true?

15           A    Yes, sir.

16           Q    And then Mr. Grant was standing on his steps;

17   true?

18           A    Yes, sir.

19           Q    And that Officer Montalto was standing down

20   facing Mr. Grant; is that true?

21                   MS. PAQUETTE:  Objection.  You can

22                   answer.

23           A    Yes.

24           Q    Okay.  Now, from that vantage point, did you

25   read anything in the report that indicate that

FOWLER - CHARLES BONNER

1    Ms. Stephanie Grant was in some kind of danger when they were

2    in that position, when Officer Lockett is behind Mr. Grant

3    and Officer Montalto is in front of him and they're just

4    standing there on the steps?  Did you read anything that

5    indicates that Ms. Stephanie Grant was in any kind of danger?

6              A    At that particular point, no, no, sir.

7              Q    Okay.  And I read you earlier from

8    Mr. Galvin's report where he indicated -- Mr. Lockett

9    indicated, Officer Lockett, that he never even saw Ms. Grant;

10   we read that?

11             A    I'm not sure.

12             Q    Okay.  Well, let me direct your attention --

13             A    Okay.

14             Q    -- back to page -- page 316.

15             A    Okay.

16             Q    It's the very first sentence.

17             A    Yes, sir.

18             Q    Can you read the first -- it says "The home

19   was a split level and Officer Lockett could not see

20   Ms. Grant --

21             A    Yes.

22             Q    -- dot dot dot dot"; do you see --

23             A    Yes.

24             Q    -- that?

25             A    Yes, sir.

FOWLER - CHARLES BONNER

1          Q     So while they're standing on the steps, you

2     understand that Officer Lockett has never seen Ms. Grant;

3     true?

4          A     Yeah, yes, sir.

5          Q     And that Officer Montalto is outside and

6     hasn't gone in the house; do you understand that?

7          A     He -- I don't know if Officer Montalto has --

8     hasn't gone in the house --

9          Q     Okay.

10         A     -- at this point but --

11         Q     All right.

12         A     At the point that you're talking about, I will

13    concede that Officer Montalto is down on -- down on the

14    ground in front of Mr. Grant and Officer Lockett and not --

15    Officer Lockett is positioned behind Mr. Grant as they both

16    are at some -- on the step -- steps or the landing --

17         Q     Okay.

18         A     -- at one point.

19         Q     Fair enough.  I appreciate that.

20         A     Yes, sir.

21         Q     Appreciate that honesty.  Now, we read the

22    Fourth Amendment earlier; you recall that?

23         A     Yes, sir.

24         Q     And the Fourth Amendment says that before an

25    officer can seize a person, there must be probable cause --

FOWLER - CHARLES BONNER

1    A    Yes, sir.

2    Q    -- or a warrant?

3    A    Yes, sir.

4    Q    Okay.  Now, while the -- you know at this

5  point the officers have already called for backup; true?

6                 MS. PAQUETTE:  Objection.

7    Q    Or do you -- you're aware that Officer Lockett

8  and Officer Montalto, they already called other officers or

9  the report had gone out to other officers?

10    A    No, I'm not.

11    Q    You're not aware of that.  Okay.  Now, is

12  there any reason why if they wanted to arrest Mr. Grant that

13  they couldn't go and get a warrant to arrest him at that

14  point and tell him to stay right there without touching him?

15  Do you know any reason why they couldn't have done that

16  consistent with the Fourth Amendment?

17                 MS. PAQUETTE:  Objection.  You can

18                 answer.

19    A    Say that again.

20    Q    Okay.  We have -- it's frozen in the position

21  in your mind that you've already told us, that Officer

22  Lockett is behind Mr. Grant, Mr. Grant is standing somewhere

23  first or second step, and then facing Mr. Grant is Officer

24  Montalto.  That's what you described and you concede --

25    A    Sure.

FOWLER - CHARLES BONNER

1     Q   -- true?

2     A   Yes.

3     Q   Okay.  Now, if Officer Lockett or Montalto
4 wanted to arrest Mr. Grant, is there any reason they could
5 not have said, "stand right here, Mr. Grant, we're going to
6 go get a warrant to arrest you"?

7              MS. PAQUETTE:  Objection.

8              You can answer.

9     Q   "We're going to call up the magistrate judge
10 and have them issue a warrant."

11    A   Is there -- and your question is there any
12 reason why they could not or should not have done that?

13    Q   Yeah, exactly.

14    A   Yes, there's a reason.

15    Q   What is the reason?

16    A   That's against our practice.

17    Q   Okay.  Well, there is -- do you see that them
18 just standing there any probable cause to touch Mr. Grant in
19 that position where you got a officer -- in fact, the officer
20 had a gun; true?

21    A   Well, they both had guns.

22    Q   They both had them, and they both had laser --
23 tasers?

24    A   I don't know.  I know that the -- the --
25 the -- the sidearm is -- is a standard issue.

FOWLER - CHARLES BONNER

1      Q    Okay.

2      A    Tasers are optional --

3      Q    Okay.

4      A    -- based on training and preference of the

5  officers.

6      Q    Okay.  So they both had guns?

7      A    Yes, sir.

8      Q    Okay.  And you saw -- did you see -- Mr. Grant

9  didn't even have shoes on.  Were you aware that he was

10  standing in socks?

11      A    I wasn't there, sir, so --

12      Q    Okay.

13      A    -- how could I --

14      Q    In anything that you viewed -- you said that

15  you viewed some videotapes, so did you see that he --

16      A    Oh, I didn't -- I didn't see that in video.

17      Q    Okay.  Well, is there any reason why between

18  the two officers with their gun they couldn't have told him

19  to "just stay here, we -- we need to -- to arrest you"?

20           MS. PAQUETTE:  Objection.

21      Q    "Don't move, we need to arrest you, put your

22  hands behind your back," did you see any reason why they

23  should have done that?

24           MS. PAQUETTE:  Objection.

25           You can answer.

FOWLER - CHARLES BONNER

1        Q    Well, let me rephrase the question.  With them

2    standing in that position, what probable cause in your mind

3    exists for them to touch Mr. Grant?

4        A    With them standing in that -- in that

5    position?

6        Q    Yes.

7             MS. PAQUETTE:  Objection.  You can

8             answer.

9        A    Well, you're -- you're -- you're freezing a

10   moment in the incident.

11       Q    Yes.

12       A    But prior to that and leading up to -- well,

13   prior to that, a lot of things have occurred, and -- and so

14   in order for me to determine whether probable cause exists, I

15   have to now climb inside the head of one of the officers that

16   are present, the person that's -- decides to initiate the

17   investigation.  To do so, that would mean that I would have

18   to experience that same thing that that officer was

19   experiencing, so if two -- an officer's standing in the yard,

20   a gentleman's standing on the front porch of his step -- of

21   his steps, and an officer standing behind him, there's not

22   probable cause make.

23       Q    Okay.

24       A    But --

25       Q    Well, let's just freeze --

FOWLER - CHARLES BONNER

1          MS. PAQUETTE:  Well --

2     Q    -- it there.  You're saying just --

3          MS. PAQUETTE:  I just want him to be able

4          to finish his answer.

5     Q    I'm sorry.  I didn't mean to interrupt you.

6     A    Sure, sure.  But if -- if something transpired

7    prior to that moment, then that could be what the arrest

8    itself is based on.

9     Q    Okay.  Now, let me just make sure I

10   understand.  You're saying with them standing there, with

11   Officer Lockett behind, Mr. Grant standing on this first or

12   second steps as they come down, and Officer Montalto facing

13   him, there is nothing in that scene that gives rise to

14   probable cause; is that what you're saying?

15          MS. PAQUETTE:  Objection.  I don't think

16          that's his testimony, but go ahead.

17    A    No, no, that's not what I'm saying.  I -- and

18   I answered you prior to you asking me that question a second

19   time.

20    Q    Well, I'm sorry.  I apologize, but I -- I want

21   to understand in that scene where is the probable cause.  Let

22   me just back up a second.  You made a statement about you

23   would have to get into the officer's head?

24    A    Sure.

25    Q    But the standard --

FOWLER - CHARLES BONNER

1       A    Yes.

2       Q    -- in the law is what a reasonable officer

3   would do at -- at the time, isn't it?

4       A    A reas -- right, a reasonable officer when

5   going through the same set of facts and circumstances --

6       Q    Yes.

7       A    -- would do at that particular time, yes, sir.

8       Q    And that is the law based on the case you know

9   Graham versus Connor?

10      A    Yes, sir.

11      Q    And that's whether or not conduct is

12  reasonable and excessive would be based on what a reasonable

13  officers would do at the time; isn't that true?

14      A    Yes, sir.  Yes, sir.

15      Q    And you told us that you were a reasonable

16  officer; true?

17      A    I still am, sir.

18      Q    And you still are.  So if you were then

19  Officer Lockett standing behind Mr. -- Mr. Grant with

20  Officer Montalto facing him, would you have jumped on his

21  back and flung him across the rail as a reasonable officer?

22              MS. PAQUETTE:  Objection.

23      A    By -- in order for me to answer your question,

24  can I ask you a question?

25      Q    Certainly.

FOWLER - CHARLES BONNER

1      A    Are you asking me to concede that -- that I --
2  that what you just described happened --
3      Q    Yes.
4      A    -- that that happened?
5      Q    Yes.
6      A    Then I can't do that.  I can't concede to
7  that.
8      Q    Well -- well, I want you to just concede it's
9  a hypothetical, that you were the --
10     A    If it's hypothetical?
11     Q    Yes.
12     A    Yes, yes, sir.
13     Q    If you were -- hypothetical, you were standing
14  where Officer Lockett was standing --
15     A    Yes.
16     Q    -- Mr. Grant was standing on his second
17  steps --
18     A    Yes, sir.
19     Q    -- and Officer Montalto was standing and you
20  had a gun and Montalto has a gun and nothing else happened
21  other than he's standing there, as a reasonable officer,
22  would you have grabbed Mr. Grant and flung him over the
23  ground and start beating him in the face?
24          MS. PAQUETTE:  Objection.
25          You can answer.

FOWLER - CHARLES BONNER

1      A     Based on that -- the question you just asked
2  me --
3      Q     Yeah.
4      A     -- and take it for granted that it's a
5  hypothetical question, my answer to you is no, I would not
6  have done that.
7      Q     Okay.  And why not?
8      A     Because what you -- the hypothetical situation
9  that you just described to me that -- the actions of the
10  officer in the hypothetical sit -- scenario would have been
11  unreasonable --
12     Q     Okay.
13     A     -- unjustified, and, in fact, illegal.
14     Q     Thank you for your honesty.  Now, based on
15  your review of the file, is there anything that took place
16  inside of the house considering we know that Officer Lockett
17  never saw Ms. Grant, we know that Montalto never saw -- do
18  you have any facts that took place inside that would have
19  justified Officer Lockett or Montalto to grab and beat
20  Mr. Grant?
21                 MS. PAQUETTE:  Objection.
22     Q     Is there anything that you know of that would
23  have justified that that took place in the house?
24     A     Are we -- is that a hypothetical question
25  also?

FOWLER - CHARLES BONNER

1    Q    No.  I'm asking you now based on your personal

2  knowledge and everything you reviewed.

3    A    Then I can't answer that question, because

4  in -- in -- in answering the question, you're asking me to

5  concede that it's my belief that they grabbed Mr. Grant and

6  beat him as you -- as you described it, and so I really can't

7  answer that question, because you -- in doing so would --

8  would mean that I concede to -- to what you just described --

9    Q    And that --

10    A    -- and I do not.

11    Q    Yeah, that's fair enough, so let me rephrase

12  the question.  You absolutely raise a good point.  Now, what

13  I want you to tell me is based on everything you've

14  reviewed -- and you told us you reviewed -- reviewed

15  Officer Galvin's report, you reviewed Montalto's police

16  officers report and you reviewed Officer Lockett's report,

17  and that's pretty much the sum total of what you reviewed --

18    A    Yes, sir.

19    Q    -- true?

20    A    Yes, sir.

21    Q    Now, based on what you reviewed, did you learn

22  of any facts that occurred inside of Mr. Grant's home that

23  would give probable cause for the officers to attack him

24  physically and beat him outside of his home on the steps?

25                    MS. PAQUETTE:  Objection.  Same

93

FOWLER - CHARLES BONNER

1          objection.

2              Go ahead.

3          A    To attack -- well, in order for me -- once

4     again, sir, in order for me to answer your question, it would

5     mean that I'm conceding to your description of what happened,

6     attack and beat him.

7          Q    Well, yeah --

8          A    And I --

9          Q    -- for this part, I want you to concede

10    that -- concede that for --

11         A    That's not going to happen.

12         Q    Okay.

13         A    That's not going to happen, sir.

14         Q    All right.  Well -- well, aside from the

15    beating then, let me -- let me ask you this:  Did you learn

16    anything from everything you reviewed that gave probable

17    cause to arrest him while -- that took place in the house

18    before they came on the steps?

19         A    Yes, sir.

20         Q    What did you learn?

21         A    In Officer Lockett's definition of Mr. Grant's

22    behavior in the house prior to him ordering him out and while

23    he's exiting the house, he describes Mr. Grant's behavior as

24    being -- as -- in his definition, his description as

25    tumultuous.

FOWLER - CHARLES BONNER

1          Q    Okay.  What -- what was tumultuous?  Did he
2    use the word tumultuous?
3          A    No, no, in -- there's a -- for disorderly
4    conduct, when you look at the -- the disorderly conduct and
5    the -- Subsection 1 uses that -- that exact word and --
6          Q    Well, I --
7          A    -- terminology.
8          Q    I appreciate that, but I'm saying what is --
9    what did Officer Lockett say that Mr. Grant did --
10         A    Sure.
11         Q    -- in his house --
12         A    Sure.
13         Q    -- that caused him to arrest, what -- what did
14   he say happen?
15         A    Loud, verbal, flailing of the arms.
16         Q    Okay.  And what else?
17         A    And up on edging, just the slamming of the
18   door in an aggressive fashion.
19         Q    Okay.  Let's take those four things.  Loud, is
20   loud -- is there a Penal Code or a particular New York law
21   that you can't be loud in your house?
22         A    No, sir.
23         Q    Okay.  He said -- the other thing he said was
24   aggressive?
25         A    Flailing of the arms.

FOWLER - CHARLES BONNER

1        Q    Okay.  Is there a Penal Code Law in New York

2   you can't fail your arm in your castle, you can't fail your

3   arms in your house?

4        A    No, sir.

5        Q    Okay.  So so far Mr. Grant hasn't done

6   anything illegal so far; true?

7        A    Well, when you -- when you separate everything

8   that I've said and -- and you asked me a question, I

9   responded to your question, and -- and -- and if you take

10  what I -- what I say to you out of context and pause as

11  you're doing, then my I direct answer to your question each

12  time would be no.

13       Q    Okay.

14       A    That's -- that separate and apart from

15  everything else is not a violation of the law, but when you

16  couple that with all -- all that the officers are dealing

17  with, everything that's occurring in -- in -- in that

18  particular moment, then I would -- I would say to you that

19  Officer Lockett's justification for either arresting or

20  detaining Mr. Grant in that situation is legal.

21       Q    Okay.  Now, you told me flailing of the arms,

22  being loud, and the other thing you said he was what?

23       A    It was the -- the door.

24       Q    The door.  Slam the door?

25       A    Yes, sir.

FOWLER - CHARLES BONNER

1    Q    And anything else?

2    A    No, I think --

3    Q    Okay.

4    A    -- that's it.

5    Q    Well, when we put those things in context, one

6    after the other, loud, flailing arms, and slam his door,

7    direct me to a law in New York that says that that's illegal

8    in your house, tell me the penal code number.

9    A    Well, disorderly conduct, when you put all of

10   those things together, it's -- it's in -- and as I was

11   saying, Subsection 1, where it says tumult -- tumultuous

12   behavior, if -- if in the officer's mind's eye -- and I -- I

13   have to go hypothetical now because I wasn't there.  And if

14   in the officer's mind's eye the behavior is -- is -- is --

15   is -- the behavior is escalating and they feel that they need

16   to physically intervene, the officer has options.  The

17   options -- first option would be de-escalation, "hey, sir,

18   please calm down," doesn't work, then, 2, because you don't

19   want it to go from the -- one person's behavior to -- to

20   endanger that of a person or a third person -- themselves or

21   a third person, then we can move towards securing that person

22   in handcuffs and even -- even further inside of a police

23   vehicle to make sure that they're not a harm to themselves or

24   to others until we can get the situation completely quell.

25   Q    Well, so for there to be a disorderly conduct,

FOWLER - CHARLES BONNER

1  there must be a victim who this disorderly conduct is

2  directed towards; isn't that true?

3         .    A    That's correct, sir.

4              Q    So you can't be disorderly conduct in your own

5  house if you're not directing it towards someone; right?

6              A    Well, the law -- the New York State law

7  requires a public inconvenience.

8              Q    Okay.

9              A    But the Family Court Act, I believe it's

10  Criminal Procedure Law 530.11, allows for certain arrests in

11  domestic situations.

12             Q    Okay.  But again there must be a victim; true?

13             A    Yes, yes, yes, sir.

14             Q    Okay.  So have you ever arrested a man in his

15  house for disorderly conduct when you didn't see anybody else

16  in the house, he's disorderly conduct with himself, it's

17  like, you know, some kind of solo disorderly conduct in his

18  own house, when you were a officer, did you ever make such

19  arrest?

20                  MS. PAQUETTE:   Objection.

21             A    For disorderly conduct?

22             Q    Yes, where -- a person by himself in his

23  house, you see nobody else in the house, and he's flailing

24  his arms, he -- he's loud and he opens his door, did you ever

25  make such arrest as a --

98

FOWLER - CHARLES BONNER

1          A    No.

2          Q    -- reasonable officer?

3          A    No, sir.

4               MS. PAQUETTE:  Objection.

5          Q    Okay.  And -- and if there's no victim, there

6     clearly can't be a crime; isn't -- isn't that the law?  If

7     there's no victim of the disorderly conduct, there cannot be

8     a crime; isn't that true?

9               MS. PAQUETTE:  Objection.

10              Go ahead.

11         A    If -- if there's no victim of the disorderly

12    conduct, there could not be a crime, I guess I would -- that

13    is true.

14         Q    That is --

15         A    Yes, sir.

16         Q    Okay.  Now, let me direct your attention back

17    to page 318 of the Officer -- Captain Thomas Galvin's report.

18         A    Three --

19         Q    318, page 318, Bates stamped at the bottom of

20    the page 318.

21         A    Oh, okay.  I -- yeah, mine's kind of covered

22    up with the other stamp, but I got it now.

23         Q    Okay.

24         A    Okay.

25         Q    Did you ever see this particular complaint,

FOWLER - CHARLES BONNER

1    the Syracuse Police Department complaint form?

2         A    Yes.

3         Q    Do you know who made this complaint?  I direct

4    your attention down, it says report made from IP address

5    74.203.239.10.  Do you recognize that IEP address?

6         A    No.

7         Q    Okay.  So when you received this complaint, is

8    that when you wrote the letter that we looked at earlier

9    to --

10         A    Yes.

11         Q    -- Mr. Alonzo Grant?

12         A    Yes, sir.

13         Q    Did you, yourself, ever call Mr. Grant?

14         A    No, sir.

15         Q    Okay.  And did you read this report when you

16    received it?

17         A    This one?

18         Q    Yes.

19         A    Yes.

20         Q    Oh.

21         A    Yes, sir.

22         Q    It gave a number of witnesses there.  You see

23    the number of witnesses?

24         A    Yes, sir.

25         Q    Did any of your officers ever talk with a

FOWLER - CHARLES BONNER

1    Mr. Dennis Willis at 806 Tallman?

2            A    No.

3            Q    Okay.  And again you want to do a thorough

4    investigation when you undertake a citizen complaint because

5    you want to keep the citizens involved in your community

6    policing; true?

7                    MS. PAQUETTE:  Objection.

8                    You can answer.

9            A    Yes, sir.

10           Q    Okay.  But you don't know as you sit here

11   today whether any of your officers ever spoke with

12   Mr. Dennis Willis at 806 Tallman; is that true?

13           A    That's true, sir.

14           Q    Okay.  And there's another witness, Mr. --

15   Ms. Tammy Wheat Hudson, did you see whether any of your

16   officers ever took a statement from Mr. --

17   Ms. Tammy Wheat Hudson?

18           A    I don't recall, sir.

19           Q    You have no knowledge of that?

20           A    No, don't ...

21           Q    You haven't seen any statement from her?

22           A    No.

23           Q    Okay.  And so you don't know whether or not

24   she had material information that would have impacted your

25   decision as to whether the force used here was lawful; is

FOWLER - CHARLES BONNER

1    that true?

2            A    That's true, sir.

3            Q    Or whether even the arrest was lawful; is that

4    true?

5            A    Well, I don't know what she had, because

6    I'm -- we --

7            Q    Because you didn't investigate?

8            A    Yes, sir.

9            Q    Okay.  Now, there's also Ms. Stephanie Grant.

10   You told us you never talked to Ms. Stephanie Grant; true?

11           A    Yes, sir.

12           Q    And there's a Ms. Sherrell Grant.  You never

13   spoke with her; true?

14           A    Yes, sir.

15           Q    And none of your officers spoke with her;

16   true?

17           A    Not that I'm aware of, sir.

18           Q    Okay.  And then there's a Ms. Bertha Davis at

19   728 Tallman.  You never spoke with that person too; true?

20           A    Right, not that I'm aware of, sir.

21           Q    None of your officers spoke with that person?

22           A    Not that I'm aware of.

23           Q    Okay.  Now, can you read to the jury what

24   the -- the complaint that you received -- you read it when

25   you received; true, Officer?

FOWLER - CHARLES BONNER

1          A     Yes, sir.

2          Q     Okay.  Read it to the jury if you would,

3    please.

4          A     "Description of complaint:  Officer Lockett

5    along with the other arresting officer vio --

6          Q     And if you would read it slowly because the

7    court reporter will get upset with us if you read too fast.

8          A     Okay.  And I'm not trying to be a wise guy.

9    This is just -- this is the way that I read.

10         Q     I know.

11         A     So if I read slower, it will -- I may end up

12   choppy.

13         Q     We just don't want to get held in contempt of

14   court reporter.

15         A     Yes, sir.  I understand.

16         Q     Okay.

17         A     Okay.  "Officer Lockett along with the other

18   arresting officers violently beat Alonzo Grant Sr. in his

19   front yard in front of the entire neighborhood.

20   Officer Lockett as well as his partner continued to punch and

21   kick Alonzo Grant, Sr. in the face and head well after

22   handcuffs were placed on.  They proceeded [sic] to scream and

23   cuss [sic] at -- at the witnesses that were looking on as the

24   incident took place.  There were individuals that managed to

25   record bits and pieces of the incident.  Officer Lockett as

FOWLER - CHARLES BONNER

1  well as -- as the officer used excessive force against an

2  innocent man who was one of -- who was the one who had the --

3  had in fact called the police for help to resolve a dispute

4  between his daughter and a neighbor Sharon Hayes.  It is an

5  outrage.  These officers are supposed to be there" -- I'm

6  sorry, "to be here to protect and serve us and not to beat

7  our innocent people, and Police Chief Fowler wonders why no

8  one ever wants to help assist in crimes.  Who knows what's

9  next maybe they will start beating children to."

10       Q    And you read all of that when you first

11  received the complaint, Officer; is that true?

12       A    I did.

13       Q    Okay.  And, Chief, it is the part of your

14  community policing to get the community to help you police

15  the community; true?

16       A    Yes.

17       Q    Okay.

18       A    Yes, sir.

19       Q    And -- and there's a concern this community

20  person's raising whether or not officers -- your police

21  officers will start beating kids.

22            MS. PAQUETTE:   Objection.

23       Q    That was concerning you when you read that,

24  isn't it?

25       A    Ask me --

FOWLER - CHARLES BONNER

1          Q    Well, the -- when you read that, that this

2    citizen is concerned that your officers maybe they will start

3    beating children, wasn't that of concern to you?

4                    MS. PAQUETTE:  Objection.

5                    Answer if you can.

6          A    Yeah, I -- actually I still don't understand

7    the question, so can I just ask you a question just for

8    clarity on my part?

9          Q    Even though the rules of evidence usually does

10   not allow me to answer your question.  I just ask them, but I

11   will indulge you.  Yes.

12         A    Thank you, sir.  And you -- you asked me if I

13   was -- I'm wondering if you're asking me if by reading this

14   that was -- that I was personally concerned as to whether my

15   officers would start beating kids; is that your question?

16         Q    Well, that is my question.  My question is a

17   little bit different, but I'm wondering whether you were

18   concerned that this citizen's perceptive, perception was that

19   your officers were using excessive force on the people in the

20   community that now they would even use force against kids?

21                    MS. PAQUETTE:  Objection.

22                    Go ahead.

23         A    Yes, I'm always whether -- I'm always

24   concerned of a citizen's perception or factual reporting of

25   information.  It's all -- I consider -- I take all of that

FOWLER - CHARLES BONNER

1  into consideration, because a person's perception is their

2  reality, whether I agree with them or not.  I do take that

3  into account, yes, sir, I do.

4      Q   Well, did you learn in this case that

5  Officer Lockett took a swung at Alonzo, Jr., 12 years old at

6  the time, when he was standing outside his father's house

7  when he was yelling at them "why were you beating my father?"

8              MS. PAQUETTE:  Objection.

9              Answer that if you can.

10     A   No, I didn't learn that.

11     Q   Well, that certainly would have been material

12  information for you to evaluate before you made a conclusion

13  that the force used here was reasonable by your officers;

14  isn't that true?

15              MS. PAQUETTE:  Objection.  That's not a

16              fact proven in this case, but go ahead.

17     A   Okay.  Now I'm thoroughly confused.  Give me

18  the -- can you ask me your --

19              MR. CHARLES BONNER:  Could you read the

20              question back?

21     A   -- question again, please?

22              THE REPORTER:  "Q    Well, that

23              certainly would have been material information

24              for you to evaluate before you made a

25              conclusion that the force used here was

FOWLER - CHARLES BONNER

1                    reasonable by your officers; isn't that true?"

2          A     If I were to concede that that indeed

3    happened, then yes.

4          Q     Okay.  At this point we're going to show

5    Alonzo Grant's testimony, Alonzo, Jr.

6                    (Whereupon a video was played.)

7                    MR. CHARLES BONNER:  Is there more on

8                    Alonzo --

9                    MR. CABRAL BONNER:  No.

10                   MR. CHARLES BONNER:  -- Jr.?

11                   THE REPORTER:  No, I don't think you go

12                   back to him.

13         Q     Okay.  All right.  Now, Chief, did you ever

14   see that film from -- statement from Alonzo, Jr., 12 years

15   old at the time?

16         A     No, sir.

17         Q     Is it a part of your policy for officers to

18   take a swing at 12-year-old kids?

19                   MS. PAQUETTE:  Objection.

20         A     It is not, but what -- I don't understand the

21   question.

22         Q     Would you want to have it read back?

23         A     No, I -- sure.  I -- I -- I guess I understand

24   your question.  Your question was clear, but are you -- are

25   you basing your question on the video?

107

FOWLER - CHARLES BONNER

1          Q    No, I'm basing my questions on my question,

2    which is that is it part of your policy to have your officers

3    swing on 12-year-old kids who's standing like he was standing

4    here in his yard?

5          A    Sir --

6                    MS. PAQUETTE:  Objection.

7          A    -- you -- you just played a video statement

8    from a Alonzo Grant, Jr; right?

9          Q    Yes.

10         A    Could you rewind the video and -- and show for

11   me where Alonzo Grant, Jr. told you that the officer took a

12   swing at him?

13         Q    Certainly.

14         A    Yes, sir.

15         Q    Certainly.

16         A    Thank you.

17         Q    I'm sorry.  You missed that?

18         A    No, I watched the entire --

19         Q    Okay.

20         A    -- thing so --

21         Q    Okay.

22         A    I guess we're going to find out together.

23         Q    Oh, yeah, certainly.

24              (Whereupon the video was played.)

25                    MR. CHARLES BONNER:  Stop it right there,

FOWLER - CHARLES BONNER

1          stop it right there.

2          Q    Did you hear he said "the cop tried to swing

3    on me"?

4          A    Yes, tried -- tried to swing.  What does that

5    mean?  Did he swing on him?

6          Q    Yeah.

7          A    Did he swing on him?

8          Q    He swung on him.  He --

9          A    But that's not what he said.

10              THE REPORTER:  Can I just have one person

11              at a time?

12         Q    Okay.  Okay.

13         A    Right.  You -- he said the cop tried to swing

14    on him.

15         Q    Yes.  What it meant and what the witnesses

16    confirmed the cop took a swing at the kid, the kid got back,

17    and you hear later everybody's yelling "AJ, AJ" -- which

18    stands for Alonzo, Jr. -- "get out of the way, get out of the

19    way."  You heard Corey McMullin earlier said he was trying to

20    pull this kid out of the way because the cop was hitting at

21    the kid.  That's what the evidence shows.

22              MS. PAQUETTE:  All right.  That's not

23              even a question.

24         Q    Well --

25              MS. PAQUETTE:  So don't even --

FOWLER - CHARLES BONNER

1      Q     The question --

2                  MS. PAQUETTE:  -- respond to that.

3      Q     -- is is what -- what is your understanding of

4   when the cop said -- when the kid said, "he tried to swing on

5   me"?  What is your understanding what the kid is testifying

6   to?

7                  MS. PAQUETTE:  Objection.

8      A     I don't -- I don't have to have an

9   understanding.  I'm listening to the young man.

10     Q     I understand.

11     A     This young man is very articulate.  He said

12  the officer tried to swing on him.  If the officer swung on

13  him, then he -- he would have said that.  Tried to swing on

14  him and swinging on him is two different things.

15     Q     What do you mean he didn't hit him?  He swung

16  on him.  He tried to hit --

17                 THE REPORTER:  Can you just say that

18                 again?  I'm sorry.

19     Q     He -- the officer tried to hit him.  He swung

20  on him.  He's saying he tried to hit him, he swing on him,

21  but he didn't hit him because they got him out the way, but I

22  can understand --

23     A     Sir, that -- what wasn't said at all.

24     Q     Yeah.

25     A     I mean, that's -- that's -- once again you're

FOWLER - CHARLES BONNER

1   testifying for this young man, and you're -- you're adding

2   words to his mouth which --

3           Q     What is your understanding when he said he

4   tried to him on swing him?

5           A     Just I'm taking him verbatim.

6           Q     Okay.  What is -- what is your understanding

7   of that?

8                 MS. PAQUETTE:  Objection.  I think we've

9                 already talked --

10          Q     What is your --

11                MS. PAQUETTE:  -- this through.

12          Q     -- verbatim understanding of that?

13          A     Okay.  My understanding of that in this young

14   man's eye that -- that in this young man's eye, he felt that

15   at some point the officer would have taken a swing at him,

16   would have taken a swing at him.

17          Q     Okay.  All right.  That's fair enough.  Well,

18   is it a part of your officer's policies to take swing at kids

19   when they're standing at a scene like that just trying to

20   observe?

21                MS. PAQUETTE:  Objection.

22          Q     Based on your understanding of what this kid

23   said, is it -- that's part of your officers' policies, to try

24   to take swing at kids?

25                MS. PAQUETTE:  Objection.  Answer if you

FOWLER - CHARLES BONNER

1           can.

2           A     Sir, you're asking me two -- two different

3     questions.  The first question I can answer, and the second

4     question you added something to it.  If -- if you don't mind,

5     please, would you ask me the question you want me to answer

6     for the third time and then I'll --

7           Q     Certainly.

8           A     I'll --

9           Q     Is it a part of your officer's policies to try

10    to take a swing at kids based on your understanding of what

11    the kid's saying?

12                     MS. PAQUETTE:  Objection.

13          A     It's -- it's -- it's -- it's not a part of our

14    policy.

15          Q     Okay.  All right.  We're going -- we'll take

16    another a break, and we're going to watch two other videos,

17    Sherrell and -- and then --

18                     MR. RYDER:  Shakeal.

19          Q     -- and Shakeal, and then we're going to watch

20    the actual video, so why don't we take a break.  We've been

21    going for a while; okay?

22          A     Okay.

23                     THE VIDEOGRAPHER:  We'll go off record at

24                1434.

25                (A discussion was held off the record.)

FOWLER - CHARLES BONNER

1        THE VIDEOGRAPHER:  We're back on record

2     at 1434.

3        MR. CHARLES BONNER:  Okay.  Shakeal.

4        MR. RYDER:  No, this is Sherrell.

5        MR. CHARLES BONNER:  Okay.  Sherrell.

6        MR. RYDER:  Expand that out too, would

7     you, so it takes up the screen better.  It

8     will be up in the top left, I believe.  Yeah.

9     (Whereupon a video was played.)

10       Q    This -- it's -- just one sec.  Have you ever

11    seen that testimony before --

12       A    No, sir.

13       Q    -- Chief?  And again would that have been

14    helpful to you to evaluate all the facts in this case?

15       A    Sir, I would -- I would have been interested

16    to see that, yes, sir.

17       Q    Yeah.  Well, generally a part of your

18    investigation include getting all the facts from all --

19       THE REPORTER:  Can you just say that

20     again?  "Of your investigation ..."

21       Q    Part of your investigation include getting all

22    the facts from all the sources to determine what -- what

23    information they could provide with getting to the truth; is

24    that a fair statement?

25       A    That's fair, sir, yes.

FOWLER - CHARLES BONNER

1          Q     Okay.  And we're going to show you one more.

2                (Whereupon a video was played.)

3                     MR. CHARLES BONNER:  Okay.  That's it.

4          Q     Again, Chief, as with the other witnesses,

5    that information would have also had -- had an impact on your

6    decision; is that true?

7          A     I certainly would have been interested to see

8    that video --

9          Q     Okay.

10         A     -- sir, or to talk to that person.

11         Q     Now we're going to show you the video that was

12   shot by Sherrell, Mr. Grant's daughter, that you heard talk

13   earlier that she -- when she came up.  And --

14               (Whereupon a video was played.)

15         Q     Could you hear on the video Mr. Grant saying

16   "why are you choking me?"

17         A     No, I -- no, I couldn't hear that.

18         Q     Okay.

19         A     I mean, if you play it again, I may -- the --

20   the person recording it -- I'm sorry.  I shouldn't say the

21   person recording 'cause I don't know whose voice that is, but

22   there's a person that's -- that's screaming that makes all

23   the other background noise inaudible.  I mean, I --

24         Q     Yes.

25         A     I'll -- I'll listen.

114

FOWLER - CHARLES BONNER

1      Q    Yes.

2      A    I'll listen for that this time.

3      Q    Listen to a couple things.  Also listen -- you

4  can hear them hitting him, and she -- she testified --

5      A    Well, why don't you -- let's go with --

6      Q    Yes.

7      A    -- one thing at a time, sir.

8      Q    One thing at a time.  You --

9      A    So what am I listening for first?

10     Q    Right --

11          MR. CHARLES BONNER:  Hold on.

12     Q    Right after he's cuffed and Officer Lockett

13  releases his neck, he said "you're choking me, why are you

14  choking me?"  You'll -- you'll hear that.  He'll pause it.

15          (Whereupon a video was played.)

16          MR. CHARLES BONNER:  Stop it right there.

17          Play that right back, right.

18          (Whereupon a video was played.)

19     Q    Could you hear "you're choking me, man, why

20  are you choking me, man?"  Did you hear that?

21          MR. CHARLES BONNER:  Play it again,

22          Cabral.

23          (Whereupon a video was played.)

24     A    Yes.  Right.  Pause it, yeah, yeah.

25     Q    Pause it right there.

FOWLER - CHARLES BONNER

1      A    At that point when Officer Lockett is moving

2 away from him?

3      Q    Yes.

4      A    Yeah.

5      Q    Yeah.

6      A    I heard -- I heard him say "you're choking me,

7 man, why are you choking me?"

8      Q    Yeah.

9      A    It's -- Officer Lockett is moving away from

10 him.

11      Q    Right, exactly.

12      A    Yes, yes.  But Officer Lockett is separated

13 from him at the point that he makes the statement.

14      Q    Yeah, because he's being choked before that.

15 He can't that talk.

16      A    Well, show me -- show me during the video

17 where you -- where he's being choked.  Am I --

18      Q    Certainly, certainly.

19      A    Okay.  I don't want to --

20           MR. CHARLES BONNER:  Play it back, play

21           it back.

22           MR. CABRAL BONNER:  Arm.

23           MR. CHARLES BONNER:  Well, give me the

24           still photographs.

25      A    I do -- I -- I absolutely see the arm.

116

FOWLER - CHARLES BONNER

1        Q    Yes.

2        A    Yep.  I see the arm.  I see -- I see both

3   his -- I see where his left arm's completely out of view.  I

4   see where his right arm is across the top --

5        Q    Yes.

6        A    -- of Mr. Grant's back, but I see by the way

7   that he's -- that he's reaching in, it looks like his -- his

8   left arm is on an angle across Mr. Grant's chest as opposed

9   to being directly across his -- directly across his neck.

10       Q    Okay.  Well, going --

11            MR. CHARLES BONNER:  Fast forward,

12       Cabral.

13            MR. RYDER:  Rewind or fast forward.

14            MR. CHARLES BONNER:  Yeah.

15       Q    Can you see the forearm there under his --

16       A    Yeah.

17       Q    -- neck?

18       A    Yes, sir.

19       Q    Okay.

20       A    Whoa, whoa, whoa.  I'm sorry.  That's -- I see

21   his -- see his elbows on the ground, and you can see -- you

22   can start to see a shadow of his foreman, and it's still

23   going across his chest.  His neck is -- his neck is

24   completely out of view.  His -- his face is underneath

25   Officer Lockett.  Officer Lockett is actually over his head.

FOWLER - CHARLES BONNER

1       Q    Can you -- we have -- we have these --

2            MR. RYDER:  He can do it right here.

3            MR. CHARLES BONNER:  Yeah, we can do it

4       right here, yes.

5            MR. RYDER: Yeah.  Okay.  Okay.  Right

6       there, where is his arm there?

7            MS. PAQUETTE:  Okay.  How about we have

8       one person asking questions now?

9            MR. CHARLES BONNER:  Okay.

10           MS. PAQUETTE:  This is a little much

11      here.

12           MR. CHARLES BONNER:  Very good.

13           MS. PAQUETTE:  We got a lot of people

14      testifying.

15      Q    What we will do -- what we will do, Officer,

16 we will -- we have these screenshots --

17      A    Sure.

18      Q    -- of every scene, so now I'll show you that

19 exhibit next.

20      A    Okay.

21           MR. CHARLES BONNER:  Let me see the

22      screenshots.  I think -- that's fine the way

23      it is.

24           MR. CABRAL BONNER:  You have them.

25           MR. CHARLES BONNER:  Where are they?

118

FOWLER - CHARLES BONNER

1    They're the next exhibit.  Oh, here we go.

2         Mark this as the next exhibit.

3         Unfortunately we only have one copy.

4    Give her a black-and-white copy.

5         THE REPORTER:  Is this one --

6         MR. CHARLES BONNER:  It will be one

7    exhibit.  It will be the next one.

8         THE REPORTER:  Yep.

9         MR. CHARLES BONNER:  And it will be A, B,

10   C or 1-1.  Okay.  And -- and let -- let me

11   have that one and --

12        THE REPORTER:  Oh, sure.

13        MR. CHARLES BONNER:  You can give me this

14   one.

15   (Whereupon Exhibit 8 was marked for

16   identification, 1/11/16, ALT)

17   Q    Chief, I've just given you what has been

18   marked Plaintiffs' Number --

19        THE REPORTER:  Eight.

20   Q    -- 8, and it's a -- it's 19 screenshots of the

21   video we just watched.  As you go through, do you recognize

22   this -- these are screenshots from the video we just watched?

23   A    I do, sir.

24   Q    Okay.  Now, sir, I would like to turn --

25   direct your attention to Number 18, screenshot Photo 18.

FOWLER - CHARLES BONNER

1        A    Okay.

2        Q    You see in that photograph Officer Lockett has

3   his left foreman underneath Mr. Grant's head and you see --

4   and his right hand on Mr. Grant's back; do you see that?

5        A    Yes, sir.

6        Q    And you see -- Officer Montalto you see has a

7   black glove on?

8        A    Yes, sir.

9        Q    You heard the other witnesses say they saw

10  Officer Montalto or the officers put gloves on?

11       A    Yes, sir.

12       Q    Now, this is June.  Is it a part of the policy

13  for the officers to -- when they show up to a house to put

14  gloves on in -- in the summertime?

15                 MS. PAQUETTE:  Objection.

16                 Answer if you can.

17       A    No, sir, it's not a part of policy, but gloves

18  are a part of their equipment that they use under certain

19  circumstances.

20       Q    Certainly.  Now -- and -- and you heard, as we

21  did, on the video that when Officer Lockett let go of

22  Mr. Grant, you heard him say "you choking me, man, why are

23  you choking me, man"; you did hear that?

24                 MS. PAQUETTE:  Objection.

25       A    I --

120

FOWLER - CHARLES BONNER

1           MS. PAQUETTE:  Go ahead.

2      A    I -- I -- words to that effect I --

3      Q    Okay.

4      A    -- did hear, yes, sir.

5      Q    Okay.  And did you -- and if you go now to the

6  next page, page 19, you see there that Officer Lockett has

7  Mr. Grant's head into a -- a lock hold with his left arm; do

8  you see that?

9           MS. PAQUETTE:  Objection.

10     A    No, that's not what I see.

11     Q    Okay.  What is -- what do you see?

12     A    Well, in fact, this is more helpful than the

13  video, as a matter of fact, because if you use -- if -- the

14  only way you could tell where -- you can't see

15  Officer Lockett's foreman that's underneath Mr. Grant.  I

16  can't see his foreman because Mr. Grant -- it's underneath

17  Mr. Grant or Mr. Grant is on top of it, whatever you --

18  however you decide to phrase that.  However, what you can see

19  is Officer Lockett's other hand, which is on the top of

20  Mr. Grant's back, and you can use that as a reference as --

21  as to Mr. -- Mr. Grant's body -- Mr. Grant's body.

22     Q    Are you looking at 18?

23     A    I'm looking at -- you asked me to look at 19.

24     Q    Yes.

25     A    What would you like for me --

FOWLER - CHARLES BONNER

1        Q    At 19 --

2        A    -- to look at?

3        Q    No, I wanted you to look at 19, but I don't

4   see Officer Lockett's hand -- right hand in 19 at all.  I see

5   his left arm is underneath Mr. Grant's neck.  I don't see his

6   right hand.  You made a comment about his right hand.

7        A    So what is that right underneath

8   Officer Lockett's chin?  What is that?  It's right underneath

9   Officer Lockett's chin.  What -- what might that be?

10       Q    I don't see anything under Officer Lockett's

11  chin.  I just see the white shirt.

12       A    You -- well, can I -- can I show you --

13       Q    Let's make sure we're looking at the same --

14       A    This --

15       Q    Oh, I'm looking at 19.  Are you looking at

16  Photograph 19?

17       A    This -- I'm looking at what's marked as 19.

18  I'm looking at what's marked at 19 and --

19       Q    Okay.  We have a different 19.  That is the

20  problem.

21       A    Okay.  All right.

22       Q    For some reason it's not numbered

23  subsequently.  Here's my 19.  Let's look at that one.  For

24  some reason -- let's look at yours.  Particular 19 I have --

25       A    What --

122

FOWLER - CHARLES BONNER

1          Q    -- is not marked.

2          A    What would you like for me -- can I hand you

3    this and could you just show me from this what it is that

4    you'd like me to look at?

5          Q    Well, this is the particular 19 I wanted you

6    to look at, this 19 here.  Those seem to be out of order.

7                    MR. CHARLES BONNER:  Huh?

8                    MS. PAQUETTE:  That's not the one I have.

9                    MR. CABRAL BONNER:  The one that he has

10               is the correct 19.

11                    MR. CHARLES BONNER:  Come here.  That's

12               the 19 I was asking him about.

13                    MR. CABRAL BONNER:  That's not 19.

14                    MR. CHARLES BONNER:  What is that?

15                    MR. CABRAL BONNER:  That is --

16                    MR. CHARLES BONNER:  Well, that's the one

17               I was -- I wanted to ask him about this one

18               right here.  Okay.  We'll renumber this, and

19               we'll use this one.  Okay.

20          Q    Officer, I'm going to use this one 19 'cause

21    that's the one I was asking you questions about.

22                    MS. PAQUETTE:  Is that your copy?  I'm

23               confused now.

24                    MR. RYDER:  Yeah, it has the tabs on it.

25          Q    It -- no, it's -- well, let's -- why don't we

FOWLER - CHARLES BONNER

1    make -- since you were describing that 19, we'll make this

2    one 19A, okay, because I think this is the one -- this is the

3    one with tab on it.  No, this is the one with the tab here,

4    and this one was with this particular 19, and I want to show

5    you now 19A because --

6                        MR. CABRAL BONNER:  Just find that one in

7                this packet.

8                        MR. CHARLES BONNER:  Okay.  We can do

9                that.  That's not the one I want to talk

10               about.  I need the other 19.  This is the one

11               I want.  Yeah, that one.  What number is that

12               one?

13                       MR. CABRAL BONNER:  Eleven.

14                       MR. CHARLES BONNER:  Okay.

15        Q     So it's Number 11 in that -- in your package I

16   want to show you.  Now, does that 11 show that

17   Officer Lockett has Mr. Grant's head in an armlock?

18                       MS. PAQUETTE:  Objection.  I don't know

19               what you're asking, I guess.

20                       Answer that if you can.

21                       THE WITNESS:  Okay.  All right.

22        A     Does it show -- what's your question again?

23                       MR. CHARLES BONNER:  Could you read the

24               question back, please?

25        Q     An armlock, a forearm lock around his neck.

124

FOWLER - CHARLES BONNER

1   I'll just ask the question.  Yeah, does this -- do you

2   observe Officer Lockett's left foreman with Mr. -- around

3   Mr. Grant's head and neck in that photograph?

4          A    No.

5          Q    Okay.  What -- what is it that you observe

6   with respect to Officer Lockett's --

7          A    It -- it --

8          Q    -- arm?

9          A    Based on where Mr. Lockett's shoulder is in

10  proximity to Mr. Grant's shoulder, it appears as though his

11  foreman is going parallel -- I'm sorry, it's -- it's going on

12  an angle, not parallel, but it's going on an angle across

13  Mr. Grant's chest, and -- and it -- it looks as though you

14  could see a portion of Mr. Grant's head underneath Officer

15  Lockett's body at this point which would indicate that his --

16  his neck would be just beyond his shoulder.

17         Q    Okay.  And why do you think Mr. Grant was

18  stating as you heard him "you choking me, man, why you

19  choking me?"

20              MS. PAQUETTE:  Objection.

21              Answer that if you can.

22         A    I don't know, sir.

23         Q    Okay.  Do you think that Mr. Grant was not

24  being choked?

25              MS. PAQUETTE:  Objection.

FOWLER - CHARLES BONNER

1          Answer that if you can.

2     A    I'm only -- I'm only going by what you show me

3     and what you -- what you ask me, sir.

4     Q    Certainly.

5          MR. CHARLES BONNER:  Now let me have

6          these marked as plaintiffs' next in order.

7          You have a black-and-white copy of these?

8          MR. CABRAL BONNER:  Did you make a

9          black-and-white copy?

10         MS. WOLF:  I don't think we made black

11         and --

12         MR. CHARLES BONNER:  Okay.  No problem.

13         MS. PAQUETTE:  Thank you.

14    (Whereupon Exhibit 9 was marked for

15    identification, 1/11/16, ALT)

16         MS. PAQUETTE:  Now, Exhibit 8,

17         screenshots, did you take those screenshots or

18         did you have some company take these

19         screenshots, or where did they -- did they

20         come from?

21         MR. CHARLES BONNER:  We just went to

22         Kinko's and took the video there and took --

23         and -- and printed off screenshots from the

24         video.

25         MS. PAQUETTE:  Okay.

FOWLER - CHARLES BONNER

1           MR. CHARLES BONNER:  They are the video.

2           MS. PAQUETTE:  Okay.

3           MR. CHARLES BONNER:  So no, we don't --

4       my son did it.

5           MS. PAQUETTE:  Okay.

6           MR. CHARLES BONNER:  We're -- Exhibit 9,

7       I believe?

8           THE REPORTER:  Correct.

9       Q    Okay.  Chief, have you seen these photographs

10   before?

11      A    I think I have, sir.

12      Q    Okay.  Now, when you were evaluating the force

13   used here, did you look at these photographs?

14      A    I -- I -- yes, sir, I'm pretty sure I did.

15      Q    And did you ask anybody why -- first of all,

16   you know Mr. Grant had called the police?

17      A    Yes, sir.

18      Q    Okay.

19      A    That was my understanding --

20      Q    Okay.

21      A    -- sir.

22      Q    And -- and directing your attention to the

23   very first paragraph.

24      A    Yes, sir.

25      Q    As a part of your community policing, is it

FOWLER - CHARLES BONNER

1   something you want to happen when someone call you for

2   service they end up bloody like this, is that part of what

3   you want to be a part of your legacy?

4                    MS. PAQUETTE:  Objection.

5                    Answer that if you can.

6          A    You started off with community policing and

7   then you finished with legacy, so I don't necessarily think

8   that the two go hand in hand.

9          Q    Well, you had told us that part of your

10  mission was to be --

11         A    Yes, sir.

12         Q    -- to engage in community policing; is that

13  true?

14         A    Yes, sir.

15         Q    And that part of your mission is to serve the

16  people; correct?

17         A    Yes, sir.  Yes, sir.

18         Q    And to protect lives --

19         A    Yes, sir.

20         Q    -- right?

21         A    Yes, sir.

22         Q    Now, Mr. Grant is one of your citizens; true?

23         A    Yes, sir.

24         Q    And he called you for service; true?

25         A    Yes, sir.

FOWLER - CHARLES BONNER

1        Q    And this is the way he ends up?

2        A    Yes, sir.

3        Q    That's not part of what you intend to happen

4  as part of your -- your mission; is that true?

5                  MS. PAQUETTE:  Objection.

6                  Answer if you can.

7        Q    When someone call, they shouldn't end up being

8  beat up like that; isn't that true?

9                  MS. PAQUETTE:  Objection again.  Multiple

10               questions here.

11               But answer that if you can.

12      A    When someone calls the police, this is not the

13  desired results that I'd like to see.

14        Q    Okay.

15      A    Hopefully that answers all of those questions

16  that are out there.

17        Q    It does.  You see that MILK, M-I-L-K?

18      A    Yes, sir.

19        Q    Do you know what that means?

20      A    I can read -- I can see on the shirt where it

21  says Men in the Lives of -- of -- of Kids.  I see the of.  I

22  don't know if there's a word behind of.

23        Q    Yes.  As a part of your investigation, did you

24  know that Mr. Grant has been trying to help kids in his

25  neighborhood to stay out of trouble, to stay out of jail, and

FOWLER - CHARLES BONNER

1  avoid contact -- negative contact with the law?

2       A    Did I learn that during the course of my

3  investigation?

4       Q    Yeah.

5       A    Yes, sir.  Yes, sir.  I learned a lot of very

6  positive things about Mr. Grant --

7       Q    What all --

8       A    -- during the course of my investigation.

9       Q    What all did you learn that was pos --

10      A    A lot of people spoke up on -- on his behalf

11 and talked about what a great citizen Mr. Grant was -- I'm

12 sorry, sorry, is, Mr. Grant is.  I didn't mean any disrespect

13 by that.

14      Q    Of course not, of course not.  And you learned

15 that before you found that the force against him was -- was

16 not unreasonable?

17      A    Yes, sir, I did.

18      Q    Okay.  And did you learn that he had been

19 assisting police officers in the neighborhood to carry out

20 your policy of community policing trying to keep drugs out of

21 the neighborhood?

22      A    Yes, sir, that -- that is what -- I did learn

23 that from someone, yes.

24      Q    From whom?

25      A    One of the councilors, a district councilor,

130

FOWLER - CHARLES BONNER

1  Fourth District councilor, Mr. Khalid Bey gave me a phone

2  call where he spoke about Mr. Grant in a very, very favorable

3  fashion I might add.

4          Q    And you learned that before you substantiated

5  the --

6          A    Yes, sir, I did.

7          Q    -- force against him as reasonable?

8          A    Yes, sir.

9          Q    Did you -- now, you know the -- your officers

10  filed criminal charges against Mr. Grant?

11          A    Yes, sir.

12              MR. CHARLES BONNER:  Plaintiffs' next in

13              order.

14          Q    And --

15              THE REPORTER:  Hang on.

16              MR. CHARLES BONNER:  I'm sorry.

17              (Whereupon Exhibit 10 was marked for

18              identification, 1/11/16, ALT)

19          Q    And you reviewed the criminal charges at the

20  time they were filed?

21          A    No.

22          Q    You reviewed them after they were filed?

23          A    No, it's -- no.  I just reviewed them during

24  the course of the excessive -- the excessive force

25  allegation.

FOWLER - CHARLES BONNER

1      Q    Okay.  And I direct your attention to this

2   Exhibit 10 to the very bottom.  There's a signature there.

3   You understand that to be Mr -- Officer Montalto's signature?

4      A    I -- I would assume that it is.

5      Q    Okay.  If you look up at the top -- at the

6   very top left-hand corner says PO Montalto Number 302.

7      A    Yes.

8      Q    And that is the person you understand who

9   signed this document?

10     A    Yeah, based on the fact that the -- that 302

11  represents the officer's IBM number, because most of our

12  signatures are scribble, but the -- the number remains

13  legible, so based on that, I would -- I would concede that

14  this is Officer Montalto's signature.

15     Q    Yes.  And down at the very bottom, it reads

16  "NOTE:  False statements made herein are punishable as a

17  Class A misdemeanor pursuant to Section 210.45 of the Penal

18  Law of the State of New York."  You saw where I read?

19     A    Yes, sir.

20     Q    And I read it correctly?

21     A    Yes, sir.

22     Q    And that is your understanding of the law?

23     A    Yes, sir.

24     Q    So if Officer Montalto made a false statement

25  in -- he committed a Class A misdemeanor; is that true?

FOWLER - CHARLES BONNER

1      A    Yes, sir.  And in fact, I would go further to

2  say that he's affirming -- his sig -- his signature is an

3  affirmation that the truth is contained in the body of this

4  and also that he's aware of the statement that you just read,

5  yes, sir.

6      Q    Okay.  And what is a Class A misdemeanor?

7      A    A Class A misdemeanor is a -- is less -- is

8  less than an felony, above a violation and punishable by up

9  to a year in jail or fine of up to a thousand dollars, I

10  believe, or a combination of the two.

11      Q    Is that one of the species of perjury, or is

12  perjury a whole separate misdemeanor?

13      A    What?

14      Q    Yeah.  Perjury, when a person makes a false

15  statement under oath, that's also perjury you told us

16  earlier?

17      A    Yes, sir.

18      Q    Okay.  Is a perjury charge separate and a part

19  from a Class A misdemeanor?

20      A    Oh, the Class A misdemeanor is the -- is the

21  area of law -- is the area of law that defines what the --

22  the punishment -- the potential punishment would be.

23      Q    I see.

24      A    So perjury itself is -- is a section of law

25  that describes a behavior that may very well fall outside the

FOWLER - CHARLES BONNER

1   scope of the law.

2           Q     Okay.

3           A     The -- the misdemeanor describes the

4   punishment that that person may receive if they violated that

5   part of the law.

6           Q     So if Mr. -- Officer Montalto made a false

7   statement in this document, that also could be perjury?

8           A     Perjury is the making of a false statement.

9           Q     Okay.

10          A     There -- it's all one in the same.

11          Q     All right.  All right.  And then you turn to

12  page -- there's -- the next page up at the top is PO Lockett

13  IBM 0306; do you see that?

14          A     Yes, sir.

15          Q     And you see down at the bottom, that's --

16  appears to be Officer Lockett's signature?

17          A     Yes, sir.

18          Q     And again the same information there, the

19  false statement would be a Class A misdemeanor appears on

20  that document above his signature?

21          A     Yes, sir.

22          Q     And the same applies, he's presumed to have

23  stated true facts --

24          A     Yes, sir.

25          Q     -- as you testified; correct?

134

FOWLER - CHARLES BONNER

1        A    Yes, sir.

2        Q    And the third page is the complaint again from

3   PO Montalto, and again the same information appears about the

4   false statement and the Class A misdemeanor; true?

5        A    Yes, sir.

6        Q    All right.  Now, you understand that the

7   district attorney dismissed all of those charges --

8        A    That's my understanding.

9        Q    -- is that correct?

10            MR. CHARLES BONNER:  Plaintiffs' next in

11            order.

12            (Whereupon Exhibit 11 was marked for

13            identification, 1/11/16, ALT)

14       Q    Giving you this next exhibit, 11, you've seen

15   this document before, Chief?

16       A    No.

17       Q    Okay.  Well, you see -- you know who

18   Mr. William J. Fitzpatrick is?

19       A    Yes, sir.

20       Q    Okay.  And you see it's a letter addressed to

21   me, Bonner, Charles A. Bonner --

22       A    Yes, sir.

23       Q    -- dated November 20th, 2014?

24       A    Yes, sir.

25       Q    And directing your attention to the second

FOWLER - CHARLES BONNER

1    paragraph state -- stating "We are certainly aware that

2    Mr. Grant has asserted his innocence in this matter.  As I'm

3    sure you know, that happens in most criminal cases.  In this

4    case, you and Mr. Ryder provided us information that you

5    considered as exculpatory in nature and argued that it

6    pointed to his innocence with regard to the charges pending

7    against him.  Accordingly, we explored and considered that

8    information, as is our legal and ethical obligation, and

9    found it to be reliable, creditable and consistent."

10               The next paragraph, "In -- I considered our

11   investigation in this matter to be thorough and exhausting

12   which included interviewing civilians and law enforcement

13   witnesses, reviewing relevant videos, and conducting the

14   appropriate legal research.  As you're aware, the end result

15   of our investigation was the determination that the original

16   charge of disorderly conduct was legally insufficient and

17   that the provable facts supporting the remaining charges were

18   questionable, at best.  Consistent with our ethical

19   responsibility, we move to dismiss all charges in furtherance

20   of justice under CPL Section 170.30."  You saw where I read,

21   sir?

22        A    Yeah, I see that.  Yes, sir.

23        Q    Okay.  And you became aware the charges were

24   dismissed?

25        A    Yes.

FOWLER - CHARLES BONNER

1      Q     You didn't have any -- you didn't lodge any
2  objection with anyone about the charges being dismissed, did
3  you?

4      A     No, not at all.

5      Q     You didn't file any appeal about them being
6  dismissed, did you?

7      A     No.

8            MS. PAQUETTE:  Objection.  Go ahead.

9      A     No.

10     Q     Now, there's a Citizen Review Board in
11 Syracuse; true?

12     A     Yes.

13           MR. CHARLES BONNER:  I'd like to have
14           this document marked as Plaintiffs' -- as
15           plaintiffs' next in order, that's 12.
16           (Whereupon Exhibit 12 was marked for
17           identification, 1/11/16, ALT)

18     Q     And, Chief, giving you this document which I
19 believe -- Exhibit 12, do you recognize this document?

20     A     I do.

21     Q     Okay.  Did you receive a copy of this in and
22 about the time it was generated, October 16th, 2014?

23     A     I -- I -- I would have received a copy of
24 this, but -- but I don't recall when I received it so ...

25     Q     Okay.  And what is your understanding of the

FOWLER - CHARLES BONNER

1    function of the Citizen Review Board?

2          A    The Citizens Review Board is -- is -- is

3    another tool that the City of Syracuse has provided for its

4    citizens in -- in order -- so that the citizens would have a

5    right and an opportunity to file complaints of police

6    misconduct.

7          Q    Okay.  And do you see this letter, Exhibit 12,

8    is a letter addressed to Mr. Grant, and it's regarding "In

9    the matter of Alonzo Grant vs. Syracuse Police Officers

10   Allegations of Misconduct:  Excessive force, False Arrest,

11   Untruthfulness"; do you see that?

12         A    Yes.

13         Q    And you said you have seen a copy before;

14   correct?

15         A    Some -- whether I seen this exact copy or not,

16   I've seen some variation of this -- the Citizens Review Board

17   findings.

18         Q    Okay.

19         A    So let me just make that clear.

20         Q    Okay.

21         A    So I don't want --

22         Q    Well --

23         A    -- to try to mislead -- I don't want to

24   mislead you in any way.  I have seen the Citizens Review

25   Board findings.

FOWLER - CHARLES BONNER

1          Q    I appreciate that, but in this particular case

2    pertaining to Mr. Alonzo Grant, did you see the finding in

3    this case pertaining to your officers who went out to his

4    house on June 28th, 2014?

5          A    Yes, sir, that's what I'm referring to when

6    I --

7          Q    Okay.

8          A    -- when I told you that I saw the Citizens

9    Review Board finding.  Whether -- whether it was -- it was in

10   this particular letter or a letter directed to me, I am fully

11   aware of the CRB's finding as it relates to Mr. Grant's case.

12         Q    Thank you.  Could you read to the jury this

13   Citizen Review Board's findings regarding --

14         A    Sure.  It says "CRB Findings, Excessive Force:

15   Sustained for Officer 1 and 2."

16         Q    And let me interrupt you there.  You

17   understand Officer 1 and 2 to be whom?

18         A    I understand that to be Officer Lockett and

19   Montalto.

20         Q    Okay.  And you read the next finding.

21         A    "False arrest:  Sustained for Officer 1 and

22   2."

23         Q    And continue, please.

24         A    "Untruthfulness:  Sustained for Officer 1, 2,

25   and 3."

FOWLER - CHARLES BONNER

1    Q    And who do you understand Officer Number 3 to

2    be?

3    A    My understanding of Number 3 would be

4    Sergeant Novitsky.

5    Q    Okay.  And then the next paragraph under that,

6    would you please read that to the jury?

7    A    "In addition, the CRB panel recommended

8    specific discipline to Chief of Police -- to the Chief of

9    Police for the sustained allegations against the officers."

10   Q    Okay.  And what recommendation did the Citizen

11   Review Board recommend regarding the discipline of these

12   three officers?

13                MS. PAQUETTE:  Objection.

14                You can answer.

15   A    I don't -- I don't recall specifically.

16   Q    Do you have a best recollection?

17   A    No.

18   Q    Did they recommend termination?

19   A    I -- that does sound familiar, but, like, for

20   what -- for what specific officer, I -- I don't recall.

21   Q    Did you terminate any one of these officers

22   for beating Mr. Grant?

23                MS. PAQUETTE:  Objection.

24   A    I did not terminate any officer in the -- that

25   was involved in -- in this case with Mr. Grant.

140

FOWLER - CHARLES BONNER

1      Q      Did you discipline any officer in any way at

2   all?

3      A      I did not discipline any officer in connection

4   with the investigation of Mr. Grant.

5      Q      Let me show you -- in the course of your

6   investigation, did you --

7                MR. CHARLES BONNER:   Wait a minute.

8            Let's mark Number 13 first.

9            (Whereupon Exhibit 13 was marked for

10           identification, 1/11/16, ALT)

11     Q      Just like for you to review this letter

12  briefly.  I see the top there's a letter from St. Joseph

13  College of Nursing dated July 9th, 2015 addressed to To Whom

14  It May Concern; do you see that?

15     A      Yes.

16     Q      And down at the bottom, you see it's from

17  Sister Rose Ann Renna?

18     A      Yes.

19     Q      Okay.  And she writes "I am a sister of

20  St. Francis of the Neumann Communities and have worked at

21  St. Joseph Hospital Health Center for more than 30 years.  In

22  that time I have met and grown to love many employees.  It is

23  with such pleasure that I speak specifically about Alonzo

24  Grant, an employee who has worked in our facility for more

25  than 30 years."  You saw where I read, sir?

FOWLER - CHARLES BONNER

1        A     Yes, sir.

2        Q     As a part of your policy and practice to

3    investigate thoroughly and get all of the facts regarding a

4    matter before you make any conclusions, did you talk to this

5    Sister Rose Ann Renna?

6        A     I did not.

7        Q     Okay.  And did you learn that Mr. Grant worked

8    at St. Joseph Hospital for 30 years?

9        A     I did not.

10       Q     Did you learn that he worked a second job

11   where he works over ten hours a week as a part-time job where

12   he's literally working seven days a week, did you learn that?

13       A     I did not.

14       Q     Okay.  And in trying to understand who

15   Mr. Grant is, wouldn't it have been important to try and

16   understand the totality of him to see if the allegation by

17   your police officers that he attacked them would have been

18   consistent with his character?  Excuse me.

19                    MS. PAQUETTE:   Objection.

20                    Answer if you can.

21       A     No, sir.

22       Q     Okay.  Now, I've attached several other

23   letters, which we won't go through, including a letter from

24   the recent, I think, CEO of St. Joseph Hospital.  I take it

25   you didn't contact anyone such as Mr. William J. Watt

FOWLER - CHARLES BONNER

1    regarding Mr. Alonzo; is that true?

2         A    That's correct, sir, I did not.

3         Q    And you didn't contact a

4    Ms. Theresa M. Faircloth regarding Mr. Alonzo who also is an

5    employee at St. Joseph; is that true?

6         A    No.

7         Q    And likewise, you didn't contact

8    Ms. Patricia Johnson; is that true?

9         A    That's true.

10        Q    All right.  Now, is --

11             MR. CHARLES BONNER:  Let me mark this

12             document.  I'm sorry.  Are these just one

13             page?

14             MS. WOLF:  Yeah.

15             MR. CHARLES BONNER:  Okay.  Mark this as

16             next in order.  Just one page or two page?

17             Okay.  That's two page, yeah.

18             (Whereupon Exhibit 14 was marked for

19             identification, 1/11/16, ALT)

20        Q    Chief Fowler, when you were working patrol,

21   did you ever have occasion to do auto patrol, patrol traffic?

22        A    Did I have --

23        Q    When you were a police officer, did you have

24   an occasion to do traffic patrol to make determination of

25   auto accidents, that kind of thing?

FOWLER - CHARLES BONNER

1      A      I've conducted accident investigations, yes,
2    sir.

3      Q      Where you do reconstruction of accidents?

4      A      No, no, not to that extent.

5      Q      Just -- just accidents.  What did you do your
6    investigation include --

7      A      My in --

8      Q      -- involve?

9      A      My investigation included -- it was limited to
10   property damage accidents and property damage accidents also
11   with -- with injuries that were not considered life
12   threatening.

13     Q      I see.  In order, for example, to determine
14   how badly a car would -- was damaged in a wreck, you would
15   sort of have to look at the impact of the damage to
16   determine, say, how -- what kind of force had hit a car?

17                   MS. PAQUETTE:  Objection.

18                   Answer if you can.

19     Q      Was that part of your investigation that --

20     A      No, no, no.  We have people who are
21   specifically trained for that.

22     Q      Okay.

23     A      And a line officer, their -- their job --
24   because it -- in New York State an accident is -- is -- is
25   basically a civil matter in the role of a police officer --

FOWLER - CHARLES BONNER

1    Q    Yeah.

2    A    -- absent of a violation of a law that caused

3    the accident, job is just simply to -- to document it or to

4    make sure that information is exchanged between the two

5    people involved.

6    Q    Sure.  But generally you've certainly become

7    aware in your course that people determine impact caused by

8    determining the speed a car's hit another car and how -- how

9    dented the car is, you've seen that kind of investigation?

10                   MS. PAQUETTE:  Objection.

11                   Go ahead.

12   A    I know that there's a lot of variables that

13   the investigating officers consider when they are doing

14   accident reconstruction, and I know this because as the

15   chief, you respond to fatalities and you -- and seeing my

16   officers who are trained in accident reconstruction, I've --

17   I've had the occasion to -- to speak with them, and -- and

18   there's a lot of variables that they consider when judging

19   the speed, the point of impact, primary, secondary, a lot --

20   a lot of things to consider.

21   Q    In determining whether the force used by your

22   officers against Mr. Grant, did you look at any of the

23   medical records to try to determine the injuries that

24   Mr. Grant received?

25   A    No, I did not.

145

FOWLER - CHARLES BONNER

1      Q    Okay.  Showing you this next exhibit, which I
2 think is Exhibit 14, you have that before you?
3      A    Fourteen is, yes, sir.
4      Q    Yes.  Now, you saw the photographs earlier of
5 his bloody face?
6      A    Yes, sir.
7      Q    Now, if you look -- you see that this is a
8 document from Upstate University Hospital, do you see that --
9      A    Yes, sir.
10     Q    -- at Community Campus?
11     A    Yes, sir.
12     Q    You see the date of service is 6/28/14?  Come
13 down the left-hand side, it says date of service.
14     A    Yes, sir, got it.
15     Q    And see the time is 8:04 p.m.?
16     A    Correct.
17     Q    Now, you recall this incident occurred around
18 7:30; is that --
19     A    Yes, sir.
20     Q    Okay.  So you see that this pertains to of
21 course Mr. Alonzo Grant.  You saw -- see his name up in the
22 top of the document?
23     A    Yes, sir.
24     Q    Okay.
25     A    I noticed it earlier.

FOWLER - CHARLES BONNER

1      Q    And you see the results is there's a CT

2   maxillofacial scan without contrast; do you see that?

3                    MS. PAQUETTE:  All right.  I'm going to

4                    object to any of these questions.  He's never

5                    seen these before.  He's not a doctor.  I

6                    don't really know where this is going but --

7      Q    You see the result in the middle of the page

8   there, I'm just directing your attention, that this was a CT

9   scan of his face?

10     A    Result or report?

11     Q    Results, it says results and then the CT.

12     A    Okay.  Let me -- let me find --

13     Q    I've highlighted it right here.  You see it,

14  look at that portion of your document.

15     A    I see that, but you keep using the word

16  "results."

17     Q    Well, no, it says the -- it -- it's right --

18     A    Oh --

19     Q    -- under the word --

20     A    -- results, yes, sir.  Okay.

21     Q    Do you see that?

22     A    Got it.  Yes, sir.

23     Q    Okay.  Now, then you go to the bottom of the

24  page, do you see impression?

25     A    Yes, I do.

FOWLER - CHARLES BONNER

1      Q    You see "Impression:  Angulated [sic] of left
2    nasal bone may represent acute, chronic fracture"; do you see
3    that?

4      A    Yes, sir.

5      Q    Now, certainly whether or not your officers
6    fractured Mr. Grant's nose would be a factor -- like your
7    accident reconstruction, one of the factors in your
8    investigation as to whether the force they used was
9    reasonable; is that a fair statement?

10              MS. PAQUETTE:  Objection.  You can
11              answer.

12      A    It says may.

13      Q    Yes.  So did you investigate whether or not,
14    in fact, he did have a fractured nose in order to determine
15    whether the force used by your officers were reasonable?

16      A    I -- this is my first time seeing this, so no,
17    no.

18      Q    Okay.  All right.  Now, let me direct your
19    attention to this document, which will be Number 15, I
20    believe.

21              (Whereupon Exhibit 15 was marked for
22              identification, 1/11/16, ALT)

23      Q    And again this is a document from Dr. Charles,
24    John Charles regarding his treatment of Mr. Grant following
25    the beating from your officers, and you see at the very top

148

FOWLER - CHARLES BONNER

1    it says Assessment Number 1?

2                    MS. PAQUETTE:  Objection again.  I mean,

3              this is so highly improper.  This is page 3 of

4              some sort of document.  He's not a doctor.

5              He's never seen this before.

6                    You can answer that question but --

7    Q    My question is do you see Assessment Number 1?

8    A    I see Assessment Number 1.

9    Q    Okay.  Do you see opposite to the right, it

10   says "850.0 Concussion W/ No Loss of Consciousness"; do you

11   see that?

12   A    I see that, yes.

13   Q    Okay.  And is it your understanding that a

14   concussion is brain damage?

15                   MS. PAQUETTE:  Objection.

16   A    No, I don't know -- I don't know what a

17   concussion is.

18   Q    Well, as part of your investigation, did you

19   seek to try to understand what a concussion is with respect

20   to your determination as to whether the force used by your

21   officers were reasonable under the circumstance and

22   consistent with your policy on the use of force?

23                   MS. PAQUETTE:  Objection.

24                   Answer if you can.

25   A    I can't.

FOWLER - CHARLES BONNER

1      Q    Well, did you ever seek to determine whether

2  or not Mr. Grant had suffered a concussion from the beating

3  from your officers?

4                  MS. PAQUETTE:   Objection to the form of

5             that question.

6                  Answer if you can.

7      A    I did not.   I don't even know what the

8  question is anymore.

9                  MR. CHARLES BONNER:   Okay.   Could you

10            read the question back to him?

11                 THE REPORTER:   "Q    Well, did you ever

12            seek to determine whether or not Mr. Grant had

13            suffered a concussion from the beating from

14            your officers?"

15     A    No.

16     Q    Okay.   You did tell us that you read in

17  Officer Lockett's report that Officer Lockett, I believe you

18  said, admitted hitting Mr. Grant six times; do you recall

19  that?

20     A    Yeah, that -- that was -- that's what -- I did

21  absolutely say six times today, and I was recalling that from

22  Officer Lockett's report, and I also said to you that you

23  mentioned eight, and I mentioned six, and I mentioned that my

24  number could be off, but -- but I did indeed say six.

25     Q    Okay.   Now -- and did you ever ask anyone

FOWLER - CHARLES BONNER

1   whether or not those kinds of blows to the head could cause a

2   concussion?

3                    MS. PAQUETTE:   Objection.

4                    Go ahead.

5          A   Did I ever ask anyone that -- if those amount

6   of blows to the head would cause a concussion?

7          Q   Yes.

8          A   No, sir, I didn't.

9          Q   Okay.  Now, I'd like to talk to you about the

10  case that you told us that you were -- you had testified in,

11  Hulee (phonetic), I believe.

12         A   That's not what I said, sir.

13         Q   You said you gave a deposition?

14         A   That's correct.

15         Q   And Hulee?

16         A   Yes, but I --

17         Q   Had given a deposition, you testified in

18  deposition?

19         A   Okay.  Testified in deposition.

20         Q   Yes.

21         A   Yes.

22         Q   Just like you're testifying here in

23  deposition.

24         A   Okay.  And -- all right.  Now I have a clear

25  understanding of what you're asking.

FOWLER - CHARLES BONNER

1        Q    Okay.  Very good.

2        A    Yes.

3        Q    Have you received a claim from Elijah Johnson?

4        A    A -- yes, I received some -- I don't know if

5  it was a Notice of Claim, but I do recall.

6        Q    Okay.  And first of all, in the Hulett case,

7  have you disciplined any officer in the Hulett case for --

8        A    No.

9        Q    -- claim of excessive force?

10             MS. PAQUETTE:  Objection.

11             You can answer.

12        A    Okay.  No.

13        Q    Why not?

14        A    Because I didn't think that the situation

15  warrant -- warranted discipline.

16        Q    And -- and you told us you didn't discipline

17  anyone in Mr. Grant's case; true?

18        A    That's correct, sir.

19        Q    And why not?

20        A    For the same reasons.

21        Q    Okay.  Is that because it's -- the force they

22  used according to you was consistent with your policy?

23        A    Yes.

24        Q    Okay.  And your practice?

25        A    Yes, and necessary to -- to effect this

FOWLER - CHARLES BONNER

1    particular arrest.

2         Q    Okay.  And with Mr. Hulee, again the force you

3    deemed there is consistent with your practice?

4         A    Yes.

5         Q    And consistent with your policy?

6         A    Yes.

7         Q    Okay.  And -- and is -- it's your practice and

8    policy to not -- to only rely on your professional standards

9    of conduct such that Mr. -- captain Thomas gave in

10   determining whether force is excessive?

11                    MS. PAQUETTE:  Objection.

12                    You can answer.

13        A    I can't because I don't clearly understand --

14        Q    I'm sorry.

15        A    -- the question.

16        Q    I'm not being clear.  You told us you -- you

17   relied upon the Office of Professional Standards report

18   issued by Captain Thomas Galvin?

19        A    Investigation, yes.

20        Q    Yeah.  And it's your -- my question is this is

21   your practice and policy to rely on -- on these kinds of

22   investigations and reports in determining whether excessive

23   force is being used by your officers; is that true?

24        A    To some degree, yes.

25        Q    Okay.  And is -- and is there some other

FOWLER - CHARLES BONNER

1    degree that we -- that you make a determination as -- whether

2    excessive force used other than relying on the investigations

3    of the Office of Professional Standards?

4         A    Well, the office -- that -- the final -- when

5    I sign off on the final investigation, there is a review of

6    the investigation prior to signing off on it, and if during

7    the course of your review, if -- if I or the other two people

8    that signed off on it has follow-up questions, those

9    questions would be asked and answered prior to final approval

10   by all of us.

11        Q    Okay.  So regarding Mr. Elijah Johnson --

12             MR. CHARLES BONNER:  I'm going to attach

13             this as plaintiffs' next in order.

14             (Whereupon Exhibit 16 was marked for

15             identification, 1/11/16, ALT)

16             MR. CHARLES BONNER:  Do you need to take

17             a break?

18             MS. PAQUETTE:  Yeah, if we could.  I

19             think this is a good time.

20             MR. CHARLES BONNER:  Sure.

21             THE WITNESS:  Do we want to do this first

22             or take a break now?

23             MR. CHARLES BONNER:  Let's take a break.

24             THE WITNESS:  It's up to --

25             MR. CHARLES BONNER:  Let's take a break.

154

FOWLER - CHARLES BONNER

1          THE WITNESS:  Okay.

2          THE VIDEOGRAPHER:  We'll go off record at

3     1532.

4     (A discussion was held off the record.)

5          THE VIDEOGRAPHER:  We are back on record

6     at 1543.

7     Q    Chief, when we left, I had given you Exhibit,

8  I believe, 16, the Elijah Johnson --

9          MS. PAQUETTE:  It's 16.

10    Q    Exhibit 16.  Okay.

11         MS. WOLF:  It's 16.

12         MR. CHARLES BONNER:  Yeah, 16.

13    Q    I'm sorry.  You have that before you, sir?

14    A    Yes, sir.

15    Q    You see this is a newspaper web page

16  publication.  Have you by any chance read this before?

17    A    No, I don't think so.

18    Q    Okay.  The heading says "Syracuse city

19  councilors to investigate police policy on use of force"; do

20  you see that?

21    A    Yes.

22    Q    It has the picture of a young man,

23  Elijah Johnson; do you see that?

24    A    Yes, sir.

25    Q    And you indicated you do recall receiving a

FOWLER - CHARLES BONNER

1    complaint from Mr. Johnson regarding excessive force by your

2    officers?

3           A     Yes, sir.

4           Q     And have you acted on that complaint?

5           A     Yes.

6           Q     And did you find that the force used by the

7    officer was excessive?

8           A     No.

9           Q     You -- what was your finding?

10          A     That the -- the force was effective -- I'm

11   sorry, was necessary to effect the arrest.

12          Q     Okay.  And your officers criminally prosecuted

13   Mr. Johnson; is that true?

14          A     No.

15          Q     Well, they filed criminal complaints against

16   him?

17          A     That's correct.

18          Q     And his case went to a jury trial?

19          A     I believe so.

20          Q     And the --

21          A     Yes, it did, yes.

22          Q     And your officers testified at the jury trial?

23          A     Yes.

24          Q     And the jury acquitted him of the charges; is

25   that your understanding?

FOWLER - CHARLES BONNER

1          A    No.

2                  MS. PAQUETTE:  Objection.

3          A    No.

4          Q    Okay.  Now, you read his allegations that your

5    officers drug him down the street causing the skin on his --

6    on the right side of his face to be totally bruised and

7    bloody; you saw that?  Was that part of allegation you

8    received?

9          A    I don't recall, sir.

10         Q    Okay.  Did you ever see any photographs of him

11   with the right side of his face bruised and bloody and his

12   right eye bloodshot?

13         A    Yes, I've seen photographs.

14         Q    And I don't mean to be repetitive, but did you

15   tell us that you did not discipline any officers in this

16   case?

17         A    I did -- yes, that's correct, sir.

18         Q    Okay.  In other words, to be clear, you

19   exonerated your officers of any allegation of excessive

20   force?

21         A    That's correct.

22         Q    Okay.  Did the city councilors investigate

23   your department's policy on use of force?

24         A    I -- I don't know.  I don't know if they did

25   or not.

FOWLER - CHARLES BONNER

1       Q    Well, you see in the very first page of this

2   article dated August 15, 2014, it reads "Noting that some of

3   Syracuse residents are 'on edge' over recent allegations of

4   police brutality, city councilors will hold a committee

5   meeting Tuesday evening to investigate the issue."  You saw

6   where I read, sir?

7       A    Yes.

8       Q    Okay.  Do you know whether such a meeting --

9   committee meeting was held?

10      A    There -- there was a public safety committee

11  meeting held regarding the use of force, yes.

12      Q    Did you appear at that meeting?

13      A    I did.

14      Q    Did you talk at that meeting?

15      A    Yes, I'm sure I did.

16      Q    Okay.  And what do you recall was the

17  substance of your talk at that meeting?

18      A    I really don't recall.

19      Q    Okay.  Were there citizens present at the

20  meeting?

21      A    There were.

22      Q    Were citizens making allegation that your

23  police officers were using excessive force against them?

24      A    They were.

25      Q    And did you make any changes in your policy

FOWLER - CHARLES BONNER

1  regarding excessive force as a result of meeting with

2  citizens and their allegations regarding excessive force?

3       A    I -- I'm not sure if I made changes, but in

4  light of Mr. Grant's case, in -- in light of Mr. Hulett's

5  complaint, in light of Mr. Johnson's complaint, it was clear

6  to me on the hills of all of those that -- that there was

7  a -- a perception.  Whether it's factual or not, I have to

8  treat a public perception as the truth, and -- and that --

9  that -- that alone has forced me to evaluate our -- our use

10  of force policy in its -- in its entirety, and I'm -- quite

11  frankly, I'm not done with that yet.

12       Q    Okay.  And what is the nature of your

13  evaluation of your use of policy that you're conducting?

14       A    Well, I'm -- in looking at the policy what

15  you -- what you want to do is to -- to make -- to assure that

16  it's -- that it's thorough, conform -- obviously conforms to

17  the law, and then you -- you look at best practices and

18  training that's available for any type of training -- changes

19  or potential changes that you may make.  You want to make

20  sure the training is available to support the changes if you

21  decide to make any.

22       Q    Now, you told us that you became the chief in

23  January of 2010; correct?

24       A    Yes.

25       Q    And there was an Officer Alp Llukaci.  That's

FOWLER - CHARLES BONNER

1    A-L-P, and the last name is L-L-U-K-A-C-I.  Did you know that

2    officer worked in your department?

3              A    Alp Llukaci, yes, sir.

4              Q    Okay.  A federal jury found that that

5    particular officer used excessive force; isn't that true?

6                        MS. PAQUETTE:  Objection.

7                        Answer if you can.

8              A    I believe so.

9              Q    Okay.  And did you impose any discipline on

10   that officer for using excessive force?

11             A    My direct answer to you is no, but I wish you

12   would allow me to explain why or ...

13             Q    Well, please explain.

14             A    Well, I wasn't the chief at the time of the

15   incident.

16             Q    I understand, but you were the chief at the

17   time that he was convicted?

18                        MS. PAQUETTE:  Objection.  It's not

19                        convicted.

20             Q    The verdict was used against him?

21             A    Right.

22                        MS. PAQUETTE:  Is that a question?

23             Q    The -- a verdict was rendered against him in,

24   what, June of 2010?

25             A    That sounds about right.  I don't -- that

FOWLER - CHARLES BONNER

1   sounds about right but --

2          Q    And you were the chief then?

3          A    I was indeed the chief when -- when the

4   verdict was rendered.

5          Q    Okay.  And my -- my question though is did you

6   impose any kind of discipline, let's say, following the jury

7   verdict of excessive force?  Did you then go back and impose

8   any discipline?

9          A    No, the investigation was concluded at that

10  point.

11         Q    And the investigation concluded that he did --

12  from your department that he did not use excessive force?

13         A    I'm not sure.  I don't --

14         Q·   Okay.

15         A    I'm not sure.

16         Q    Well, in August of 2014, did you receive a

17  complaint from a Ms. Louise Thomas, age 76, that she was

18  handcuffed and charged with resisting arrest by your police

19  officers?

20         A    Yes, sir.

21         Q    And she had called the police to talk to them

22  about a dispute between her daughter and a disabled neighbor;

23  is that your understanding?

24         A    I knew it had something to do with her

25  daughter for sure, but the disabled neighbor part, I don't

161

FOWLER - CHARLES BONNER

1    recall that.

2         Q    Well, again like Mr. Alonzo Grant, she called

3    the police for help and service; was that your understanding?

4         A    As I can recall, yes.

5         Q    And she complained to you that your police

6    officers "manhandled me"; do you recall her saying that?

7         A    I don't recall that specific language --

8         Q    Okay.

9         A    -- no.

10        Q    Did you discipline any of the officers

11   pursuant to Ms. Louise Thompson, 76-year-old lady's

12   complaint?

13        A    No.

14        Q    Why not?

15        A    I -- I don't recall the investigation

16   specifically, whether Ms. Thompson was arrested or -- or what

17   the circumstances were, but no, I didn't because the

18   investigation didn't warrant discipline in this case.

19        Q    Okay.  You also in around January of 2014

20   received a complaint from a -- a Reverend L. Micah Dexter,

21   II?

22        A    Yes.

23        Q    And he alleged excessive force by your

24   officers?

25        A    Okay.

162

FOWLER - CHARLES BONNER

1    Q    I'm -- I'm asking you.

2    A    I -- I believe he -- I believe he did.  He --

3 yes.

4    Q    Okay.  And again he had called the police for

5 service?

6    A    No.

7    Q    He didn't call your office for services

8 because there was a -- he thought there was a burglary

9 occurring at his property, a trespass?

10   A    A trespass, yes.  Him, no.  His wife, yes.

11   Q    Okay.  His wife called.  And again like

12 Ms. Thompson, like Mr. Grant, he had called -- she had called

13 for services; true?

14   A    His wife called, yes.

15   Q    His wife called.  And he alleged that the

16 office immediately grabbed him and threw him against a car or

17 something and handcuffed him; was that your understanding of

18 his allegation?

19   A    I don't recall what his -- what his

20 allegations were.

21   Q    Okay.  But he filed a complaint of excessive

22 force; true?

23   A    Yes.

24   Q    And did you find excessive force?

25   A    No.

163

FOWLER - CHARLES BONNER

1    Q    Did you discipline the officers who the
2  complaint was directed against?
3    A    No.
4    Q    And you've told us about Mr. Brad Hulett;
5  correct?
6    A    Yes.
7    Q    The disabled man who was tasered multiple
8  times while standing on a bus, you told us about him?
9         MS. PAQUETTE:  Objection to the form of
10             the question.
11             Go ahead.
12    A    I told you about Mr. Hulett, yes.
13    Q    Okay.  And the allegation there was he was
14  disabled, he couldn't sit down on the bus; do you recall
15  that?
16    A    The allegation?
17    Q    Yeah.
18         MS. PAQUETTE:  Objection.
19    Q    His complaint, Mr. Hulett's complaint.
20    A    Mr. Hulett's complaint, yes.
21    Q    And he complained to your department that his
22  office -- your officers raised his shirt and tased him on his
23  naked skin several times; do you recall that?
24    A    Not specifically.
25    Q    Well, did you see the video where the officers

FOWLER - CHARLES BONNER

1   did that?

2          A    Yes, I saw the video.

3          Q    Okay.

4          A    Yes sir.

5          Q    The video showed them raising his shirt and

6   tasing him on his naked skin; do you remember that?

7                    MS. PAQUETTE:  Objection to the form of

8                    that question.

9                    Answer if you can.

10         A    I did see the video, yes, sir.

11         Q    And then they broke his hip?

12                   MS. PAQUETTE:  Objection to that.

13                   Don't even answer that.

14         Q    Isn't that true?

15                   MS. PAQUETTE:  Answer that if you can.

16         A    No, that's not true.

17         Q    Well, in the course of their detaining him,

18  wasn't Mr. Hulett's hip broken?

19         A    No.

20         Q    He sustained some kind of fracture though,

21  didn't he?

22         A    I don't -- at what point?

23         Q    During the course of your officers arresting

24  him.

25         A    No.

165

FOWLER - CHARLES BONNER

1  Q Okay.  Well, did you find excessive force

2 in -- from -- by your officers in his case?

3  A No.

4  Q You exonerated them --

5  A Yes.

6  Q -- is that true?

7  A Yes, sir.

8  Q And why?

9  A Because the force -- in reviewing the

10 investigation, the force was necessary to effect the arrest.

11  Q Well, even when the arrest can be legitimate,

12 force can still be excessive; true?

13  A Yes, sir.

14  Q If it's excessive to a reasonable person, then

15 it would be a violation of law; true?

16    MS. PAQUETTE:  Objection.  That's not the

17    law.

18    But go ahead.

19  A No, that's -- she's right.  That's not the

20 law.

21  Q Well, aside from whether she's right, I'll ask

22 you another question.

23    MR. CHARLES BONNER:  Let me have this

24    document marked as the next in order.

25    (Whereupon Exhibit 17 was marked for

FOWLER - CHARLES BONNER

1    identification, 1/11/16, ALT)

2         MR. CHARLES BONNER:  And -- and let me

3    see it again --

4         THE REPORTER:  Sure.

5         MR. CHARLES BONNER:  -- please, because

6    unfortunately I do not have a copy of that

7    one.

8         THE REPORTER:  Do you want me to go run a

9    copy --

10        MR. CHARLES BONNER:  If you could run us

11   a couple of copies for Ms. Paquette and ...

12        THE VIDEOGRAPHER:  Shall we go off record

13   then?

14        MR. CHARLES BONNER:  Yes.

15        THE VIDEOGRAPHER:  We'll go off record --

16        MR. CHARLES BONNER:  Yes.

17        THE VIDEOGRAPHER:  -- at 1557.

18   (A discussion was held off the record.)

19        THE VIDEOGRAPHER:  We're back on record

20   at 1606.

21   Q    Chief, I have given you a document marked as

22   Exhibit 17, and you've had a chance to review it?  Have you

23   had --

24   A    Yes, yes, yes.

25   Q    Okay.  At the top of the document, it states

FOWLER - CHARLES BONNER

1    quote "Discipline recommended in 21 complaints against

2    Syracuse Police."  You've -- have you seen this document

3    before?

4             A    This is a newspaper article.

5             Q    Yes.

6             A    I'm not -- I -- I see it now.  I don't know if

7    I've seen it before, but I --

8             Q    Okay.  Well, down in the -- in the first

9    paragraph, it says "The CRB" -- which is the Citizens Review

10   Board -- "administrator Joseph Lipari, presented the board's

11   third annual report to Syracuse City councilors on Monday,

12   outlining the results of 107 complaints filed with the board

13   in 2014."  Do you see where I read, sir?

14            A    Yes.

15            Q    It continues that "Members found that about a

16   quarter of the complaints warranted a hearing.  Among those,

17   they recommended discipline in 21 cases."  Again that's in

18   quotes.  Do you see where I read, sir?

19            A    Yes.

20            Q    So do you recall receiving complaints in -- to

21   your office of 107 complaints in 2014 of -- against your

22   police officers?

23            A    I don't know about that specific number, but I

24   would -- I wouldn't argue that that was inaccurate, and even

25   if we were to discover that that was higher, I would be

168

FOWLER - CHARLES BONNER

1    willing to concede that as well.

2          Q    Sure.  And it goes on to state "The Chief of

3    Police" -- and that would be you; correct?

4          A    Yes, sir.

5          Q    -- "imposed sanction or discipline in one of

6    the 21 cases"?

7          A    Yes, sir.

8          Q    Okay.  What was the nature of the discipline

9    that you imposed in the one case?

10         A    Don't recall.

11         Q    And why didn't you impose any discipline in

12   the other 20 cases where the Citizen Review Board recommended

13   discipline?

14         A    I -- that's 21 cases, and I don't remember

15   what the circumstances were, so I can't accurately answer

16   you.

17         Q    When the cit -- how many members are there on

18   the Citizen Review Board?

19         A    I don't know.

20         Q    Do you have any understanding?  Are there ten?

21   Eleven?

22         A    I don't know.

23         Q    Do you know the names of any of them?

24         A    No.

25         Q    Okay.

FOWLER - CHARLES BONNER

1          A      I probably do if I could think of it, but no,
2     no.  They're actually, like, divided, the mayor and the
3     councilors.
4          Q      Are there police officers on the Citizens
5     Review Board?
6          A      There have been.
7          Q      Okay.  So when the Citizen Review Board
8     recommends discipline, is it true that they have found that
9     there's been some violation of the citizen's right?
10                     MS. PAQUETTE:  Objection.
11                     You can answer.
12          A      That the CRB has found that -- yes, yes, I
13     would have to say.
14          Q      And when you only found -- when you only
15     disciplined 1 in the 21 cases, that means that you exonerated
16     the other 20 cases of allegations of discipline?
17          A      Yes.
18          Q      Okay.  You see down in the paragraph before
19     the last, it reads "Lipari said more than half of the 21
20     cases that resulted in CRB recommendations of discipline
21     involved complaints about police 'untruthfulness', more than
22     70 percent involved claims of excessive force."  You saw
23     where I read?
24          A      Yes.
25          Q      And again excessive force violates

FOWLER - CHARLES BONNER

1   constitutional rights; true?

2         A   Yes, sir.

3         Q   Okay. And you exonerated all of those except

4   1 case out of the 21; is that true?

5         A   Yes, sir.

6         Q   Okay. And -- and you did that pursuant to

7   your practice?

8                MS. PAQUETTE: Objection.

9                Answer if you can.

10        A   No, pursuant to an in -- our investigation.

11        Q   Okay. And -- and your investigation is

12   pursuant to your practice?

13        A   It's -- it's based on some aspect of our --

14   our practice, yes.

15        Q   Yes. Okay. Now ...

16               MR. CHARLES BONNER: Yeah. The ones with

17              the stickers. Okay. Do you have them?

18               MR. CABRAL BONNER: The ones with the

19              stickers.

20               MR. CHARLES BONNER: The ones with the --

21               MS. WOLF: Oh, these?

22               MR. CHARLES BONNER: Yeah.

23               MR. CABRAL BONNER: Those other ones --

24              there's nothing on those other ones.

25               MR. CHARLES BONNER: Yeah. Just going to

FOWLER - CHARLES BONNER

1          have this marked as --

2                  MR. CABRAL BONNER:  Not that one?

3                  MR. CHARLES BONNER:  Huh?

4                  MS. WOLF:  No, no, no.

5                  MR. CHARLES BONNER:  I'm just going to

6          mark these with the ...

7                  MR. CABRAL BONNER:  I thought you didn't

8          want the ones from '15?

9                  MR. CHARLES BONNER:  This is not '15.

10         This is -- this is '12.

11                 MR. CABRAL BONNER:  Oh, oh, sorry.

12                 MR. CHARLES BONNER:  Okay.  Did I give

13         you two?

14                 THE REPORTER:  Yeah.

15                 (Whereupon Exhibit 18 was marked for

16                 identification, 1/11/16, ALT)

17     Q    Okay.  Chief, I'm showing you the Syracuse

18  Citizen Review Board Annual Report dated January 1 to

19  December 31st, 2012, the front page and specifically page 8.

20  Do you have that before?

21     A    Yeah, yes.

22     Q    Okay.  And when these Citizen Review Board

23  reports come out, do you receive them?

24     A    Yes.

25     Q    Do you review them?

FOWLER - CHARLES BONNER

1        A    Yes.

2        Q    It's part of your duties as the final

3   authority of the chief of police department to review these

4   reports?

5        A    It's a practice to review the report, yeah.

6        Q    Sure.  And it's -- you see it states at the

7   top the intake and disposition of cases and this -- the total

8   cases received from January 1 to December 31, 2012.  You were

9   the chief of police during this time; true?

10       A    Yes.

11       Q    And it shows that the active misconduct cases

12  filed against your office, this was 57; do you see that?

13       A    Yes.

14       Q    Then it shows that the number of cases fully

15  processed and closed by the board as of December 31st, 2012

16  was 52; do you see that?

17       A    Yes.

18       Q    The number of cases where the CRB panel

19  recommended disciplinary sanction be imposed by the chief of

20  police was nine; do you see that?

21       A    Yes.

22       Q    And did you impose any discipline on any one

23  of those nine cases as recommended by the Citizens Review

24  Board?

25       A    I don't recall.

FOWLER - CHARLES BONNER

1        Q     Is it your best recollection that you didn't?

2        A     I don't recall.

3        Q     Okay.  And the next line says the Citizen

4    Review Board sustained rate, the rate at which the CRB

5    sustained the complainant's allegation against an officer was

6    17.3 percent; do you see that?

7        A     Yes, sir.

8        Q     And that was 9 cases out of 52 fully processed

9    as of December 31st, 2012; do you see that?

10       A     Yes.

11       Q     Okay.  Now, in the next paragraph, it says the

12   number of CRB cases where the chief of police imposed

13   sanctions or discipline when discipline recommendations were

14   made by the CRB panel, and how many does -- did they say you

15   imposed to discipline?

16       A     One.

17       Q     Is that consistent with your recollection?

18       A     No.  It's just consistent with what's on this

19   form here, so I don't --

20       Q     Okay.

21       A     -- recall this.

22       Q     Okay so one out of nine is -- is -- is what

23   the form says?

24       A     Yes, sir.

25       Q     Okay.  And you don't have any reason to

FOWLER - CHARLES BONNER

1    believe the form is incorrect, do you?

2             A    No.

3                       MR. CHARLES BONNER:  Okay.  Now I'd like

4             to mark this report.

5                       MR. CABRAL BONNER:  What number is this?

6                       THE REPORTER:  Nineteen.

7             (Whereupon Exhibit 19 was marked for

8             identification, 1/11/16, ALT)

9             Q    So you have now the Citizen Review Board

10   Report -- Annual Report for 2013; do you see that?

11                      MS. PAQUETTE:  Well, this is a portion of

12            it, right, so it's only two pages.

13            Q    A portion of it, yeah.  It's the front page

14   and then page 20.

15            A    Okay.

16            Q    Okay.  You see at the top it says the total

17   complaints received in 2013 was 111?

18            A    Yes.

19            Q    Okay.  Is that -- is that consistent with your

20   recollection?

21            A    No, just consistent with this report that I

22   have in front of me.

23            Q    Okay.  And then active misconduct cases of 96;

24   do you see that?

25            A    Yes.

FOWLER - CHARLES BONNER

1          Q    Okay.  And it says the total number of cases
2    fully processed enclosed by the board in 2013 was 114; do you
3    see that?
4          A    Yes.
5          Q    The number of cases where the CRB panel
6    recommended disciplinary sanctions be imposed by the chief of
7    police during 2013 was 26, see that?
8          A    Yes.
9          Q    Did you recommend any discipline of those 26
10   cases as recommended by the Citizen Review Board?
11         A    I don't recall.
12         Q    Okay.  If I can turn your attention to
13   page 21.  It should be attached.
14         A    Okay.
15         Q    It says "Category of Complaints Received by
16   the CRB during 2013, Number & Percent of Annual Intake"; do
17   you see where I read?
18         A    Yes.
19         Q    It says excessive force 49 cases, 44 percent
20   of the cases made allegations of excessive force; do you see
21   that?
22         A    Sure, yes.
23         Q    Okay.  Do you have a recollection whether you
24   imposed any discipline for excessive force of those 49 cases?
25         A    No, I don't recall.

FOWLER - CHARLES BONNER

1          Q     Okay.  Is it your best recollection that you

2    did not?

3          A     I -- I'm saying to you now, just as I said to

4    you on -- when we were referring to the first page of this

5    document, that I don't recall.

6          Q     Okay.  Fair enough.  Now ...  Going back to

7    page 20 of the 2013 report, you see it says "The number of

8    CRB cases where the chief of police or the Syracuse Police

9    imposed sanctions or discipline when disciplinary

10   recommend -- recommendations were made by a CRB panel during

11   2013," and it says TBA.  Do you understand that to be to be

12   announced?

13         A     That's my understanding.

14         Q     Okay.  And was that because you were supposed

15   to communicate to the board how many cases were, in fact,

16   discipline of those cases they recommended?

17         A     I don't know why they put that there.

18         Q     Okay.

19         A     But I could tell you what the procedure is.

20         Q     Okay.  What is the procedure?

21         A     It's -- it's not -- it's based on case by

22   case.  When the CRB for -- when the CRB forwards a case to

23   us, then we let them know what our finding are, and they

24   extract their numbers from closed investigations.  That's --

25   that's how that works so --

177

FOWLER - CHARLES BONNER

1        Q    Do you know whether you gave them the -- for

2  2013 the number of cases that you imposed discipline?

3        A    I could tell you this:  That we -- we did what

4  was required of us by the ordinance.

5        Q    Okay.  Very good.  Now, the last one is 2014.

6            (Whereupon Exhibit 20 was marked for

7            identification, 1/11/16, ALT)

8        Q    Directing your attention to page 1.

9        A    Yes.

10        Q    See the CRB reports that there was 107

11  complaints received?

12        A    Okay.

13        Q    Do you see that?

14        A    Yes.

15        Q    It says the annual sustained rate for 2014 was

16  19 percent of the 107 complaints received, 21 resulted in 1

17  or more sustained findings; do you see that?

18        A    Yes.

19        Q    Regarding excessive force, there was

20  40 percent of the complaints received, 18 out of 43 were

21  sustained; do you see that?

22        A    Yes.

23        Q    And that represented 72 percent of the

24  sustained findings; do you see that?

25        A    Yes.

FOWLER - CHARLES BONNER

1    Q    And it represent 42 percent of excessive force
2    complaints; do you see that?

3    A    Yes.

4    Q    For untruthfulness, there were 13 sustained
5    findings; do you see that?

6    A    Yes.

7    Q    And 52 percent of hearings with a sustained
8    findings; do you see that?

9    A    Yes, I do.

10   Q    It says CRB disciplinary recommendation, four
11   recommendations for retraining.  Do you know whether you
12   carried out that recommendation for retraining?

13   A    I don't recall, sir.

14   Q    There were 16 recommendations for written
15   reprimand.  Do you know if you carried out that
16   recommendation for written reprimands for the 2014
17   complaints?

18   A    I don't recall.

19   Q    There were 21 recommendations for suspensions.
20   Do you know whether you carried out the 21 recommendations
21   for suspensions?

22   A    I -- I absolutely didn't carry out all 21, but
23   I don't recall if -- if -- how many.

24   Q    Okay.  Do you recall carrying out any?

25   A    I don't, no.  I -- no, not specifically.

FOWLER - CHARLES BONNER

1      Q   Okay.  There were three recommendations for

2  terminations.  Did you terminate any of the officers pursuant

3  to the Citizen Review Board recommendation?

4      A   I don't -- no, I don't believe so.

5      Q   Okay.  Then SPD disciplinary action rate,

6  6 percent.  "The CRB received 16 responses from SPD to the 21

7  hearings in which a CRB panel sustained an allegation.  Based

8  on available information, the SPD imposed disciplinary --

9  discipline in one case where the CRB recommended discipline."

10  Is that your recollection?

11      A   That's what's here on the paper, sir.

12      Q   Okay.  And why did you only impose discipline

13  in one case of all these cases that were recommended?

14      A   That's actually not -- that's actually not

15  what it says.  It -- it says that the CRB only -- CRB

16  received 16 responses out of the 21, and -- and their number

17  is based on that -- that 16, not the 21 --

18      Q   Okay.

19      A   -- total.

20      Q   Yeah, that's fine.  Why is it that you only

21  imposed 1 disciplinary action out of that 16?

22      A   I -- I don't know, sir.

23          MR. CHARLES BONNER:  Okay.  Now let's

24          have this document marked as next in order.

25          What number is that?

FOWLER - CHARLES BONNER

1          (Whereupon Exhibit 21 was marked for

2          identification, 1/11/16, ALT)

3      Q    I'm handing you Exhibit 21.  Are you familiar

4  with this Professional Standards of Conduct & Ethics?

5      A    Yes.

6      Q    This is one of the policies that you

7  implement?

8      A    Yes, sir.

9      Q    The first paragraph, it says "The purpose of

10  this policy is to provide additional specificity to the

11  standards of conduct embodied by the law enforcement

12  officer's code of ethics and the values that guide the

13  Syracuse Police Department."  You saw where I read, sir?

14      A    Yes, sir.

15      Q    Okay.  And the last paragraph, it says

16  "Therefore, it is the policy of the Syracuse Police

17  Department that its members conduct themselves at all times

18  in a manner that reflects ethical standards consistent with

19  the rules and regulations contained in this policy," see

20  that?

21      A    Yes, sir.

22      Q    And down at the bottom under D, it says

23  "Malfeasance - The doing of an unlawful act in office."  That

24  is what malfeasance is; correct?

25      A    Yes.

FOWLER - CHARLES BONNER

1        Q    If you turn over to page 2, it says standard

2   of conduct for police officers.  It states in Number 1 "The

3   law enforcement code of ethics:

4               As a law enforcement officer, my fundamental

5   duty is to serve mankind; to safeguard lives and property, to

6   protect the innocent against deception, the weak against

7   oppression and intimidation, and the peaceful against

8   violence or disorder and to respect the Constitutional rights

9   of all citizens as to liberty, equality and justice."  Do you

10  see where I read, sir?

11       A    Yes, sir.

12       Q    And that is the code of ethics; right?

13       A    Yes, sir.

14       Q    So that if an officer and the specific

15  officers in Mr. Grant case --

16               THE REPORTER:  Can you just say that

17               again?  Sorry.

18       Q    Okay.  I'm sorry.  So if an officer and

19  specifically if the two officers in Mr. Grant's case filed

20  false police reports as to the reasons why they used force

21  against Mr. Grant, that would be a violation of the code of

22  ethics; isn't that true?

23       A    If they did, yes.

24       Q    Yes.  And if they used such force against

25  Mr. Grant without justification, that would be a violation of

FOWLER - CHARLES BONNER

1   Mr. Grant's constitutional rights; isn't that true?

2        A    Yes, if they did.

3        Q    Okay.  Now, we're going to conclude here in

4   just a few minutes.  I want to understand, when a police

5   officer commits an assault against a citizen without

6   justification, that can be prosecuted as a crime; is that

7   true?

8        A    An assault itself is an illegal act despite

9   who -- who the person is committing such act, and yeah,

10  that -- that is -- that's an offense that can and shall be

11  prosecuted.

12       Q    Okay.  And how does a citizen go about making

13  a complaint for criminal prosecution against a police

14  officer, what are the steps, the 1, 2, 3 steps?

15       A    Well, there's not necessarily 1, 2, 3 steps,

16  but there's -- here -- here in the City of Syracuse, the

17  citizen has a number of -- a number of options to -- to file

18  a complaint against a police officer.  They can go directly

19  to a Notice of Claim where they -- they hire an attorney.

20  They file a Notice of Claim with the City of their intent to

21  sue and pursue the matter that way.  The Citizens Review

22  Board, we just talked about them, they can go right directly

23  to the Citizens Review Board, and once a person goes to the

24  Citizens Review Board, we run a parallel investigation to the

25  Citizens Review Board, then if it's -- if it's an allegation

183

FOWLER - CHARLES BONNER

1   of criminal conduct, they have the option also to go to the

2   District Attorney's office to -- to file their complaint

3   of -- of alleged criminal behavior, then -- and then last

4   on -- on the prong -- our purpose is the Office of

5   Professional Standards.  Once the Office of Professional

6   Standards receives the complaint, we -- we then have an

7   obligation to -- of a police misconduct to also advise the

8   office -- the CR -- the Citizens Review Board so that they

9   can -- they can run a parallel complaint to our -- our

10  investigation, and that's -- that's what the -- the options

11  are for.

12          Q    So if a citizen wanted to a file a criminal

13  complaint against a police officer, would they start with

14  you, bring the complaint to you and say "I don't want this to

15  go to the Citizen Review Board, I want this to be

16  investigated --"

17          A    Yes, sir.

18          Q    -- "as a criminal complaint," do they initiate

19  that with you?

20          A    Yes, sir.  Yes, sir.

21          Q    And then you investigate that criminal

22  complaint?

23          A    That's correct.  Well, I investigate that

24  complaint.  That -- that's handled a little bit differently,

25  because we're taking about a criminal matter, so yes, I

FOWLER - CHARLES BONNER

1    investigate the complaint, but I -- I also -- I don't

2    conclude an investigation.  I -- I -- I -- I investigate the

3    complaint, and before I determine my findings, I turn the

4    matter over to the District Attorney's Office for review.

5            Q    Okay.  All right.  Well, at this point of the

6    deposition, I want to deem this deposition -- this portion --

7    and you can mark this a certification -- a criminal complaint

8    on behalf of Mr. Alonzo Grant, Ms. Stephanie Grant, and

9    Mr. Alonzo, Jr., Mr. Alonzo Grant, Jr.  We are hereby on this

10   record making a written formal criminal complaint to be

11   lodged with you as the chief of police against

12   Officer Lockett for the following charges:  Criminal assault,

13   criminal battery causing great bodily injury, false arrest,

14   criminal trespass, and perjury.

15           Against Officer Paul Montalto, we are hereby

16   making the complaint on behalf of Mr. Alonzo Grant and

17   Ms. Stephanie Grant and Mr. Alonzo, Jr. for one, criminal

18   assault, criminal battery causing great bodily injury, false

19   arrest, criminal trespass, and perjury.

20           Against Officer Brian Novitsky, we are hereby

21   making a form criminal complaint to you, Chief, for one,

22   criminal assault, criminal battery, false arrest, and

23   perjury.

24           The evidence to support this -- these charges

25   are one, a declaration which is --

FOWLER - CHARLES BONNER

1      MS. PAQUETTE:  I'm going to stop you

2      right there.  I'm objecting to all of this

3      colloquy right now.  This is not the way to

4      make a complaint.  This is a deposition right

5      now.

6           MR. CHARLES BONNER:  You can object all

7      you want.

8           MS. PAQUETTE:  I will object all I want.

9           MR. CHARLES BONNER:  Well, please --

10          MS. PAQUETTE:  And I think this --

11          MR. CHARLES BONNER:  Your objection's

12     noted.

13          MS. PAQUETTE:  I think this needs to stop

14     right now.

15  Q    The --

16          MS. PAQUETTE:  This is a deposition.

17  Q    The evidence to support --

18          MS. PAQUETTE:  This is not a formal --

19          THE REPORTER:  Can I have one person --

20          MS. PAQUETTE:  -- criminal complaint.

21  Q    Okay.  The evidence to support these criminal

22  complaints are one, the affidavit of Sherrell Grant which is

23  Exhibit 1 to this deposition today which will be provided to

24  you, it's signed under penalty of perjury, the video

25  deposition you saw of Mr. Corey McMullin, the video

FOWLER - CHARLES BONNER

1   deposition you saw of Ms. Sharon Hayes, the deposition

2   testimony of Mr. Alonzo Grant, the video testimony you saw of

3   Mr. Shakeal Stirrup, the video deposition you saw of

4   Mr. Alonzo Grant, Jr., and all of the investigation -- also,

5   yeah, the video -- the deposition of Ms. Stephanie Grant and

6   all of the papers on file with the District Attorney's

7   Office, with Mr. William Fitzpatrick, all of the depositions

8   and papers on file in this federal case, and we will be

9   sending a copy of this portion of the dec -- of this

10  deposition and this complaint to the Attorney General of the

11  United States, Ms. Loretta Lynch, and filing the same charges

12  with her so that her office can further investigate the case.

13          Any communication that you have regarding this

14  complaint, please direct it to my office, the Law Offices of

15  Bonner & Bonner, which your attorney has, but this is now a

16  formal complaint that we're lodging with you.

17          Just in concluding, I too take an oath as a

18  lawyer to uphold the Constitution, and promise so help me God

19  that I will uphold the Constitution, and that means the

20  complete Constitution with a zero tolerance just like you,

21  and so it is my obligation as an officer of the court, like

22  you, and officer of the law to uphold the Constitution, and

23  we have the evidence here of a constitutional violation, so I

24  hope you receive it in that spirit.

25          And with that, we're going to adjourn your

FOWLER - CHARLES BONNER

1    deposition.  Your attorney and I are going to resume -- we

2    have under law at least seven hours, but there's some

3    documents that she's going to produce to us after she -- I

4    have a judge review those documents, and then we'll resume

5    with your deposition at -- at some other time.  Is that fair

6    enough?  We're -- we're through for today.

7              A    I understand that.

8                   MR. CHARLES BONNER:  Okay.  Thank you

9              very much.

10                  THE VIDEOGRAPHER:  All right.  This will

11             conclude today's testimony.  Time off record

12             is 1636.

13             (Whereupon the proceeding was adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

188

1                      C E R T I F I C A T I O N

2

3

4              I, AMANDA L. THELEMAN, Registered Professional

5     Reporter, and Notary Public in and for the State of New York,

6     DO HEREBY CERTIFY that I attended the foregoing proceedings,

7     took stenographic notes of the same, that the foregoing is a

8     true and correct copy of same and the whole thereof.

9

10

11

12

13

14

15

16

17     _____

18              AMANDA L. THELEMAN, RPR, CRR

19

20

21

22

23

24     Dated:   January 28, 2016

25