# EXHIBIT TT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x

ALONZO GRANT and STEPHANIE GRANT,

                  Plaintiffs,

        -against-

CITY OF SYRACUSE, SYRACUSE POLICE DEPARTMENT,
POLICE OFFICERS DAMON LOCKETT AND PAUL
MONTALTO, POLICE OFFICER BRIAN NOVITSKY, CHIEF
OF POLICE FRANK FOWLER and Does 10-100,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x

                160 Broadway
                New York, New York

                July 26, 2016
                10:45 a.m.

      **DEPOSITION** of **JOSEPH LEO LIPARI**, a

Non-Party Witness in the above-entitled action,

held at the above time and place, pursuant to

Subpoena, taken before Jennifer M. Juliani, a

shorthand reporter and Notary Public within and

for the State of New York.



LEX#118593

```
1                                                      2

2     A p p e a r a n c e s:

3

4           RYDER LAW FIRM
                  Attorneys for Plaintiffs
5                 6739 Myers Road
                  East Syracuse, New York 13057
6           BY:  JESSE P. RYDER, ESQ.

7

8

9           THE LAW OFFICES OF BONNER & BONNER
                  Attorneys for Plaintiffs
10                475 Gate Five Road, #212
                  Sausalito, California 94965
11          BY:  CHARLES BONNER, ESQ.

12

13

14          DEPARTMENT OF LAW CORPORATION COUNSEL
                  Attorneys for Defendants
15                233 E. Washington Street,
                  City Hall Room 300
16                Syracuse, New York 13202
            BY:  JOHN A. SICKINGER, ESQ.
17

18
      ALSO PRESENT:
19          Ilse Wolfe

20

21

22

23

24

25
```

1                                                      3

2                    S T I P U L A T I O N S

3

4           IT IS HEREBY STIPULATED AND AGREED

5     by and between the attorneys for the

6     respective parties herein, that filing,

7     sealing and certification be and the same

8     are hereby waived.

9

10          IT IS FURTHER STIPULATED AND AGREED

11    that all objections, except as to the

12    form of the question shall be reserved to

13    the time of the trial.

14

15          IT IS FURTHER STIPULATED AND AGREED

16    that the within deposition may be signed

17    and sworn to before any officer

18    authorized to administer an oath, with

19    the same force and effect as if signed

20    and sworn to before The Court.

21

22

23

24

25

                                                    4

1

2   J O S E P H   L E O   L I P A R I, the witness

3        herein, having been first duly sworn by

4        a Notary Public of the State of New

5        York, was examined and testified as

6        follows:

7   EXAMINATION BY

8   MR. RYDER:

9        Q     Can you state and spell your full

10   name for the record, please?

11        A     Joseph Leo Lipari; J-O-S-E-P-H,

12   L-E-O, L-I-P-A-R-I.

13        Q     And if you could please state

14   your current address for the record, please.

15        A     So I just signed a lease.  It's

16   527 East 83rd Street, Apartment 5-W, zip code

17   is 10028.  I'll technically be living at that

18   address this weekend.

19        Q     Okay.  Hello, Joe.  My name is

20   Jesse Ryder.  I'm an attorney for the

21   plaintiffs.

22        A     Good morning.

23        Q     Have you ever done a deposition

24   before?

25        A     Yes.

```
 1                    J. Lipari                  5

 2         Q     So you are familiar with some of

 3    the general rules like speaking clearly,

 4    answering in the affirmative, waiting until

 5    we conclude our question before you give us

 6    an answer, some of the basics?

 7         A     Yes.

 8         Q     We've already got your name on

 9    the record, but would you please spell that

10    for us?

11         A     J-O-S-E-P-H, L-E-O, L-I-P-A-R-I.

12         Q     Joseph, what do you do for a

13    living currently?

14         A     I'm currently the senior policy

15    manager for the Office of the Inspector

16    General for the NYPD.  That's an agency that

17    is under the umbrella organization of the

18    Department of Investigations for the City.

19         Q     What is the address; do you know

20    the address off the top of your head for your

21    employer?

22         A     80 Maiden Lane.

23         Q     Here in Manhattan?

24         A     Here in Manhattan, yeah.

25               14th Floor.
```

```
 1                    J. Lipari                    6
 2        Q     Prior to your position here in
 3   Manhattan with the NYPD, who was your
 4   employer?
 5        A     The City of Syracuse.  I was the
 6   administrator for the Citizen Review Board.
 7        Q     How long were you in that
 8   position, Joe?
 9        A     Almost exactly four years.  From
10   May 16, 2012 until May -- mid May of 2016.
11        Q     Give us your educational
12   background, Joe.
13        A     I received my bachelor's degree
14   in anthropology and a minor in political
15   science at Louisiana State University in
16   2000.  I received my master's degree in
17   history, University of Illinois at Chicago in
18   2005, I believe.  And I nearly completed the
19   Ph.D also at University of Chicago in
20   history.  I was at the status of what they
21   call ABD, all but dissertation, about a
22   chapter-and-a-half away from completing the
23   dissertation.
24        Q     Okay.  So you stated that your
25   position at the Syracuse CRB was the
```

```
1                    J. Lipari                    7

2      administrator, correct?

3           A     Correct.

4           Q     Had you held any other positions

5      with the CRB prior to becoming the

6      administrator?

7           A     No.

8           Q     Can you explain generally the

9      responsibilities of the administrator of the

10     CRB while you were in Syracuse?

11          A     So the administrator essentially

12     facilitates the entire process.  Conducting

13     investigations, managing the administrative

14     responsibilities of the office, conducting

15     community outreach, managing the board

16     members and the various meetings and hearings

17     that the board holds, reporting to the

18     council when asked to do so.  Those are the

19     main tasks.

20          Q     Can you explain, if you know, how

21     the CRB is empowered under law; do you

22     understand that process?

23          A     Sure.

24          Q     Okay.

25          A     So --
```

```
1                    J. Lipari                    8

2                    MR. SICKINGER:  Object to

3            form.

4      A      Local law, now it's one of 2012;

5  used to be local law 11 of '93, 1993 I

6  believe.  The current law empowers the board

7  to conduct independent investigations,

8  authorizes -- authorize the CRB with subpoena

9  power to acquire documents, or to compel

10 cooperation from witnesses, and we ultimately

11 make the board members make a finding in a

12 case.

13            First they decide whether to send

14 the case to a hearing.  If they send it to a

15 hearing then they -- three members of the

16 panel sit on that hearing.  Three members of

17 the board sit on that hearing panel and make

18 -- and determine whether to sustain the

19 allegation of misconduct against the officer

20 or officers.  And if they do so, then they

21 can make a disciplinary recommendation to the

22 chief of police.

23            And then the administrative --

24 the administrator, the role is to write a

25 letter to the chief, to the subject officer
```

```
1                    J. Lipari                    9
2     and to the complainants explaining what the
3     outcome of the hearing was.  And if there's
4     no hearing, what the outcome of the case in
5     general was.
6          Q     Was Chief Frank Fowler employed
7     as the chief of police during your -- the
8     time that you were the administrator of the
9     CRB?
10         A     Yes.
11         Q     For the entire time?
12         A     For the entire time, yeah.
13         Q     Was Stephanie Miner the mayor of
14    Syracuse during your entire tenure as the
15    administrator of the CRB in Syracuse?
16         A     Yes.
17         Q     This is a little bit of a broad
18    question, but let's see if you can answer
19    this generally.  In your knowledge, what is
20    the purpose of the CRB or Citizen Review
21    Board generally; what is the purpose of that?
22                    MR. SICKINGER:  Object to
23                    form.
24         A     The purpose is to maintain a
25    independent investigative system that
```

<pre>
1                    J. Lipari              10

2    investigates complaints against police and

3    comes to an unbiased finding and makes

4    disciplinary recommendations in individual

5    cases, but also policy and training

6    recommendations to the department as a whole,

7    to the City as a whole.

8         Q    Can you explain to me what the

9    procedure is for processing a citizen

10   complaint at the CRB?

11                   MR. SICKINGER:  Object to

12             form.

13        A    So complaints could come in one

14   of two ways.  Either directly to the CRB as a

15   walk-in, as a phone call, or completing a

16   complaint form.  Ultimately, first the

17   complainant has to complete a complaint form

18   and sign the complaint form so it can come

19   directly to the CRB or it can come -- it can

20   be filed with the Office of Professional

21   Standards within the Police Department.

22   Either way, if they get it, they have to give

23   a copy to us.

24                   We -- if the CRB were to receive

25   it, then the CRB has to give the copy to
</pre>

```
 1                    J. Lipari              11

 2     Office of Professional Standards.  Once the

 3     complaint is received, usually within a

 4     couple of weeks we would begin receiving

 5     documents from the department; police

 6     reports, evidence technician photographs, use

 7     of force reports if it was a use of force

 8     incident, any other documents relevant to the

 9     case we would receive from the department.

10     Then we would begin to conduct our own

11     separate investigation.

12                I would, after reviewing the

13     documents I received from the department,

14     interview witnesses, perhaps identify

15     additional witnesses, conduct the site visit

16     to the scene, take photographs if necessary,

17     look for any additional video evidence,

18     photographs, audio, gather all of the

19     evidence I can, evaluate the evidence,

20     compose a investigative report, then I

21     provide that report or the administrator

22     provides that report to the board members

23     prior to that month's board meeting.

24                The board members review the

25     report and they can ask for any evidence from
```

J. Lipari                    12

2  the file if they want to see any.  And then

3  at the board meeting each month, we go into

4  executive session where the board members

5  vote on whether to send the case to a hearing

6  or not.  If it goes to a hearing, I would or

7  the administrator then schedules the hearing

8  with the complainant, with the officers, with

9  any other witnesses, although typically, the

10 officers do not participate in the hearing

11 even though they were invited.

12          And then at the hearing itself,

13 the administrator facilitates the hearing by

14 introducing everyone and kind of laying out

15 the ground rules.  But a chair of the panel

16 from the membership actually runs the

17 hearing.  And then in that hearing, the

18 complainant and the witnesses are questioned.

19 They give their accounts of what happened

20 from their perspective and then the panel

21 members ask questions of the complainant and

22 witness.  And then we let them -- the

23 complainant and witnesses depart and the

24 three panel members deliberate for as long as

25 they need to come to a finding and then they

<pre>
 1                    J. Lipari              13

 2    communicate that finding to the administrator

 3    and there -- if they -- if they did sustain

 4    anything, they would communicate the

 5    disciplinary recommendation as well through

 6    the administrator and then the administrator

 7    would compose a letter to the chief, to the

 8    officers involved, and complainant explaining

 9    what the outcome was.

10         Q     Okay.  Thank you very much.

11         A     Sure.

12         Q     So you mentioned that there were

13    complaints filed.  Were the complaints filed

14    either with the Police Department or with the

15    CRB?

16         A     Correct.

17         Q     That's how an investigation could

18    be initiated, correct?

19         A     Correct.

20         Q     Was there any timeframe on the

21    sharing of these complaints between agencies,

22    between the Police Department or between the

23    CRB back and forth, were there timeframes

24    outlined in the enabling legislation that

25    bound the agencies to adhere to these
</pre>

```
 1
 2    timeframes to share this information?
 3                    MR. SICKINGER:  Object to
 4             form.
 5         A     Yes.  In the ordinance the Office
 6    of Professional Standards is required to
 7    provide the entire case file they have, the
 8    case, to the CRB within thirty days and then
 9    the CRB is directed to complete their process
10    within sixty days of the complaint being
11    filed.  Those are the two main timeframes.
12                    And then once the CRB provides
13    the finding to the chief of police, he has
14    to -- he or she would have to respond in
15    writing to our findings and -- CRB's finding
16    and recommendations within thirty days.
17         Q     You mentioned just previously
18    that officers did not generally attend these
19    CRB hearings although they were invited.  Was
20    it -- would it have been helpful to the CRB
21    to have officers attend these hearings
22    generally to get their side of the story and
23    these -- during these hearings?
24                    MR. SICKINGER:  Object to
25             form.
```

```
1                    J. Lipari              15

2         A     It's hard to say generally.  I --

3   I do think, you know, there would certainly

4   be cases where the panel members would have

5   liked to question the officers, absolutely.

6   But, you know, the panel members would get,

7   you know, all the written documents from the

8   department which would include the officer's

9   written report, police report.  The board

10  would also get what is called 10-1 statements

11  from the police officer.  That's a written

12  memo responding to some aspect of the

13  complaint.

14              So we would have the officer's

15  perspective in writing, the subject involved

16  officer, but we just wouldn't have -- we

17  didn't have the benefit of having the officer

18  in front of the panel where they could

19  question them and read the body language and,

20  you know, the typical things you do in a

21  question scenario, questioning scenario like

22  that hearing.

23              So yeah, I think generally, and,

24  you know, the board was working to go get

25  officers to attend the hearing because we
```

```
1                    J. Lipari              16

2     generally felt that it would be beneficial to

3     the process to have the officer's input

4     and -- directly and be able to be forced to

5     respond to the questions.

6              Although had the officer

7     attended, they -- our understanding was they

8     could essentially take the equivalent of the

9     Fifth Amendment and not directly respond to

10    questions, so they could bring their attorney

11    with them.

12              So the CRB's approach has been

13    for those four years under my tenure, we

14    initially decided not to subpoena officers to

15    the hearings because we knew the prior CRB

16    did that and the union fought it, got an

17    injunction from a judge to stop the

18    subpoenaed officers to hearings.  So we

19    decided we didn't want to start right off in

20    an adversarial manner by subpoenaing

21    officers, so we tried to demonstrate to the

22    department that our process was fair, that it

23    wasn't a witch hunt, that we wanted to hear

24    from the officers.  So we tried to give them

25    a year or two to get used to this new CRB,
```

```
1                          J. Lipari                    17
2        and hopefully -- we were hoping they would
3        start coming to the hearings, but that never
4        happened.
5                    We had one officer attend a
6        hearing and unfortunately for that hearing,
7        it involved a video conference with an inmate
8        at a correctional facility and the -- that
9        was -- it was a new technological system for
10       that prison at that time and it didn't work
11       that day that we had that hearing scheduled.
12       So the officer -- we couldn't hold the
13       hearing that day.  He left.  By the time we
14       got it rescheduled and were able to do the
15       hearing in person, the officer had decided
16       not to participate in the hearing.  And we
17       were -- we, you know, understood.
18                    I think the president of the
19       union at one point -- the president of the
20       union -- I don't want to misspeak here.  Let
21       me -- we learned through the course of the
22       four years that officers were discouraged
23       from participating in the CRB process,
24       whether it was a union policy or just sort of
25       informal discouragement.
```

```
 1                    J. Lipari                18

 2              Either way, we never had officers

 3      successfully attend the hearing.

 4         Q      So you mentioned that in your

 5      four years of tenure, one officer had

 6      attempted to attend but then had changed his

 7      mind when the hearing had kind of fallen

 8      apart because of technical problems?

 9         A      Correct.

10         Q      You mentioned your title as

11      administrator.  You -- I've heard you use the

12      word chairman, or chairperson, something

13      along those lines.  I heard you mention board

14      members.  Just explain to me basically the

15      structure of the CRB.

16                    MR. SICKINGER:  Object to

17              form.

18         A      Sure.  So the administrator and

19      the administrative assistant are the

20      full-time employees of the office.  Then

21      there are eleven volunteer board members who

22      are appointed by the mayor and the common

23      councilors.  Three board members are

24      appointed by the mayor, five are appointed by

25      each of the district councilors, and then
```

```
1                      J. Lipari                    19

2     three are appointed by the at-large

3     councilors.  And then the membership itself

4     elects the chair and the vice chair -- the

5     chairman and the vice chairman.  And the

6     chairman runs the board meetings, helps

7     develop the agenda for each board meeting,

8     and has kind of the day-to-day interaction

9     with the administrator.  Kind of who the

10    administrator has the most interaction with,

11    I guess.  And ultimately, the administrator

12    reports to the board.  The board hires the

13    administrator and the board can fire the

14    administrator.

15         Q     During your tenure, did you have

16    the same board members throughout that four

17    years or did that change?

18         A     No, that changed.

19               So they were on staggered terms.

20    Each board member serves a three-year term

21    and they can serve up to two terms, so when

22    they started -- when they made these

23    appointments, when the common council made

24    these appointments, they staggered the first

25    appointment so that they wouldn't all come up
```

```
 1                    J. Lipari              20

 2      on the same year due for reappointment.  So

 3      we had, you know, at least one or two,

 4      sometimes three new board members a year.

 5      Board members, their term can end, they can

 6      leave the board, they could resign just for

 7      personal reasons or family reasons.  There

 8      was one or two in the early stages that

 9      didn't show up for meetings and so we had

10      them removed essentially; they ultimately

11      resigned.

12                 So there is a number of different

13      ways that turnover is created on the board.

14      But I had -- I think there were three board

15      members who are still on the board that were

16      there when I first started in 2012, so

17      there's been a fair amount of turnover.

18          Q    Do you know the process for

19      selecting these volunteer board members from

20      the community; do you know that process?

21                    MR. SICKINGER:  Object to

22                 form.

23          A    It's essentially up to the

24      selector, the -- either the mayor or the

25      common councilors.  You know, there's a --
```

```
1                    J. Lipari            21
2    and there's application process.  We would
3    notify -- you know, we would make a public
4    notice, there was a vacancy and then people
5    could turn in their applications.  We would
6    make sure -- my office would make sure that
7    the people making the appointment would
8    receive those resumes.  And some of the
9    appointors wanted more assistance than others
10   and some, you know, could -- could select
11   someone, find an appointment to the board on
12   their own, but I would offer as much, you
13   know, assistance as possible.  But it's
14   ultimately up to the elected officials, the
15   mayor and the common councilors to make that
16   selection.
17           So in terms of how each
18   individual decision was made, I can't really
19   speak to that; that would be between the
20   elected official and that of the person who
21   is appointed.
22       Q    Now, do you know, are these board
23   members selected from within the City of
24   Syracuse residents, or are they the county,
25   or how is that -- how does the residence play
```

```
1                    J. Lipari                22
2    into that?
3         A     They have to be -- I'm sorry.
4    They have to be a Syracuse City resident,
5    correct, and they have to be over eighteen,
6    they can't have an immediate family member
7    who is a police officer or any kind of law
8    enforcement, they can't have an immediate
9    family member who is an elected official in
10   Syracuse, and they can't have -- be or have
11   an immediate family member who has a lawsuit
12   against the City, the police union, or the
13   Police Department.
14        Q     Okay.  I'm just going to ask some
15   more questions on this, okay, because this --
16   now we've narrowed down this pool of City
17   residents, range of particular ages, and we
18   have certain criteria that excludes them.
19   But can you speak to the diversity of the
20   members of the board as far as their ethnic
21   background and their educational background
22   and their professional background?
23        A     Sure.  It was a pretty diverse
24   group.  We had white, African-American, male,
25   female, straight, gay, transgender, we had a
```

```
 1                    J. Lipari              23

 2   young man of Indonesian descent recently

 3   appointed, also a good diversity in terms of

 4   background and experience.

 5            You know, we had people, everyone

 6   from a CEO of a capital management firm to a

 7   homemaker and everything in between.  We had

 8   secretaries, we had people who were involved

 9   in community development.  Anyone who, you

10   know, had a commitment in the City of

11   Syracuse and was willing to do a good bit of

12   work without getting paid; it was all

13   volunteer.  What else did you ask about the

14   makeup of the board?

15       Q    I think that's -- that covers it.

16   I think you covered what we were asking.

17            During your tenure, were any of

18   the members of the board either attorneys or

19   judges or somebody employed in the legal

20   field?

21                 MR. SICKINGER:  Object to

22            form.

23       A    Three of the board members were

24   attorneys.  I think that's -- I believe

25   that's it.  Yeah, three were attorneys.
```

1                     J. Lipari                    24

2        Q     All right.  What is the process

3   when the CRB board members sustain a finding

4   of misconduct or a violation of any

5   constitutional rights on behalf of a citizen

6   in the City of Syracuse; what is the process

7   at that point?

8                     MR. SICKINGER:  Object to

9             form.

10       A     So that would come out in the

11  hearing process.  After they deliberate, they

12  would communicate to the administrator what

13  their finding was and sort of the logic of

14  it, why they decided the way they did.  Then

15  if they sustained it, they would develop a

16  disciplinary recommendation.

17             We did develop certain points in

18  that four years, like around year two or

19  three, what's called a disciplinary matrix,

20  so it's kind of a chart that gives you kind

21  of guidelines for what discipline to impose.

22  We had asked the Police Department if they

23  had a disciplinary matrix, we would like to

24  be able to use it, consistent matrix or chart

25  to recommend discipline, make it consistent

```
1                      J. Lipari                    25

2     with what the department had.  They did not

3     have a disciplinary matrix.

4              My understanding is we developed

5     our own disciplinary matrix to keep our

6     recommendations consistent with the nature of

7     each case.  So the panel may consult that

8     matrix, tell the administrator what -- and

9     they would discuss it among themselves.  You

10    know, someone would suggest a disciplinary

11    recommendation and then others would kind of

12    chime in and they deliberate, discuss what

13    they fell was fair, what they felt was

14    consistent with the matrix.

15              Progressive discipline was

16    necessary if this was an officer who we had

17    multiple complaints on or had sustained

18    complaints against them in the past and that

19    would be taken into consideration when they

20    would develop their disciplinary

21    recommendation.

22              So once they made a decision on

23    what to recommend, they would communicate

24    that to me as the administrator, and then I

25    would put that into a formal letter to the
```

```
1                    J. Lipari                    26

2    chief of police and the chief would get a

3    copy of that letter, and then I would do

4    another letter to the officer or officers,

5    and then a finding letter also to the

6    complainant.

7               I should say, earlier you asked

8    me the timeframes, where there are sort of

9    deadlines.  I forgot to mention within one

10   day of the hearing being completed, the CRB

11   was directed to provide the findings, the

12   finding letter to the chief within -- within

13   one business day, so that was one I forgot to

14   tell you.

15               So, yeah, we would then provide

16   that to the chief and the officer and the

17   complainant and then the chief within thirty

18   days is supposed to provide the -- write a

19   letter in response to us telling us his

20   disciplinary decision in that case.  And if

21   no discipline was -- if he imposed

22   discipline, he was supposed to tell us why

23   this one was imposed.  If he did not impose

24   discipline, he was supposed to tell us the

25   reasons why no discipline was imposed.
```

```
 1              J. Lipari                27

 2          And that's all from the

 3     ordinance.

 4          Q    Now, are you aware of the fact

 5     that police officers have to take an oath to

 6     uphold the constitution in order to be hired

 7     as police officers?

 8                   MR. SICKINGER:  Object to

 9              form.

10          A    Sure, yes.

11          Q    And are you aware of the fact

12     that if the CRB makes an allegation of

13     excessive force, false arrest or

14     untruthfulness, those are very serious

15     allegations and most would go to the heart of

16     constitutional violations of the citizens of

17     the City of Syracuse?

18                   MR. SICKINGER:  Object to

19              form.

20          A    I mean, I can say that I -- you

21     know, I and the CRB during my tenure took all

22     three of those categories very seriously.

23     Excessive force was -- the first three years

24     or so was the most common complaint we would

25     have, although that went down towards the end
```

```
 1                    J. Lipari                28

 2    of that four years.  Untruthfulness was an

 3    issue we -- we looked at very carefully for

 4    every case.  What was the other, false

 5    arrest?

 6         Q     Untruthfulness, false arrest,

 7    excess force.  And these are just examples of

 8    allegations of violating citizens'

 9    constitutional rights.  And I just want to

10    make sure that you understand that these

11    police officers do take an oath to uphold the

12    constitution, correct?

13                    MR. SICKINGER:  Object to

14             form.

15         A     Sure, absolutely.

16         Q     And I want to know if you

17    understand that allegations of excessive

18    force, false arrest, and untruthfulness in

19    the course of their employment would be a

20    direct violation of a citizen's

21    constitutional rights; do you understand

22    that?

23                    MR. SICKINGER:  Object to

24             form.

25                    Mr. Ryder, I gave you great
```

```
 1                    J. Lipari                29
 2          leeway in going --
 3                MR. RYDER:  You can put your
 4          objections on the record, but are
 5          you going to instruct him not to
 6          answer questions?
 7                MR. SICKINGER:  I'm telling
 8          you, you're in violation of the
 9          Court's June 28th order.  And if
10          you want to continue in this line
11          of questioning, I'll call the
12          magistrate.
13                MR. RYDER:  And that's fine.
14          You can call him right now.
15                MR. SICKINGER:  It's her --
16                MR. RYDER:  You can call her
17          right now.
18                MR. SICKINGER:  -- so that
19          shows your knowledge of the case.
20                MR. RYDER:  You can call her
21          right now.
22                MR. BONNER:  Let's go off
23          the record.
24                (Whereupon, a discussion was
25          held off the record.)
```

```
 1                    J. Lipari              30

 2              MR. RYDER:  For the record,

 3         I am reading from Judge Danks'

 4         (phonetic) June 28th order, 2016.

 5         Mr. Lipari's deposition shall be

 6         limited to the documents

 7         previously produced regarding the

 8         CRB investigation of the arrest

 9         that is the subject of this

10         lawsuit and the redacted

11         documents being produced in

12         accordance with this order.

13         Additionally, questioning of Mr.

14         Lipari regarding the documents

15         being produced in accordance with

16         this order shall only involve

17         questions pertaining to any

18         complaints to the CRB involving

19         sustained substantiated claims of

20         excessive force, false arrest,

21         and false imprisonment by any

22         officer supervised by defendants

23         Novitsky and/or Fowler.

24         Complaints that may be addressed

25         in the redacted documents
```

```
1                    J. Lipari              31

2         concerning any other behavior

3         shall not be permitted.

4              MR. BONNER:  And that also

5         includes untruthfulness.

6              That's the order.  Now, if

7         you want to make objections as we

8         go through, you can certify the

9         question.  We can argue it to the

10        Court later.  But let's again go

11        forward in the interest of --

12             MR. RYDER:  The last

13        question that I read was getting

14        into that.  I think I got what I

15        needed there.

16             MR. SICKINGER:  I'm not

17        trying to prolong this.  I've got

18        a flight to catch.  I don't want

19        to go down there right --

20             MR. RYDER:  How about we

21        make a list?

22             MR. SICKINGER:  I will allow

23        you to ask this question.  Note

24        my objection until we can get the

25        magistrate on the phone.  But I
```

```
 1                    J. Lipari                32
 2             would prefer if we just --
 3                  MR. RYDER:  Simpler too for
 4             you.  So I just -- my question
 5             was --
 6                  Okay, go ahead.  I'm sorry.
 7             Attorney Jesse Ryder back on the
 8             record.
 9                  MR. SICKINGER:  Just note my
10             continuing objection to the
11             question.
12                  MR. RYDER:  My question,
13             Joe, simply was, do you
14             understand that the allegation of
15             excessive force on behalf of a
16             police officer, false arrest,
17             untruthfulness, that each of
18             those allegations would be a
19             violation of a citizen's
20             constitutional rights, yes or no?
21        A    Yes.
22                  MR. RYDER:  Now, go back on
23             record.
24        Q    You mentioned something earlier
25     before this -- we were -- had this debate.
```

```
 1                    J. Lipari              33

 2     You mentioned that you had noticed a pattern

 3     of excessive force early on in your tenure.

 4     Is it part of your job as the administrator

 5     of the CRB to recognize patterns in police

 6     misconduct?

 7                    MR. SICKINGER:  Object to

 8              form.

 9          A     I think what I said was we

10     noticed excessive force was one of our

11     highest -- the highest category of a

12     complaint intake.  I don't think I used the

13     word pattern, but we did notice there was a

14     large -- it was most -- largest category of

15     complaints that we were receiving in the

16     first couple of years.

17          Q     Would it be part of your job as

18     administrator to look for patterns of

19     behavior among the police officers?

20                    MR. SICKINGER:  Object to

21              form.

22          A     Sure, yes.

23          Q     Okay.  Now on to the

24     recommendations made by the CRB to the police

25     chief.  What range of recommendations would
```

```
1                    J. Lipari                34
2     the CRB empower to make?
3                    MR. SICKINGER:  Object to
4               form.
5          A     Anything from training to
6     termination of the officer and everything in
7     between.  So it could be training, it could
8     be a verbal warning such as counseling, it
9     could be written reprimand, a letter of -- a
10    letter in the officer's personnel file.  Then
11    you could get into demotions, you have time
12    off, you know, suspension without pay, and
13    then termination.
14               It's essentially the range of
15    options that are open to the chief of police
16    we could -- chief of police we could
17    recommend.
18         Q     During your four years, had you
19    made recommendations throughout this entire
20    range on various cases?
21         A     Oh, yes.
22         Q     Okay.  I'm handing you a document
23    previously marked as Exhibit 12 and this
24    document is entitled, in the matter of Alonzo
25    Grant versus Syracuse police officers'
```

```
 1                    J. Lipari              35
 2    allegations of misconduct, excessive force,
 3    false arrest, and untruthfulness.  And at the
 4    top of this document it is entitled, Citizen
 5    Review Board Stephanie A. Miner.
 6              Do you recognize that document?
 7         A    Yes, this is the finding letter
 8    that we sent to Mr. Grant after the
 9    conclusion of his hearing.
10         Q    And isn't that your name and
11    signature at the bottom of that document?
12         A    Yes.
13         Q    Did you recall this particular
14    case?
15         A    Yes.
16         Q    In your recollection, best of
17    your ability, what were Mr. Grant's
18    complaints?
19                   MR. SICKINGER:  Object to
20              form.
21         A    Essentially the complaint
22    consisted of he had called police, it was a
23    dispute involving his daughter.  I forget
24    exactly what he called the police for, if it
25    was to remove the daughter or just to resolve
```

```
1                    J. Lipari                36

2     the dispute.  But by the time the officers

3     arrived, I believe the daughter was no longer

4     on scene.  There was some discussion.  At

5     some point he is, I believe directed by the

6     officer to go outside.  He goes through the

7     door.  This is what was alleged in the

8     complaint.  And then he alleged in the

9     complaint that the officer essentially took

10    him down while he was going down the steps

11    and struck him multiple times about the face

12    and I think other parts of the body.  And

13    that he -- all he had done was push the door

14    open from his account.  And so it was

15    essentially a complaint of excessive force.

16              Then he was -- I think he was

17    charged.  I forget what the charges were

18    against him, but I think he was charged.  So

19    I think he was probably -- I think he was

20    complaining about false arrest as well.  That

21    was the -- to the best of my recollection,

22    that was the initial aspect, components of

23    his complaint.

24         Q    You mentioned earlier the process

25    of your investigation, correct?
```

```
 1                    J. Lipari                    37

 2        A      Yes.

 3        Q      Did you conduct what you would

 4   consider a full investigation in this case?

 5                  MR. SICKINGER:  Object to

 6             form.

 7        A      Yes.

 8        Q      Briefly give us a -- an idea of

 9   exactly what you did in the course of your

10   investigation.

11                  MR. SICKINGER:  Object to

12             form.

13        A      And this is just as much as I can

14   recall without having my -- the file in front

15   of me.

16                  So I remember receiving video of

17   interviews, I think Mr. Bonner had done with

18   Mr. Grant, reviewed those, which is not

19   uncommon to have other statement prior to my

20   ability to question someone.  So I wanted to

21   have access to whatever has already been put

22   on the record.

23                  So I reviewed those, developed my

24   own questions, scheduled a time to go to the

25   site, to the house where it happened, sit
```

J. Lipari                    38

1

2   down with all the individuals involved and

3   witnesses.  And we met at a certain day and

4   time.  I think -- I believe it was in the

5   evening.  Still daylight outside.  And

6   they -- all the people who were there, see if

7   I can remember everyone, I don't remember all

8   the names.  Mr. Grant, his wife Stephanie,

9   there were at least three other witnesses in

10  the room; I don't remember their names.  I

11  remember one was the young man who was

12  outside who gave testimony about what he saw.

13          So I took testimony from each of

14  them, asked them questions.  We kind of

15  reenacted, had them sort of reenact the scene

16  for me, kind of explaining from their

17  perspective what they remember, how it all

18  happened and interjected questions.  So I

19  think I was there for a couple hours.

20  Reviewed the police reports with them.  I

21  think that was mostly the activity -- most of

22  the activity on that day.

23          Then after the interviews --

24  well, even before the interviews I would have

25  had access to the police reports, the

```
 1                    J. Lipari                39
 2    photographs, I went through all of those
 3    carefully.  There was some -- I think there
 4    was some media reporting at the time so I was
 5    going to be sure I was reading the newspaper
 6    reports just to make sure I was aware of
 7    everything that was out there.  There could
 8    be some other steps in there that I took that
 9    I can't think of at the moment, but those
10    would be the most important.  Then I would --
11    once I had all of the information together
12    from the police file, from the Office of
13    Professional Standards file, interviewed the
14    complainant and all the witnesses, my next
15    step would have been to identify any
16    inconsistencies between the various accounts.
17              I can't remember it for sure but
18    often I would have -- I can't remember for
19    sure in this case, but often I would have
20    follow-up phone conversations with people to
21    clarify any of those inconsistencies I may
22    have found.  Sometimes I sit down with the
23    individuals in person.  But again, I can't
24    remember if I had to do that in this case.
25              And so then once I felt like I
```

```
1                    J. Lipari              40
2   had everyone's account, all of the
3   information that was available, resolved --
4   and I resolved inconsistencies, but I got
5   accounts from everyone relative to those
6   inconsistencies, then I would put my
7   investigative report together and prepare to
8   provide it to the board members.
9        Q     And do you recall if you
10  recommended a hearing in this case?
11                  MR. SICKINGER:  Object to
12              form.
13       A     I believe I did recommend a
14  hearing for this case, yes.
15       Q     You mentioned earlier that you
16  believe Alonzo Grant was charged with various
17  offenses?
18       A     Yeah, I think he was charged,
19  yes.
20       Q     Do you recall if Mr. Grant was
21  prosecuted for any of those charges?
22                  MR. SICKINGER:  Object to
23              form.
24       A     I recall that the charges were
25  dropped at some point, so yeah, he was
```

```
 1                    J. Lipari                 41
 2    charged, but I don't know -- I don't think it
 3    went to trial.  I think the DA just dropped
 4    the charges at some point.
 5          Q      And as part of your investigation
 6    or as part of the hearing, you offered the
 7    officers an opportunity to testify?
 8          A      Yes.
 9          Q      Do you recall if they did?
10          A      They did not.
11                 We sent them a standard letter
12    that we send all officers inviting them to
13    participate in the hearing.
14          Q      Who else testified; do you
15    recall?  And I know it's been some time, so.
16          A      Yeah, it's been a couple years.
17                 There were -- I remember there
18    were, like, several witnesses for this case.
19    The young man who was outside, I'd recognize
20    his name if I heard it.  He testified.  I
21    think the -- I know the daughter; they had a
22    couple of daughters, at least two.  One, if
23    not two of them testified at the hearing.
24    Then, of course, Mr. Grant, Stephanie
25    testified.  So that's what, that's four or
```

```
1                   J. Lipari                42

2     five right there.  May have been one or two

3     others that -- witnesses that testified.

4     Those are the specific ones I can recall.

5          Q      Do you recall the findings of the

6     panel after the hearing?

7                      MR. SICKINGER:  Object to

8                 form.

9          A      The panel did sustain the

10    allegations that were presented and I have

11    the finding letter in front of me, so I

12    could -- helps me recall what the actual

13    allegations were.  Excessive force, false

14    arrest, and untruthfulness.  They sustained

15    excessive force, false arrest against the two

16    responding officers who were initially on

17    scene and took Mr. Grant down and used force

18    on him, and then they also sustained

19    untruthfulness against those two officers.

20                 In addition, a responding

21    sergeant who provided a statement in his use

22    of force report that the panel ultimately did

23    not find compelling or truthful, so they

24    sustained untruthfulness against the two

25    responding officers and the sergeant.
```

```
1                     J. Lipari                    43

2        Q      Okay.  So in accordance with what

3    you told me earlier, you have a very limited

4    window in order to provide your findings to

5    the chief of police, correct?

6        A      Yeah.  I think the ordinance

7    directed within one business day.

8        Q      Did you follow through on that?

9        A      I can't remember for this case.

10   There were -- I know there was a period where

11   there might be two or three days that would

12   go by.  I can't remember if that was before

13   or after this case, before we would get the

14   finding in.

15              Some of these, you know, the

16   finding letter to the complainant is very --

17   it's a form letter, you know, it's just

18   pretty standard.  But the finding letter to

19   the chief is -- it's a -- can be a very

20   fairly complicated legal document, so

21   sometimes I would need more than one day to

22   write it all out for him, all of the, you

23   know, the laws that were at play, the

24   policies that were at play, thinking, the

25   logic of the panel members.  So those letters
```

```
1                    J. Lipari                    44
2    had to be written very carefully.
3              There were times I know where we
4    would pass that one business day.  I can't
5    recall for this particular case if it was --
6    well, we have -- if we look at the dates on
7    the hearing date and then the date that we
8    sent -- that's on the letter to the chief,
9    that would tell us one business day or two or
10   three.  Wouldn't have been more than -- I
11   wouldn't think it would be more than a week
12   that went by.
13       Q    Let me ask you this:  If you did
14   not supply that document to the chief of
15   police within that one business day, would
16   that create any further issues with
17   cooperation between CRB and the chief of
18   police?
19                  MR. SICKINGER:  Object to
20              form.
21       A    There was nothing in the
22   ordinance that laid out any consequences or
23   further action if those deadlines weren't
24   met, whether it was a thirty-day deadline,
25   sixty-day deadline, a ninety-day deadline.
```

```
 1                     J. Lipari              45
 2    On a separate issue in terms of our sixty-day
 3    timeline to complete a case, we had our
 4    outside legal counsel look at what it meant
 5    in the ordinance, for the ordinance to say,
 6    CRB shall complete this.  And according to
 7    his legal research and his understanding,
 8    that language, shall, was directory and not
 9    mandatory.
10              It means you were -- our
11    understanding was you aim to meet those
12    dates, those timeframes, but if you went
13    beyond that, there was no consequence, no
14    negative consequence or anything that
15    happened if you did not meet those deadlines.
16         Q    Do you recall if these deadlines
17    were met in this particular case with Alonzo
18    Grant?
19         A    I do not recall.  I'm almost
20    positive -- no, I'm not even positive about
21    that.  I was going to say we might have gone
22    past the sixty-day timeframe to hold the
23    hearings for this case, but I'm not even sure
24    that we got it done within sixty days.
25         Q    That's okay.  I understand some
```

```
1                    J. Lipari                 46

2    time has gone by.  And we were not provided

3    with all the documents that we had originally

4    requested for various reasons.

5         A     Right.

6         Q     Is it fair to say that you did

7    supply the hearing -- findings of the hearing

8    to the chief at some point?

9                    MR. SICKINGER:  Object to

10                   form.

11        A     Absolutely, yes, sir.

12        Q     Did you provide those to the

13   mayor?

14                   MR. SICKINGER:  Object to

15                   form.

16        A     They would go -- a copy of the

17   original would go to the chief and a copy

18   would go to Corporation Counsel's office

19   which the ordinance required us to do.  We

20   would not send a copy of the findings

21   directly to the mayor.  We would send them to

22   Corporation Counsel.  We were not required by

23   anyone to send it to the mayor; just

24   Corporation Counsel and chief.

25        Q     Understood.
```

```
1                    J. Lipari                 47

2              You mentioned another deadline,

3     the chief has thirty days to respond to your

4     recommendations --

5         A     Correct.

6         Q     -- of the board?

7         A     Yes.

8         Q     Do you recall if the chief

9     responded?

10                    MR. SICKINGER:  Object to

11                form.

12        A     I don't recall if he responded to

13    this.  There was a period, we sort of went in

14    and out of periods with the chief where he

15    was responding in writing to our findings.

16    Early on it was very difficult to get those

17    letters from the chief as it was required in

18    the ordinance, so we over several months, a

19    year or so, we kind of prevailed upon him to

20    provide those and eventually we did start

21    getting those, but then there was a period

22    where they began -- the department or the

23    chief and Corporation Counsel began to argue

24    that if we were holding the hearing after the

25    sixty-day timeframe that the ordinance
```

```
 1                    J. Lipari                48

 2    directed CRB to complete the process in, then

 3    he didn't have to respond to our findings.

 4    But they didn't -- yeah, he did not respond

 5    to the finding so we, you know, worked

 6    through that issue and then eventually got to

 7    the point where the chief was providing his

 8    findings to us again.

 9              And then another incident

10    happened and he stopped providing them to us

11    again, so it was sort of periods where he was

12    providing the letters to us and periods where

13    he was not.  So I'd have to see the file to

14    recall whether the chief responded

15    specifically to this one.

16        Q     You had made sustained findings

17    for each one of the officers and Alonzo

18    Grant's particular case, yes or no?

19                    MR. SICKINGER:  Object to

20              form.

21        A     The panel did.  I didn't.

22        Q     Sorry, the panel did.

23              Do you recall the recommendations

24    for discipline put forth by the CRB for each

25    one of these officers?
```

```
1                        J. Lipari                    49
2                    MR. SICKINGER:  Object to
3            form.
4        A      Not off the top of my head, no, I
5    don't recall.
6        Q      Are you aware of whether or not
7    the chief complied with these recommendations
8    for the CRB?
9                    MR. SICKINGER:  Object to
10           form.
11       A      If he provided a letter or
12   response letter, you know, we would have that
13   in the letter.  I don't believe any
14   discipline was imposed in this case.  Yeah,
15   I'm pretty sure no discipline was imposed in
16   this case by the chief.
17       Q      Had you been contacted by the
18   chief of police in regards to the
19   recommendations made by the CRB in this case?
20                   MR. SICKINGER:  Object to
21           form.
22       A      I don't believe so, no.
23       Q      Had you been contacted by the
24   mayor?
25                   MR. SICKINGER:  Object to
```

```
1                    J. Lipari              50
2            form.
3      A     No.
4      Q     Had anybody from the mayor's
5  office contacted you in the spirit of
6  cooperation in order to enact any
7  recommendations by CRB?
8                MR. SICKINGER:  Object to
9            form.
10     A     No.
11     Q     What authority does the CRB have
12 when recommendations are not met or followed
13 through by either the chief or the mayor?
14                MR. SICKINGER:  Object to
15            form.
16     A     CRB had no role at that point.
17 Once we provide the finding and the
18 recommendation to the chief and then the
19 chief provides the written response back to
20 us, that's the end of -- end of the role of
21 the CRB in the case, other than providing the
22 finding letters to all the involved parties.
23 There was no mechanism or recourse, you know,
24 if we wanted -- if the panel wanted to insist
25 on discipline, there was nothing like that.
```

```
1                    J. Lipari              51

2    It was the chief made the final decision.

3         Q    So it's your understanding the

4    chief makes the final decision or does the

5    mayor make the final decision?

6                    MR. SICKINGER:  Object to

7                 form.

8         A    I guess at the end of the day the

9    chief works for the mayor, so, you know,

10   decisions ultimately, you know, are made by

11   the mayor.  We'd have to check the charter to

12   see -- the City charter to see if the mayor

13   can supersede the chief in a disciplinary

14   matter.

15                 My operating assumption was

16   always the chief made the final decision in

17   disciplinary manners, but conceivably the

18   mayor could fire the chief.  You know, the

19   chief serves at the pleasure of the mayor, so

20   if the mayor didn't like something that the

21   chief was doing, they could -- I don't know

22   if they could direct them how to impose

23   discipline.  Again, that'd be something we'd

24   have to check the charter on.  But certainly,

25   the chief serves at the pleasure of the
```

```
1                    J. Lipari                52
2    mayor.
3         Q     During your tenure, had you ever
4    been made aware of anybody -- citizens
5    expressing their feelings about whether --
6    how they felt about whether or not the Police
7    Department or the mayor had followed through
8    on any recommendation from the CRB?
9                    MR. SICKINGER:  Object to
10                   form.
11        A     The question was whether the
12   public --
13        Q     Yes, whether any citizens or
14   anybody --
15                   MR. SICKINGER:  Are you
16                   limiting the question to Mr.
17                   Grant or are you asking
18                   generally?
19        Q     I could ask in this case, Mr.
20   Grant's case, were you aware of any citizens
21   in this -- Syracuse, had they made any of
22   their feelings known in regards to whether or
23   not the chief had enforced or followed
24   through on any recommendations in the CRB or
25   mayor?
```

```
 1                    J. Lipari              53

 2                    MR. SICKINGER:  Object to

 3            form.

 4       A     I don't recall any citizens or

 5   public making any comments about the chief's

 6   decision in this case.  I'm sure some people

 7   did, but I don't recall anything

 8   specifically.

 9       Q     So where are we with our

10   exhibits?  41 or 42?

11            Let me hand you a document which

12   is being marked as Plaintiff's Exhibit 41,

13   and ask if you recognize this document.  Take

14   a moment to review that document, please.

15                    (Syracuse Citizen Review

16            Board case report:  CRB #12-059

17            was marked as Plaintiff's Exhibit

18            41 for identification, as of this

19            date.)

20                    (Finding letter from chief

21            was marked as Plaintiff's Exhibit

22            42 for identification, as of this

23            date.)

24       A     I do generally remember this case

25   and the document is an investigative report I
```

```
 1                    J. Lipari                54
 2    wrote based on the case, and I do sort of
 3    vaguely remember this case.  I remember the
 4    basic outline of the incident.
 5         Q    For the record, this is case
 6    report CRB number 12-059, correct?
 7         A    Correct.
 8         Q    Dated December 27, 2012?
 9         A    Correct.
10         Q    And investigation by CRB
11    administrator Joseph Lipari, correct?
12         A    Yes.
13         Q    I will hand you what has been
14    marked Plaintiff's Exhibit 42 dated January
15    17, 2013.  Do you recognize that document?
16         A    Yes.  This is a finding letter to
17    the chief.  Oh, yeah, it's a finding letter
18    for that -- the case for the investigative
19    report that you just handed me, 12-059.
20         Q    In regards to this case, were
21    there sustained findings of misconduct?
22         A    I believe so, yes.
23         Q    At the very bottom of the -- not
24    the very bottom but above your name, that's
25    your name, Joseph Lipari, correct, at the
```

```
 1                     J. Lipari                    55

 2   bottom?

 3        A      Yes.

 4        Q      Two paragraphs up where it starts

 5   with, unfortunately.

 6        A      Yes.

 7        Q      Could you read that?

 8        A      Unfortunately, the CRB was not

 9   informed of this complaint until late

10   October, many months after the notice of the

11   incident was provided to OPS by Deputy Chief,

12   redacted, and well after you had already made

13   your disciplinary decision.  In the future,

14   the CRB should be notified immediately so

15   that the CRB can conduct its own

16   investigation and provide its recommendation

17   to you in a more timely fashion.

18        Q      Okay.  Earlier in this testimony,

19   you mentioned that there had was some

20   struggle between the CRB and the chief of

21   police over these timelines?

22        A      Right.

23        Q      Is this what you mean in regards

24   to this statement?

25                     MR. SICKINGER:  Object to
```

```
 1                    J. Lipari                    56

 2            form.

 3       A      This one was a little different.

 4   Because it came directly from a deputy chief,

 5   it was essentially a complaint filed by a

 6   deputy chief who became aware of the incident

 7   and so they just -- the OPS, Office of

 8   Professional Standards department proceeded

 9   with their process and did not turn the file

10   over us, I think until they completed the

11   case.  I think that's the way it happened.

12   And so that, you know, that was contrary to

13   the ordinance that this -- that instructs the

14   Office of Professional Standards to provide

15   the case, the entire case file to the CRB

16   within thirty days.

17            So if I remember correctly -- I

18   don't remember the exact timeframe, but after

19   they had -- Office of Professional Standards

20   had completed the case, they turned it over,

21   the full packet to us with their

22   investigation.  And so at that point, it must

23   have been past the thirty days which is why I

24   would have raised it in this letter.

25            So yeah, the department had come
```

```
 1                    J. Lipari                57

 2   to its decision and made its finding on this

 3   case without having sent it to us.

 4        Q     Do you recall what that decision

 5   was?

 6        A     I believe they did impose

 7   discipline against this officer for this

 8   incident, this one that was essentially filed

 9   by the deputy chief of police.

10        Q     Do you recall who that deputy

11   chief of police was?

12        A     Thompson.  Thompson.  Rebecca

13   Thompson.

14        Q     I want to set those in the pile

15   there and hand you this document.

16                    (Syracuse Citizen Review

17                    Board case report:  CRB#13-020

18                    and 13-021 was marked as

19                    Plaintiff's Exhibit 43 for

20                    identification, as of this date.)

21        Q     It's marked as Plaintiff's

22   Exhibit 43.  Can you take a moment to refresh

23   your recollection?

24                    MR. SICKINGER:  Off the

25                    record.
```

```
 1              J. Lipari                    58

 2                   (Whereupon, a discussion was

 3              held off the record.)

 4                   MR. RYDER:  Back on the

 5              record.

 6         Q    Okay, Joe, I'm going to actually

 7    back up a little bit.  I got ahead of myself.

 8    I'm going to ask you to take a look back at

 9    Exhibit 41, if you could.

10         A    41?

11         Q    Yes.

12              You mentioned that you recognize

13    that document.  You had been familiar with

14    the facts of that case?

15         A    Yes.

16         Q    All right.  Can you just tell me

17    briefly what that case entailed?

18         A    Without having read it

19    completely, just having skimmed it and my

20    memory being jogged, it was an incident with

21    a teenager at a group home called Elmhurst.

22    I forget exactly how the incident started,

23    but at some point an officer was called and

24    they had the young man in a room and there

25    was an interaction between the young man and
```

```
1                    J. Lipari              59
2    the officer where the officer's words to the
3    young man were alleged to be threatening, and
4    then this officer at some point grabbed the
5    young man around the neck.  And then I
6    remember there was a description of the young
7    man's face turning red and then she let --
8    the male officer let him go.  And I think
9    they exchanged some more words towards each
10   other.  That's the basics of the case.
11        Q    And to your recollection, there
12   were sustained findings from the CRB?
13                  MR. SICKINGER:  Object to
14            form.
15        A    Yeah.  So I think this is the one
16   where we received along with the complaint
17   and the report and everything from OPS, the
18   chief's finding and his decision on the case,
19   and so we were -- that's where we felt like,
20   well, we should have received this before you
21   made this decision and been given an
22   opportunity to conduct our own investigation
23   and make a recommendation and then you make
24   your decision as the ordinance lays out.
25        Q    Do you recall what the chief's
```

```
1                        J. Lipari                    60

2     finding was?

3                    MR. SICKINGER:  Object to

4               form.

5          A     I forget what they called it, if

6     it was conduct unbecoming or something, but I

7     remember they did impose discipline against

8     this officer.  I remember it because it -- I

9     didn't -- we didn't see a lot of other

10    discipline being imposed in such cases,

11    excessive force cases, so that one stuck in

12    my mind as one that was -- discipline was

13    actually imposed.

14               And the fact it was unusual to

15    have a deputy chief filing the complaint, so

16    I figured that played into it.

17         Q     So you mentioned that the finding

18    was, to your recollection to be fair, was

19    conduct unbecoming; is that what you said?

20                    MR. SICKINGER:  Object to

21               form.

22         A     I'm not positive about that, but

23    I don't remember it being labeled as

24    excessive force but it could have been.  For

25    some reason, conduct unbecoming is sticking
```

2      out in my mind so I think that may be what
3      they called it, but without having it
4      right --
5           Q     Do you recall if there was a
6      finding of excessive force?
7           A     From the department?
8           Q     Yes.
9                      MR. SICKINGER:  Object to
10               form.
11          A     If I remember correctly, it
12     was -- it was something other than excessive
13     force.  It was conduct -- yeah, and now that
14     I look at what -- how we labeled it, the
15     allegations, we included conduct unbecoming.
16     So that's -- that reminds me, yeah.  That was
17     -- that's what the department had decided,
18     conduct unbecoming.
19          Q     We will go ahead and skip forward
20     to the last exhibit I gave you, which should
21     be Plaintiff's Exhibit 43 if I'm keeping them
22     in order here; is that correct?
23          A     I have 43 here, correct.
24          Q     Are you familiar with that
25     document?

```
1                    J. Lipari              62

2        A     It's another one of my

3   investigative reports.  I don't remember who

4   these individuals were.  We had a number of

5   cases that involved officers offering to not

6   charge someone with something, with a crime,

7   in exchange for information on either the

8   drug trade or guns -- getting illegal guns to

9   them.

10              So as I skimmed it, the situation

11  is familiar, but I don't remember exactly

12  which case, which individuals these are.  We

13  had several of these.

14       Q     Okay.  So for the record, we're

15  discussing CRB case report 13-020 and 13-021,

16  dated April 1, 2013.  Investigated by CRB

17  administrator Joseph Lipari, correct?

18       A     Correct.

19       Q     So you mentioned that something

20  that stuck out to you after skimming this was

21  that this was an investigation over officers

22  offering, how did you put it, reduction in --

23  reduction in consequence or something?

24       A     Yes, so we had sort of --

25              MR. SICKINGER:  Object to
```

J. Lipari                    63

2      form.

3          A     We had sort of wrestled with how

4     to -- what to call these cases, so I think at

5     one point we were referring to them, I think

6     we eventually settled on nonfeasance in

7     exchange for incriminating information.

8     Nonfeasance meaning not doing something you

9     were supposed to do, as in arrest the person

10    or give them a citation.  Other things we

11    called it I think were inappropriate offers

12    in exchange for information, always along

13    those lines, sort of capturing of the

14    officers not doing something that -- that

15    they should have done in exchange for

16    information.

17         Q     Okay.  You mentioned that the CRB

18    was empowered to make a wide range of

19    recommendations to the chief, correct?

20         A     Correct.

21         Q     These would include everything

22    from maybe a verbal warning to termination,

23    somewhere in between?

24         A     In terms --

25                MR. SICKINGER:  Object form.

```
 1                    J. Lipari                64

 2         A     In terms of discipline, yes, but

 3    we also had -- could make recommendations in

 4    terms of policy and training.

 5         Q     And had you throughout the tenure

 6    of your career in Syracuse as the CRB

 7    administrator, had you made recommendations

 8    of policy and what did you say, education?

 9         A     Training, yes.  In our annual

10    report every year we would make policy and

11    training recommendation.

12         Q     Would you make the particular

13    policy and training recommendations in your

14    documentation that you sent over to the

15    chief?

16         A     We could.  We didn't have to make

17    a policy and training recommendation, but we

18    certainly could, and in an individual case,

19    if we thought -- if the panel thought that a

20    case raised a particular policy or training

21    issue, they could -- they didn't have to wait

22    until the annual report to make that

23    recommendation.  They could put that in the

24    findings to go to the chief.

25         Q     And do you recall within your
```

J. Lipari                    65

1   tenure, had you done that?

2       A      We did that several times, yes.

3       Q      Do you recall within your tenure

4   whether or not the chief of police had

5   followed through on that particular

6   recommendation?

7                   MR. SICKINGER:  Object to

8                   form.

9       A      For the policy and training

10  recommendations, he was not required under

11  the ordinance to respond to us in any way

12  when we made a policy or training

13  recommendation, so we wouldn't necessarily be

14  told if he had.  Some of the issues that we

15  raised we saw give -- there would be a point

16  where it became less of a problem and so we

17  would -- hoping that maybe it was raised

18  in -- in service training or in roll call to

19  correct some of this, but we never had any

20  kind of confirmation or official, you know,

21  notice that any of our recommendations on

22  policy or training were ever adopted or

23  instituted.

24      Q      I'm going to hand you what is

```
 1                    J. Lipari              66

 2    marked as document Plaintiff's Exhibit Number

 3    44.

 4                    (Finding letter for case

 5                    #13-020 and #13-021 was marked as

 6                    Plaintiff's Exhibit 44 for

 7                    identification, as of this date.)

 8         Q     Take a look at that for a moment.

 9         A     This is the finding letter for

10    the same case we were just looking at, 13-020

11    and 13-021.

12         Q     And then the second page of that

13    document, is that your name as administrator?

14         A     Yes.

15         Q     In this case, did the CRB

16    conclude any or sustain any findings?

17         A     Yeah, according to this finding

18    letter, the panel did sustain demeanor and

19    excessive force and also improper offer to

20    remove charges.

21         Q     Underneath the CRB finding title

22    on this document, there's a title CRB

23    recommendation.  Do you see that?

24         A     Yes.

25         Q     Could you read those
```

```
1                    J. Lipari                    67
2    recommendations, please?
3         A     For demeanor and excessive force
4    written reprimand, improper offer to remove
5    charges, command level review of SPD practice
6    of discretionary enforcement in exchange for
7    information on guns or drugs.
8         Q     To your knowledge, were any of
9    these recommendations followed through with
10   by either the chief of police or the mayor of
11   Syracuse?
12                    MR. SICKINGER:  Object to
13               form.
14        A     Again, we received no
15   notification, formal or informal that that
16   recommendation was acted upon; however, I
17   would say that after we made that
18   recommendation in an annual report, there was
19   some media coverage of it, we would still get
20   complainants say that -- tell us that an
21   officer tried to get information from me and
22   then we would ask him, did they refer to the
23   DA's office at all, but that's what was at
24   stake here was our recommendation was
25   ultimately that, of course you want to go up
```

```
 1                    J. Lipari                68

 2    the food chain, try to ask lower level

 3    criminals about higher level stuff, but no

 4    one wants to get in the way of that.

 5              But there is a process outline

 6    with the DA's office on how to do that.  You

 7    go through the DA's office, the DA is

 8    ultimately who decides who gets charged and

 9    doesn't get charged, not the officers.  And

10    so our recommendation was, you know, to

11    remind officers that only the DA's office can

12    make that decision.  What officers can do is

13    say, look, I can try to help you out if you

14    give me this information and we'll talk to

15    the DA's office, try to, you know, see if the

16    DA will lower the charges or drop the

17    charges, but it's up to the DA and you have

18    to make it clear to the individuals that the

19    officer is not the one making that decision

20    and will drop the charges at the DA's office.

21    It has to go through these formal official

22    channels.

23              So after we made our

24    recommendation, we started asking -- we

25    continued asking complainants when they would
```

```
 1              J. Lipari                69

 2    bring up this issue, yeah, they were trying

 3    to get information.  They were trying to get

 4    me to give a gun, or we would ask them, did

 5    they mention anything about the DA's office

 6    and they would stop and they would think,

 7    yeah, they did actually.  They said we needed

 8    to -- we would have to get this cleared by

 9    DA's.  So we felt like we never got into our

10    formal complaints about that happening

11    without the DA being mentioned so we felt

12    like our -- us -- the CRB raising it and

13    making recommendation -- policy

14    recommendation and training recommendation on

15    this one may have actually helped tamp down

16    the occurrence of that happening out on the

17    street.

18         Q    So as administrator, you're fully

19    aware of the functions of the CRB; is that

20    fair to say?

21         A    Yes.

22         Q    So, would it be one of the

23    functions of the CRB to identify and

24    recognize patterns, in particular,

25    allegations against the police within the
```

```
1                    J. Lipari                    70
2    City of Syracuse?
3                    MR. SICKINGER:  Object to
4              form.
5         A    So I think the way it's worded in
6    the ordinance is policies and training.  I
7    don't think they could use the word, pattern
8    and practice, in the ordinance per se.  But
9    when you're looking at policies and training,
10   you're -- by nature you're often looking at
11   the way things are done, whether informal or
12   formally, so essentially be a pattern or
13   practice.  So in the field of civilian
14   oversight more broadly that's often what
15   we're asked to do is look at pattern
16   practices, so I would say that during my time
17   at the CRB, yeah, I considered it within my
18   purview to look for patterns and practices
19   and to try to address them if there was a,
20   you know, if there was a solution to them.
21        Q    Could you give me an example of
22   maybe one of the patterns and practices that
23   you would have identified while you were CRB
24   administrator in Syracuse?
25                   MR. SICKINGER:  Object to
```

```
1                    J. Lipari                71

2            form.

3        A     So I think this is a good

4   example, this practice of telling arrestees,

5   potential arrestees that, you know, we'll

6   make this -- we won't arrest you on this if

7   you give us information on A, B, or C.

8            We also saw a pattern of officers

9   failing to adhere to the, what is called the

10  felony stop policy or high-risk traffic stop

11  policy.  We had a number of cases where

12  officers would run up to a car with guns

13  drawn if they thought there was a gun in the

14  car or a felon in the car or something.

15  That's a very dangerous thing to do.

16            So out of office -- concerns for

17  officer safety we recommended that -- they

18  had a good policy on felony stops on these

19  high-risk traffic stops.  We weren't seeing

20  it being followed in our cases that we were

21  investigating, so we did make a policy and

22  training recommendation on that one --

23  training recommendation on that one and we

24  saw that essentially taper off as well.

25            In terms of use of force, you
```

```
 1              J. Lipari                72

 2   know, I think from the start with those high

 3   excessive force complaint numbers we were

 4   always concerned with the City's policy and

 5   its training on use of force.  And so we did

 6   over three years make multiple

 7   recommendations to the department that it

 8   update its use of force policy and to train

 9   officers on that -- on this new policy.

10           So yeah, I mean, I would say, you

11   know, the issue of use of force became a deep

12   concern for us.  I will leave it at that,

13   yeah.

14       Q    Were policy recommendations made

15   to the City of Syracuse in regards to use of

16   force then?

17               MR. SICKINGER:  Object to

18               form.

19       A    Yes.  In 2013.  In our 2013

20   annual report, we recommended that the City

21   conduct a review of its use of force policy

22   to ensure that it is in line with what the

23   Department of Justice recommends in their

24   consent decrees that they reach with the

25   cities around the country.
```

J. Lipari                                    73

2          As far as I was aware, that was

3    never acted upon by the department.  So in

4    our 2014 annual report, we made another

5    recommendation that the City again review its

6    use of force policy, and this time we said to

7    make it consistent with DOJ consent decrees

8    and recommendations, and the recommendations

9    that DOJ would have in these consent decrees,

10   that they add these particular components to

11   their use of force policy.

12          I won't go through all of them

13   but we had certain -- we had several things

14   that we wanted to see added to the policy.

15   Again, we didn't receive any notification

16   that that was being adopted or changed, and

17   the policy was not changed.  So in our 2015

18   annual report, the board members directed me

19   to develop a full comprehensive use of force

20   policy for the purposes of the CRB but then

21   also to recommend to the City that they adopt

22   this policy or something very similar to it.

23   So we included that in our 2015 annual

24   report, this recommended use of force policy.

25       Q     And what was the outcome of that,

```
 1
 2   to your knowledge?
 3            MR. SICKINGER:  Object to
 4            form.
 5      A     As far as I know, no action has
 6   been taken on that by the department or the
 7   City either.
 8      Q     In previous answers you
 9   referenced some of the aspects of your
10   recommendations with the new use of force
11   policy.  You said you didn't want to get into
12   that, seemed like maybe that was voluminous,
13   but could you go into some of those?
14            MR. SICKINGER:  Object to
15            form.
16            Again, Mr. Ryder, you're far
17            outside the scope of the order.
18            If you want to continue this, I'm
19            going to call the magistrate now.
20            I'm trying to avoid that.
21            MR. RYDER:  Let's go off.
22            MR. SICKINGER:  No.  We're
23            on the record.
24            MR. RYDER:  I just want to
25            see what his concerns are
```

1           J. Lipari                    75

2      exactly.  I want to make sure

3      that maybe I'm not --

4           MR. SICKINGER:  My concern

5      is that the order specifically

6      states what you've been

7      questioning him about.  You're

8      getting into policies, you're

9      getting into his understanding of

10     patterns and practices.  That's

11     far outside of the scope of the

12     Court's June 28th order.

13          I would like to see if we

14     can conclude this deposition by

15     sticking to the terms and scope

16     of the order without getting into

17     these issues.

18          MR. RYDER:  Certainly I

19     don't want to get into anything

20     purposefully.  Okay?  So maybe

21     sometimes I am kind of leading

22     into something but I'm not really

23     aware.

24          MR. SICKINGER:  I understand

25     that, Mr. Ryder.  I'm just trying

```
 1                J. Lipari                    76

 2                to make sure that we both get

 3                this done today and --

 4                     MR. RYDER:  And I am

 5                certainly not just doing anything

 6                to get under your skin.  I'm

 7                following through with some of

 8                the questions I have.

 9       A     I mean, the easy answer to the

10   use of force of policy question is just to

11   look at the annual report.  It's all in the

12   report.

13       Q     All right.  I'm going to hand you

14   what we've marked as Plaintiff's Exhibit 45.

15                     (Case report:  CRB#13-100

16                was marked as Plaintiff's Exhibit

17                45 for identification, as of this

18                date.)

19       Q     Do you recognize that document?

20       A     It's another investigative report

21   that I concluded.

22       Q     This would be?

23       A     Just 13-100.

24       Q     Dated December 3, 2013?

25       A     Correct.
```

```
 1                    J. Lipari                  77

 2        Q      Investigated by CRB administrator

 3   Joseph Lipari?

 4        A      Correct.  Okay, yeah.  I remember

 5   this case.

 6        Q      Could you tell me briefly what

 7   that document embodies?

 8        A      This is the investigative report

 9   for an excessive force allegation, an

10   individual that was wanted on petty larceny

11   and trespassing counts.  An officer spotted

12   him on the street, there was some dispute

13   over the complainant's actions at that point.

14   The complainant said he just took off running

15   when the officer said we have been looking

16   for you.  The officer said I think the

17   complainant threw down a bottle of beer or a

18   glass bottle and it shattered and then he

19   took off running.  Either way, the

20   complainant took off running.

21               The officer caught him and fairly

22   significant use of force on the individual as

23   the officer, you know, detailed in his report

24   in terms of striking the individual in the

25   face, I think multiple times.  And the
```

```
1                    J. Lipari                    78

2      complainant certainly complained that he was

3      struck in the face multiple times.  I don't

4      remember if he alleged that he was kicked or

5      not.  Yeah, he does.  It does allege that he

6      told an officer that he couldn't breathe and

7      that an officer stated, I hope you die,

8      kicked him in the face.

9                And then the complainant also

10     alleged that he asked the officer's name and

11     the officer said, get it off the report and

12     refused to give his name.

13               And so there was a sergeant that

14     then responded to the incident after the use

15     of force had ceased, and the complainant, I

16     believe recounted that he told the sergeant

17     or he asked the sergeant why he -- why the

18     officer beat me up this way or something to

19     that effect.  And then the complainant

20     alleges that the sergeant responded, you

21     should have run faster, meaning he shouldn't

22     have gotten caught.

23               So that's the gist of the case.

24        Q     I'm going to hand you what has

25     been marked as Exhibit 46.
```

```
 1                J. Lipari                79

 2                    (Finding letter for CRB

 3                    #13-100 was marked as Plaintiff's

 4                    Exhibit 46 for identification, as

 5                    of this date.)

 6          Q     Briefly review that document.

 7          A     So this is the finding letter for

 8     that case we were just discussing, 13-100.

 9          Q     Were there disciplinary

10     recommendations made?

11          A     Yes.  So the panel sustained

12     excessive force against both officers who

13     were involved in that incident.  One received

14     a fifteen-day -- one was the panel

15     recommended a fifteen-day suspension without

16     pay for one officer and a five-day suspension

17     without pay for the other officer.

18          Q     Do you recall whether or not

19     those recommendations were filed through

20     either the chief of police or the mayor?

21                    MR. SICKINGER:  Object to

22                    form.

23          A     I don't believe they were.

24          Q     On the second page, first

25     paragraph in bold I'm going to have you read
```

```
 1                      J. Lipari                  80

 2      that first paragraphs for me, please.

 3            A     This is a letter from me assigned

 4      to -- written to the chief of police.

 5                 The CRB appreciates the written

 6      responses that we have now begun to receive

 7      from you.  Your responses assist the CRB in

 8      understanding the reasoning behind your

 9      disciplinary decisions.  We look forward to

10      continuing to receive these responses because

11      they will likely contribute to further

12      convergence of the investigative findings and

13      disciplinary decisions of our respective

14      agencies.

15            Q     Now, my experience after looking

16      through all these documents, I hadn't seen

17      that language before.

18                 Could you explain the reasoning

19      behind that language?

20            A     Yes.  So that tells you this was

21      a point where, remember earlier I was telling

22      you that there was a period where the chief

23      wouldn't provide these written letters to us,

24      his written responses once we provided the

25      finding letter.  So this was the beginning of
```

<pre>
1                    J. Lipari              81
2    the period when he did start responding,
3    providing these responses to us.  So that
4    whatever the case that we handled right
5    before this one, he must have responded in
6    writing to that one and must have been new
7    for us, so I -- in this next letter I
8    indicated that we appreciated getting that
9    now and that we look forward to continuing
10   getting those in the future.
11        Q    Do you recall if you had received
12   your response to this letter?
13        A    Do I recall what?
14        Q    If you had received a response to
15   this recommendation.
16        A    I am not positive, but all of
17   those letters are kept in the office.  You
18   know, I had a file that every response letter
19   we got from the chief went in there, so those
20   are saved.  I don't remember the guy's name.
21   I don't remember if I we got a response
22   letter from the chief on this one.
23        Q    But you do remember whether or
24   not the recommendations were followed through
25   with?
</pre>

1                     J. Lipari                    82

2                     MR. SICKINGER:  Object to

3          form.

4          A     No.  We would have had to have

5     gotten the response letter from the chief to

6     know for sure whether any discipline was

7     imposed or not.  So I would -- I would defer

8     to whatever the written record says on that.

9     I mean, the -- the way it works in my mind is

10    a handful of cases where discipline was

11    imposed, I kind of remember those and then

12    the others, you know, if it doesn't stick out

13    in my mind it's just one that was where

14    discipline -- where the chief imposed

15    discipline.  Usually falls in the other

16    category of not having imposed discipline.

17              Usually if it didn't fall into

18    the category of having discipline imposed by

19    the chief, then it meant it was in the other

20    category of no discipline being imposed.  But

21    again, I would defer to the written record.

22         Q     Was it common to have discipline

23    imposed by the chief or by the mayor or would

24    be that uncommon?

25                     MR. SICKINGER:  Object to

```
1                        J. Lipari                    83
2               form.
3       A       For excessive force?
4       Q       For any of these.
5       A       For any?  It was uncommon --
6               MR. SICKINGER:  Again, Mr.
7               Ryder, if you're going to ask
8               these questions, I tried to
9               contact the magistrate earlier
10              but she was on the bench.  I will
11              contact her again in her chambers
12              because you're getting -- you're
13              way outside of the parameters of
14              the June 28th order.  I would
15              like to limit it to that and see
16              if we could avoid contacting her,
17              but if you're going to continue
18              down the road, I'm going to have
19              to --
20              MR. RYDER:  He said it.  I
21              just followed through with what
22              the witness just said.  I didn't
23              ask him that originally.  I
24              followed through with his
25              statement.
```

```
1                        J. Lipari                    84
2                   MR. SICKINGER:  The order
3              does delineate.
4                   MR. RYDER:  I can't stop him
5              from representing --
6                   MR. SICKINGER:  That's fine,
7              but you don't have to ask the
8              follow-up question.
9                   MR. BONNER:  Off the record
10             one second.
11                  (Whereupon, a discussion was
12             held off the record.)
13                  MR. BONNER:  Back on the
14             record.
15        Q    Okay.  Gentlemen, I hand you
16   Exhibit 47.  Take a moment to look at that.
17                  (Case number 13-111 dated
18             January 30, 2014 was marked as
19             Plaintiff's Exhibit 47 for
20             identification, as of this date.)
21        A    I remember this case.  Case
22   number 13-111 dated January 30, 2014.
23        Q    Give me a brief description of
24   your recollection here after reviewing this
25   document.
```

J. Lipari                    85

       A      So this started off as a vehicle

and traffic stop.  The basic gist of it was

the officer pulled the man over, I forget

what the initial violation was, but he

appeared nervous, I think they said his eyes

were red.  At some point they instructed him

to get out of the vehicle or turn the

ignition off and get out of the vehicle and

then the accounts diverge at that point.

There was a little bit of confusion over

exactly what the next steps were, but I think

the complainant acknowledged that he was

scared according to his account and he

decided not to get out of the vehicle.  And

he went -- I don't remember the details

right.  He went to start the car again or he

never turned it off.  Either way, he went to

move the vehicle.

            The officer tased him through the

vehicle while he was still in the vehicle,

struck him several times in the face, and I

think this was the one where the officer had

a small flashlight in his hand when he struck

him through the window -- through the window

```
 1                    J. Lipari                86
 2   that was down, striking him in the face.  But
 3   he was buckled in and the strikes and the
 4   taser didn't have the desired effect and the
 5   guy ended up taking off in the vehicle.  I
 6   think during the pursuit the officers
 7   reported seeing something being thrown out of
 8   the window.
 9              He did eventually stop around
10   Salt Springs Road, bailed from the vehicle
11   and I think the officers caught him pretty
12   quickly, took him down, and then there was
13   some more strikes to his face, to his eyes.
14              I remember this, when the
15   complainant was giving me the account, he
16   remembered something grinding in his mouth.
17   He was -- he may have been intoxicated, he
18   had been struck numerous times and he wasn't
19   sure what it was and he just remembered like
20   this gravelly feeling in his mouth.  And I
21   remember questioning him, trying to figure
22   out what that was.  I thought maybe his mouth
23   was on the concrete or somehow concrete had
24   gotten in his mouth or maybe something got
25   stuck in his mouth.  But I think what we
```

```
1                    J. Lipari                87

2    figured out eventually is that it was some of

3    his teeth that were broken and that's what he

4    was feeling, this gravelly sensation in his

5    mouth.

6              His -- I remember his eye was

7    very badly injured as well.  There was --

8    just consulting the report, there was the

9    choroid coat -- and I am reading from the

10   report here, which is like a layer around the

11   eye.  I am no doctor -- you know, eye doctor,

12   so, you know, referencing this using

13   reference material to understand this, but

14   there was a layer around the eye that was

15   disturbed or hemorrhaged in some way.  So it

16   was a, you know, fairly severe injury to the

17   eye.  So I think that's the gist of the case.

18        Q    I'm going to hand you what has

19   been marked Exhibit 48.  Just take a moment

20   to look at that.  That one's a little longer

21   than some of the other ones.

22                   (Finding letter for 13-111

23                    was marked as Plaintiff's Exhibit

24                    48 for identification, as of this

25                    date.)
```

```
1                        J. Lipari                    88
2         A     Yeah, this is the finding letter
3    for 13-111, same case we were just talking
4    about.
5         Q     Were there sustained findings in
6    this particular case?
7         A     There were -- ended up being one
8    sustained finding from the CRB panel on this
9    case, yes.  One excessive force finding.
10        Q     And was there a recommendation
11   for discipline?
12        A     This one the panel recommended a
13   written reprimand to go in one officer's
14   file, personnel file for six months.
15        Q     And were those followed through
16   with, if you know?
17        A     I don't believe so, but I'd have
18   to, again, check the written record to be
19   sure.
20        Q     Do you recall receiving a
21   decision and a response and a reason from the
22   chief within the thirty days?
23                   MR. SICKINGER:  Object to
24              form.
25        A     You know, I do recall now there
```

```
1                    J. Lipari                89
2    was an unusual response we got in this case.
3    The chief actually, before responding in
4    writing to our decision, asked for the
5    medical records for this case and I remember
6    being kind of excited that, oh, he wants to
7    see more of the evidence that we acquired.
8    Because I think up to that point they had not
9    been acquiring medical records for these
10   cases.  So we started doing that.  So when he
11   asked for the medical records, I'm like, oh,
12   good, he's taking a closer look at this one.
13   I think he wanted to know more about that eye
14   injury.  So I provided that to him and then I
15   think within a few days or a week or so, we
16   got the written response from him.  If I
17   remember correctly, no discipline was
18   imposed.
19        Q    I'm going to ask you read again
20   from your document.  I'm sorry I have to do
21   this to you.  As you go to about halfway down
22   the document you'll see a paragraph that's --
23   a short paragraph that starts, to facilitate.
24             Do you recognize that?
25        A    I see it, yeah.
```

<pre>
 1                   J. Lipari                90
 2        Q      Could you read that, please, for
 3   the record?
 4        A      You want just the paragraph
 5   that's in bold or the whole --
 6        Q      I want --
 7        A      -- the preceding paragraph too?
 8        Q      I want the paragraph that says,
 9   to facilitate a better understanding, and
10   then I would like the bold paragraph, and
11   then I would like the next paragraph
12   underneath it.
13        A      To facilitate a better
14   understanding of the department's policy and
15   training in regards to strikes to the head, I
16   would ask that we begin to reconvene the use
17   of force training that the SPD's training
18   division previously provided for CRB members.
19   As required by local law 1 of 2012, the
20   police -- and this is the bolded quoted
21   section -- the police liaison committee will
22   act as a resource to the board on matters of
23   information regarding Syracuse Police
24   Department policies, procedures and training
25   and will assist the CRB administrator as
</pre>

```
1                    J. Lipari                91

2    requested in developing an initial

3    orientation for board members and ongoing

4    training.  It's the end of the quoted

5    section.  If we can get the liaison on

6    committee active and the training for CRB

7    members back on track, the SPD training

8    division could likely address the board

9    members relating to strikes to the head.

10   Reactivating the training for CRB members may

11   also result in an increased rate of agreement

12   and findings between our respective office.

13         Q     Okay.  Thank you.

14               So the reason I had you read this

15   was because this is another recommendation

16   from you or a writing from you that I don't

17   see in -- usually in some of these

18   recommendations you sent the chief.  Could

19   you explain to me why this was put in this

20   document?

21                    MR. SICKINGER:  Object to

22               form.

23         A     Yeah, so I think at this point we

24   had -- I had first came in 2012.  I was --

25   the first thing we did was ask to set up this
```

```
1                    J. Lipari                92

2     police liaison committee that's required by

3     the ordinance.

4          Q     And that's the ordinance that you

5     had just read; that's quoted material from

6     that --

7          A     Correct.

8                And so there was some delay in

9     getting that set up.  We eventually did get

10    it set up and we met three or four times, had

11    real good meetings with the officers who were

12    appointed to this liaison committee.  It was

13    an officer in charge of the training and an

14    officer in charge of OPS and the police union

15    rep.  So we had some pretty, what I call

16    pretty productive meetings that went on

17    longer than we had ever planned for those

18    meetings to go on.  Both sides were actively

19    engaged.  And then at a certain point, the

20    Police Department stopped having those

21    liaison meetings with us.  And so this must

22    have been after that point where I am going

23    to the chief saying, let's get these liaison

24    committee meetings back on track because they

25    are important.  We need to hear from you guys
```

```
 1                    J. Lipari              93

 2    how you train on head strikes.  We would like

 3    to convey our sentiments on head strikes to

 4    you, to the department.  We would like to,

 5    you know, keep in place some training that

 6    the department could do for our board

 7    members, whether it be excessive use of force

 8    training, other constitutional aspects of law

 9    enforcement.

10            So we were -- I was calling on

11    the chief to provide that training to the

12    board again.

13        Q    Was there a response to your

14    request?

15                MR. SICKINGER:  Object to

16                form.

17        A    I don't think we got a specific

18    response to this, to the request in this

19    letter to get the liaison committee back on

20    track.  I think there was some discussions

21    happening, you know, back channel -- not back

22    channel, you know, behind the scenes.  I know

23    at one point we had a City councilor, common

24    councilor kind of prevail on the chief to get

25    these liaison meetings started; that was the
```

```
 1                      J. Lipari                   94

 2     early stage.

 3                 So, no, in the rest of my time

 4     there through 2015, we never had another

 5     liaison meeting even though we requested it

 6     multiple times.  Yeah.  That's where we were

 7     at whenever I left.  And I know the board

 8     members, one board member in particular kept

 9     raising at each board meeting, let's get the

10     liaison committee back on track; we really

11     want that.  So that's something that the

12     board members were very keen on.

13          Q    We're almost done with these.

14     I'll hand you a document marked as Exhibit

15     49.

16                      (Investigative report for

17                      case 14-018 was marked as

18                      Plaintiff's Exhibit 49 for

19                      identification, as of this date.)

20          Q    If you could review that for me.

21                      MR. SICKINGER:  Off the

22                      record.

23                      (Whereupon, a discussion was

24                      held off the record.)

25                      MR. SICKINGER:  Back on
```

```
1                    J. Lipari                    95

2              record.

3         Q     So I had handed you Exhibit 49

4    and you reviewed that.  Do you recognize that

5    document, Joe?

6         A     Yes.

7         Q     Tell us a little bit about that

8    briefly.

9         A     So it's another investigative

10   report that I completed, case 14-018.  This

11   was a case that I think there was a -- an

12   ongoing narcotics investigation of the

13   individual.  He got into a vehicle, they

14   stopped the vehicle, and the complainant

15   alleges that he did have some kind of dope in

16   his vehicle, crack I believe, and then I

17   think he had it in a brown paper bag, he

18   alleged and, I mean, the gist of it is he

19   alleged that the officers just kind of

20   reached in the vehicle, started punching him

21   in, I believe in the face, sort of upper body

22   area.

23              At some point the bag of dope

24   broke open and went -- got all over the car

25   and the curb and everything out of the
```

```
 1                    J. Lipari                96

 2    vehicle.

 3              What are the other highlights

 4    here?  I think after he was -- after force

 5    was used on him, he described laying on the

 6    ground, having blood coming from his mouth

 7    and I think he described sort of spitting

 8    some blood out and the officer telling him,

 9    he quotes, if you spit on my foot, I'll kick

10    you in the face.  They also reported that he

11    was, in his words, snatched out of the

12    vehicle.

13              And then the other reason that

14    this one sticks out in my mind is the

15    individual had sort of a bowel movement

16    during or after the use of force and so they

17    had to bring him to the house where they

18    searched him and they searched the house and

19    allowed him to clean up as they searched

20    him -- before they searched him.

21              The other aspect of this case was

22    the wife or partner, significant other, of

23    this man was an individual woman who had

24    filed multiple complaints with the CRB

25    involving her former partner, involving her
```

```
 1                        J. Lipari                    97
 2    kids and other complaints.  Her former
 3    partner had died in police custody in 2000 --
 4    in the early 2000s, so she, you know, not
 5    surprisingly had, you know, had multiple
 6    complaints against the department for that
 7    case, but for other incidents that involved
 8    her kids.
 9               And so she -- the individual
10    filed this complaint from the justice center,
11    from jail, but then she came in, his partner
12    at some point in the process, and told me
13    that the officers had told the complainant,
14    the man, referencing her, tell that bitch
15    this:  We're going to do you like we did her
16    other baby daddy.  Tell her this is what we
17    did.
18               So that allegation came from her,
19    and so she was essentially presenting this as
20    similar to what had been done to her previous
21    partner, and that -- that this was
22    essentially part of the -- I'm sort of
23    paraphrasing her perspective here.  That this
24    was part of sort of retribution against her
25    for filing complaints against officers and
```

```
1                     J. Lipari                98
2    they targeted him to get at her is the way
3    she thought of it.
4         Q     Let me hand you what has been
5    marked Exhibit 50.  Do you recognize that
6    document?
7              I'm going to back up on the
8    record and just say that the document we had
9    previously marked as 49 was CRB report
10   14-018, April 30, 2014.
11                    (Finding letter for case
12                    14-018 was marked as Plaintiff's
13                    Exhibit 50 for identification, as
14                    of this date.)
15        A     So Exhibit 50 that you just
16   handed me is case 14-018, the same case, the
17   finding letter for that case.
18        Q     You're familiar with these
19   documents; you generated documents yourself
20   when you were the administrator?
21        A     Correct.
22        Q     So looking at them you can kind
23   of look through them pretty quick?
24        A     Yeah.  Yeah, what's going on
25   here.
```

J. Lipari                    99

1

2      Q      All right.  So there were

3  findings?

4      A      Yes.  The panel sustained

5  excessive force against two officers, found

6  insufficient evidence, meaning not sustained,

7  poor demeanor against two officers, and then

8  sustained untruthfulness against a sergeant.

9      Q      And there were disciplinary

10  recommendations?

11      A      Panel recommended a ten-day

12  suspension without pay for the excessive

13  force against two officers, and a ten-day

14  suspension without pay for untruthfulness by

15  the sergeant.

16      Q      Okay.  And do you know if those

17  recommendations were followed through with,

18  either by the police chief or by the mayor?

19              MR. SICKINGER:  Object to

20              form.

21      A      Pretty sure that I remember

22  receiving a letter on this one that -- that

23  no discipline was imposed on this one.

24      Q      On the second page, I'm going to

25  take a look at a paragraph here.  It's the

1                    J. Lipari                    100

2      third paragraph down above the bold, request

3      for.

4           A     Uh-huh.

5           Q     Okay.  So you see where I'm

6      looking at the paragraph that starts -- it

7      says, lastly, comma?

8           A     Yes.

9           Q     It's a lengthy paragraph, I'm

10     sorry, but I'd like you to read that

11     paragraph.

12          A     Lastly, the panel requested that

13     I take this opportunity to encourage your

14     office to adopt a policy that requires

15     officers to intervene or intercede if they

16     observe another officer engaged in misconduct

17     or use of force that is clearly beyond that

18     which is objectively reasonable under the

19     circumstances.  I conducted a preliminary

20     review of the SPD rules and regulations

21     manual and could find no such policy.  If the

22     department does have a policy on this issue,

23     please provide the CRB with a copy or

24     indicate where in the rules and regulations

25     the policy can be found.  I have enclosed a

```
1                    J. Lipari                101

2    few examples from around the country that

3    have such policies.  In addition, I have

4    enclosed a brief article on the topic by

5    attorney and police officer, redacted,

6    director of the Legal and Liability Risk

7    Management Institute.  The CRB would like to

8    know your view on the possible adoption of

9    such a policy for the SPD.

10        Q     In your recollection, did anybody

11   from the Syracuse Police Department or the

12   mayor's office respond to you in regards to

13   this request?

14                   MR. SICKINGER:  Object to

15             form.

16        A     No, I don't recall ever getting

17   any kind of response to it.  In the use of

18   force policy recommendation that we made in

19   the annual report, we also pointed this out

20   again, that they needed what's called a duty

21   to intervene policy, meaning a clause in the

22   policy that says, if you as an officer see

23   another officer violating policy by using

24   force that is not reasonable, then you should

25   intervene and stop it and report it.  And
```

```
1                    J. Lipari                102
2      it's, you know, it's a very tricky thing to
3      intervene in a use of force situation, so
4      there has to be training on how to do it
5      properly and safely.
6                  So that's what that was about,
7      the CRB trying to encourage the City to adopt
8      the duty to intervene policy.
9         Q    And let me -- I'm just going to
10     ask you about that really quickly.  I'm not
11     going to try to solicit any objections.  I'm
12     unfamiliar with that terminology.  Is it
13     something that you had become aware of at the
14     time when you were tenured there at Syracuse,
15     or something that you brought previously or
16     what is the -- how did you find this
17     information?  What is the basis for that
18     knowledge?
19                    MR. SICKINGER:  Object to
20                form.
21        A    I think the first time it came
22     up, I don't recall if it was for this case or
23     a previous one, but one of our panel members
24     asked me a question, is there -- I think he
25     asked the question or made a suggestion that
```

```
 1                    J. Lipari                103
 2    we look at this question of obligations to
 3    intervene.  And we -- so I did some research
 4    on it and we found this duty to intervene
 5    component in many departments, policies
 6    around the country, and increasingly, the
 7    Department of Justice's consent decrees are
 8    including them.  And they say essentially
 9    that officers have a duty to intervene and
10    stop a constitutional violation if they
11    observe it and to report it to, you know, up
12    the chain of command if they witness it.
13                    MR. BONNER:  It's a
14                    requirement under 42 U.S.C.
15                    1986.
16                    MR. SICKINGER:  Was that a
17                    question you want a response to?
18                    MR. BONNER:  I was just
19                    making a comment on the record.
20         Q    So your recollection was that the
21    chief did respond within the thirty-day time
22    period, correct?
23         A    I can't say with -- if it was
24    within a thirty-day timeframe, but I do
25    remember that we got a letter for this.
```

J. Lipari                        104

2    Q      And it's your recollection that

3    none of the recommendations on behalf of the

4    board were followed through?

5                MR. SICKINGER:  Object to

6                form.

7    A      Correct.

8    Q      Okay.  I'm going to hand you what

9    has been previously marked as Exhibit 18.

10   See if you recognize that document.

11   A      Yes, this is, well, one of the

12   pages -- eight pages of our annual report

13   from 2012.

14   Q      And on that eight-page, what --

15   what would you title that single page that

16   you recall?

17   A      It's headed as intake and

18   disposition of cases.

19   Q      So is this kind of like a

20   statistical breakdown?

21   A      Exactly.  So the ordinance

22   requires the CRB to report certain numbers

23   publicly in its annual and quarterly reports

24   and so most of what is on this page is

25   required by the ordinance that we report

```
1                      J. Lipari                105

2   publicly or the CRB reported publicly.

3        Q    So on this page, you're going to

4   have documentation of the number of total

5   complaints received by the CRB, correct?

6        A    Correct.  For that quarter or for

7   that year depending on if -- this is the

8   annual report, so for that year --

9        Q    And what year?

10        A    -- although I would point out

11   this was my first year, 2012 was my first

12   year, I started there in May of 2012, so

13   it's -- the numbers here are essentially

14   about a half year's worth of data so that's

15   why the numbers go up in '13, '14.  We also

16   had a full year.  So even though it says on

17   front, January to December, we weren't really

18   active until May, June 2012.

19        Q    So you had the total number of

20   complaints for your time period throughout

21   that year of 2012, you have the -- a

22   breakdown as to what those complaints

23   consisted of, correct?

24        A    Correct.

25        Q    What were the percentages of the
```

```
 1                    J. Lipari                    106
 2      breakdown on the different types of
 3      complaints?
 4           A    I don't have the percentages but
 5      I can give you the raw numbers.  So the way
 6      the ordinance asked us to -- to break these
 7      out was active misconduct, which is
 8      essentially anything except failure to act.
 9      Failure to act is the next category, active
10      misconduct.
11                We have active misconduct,
12      fifty-seven complaints received; passive
13      misconduct, again, failure to act, twelve
14      complaints received; damage to property, two;
15      denial or violation of constitutional rights,
16      two; and lack of truthfulness in a police
17      report, two.
18           Q    Then you have the number of
19      sustained complaints, correct?
20           A    Correct.  The number of cases
21      where a CRB panel recommended this --
22      disciplinary sanctions be imposed by the
23      chief of police, nine is what was recommended
24      for that year.
25           Q    And then you have the total
```

J. Lipari                    107

2   number of cases where the chief followed

3   through on those recommendations?

4         A     Yes.

5         Q     What's that number?

6         A     We have one for that first year.

7   I'll say at that point, we were counting any

8   discipline imposed by the department as a

9   grievance, whether it was the same discipline

10  our panel recommended or different discipline

11  if they impose discipline and carried out

12  discipline, we consider that an agreement at

13  that point.  That we considered that the

14  department impose discipline.  We weren't

15  parsing whether it was exactly what we

16  recommended or not, we just counted it if

17  they did impose discipline, just to clarify.

18        Q     I'm going to hand you -- first,

19  do you have any more comments on that

20  document that I handed you even though I know

21  it's limited, just -- it's just for this

22  particular page?

23              MR. SICKINGER:  Object to

24              form.

25        A     No.

```
1                       J. Lipari                    108
2          Q      I'm going to hand you what's been
3    marked as Exhibit 19.
4          A      So, yeah.
5          Q      Do you recognize that document?
6          A      Yes, this is the annual report
7    for 2013.
8          Q      As part of that document we
9    attached that same page or relevant page to
10   the last exhibit which would show, basically,
11   I guess I would kind of characterize them as
12   statistics or summary of operations?
13         A      Yes.
14         Q      Go through those numbers with me
15   really quick just like we did on the last
16   one.
17         A      Just the second page?
18         Q      Yes.  I guess it would be -- yes,
19   that page.
20         A      Total complaints received during
21   2013, 111.  Categories of allegations:
22   Active misconduct, ninety-six; passive
23   misconduct, twenty-two; damage or lost
24   property, two; denial or violation of
25   constitutional rights, one; lack of
```

1                    J. Lipari                    109

2    truthfulness on a police report or falsifying

3    a report, three.

4           Q     Is there a -- is there a

5    documentation of the findings that is -- are

6    those your findings, recommendation for

7    discipline, those numbers?

8           A     So out of the ninety-six -- well,

9    out of the 111 cases that we received that

10   quarter, the panel recommended disciplinary

11   action in twenty-six of those.

12          Q     Do you have the documentation of

13   what number of recommendations were followed

14   through by either the chief or the mayor?

15          A     We put --

16                  MR. SICKINGER:  Object to

17              form.

18          A     We put TBA there, to be

19   announced, because what that tells me is that

20   that was a period where we hadn't received

21   all of the written responses from the chief,

22   so we couldn't calculate that number.

23          Q     Do you have a recollection now at

24   this point in time of how the -- the end

25   results on that?

1                    J. Lipari                    110

2                    MR. SICKINGER:  Object to

3              form.

4         A    Not the exact number, but it

5    would have been just, you know, a handful,

6    you know, less than five, if that much.  But

7    I can't recall the exact number for that

8    year.

9         Q    Let's take a look at the second

10   page.  I guess there was a -- the first page

11   indicated -- yes, let's take a look at that.

12   What is that page?  Tell me about that.

13        A    So, this is the -- these are the

14   categories of complaints as we track them, so

15   we have excessive force, demeanor, failure to

16   act, harassment, racial bias, false arrest,

17   et cetera, et cetera.  So we break it down by

18   that quarter.  So how many of each of those

19   categories, complaints we received that

20   quarter, October 1st through December 31st of

21   2013, and then we break it down for the whole

22   year, for all of 2013 with the same

23   categories.

24        Q    Could you give me those -- those

25   numbers, please?

```
1                        J. Lipari                 111

2          A      For the quarter?

3          Q       For the quarter, then for the

4     year.

5          A      Okay, so excessive force, eight;

6     demeanor, six; failure to act, three;

7     harassment, zero; racial bias, zero; false

8     arrest, one; improper search and seizure,

9     three; theft/larceny, one; taser discharge,

10    two; untruthfulness, zero; gender bias, zero;

11    evidence tampering, zero; improper offer to

12    eliminate charges in exchange for

13    incriminating information, zero;

14    constitutional violation, zero; and violation

15    of SPD high-risk traffic stop policies, zero.

16              So for the year, excessive force,

17    forty-nine, which was forty-four percent of

18    the cases received that year.  Demeanor,

19    twenty-four, which was twenty-one point six

20    percent of the cases received that year.

21    Failure to act, twenty, which was eighteen

22    percent of the cases received that year.

23    Harassment, five, which is four point five

24    percent.  Racial bias, five; four point five

25    percent again.  False arrest, nine, which is
```

```
1                        J. Lipari                  112

2     eight percent.  Improper search and seizure,

3     thirteen, which is eleven point seven

4     percent.  Theft and larceny, six, which is

5     five point four percent.  Taser discharge,

6     five, which is four point five percent.

7     Untruthfulness in a police report, three,

8     which is two point seven percent.  Gender

9     bias, zero.  Evidence tampering, three, which

10    is two point seven percent.  Improper offer

11    to eliminate charges, four, which is three

12    point six percent.  Constitutional violation,

13    one, which is point nine percent.  And

14    violation of SPD high-risk traffic stop

15    policy, four, which is three point six

16    percent.

17         Q    So in your role as administrator

18    for the CRB during that period, 2012 to

19    beginning of 2016, correct, what is your

20    understanding -- what is the purpose of

21    compiling these statistics as enabled under

22    the law?

23                   MR. SICKINGER:  Object to

24              form.

25         A    To -- I mean, there is an
```

1                          J. Lipari                    113

2       internal process and an external purpose I

3       guess you could say.

4              Q       Explain both.

5              A       Internal purpose would be for us

6       to track the -- the complaints that we're

7       getting so that we could know if there's a

8       problem in a particular category, so we can

9       identify it as early on as possible and try

10      to address it if it needs to be addressed.

11      The external component is for public

12      transparency so that the public can know some

13      degree or have some degree of transparency in

14      what's being filed.  If not, you know, the

15      public can't find out about, you know, the

16      specific cases and our dispositions and our

17      investigations but it's helpful to have the

18      public have some information on the

19      operations of the agency, what kind of

20      complaints it's getting so that they can draw

21      their own conclusions or, you know, do

22      whatever they want with the information.  So

23      it's just a public transparency requirement.

24      It's pretty standard in the field to report

25      as much information like this as you can.

```
1                    J. Lipari                    114

2          Q     And did you find it helpful in

3    concluding with your investigations and in

4    your role as administrator?

5          A     Oh, sure, yeah.  I mean, you

6    know, our concern with the excessive force,

7    the high numbers of excessive force

8    complaints in the early years, we were able

9    to, you know, track those numbers through

10   2015 and see if that declined in 2015, which

11   told us -- we felt told us that at least

12   maybe some of what we were doing was having

13   an impact, having an effect.  Others may

14   disagree with that assessment but it allows

15   us to know that at least we're getting less

16   complaints of excessive force after three

17   years or so of doing this work.  You can draw

18   conclusions from that why, but knowing what

19   we're getting is the first step.

20         Q     I'm going to follow up with

21   Exhibit 20 which was previously marked.

22   Could you identify that document?

23         A     This is the annual report for

24   2014 or the summary page.

25         Q     And like the last two documents
```

```
 1                    J. Lipari              115

 2      that you had reviewed, that document there

 3      has these statistics on the different types

 4      of alleged violation by the Police

 5      Department, correct?

 6            A     Yes.

 7                  So this is sort of an abbreviated

 8      version of what comes at the end of the

 9      report.  This is essentially like an

10      executive summary.  So it lists how many

11      complaints we received in 2014 which was 107,

12      held twenty-five hearings, sustained rate for

13      2014 was nineteen percent, meaning twenty-one

14      of the 107 complaints received resulted in

15      sustained findings.

16                  For that year, excessive force

17      represented forty percent of the complaints

18      we received.  Eighteen out of the forty-three

19      those -- of those, forty-three excessive

20      force complaints were sustained by the CRB

21      panel, which represented seventy-two percent

22      of the sustained findings for that year, and

23      forty-two percent of the excessive force

24      complaints were sustained.  Untruthfulness we

25      had thirteen sustained findings which
```

J. Lipari                    116

1
2    represented fifty-two percent of the hearings
3    that had a sustained finding so obviously,
4    there's some overlap there in the
5    untruthfulness and the excessive force.  You
6    have both of them happening at the same time.
7                Then we have a summary of our
8    disciplinary recommendations -- CRB
9    disciplinary recommendations, we have four
10   recommendations for retraining, sixteen
11   recommendations for a written reprimand,
12   twenty-one recommendations for suspension,
13   and three recommendations for termination.
14                Then the page concludes by noting
15   that the disciplinary, what call the
16   disciplinary action rate which means the rate
17   at which the chief impose -- imposed
18   discipline on when the CRB recommended it, we
19   had six percent for that year.  The CRB
20   received sixteen responses from SPD from the
21   chief to twenty-one hearings, in which we had
22   a panel sustain an allegation.  So that
23   indicates to me that part of that year in
24   2014, we still weren't receiving all the
25   written responses from the chief but we got a

1                    J. Lipari                    117

2    big chunk of it, sixteen out of twenty-one.

3         Q    Now I'm going to ask you a

4    question.  In the course of your

5    investigations as a member of the CRB, would

6    you go back and look in the past to see

7    whether an officer had already -- because let

8    me just preface that.  The CRB predated your

9    tenure, correct?

10        A    Correct.

11        Q    So would it be common to go back

12   into the files of the CRB to look into

13   whether or not a police officer had been

14   either brought before the CRB or had a

15   sustained finding against them previous to

16   the complaint that you're handling at that

17   particular time?

18                   MR. SICKINGER:  Object to

19             form.

20        A    Right.  So, unfortunately, from

21   the years preceding me, my tenure as

22   administrator, we have all the case files,

23   all the case files were in the office, but

24   they're not cataloged in any way by officers

25   involved in the complaint, so we had no way,

```
1                    J. Lipari                 118

2     other than read through every single file

3     which is impossible, by that point it was

4     fourteen or so years of files, so we had no

5     way of sort of efficiently assessing how

6     frequently an officer before us now had been

7     before the board in the past.  So the old --

8     unless the complainant came in and said, I

9     filed a complaint in 2008 and it was the same

10    officer, then we could go to that file, pull

11    it, and have that information.

12              What we ended up doing though,

13    once I came in in 2012, we obviously started

14    tracking everything by officer, by

15    complainant, by case number, so we could go

16    back and look at the officer's history.  So

17    what we would do when we held a hearing for a

18    case, I would not disclose to the panel

19    members the officer's history with the CRB

20    during the hearing testimony phase.  And when

21    they're questioning the complainant, if

22    they -- then there -- they deliberate if they

23    sustain it and they get to the disciplinary

24    stage, then I would disclose to them for the

25    purposes of progressive discipline if the
```

1                    J. Lipari                    119

2    officer had a history with the CRB and what

3    that history was.  But I -- we would not

4    disclose it before they made their decision

5    on whether to sustain or not because we did

6    not want that to taint their decision saying,

7    oh, well, we sustained three allegations

8    against this officer so he must have been

9    disciplined.  We didn't want these set up

10   that way.  Every case had to be decided based

11   on merits and the evidence of the case, so we

12   would hold off on telling the panel.

13             Now, panel members would

14   sometimes recognize an officer's name.  Oh, I

15   know.  We've seen that officer before or

16   something like that, but they wouldn't know

17   the exact record until they got to the

18   disciplinary stage.  And then that's when

19   they need to know, okay, this is the first

20   time this officer has -- has been alleged

21   against this officer, it's the first time he

22   appeared before the CRB and so they would

23   take that into consideration in making their

24   disciplinary recommendation.

25             If, on the other hand, it was the

```
 1                    J. Lipari                120

 2      third or fourth time this officer had a case

 3      it appeared involving this officer before the

 4      CRB and recommended -- you know, sustained,

 5      now sustained something against this officer

 6      in the past and recommended discipline in the

 7      past, then they need to know that when they

 8      came up with the disciplinary recommendation

 9      for that particular case.

10                    So that was the logic of how we

11      sort of -- our rules for disclosing history

12      of complaints against an officer to the

13      panel.  Is that clear?

14          Q     It is very clear actually.

15                    And I actually do have a

16      follow-up.  Who -- was that your idea; that's

17      something that you had initiated --

18                    MR. SICKINGER:  Object to

19                    the form.

20          Q     -- to the CRB or something that

21      had been in place previously?

22                    MR. SICKINGER:  Object to

23                    form.

24          A     It was not in place previously.

25      It was something that came out of discussions
```

```
1                    J. Lipari                121

2      amongst our board, ask -- whether the board

3      members started asking, you know, do we --

4      does this officer have a history, do we need

5      to know this, and then that started a

6      conversation where we said, okay, let's think

7      about this.  What's the fairest -- best way

8      to do this?  And so then we had a board

9      discussion like we were asked to do, we sort

10     of the made decisions --

11          Q     Interesting.

12          A     -- by consensus.

13                And again, the administrator

14     works for the board members so I would -- on

15     most big questions like that, I would sort of

16     initiate the -- facilitate the conversations,

17     they would make a decision and then I would

18     carry out the decision.  So after talking

19     about it, they decided -- you know, sometimes

20     I would give them recommendations on what I

21     thought would be the best way to go or

22     whatever agencies were doing it around the

23     country.  It's -- I think this conversation

24     played out in a similar way.

25          Q     I want to hand you what's marked
```

```
1                    J. Lipari                  122

2     as Exhibit 51.  This is a little bit of a

3     lengthy document.  I'm not going to ask you

4     to look all the way through it.  Okay.

5                    (Documents were was marked

6                    as Plaintiff's Exhibits 51

7                    through 54 for identification, as

8                    of this date.)

9          Q    I'm going to have you just kind

10    of look it over real quickly and some of

11    these documents are going to predate your

12    time on the CRB, so I don't expect that you

13    would necessarily have knowledge in regards

14    to these documents, but in the spirit of our

15    previous questioning whether or not you ever

16    had -- were privy to previous complaints or

17    previous documentation, I just want to know

18    whether or not you had ever come across these

19    documents or whether you recognize the

20    particular officer.

21                    There are officers in these that

22    are not redacted because these are the

23    officers that were involved in our particular

24    case.  Okay?

25                    So just go ahead and then take a
```

```
 1                    J. Lipari                123

 2   quick look and then you should be able to

 3   just kind of get through it on the original

 4   one.  See if you recognize the document.

 5          A     I'm just going to take a restroom

 6   break.

 7          Q     Go ahead.

 8                    (Whereupon, a recess was

 9                taken at this time.)

10                    MR. RYDER:  Back on the

11                record.

12          Q     So, I had previously gone over

13   some documents with you, Joe, on the records

14   that were entitled Exhibit 18, 19, 20 which

15   were the CRB annual reports for 2012, 2013,

16   and 2014.  Is that right?

17          A     Correct.

18          Q     Within those documents we asked

19   you to go ahead and go down through and read

20   to us these compiled statistics for each one

21   of these years; isn't that correct?

22          A     Correct.

23          Q     And then you had taken the time

24   through the course of your employment at CRB

25   to carefully document the percentages of each
```

1                        J. Lipari                    124

2      one of these particular allegations for, say,

3      excessive force, unlawful imprisonment,

4      et cetera, et cetera, et cetera, and then you

5      took the time to go ahead and document the

6      sustained findings for each one of these

7      particular allegations, correct?

8              A      Correct.

9              Q      So, you mentioned earlier in your

10     testimony that part of your job as

11     administrator of CRB was to go ahead, to be

12     aware of and document patterns of particular

13     offenses that were either alleged or

14     sustained within the CRB, correct?

15                     MR. SICKINGER:   Object to

16                     form.

17             A      So the ordinance asked us to look

18     at the policy in training issues.  Generally

19     in the field -- in the field of civilian

20     oversight law enforcement, we'd look at

21     patterns and practices and so I consider that

22     part of my purview, yeah.

23             Q      So in -- within these documents

24     here that we had previously gone over,

25     particularly Exhibit 18, 19, 20, you had gone

```
1                        J. Lipari                125

2    ahead and read to me those statistics there

3    where you had documented the total findings

4    of each particular allegation and what

5    percentage those were in regards to total

6    complaints, correct?

7         A    Correct.

8         Q    So, in the course of your tenure

9    at the CRB it'd be fair to say in regards to

10   your previous testimony that you did notice

11   patterns for particular allegations and

12   sustained findings, correct?

13        A    How you define a pattern, you

14   know, it's -- could be kind of tricky, I

15   guess.  We certainly found patterns in the

16   complaints that we were receiving if I could

17   put it that way.  Yeah.

18        Q    Did you -- you didn't notice any

19   patterns in your sustained findings?

20                  MR. SICKINGER:  Object to

21             form.

22        A    They -- I mean, no, we certainly

23   found -- you know, there were cases that, you

24   know, we put into categories in terms of what

25   was alleged.  It's hard to talk about
```

```
 1                    J. Lipari                126

 2   patterns, obviously, because I mean, I know,

 3   I understand the import of that word in this

 4   context.

 5            I think it's fair to say that the

 6   CRB identified issues that it wanted to see

 7   addressed and that it thought were problems.

 8   When you look up the definition of pattern

 9   and practice, there is no clear -- real clear

10   definition.  If someone wanted to provide me

11   with a definition of that and then I can

12   apply it, I'd be more comfortable doing that.

13   But to say there's a pattern that existed, a

14   pattern or practice that existed on A, B, or

15   C without those words being defined, it's

16   hard for me to do.  So I think the most

17   accurate thing I could say is that there were

18   clearly issues and concerns that the CRB

19   had --

20            Q     Okay.  Fair enough.

21            A     -- related to use of force.

22            Q     Fair enough.

23            Somebody in your field obviously

24   is somebody who's going to be very well

25   versed and educated in these concepts of
```

```
1                    J. Lipari                127

2     pattern and practice, and as an attorney, I

3     probably am not going to be, so I don't

4     really want to get into that with you as far

5     as education on those issues because I'm sure

6     you understand them better than I do based on

7     what you do.  Okay.

8                  So let me ask you this:  So these

9     areas of concern that you identified, would

10    it be fair to say that excessive force would

11    have been one of those areas of concern to

12    their job?

13                  MR. SICKINGER:  Object to

14             form.

15        A    Yes.

16        Q    I'm going to stop you.  So would

17    it be fair to say that lack of truthfulness

18    would have been one of these areas that you

19    would have considered an area of concern?

20                  MR. SICKINGER:  Object to

21             form.

22        A    Yes.

23        Q    And so we can go down through

24    each one of these.  False imprisonment would

25    be an areas that you would pay attention to
```

```
1                        J. Lipari                    128

2     and identify as an area of concern?

3                      MR. SICKINGER:  Object to

4               form.

5          A     False imprisonment in terms of

6     false arrest?

7          Q     False arrest, I'm sorry.

8          A     Yeah.  That was less -- the false

9     arrest was -- the numbers weren't as high as

10    our, say, excessive force allegations, for

11    example.

12         Q     Fair enough.

13         A     But it's an important issue that

14    we kept an eye on.

15         Q     Fair enough.

16               I don't want to put any words in

17    your mouth, but like I said, this is asking

18    you this.  So why don't you just briefly

19    identify quickly what you think that those

20    areas of concern were while you were a

21    tenured CRB in Syracuse.

22                      MR. SICKINGER:  Object to

23               form.

24         A     The top three were pretty

25    consistently excessive force, failure to act
```

```
 1                    J. Lipari                  129

 2     and demeanor.  Those were the three biggest

 3     categories in those three or four years.

 4         Q    So I'm going to ask you, had

 5     anybody from the Police Department,

 6     particularly the chief, ever communicated

 7     with you in regards to what they may do or

 8     may not do in regards to changing or

 9     addressing the issue of excessive force

10     within the Police Department?

11                    MR. SICKINGER:  Object to

12             form.

13         A    When I raised -- when I first

14     raised the issue of -- of updating the use of

15     force policy, I was in a meeting with the

16     chief and I think the mayor's chief of staff

17     and I told the chief, you know, that we

18     needed to update this policy that, you know,

19     I gave my presentation on it and his response

20     was, it'll never happen, not as long as I'm

21     chief.  He said, that's going to get an

22     officer killed.

23         Q    Okay.  Let me ask you this:  Has

24     anybody from the mayor's office addressed the

25     issue of excessive force in the same type of
```

```
1                      J. Lipari                  130

2    way where they would have reached out to you

3    and sought your assistance on what they could

4    or could not do to curb that concern with the

5    CRB?

6                    MR. SICKINGER:   Object to

7              form.

8         A     No one from the mayor's office

9    that I can recall ever raised the issue of

10   use of force with me or responded to any of

11   our concerns that we raised.  I was -- I

12   forget how the interaction occurred but there

13   was an attorney from the Corporation

14   Counsel's office who kind of indicated to me

15   at one point several years ago that I think

16   it was after we made one of our first or

17   second recommendations to provide the use of

18   force policy, that she was working on it, on

19   the use of force policy, so I was happy to

20   hear that.  But a year or so went by and

21   nothing ever came out of the office in terms

22   of the use of force policy that we made our

23   2015 annual report recommendation that

24   included the full use of force policy.

25        Q     Do you recall that person's name?
```

```
1                    J. Lipari                 131

2          A     So how does this work if someone

3    asked me to keep that in confidence and I

4    would like to respect that?

5          Q     Then we're going to allow you to

6    do that.  I'm not going to pressure you any

7    further.

8          A     Okay.  Thank you.

9          Q     Had anybody from either the

10   mayor's office or the City or Police

11   Department ever asked you whether you had

12   ever noticed any patterns in excessive force

13   through your career at the CRB?

14               MR. SICKINGER:  Object to

15               form.

16         A     No.

17         Q     So I'm going to just kind of go

18   through these other two very quickly even

19   though we probably know the answers.

20               On the failure to act, had

21   anybody at the Police Department, chief of

22   police or anybody at the Police Department,

23   reached out to you and addressed the issues

24   that you thought were a concern during your

25   tenure at the CRB over the issue of failure
```

```
1                    J. Lipari                    132
2    to act?
3                    MR. SICKINGER:  Object to
4           form.
5       A    I did not -- I mean, we reported
6    those numbers in our report, but we didn't
7    make a policy recommendation or training
8    recommendation on failure to act, I believe.
9    So there was -- I was not really pushing them
10   to respond to that one necessarily.  But no,
11   I never got any.
12      Q    Right.  And that's a different
13   question.
14      A    Yeah.
15      Q    Had anybody ever reached out to
16   you in regards to the findings that you had
17   come up with in your annual reports or had
18   anybody identified from the Police Department
19   the issue of concern over the failure to act
20   and address that with you?
21                   MR. SICKINGER:  Object to
22          form.
23      A    No.
24      Q    Anybody from the mayor's office?
25                   MR. SICKINGER:  Object to
```

```
1                      J. Lipari                133
2              form.
3         A     No.  When I did my first
4    quarterly report, I did contact the mayor's
5    office and ask if I could sit down with the
6    mayor to go through the report with her to
7    give her a, kind of a heads up on what was
8    coming and the mayor declined to meet with
9    me.  She said she would wait until it became
10   public and she'd read it when it became
11   public.
12        Q     Had the mayor ever met with you?
13              MR. SICKINGER:  Object to
14              form.
15        A     Not individually.  She had me
16   come into other meetings where other people
17   were present to talk about the CRB.  That was
18   very early on.  But we never had a -- we
19   never had a one-on-one meeting.
20        Q     In those meetings with the mayor
21   where the mayor was present, was there ever
22   any discussion between yourself and the mayor
23   over what could be done to curb what you had
24   identified as administrator of the CRB as
25   issues of concern, particularly excessive
```

```
1                    J. Lipari                    134

2      force, failure to act, or demeanor?

3                    MR. SICKINGER:  Object to

4               form.

5           A      No.  I don't think any of the

6      contents of our investigation or findings

7      were discussed with the mayor.  It was -- I

8      think the two meetings, one was with a few

9      board members where I was just getting

10     started.  It was just kind of an introduction

11     meet and greet with the mayor.  And then she

12     had me come in twice with a group of

13     ministers and kind of explain what the CRB

14     does, what it had been doing up to that point

15     with these administrators, but that was it.

16               It was more so of a general

17     overview of what the CRB does, how it

18     operates, how they could put their -- their

19     constituents -- not constituents.  What do

20     you call a church order?  Congregates in

21     touch with the CRB if they need to file a

22     complaint.

23          Q     To your knowledge, the mayor has

24     access to these CRB reports, correct?

25                    MR. SICKINGER:  Object to
```

```
 1                    J. Lipari              135

 2            form.

 3       A      We give them to Corporation

 4  Counsel's office so I wouldn't speculate

 5  beyond that.

 6       Q      They were made public, correct?

 7       A      The annual reports, yeah, those

 8  are on the website.

 9            Sorry, that's what I thought you

10  were referring to, our finding letters.

11  Yeah, those are made public, and I'm actually

12  required and we would always send those

13  directly to the mayor, common councilors, the

14  chief of police.  We were required under the

15  ordinance to provide a copy directly to them

16  in addition to putting it on the website.

17       Q      Just quickly, so on the issue of

18  demeanor, and that was an area, you said was

19  one of the top three that you had identified

20  while you were at the CRB, of concern,

21  correct?

22                 MR. SICKINGER:  Object to

23            form.

24       A      Correct.

25       Q      Okay.  So on that issue of
```

```
 1                    J. Lipari                136

 2     demeanor like the other two issues, had

 3     anybody from the Police Department, the chief

 4     of police, anybody from the Police Department

 5     or anybody from the mayor's office ever

 6     reached out to you or reached out to the CRB,

 7     to your knowledge, to try to find a way to

 8     address those concerns or issues that you

 9     identified, particularly with demeanor?

10                    MR. SICKINGER:  Object to

11              form.

12        A     No.

13        Q     And in follow-up to that then,

14     Joe, I know that you had not identified false

15     arrest or untruthfulness or other issues of

16     conduct being active or passive as particular

17     areas of concern that were raised within the

18     top three, but did -- had anybody from the

19     chief's office or anybody from the Police

20     Department or the mayor's office addressed

21     any of those issues individually in the same

22     way to try to find a way to address those

23     issues and work with the CRB?

24                    MR. SICKINGER:  Object to

25              form.
```

J. Lipari                     137

1

2      A      Not in a direct response to any

3   sort of, you know, effort by us to put it on

4   their radar asking for a response.  In some

5   of the finding letters that the chief would

6   get where we would find untruthfulness, I'm

7   sure he would respond in writing.  You know,

8   I think the typical response in a case that

9   involved around a he said/she said situation

10  was to indicate that he felt the officer's

11  account was more compelling and that he did

12  not believe the plaintiff's account, so we

13  were disagreeing on that point.

14          So in that sense, it was a

15  response to our concern about untruthfulness

16  in a particular case and he was simply

17  responding, saying, no, I believe the officer

18  and I don't believe the complainant.

19  Paraphrasing.

20      Q      Okay.  So we have just these

21  exhibits here that we want to just have you

22  briefly review, see if you recognize these,

23  and if you do, then we're going to have some

24  follow-up questions.  Okay?

25          MR. RYDER:  And I need one

```
 1                    J. Lipari                    138

 2                more exhibit tab, that's to be

 3                Exhibit 55.

 4                    (Document was marked as

 5                Plaintiff's Exhibit 55 for

 6                identification, as of this date.)

 7        Q     I'm going to hand you what's been

 8    previously marked as Exhibit 51.  I want you

 9    to just take a look at this document for the

10    record that I'm going to identify that this

11    is part of a police file for Officer Lockett

12    which -- in which he's indicated that he's

13    been involved in some type of a complaint.

14    Okay?

15                I don't know whether there was

16    ever a CRB report, I don't know whether

17    anybody had ever -- a citizen had ever filed

18    a complaint officially, I don't really know.

19    So what I'm going to do is I'm going to hand

20    you this and this document is a predate to

21    your tenure in regards to whether or not you

22    had ever had to use previous files that were

23    on file with the CRB or ever identified any

24    of these documents.

25                So take a look at that and just
```

```
1                    J. Lipari                139

2    read real quickly the facts of that case as

3    portrayed by the officer and see if you

4    recognize that document.  Or that incident I

5    should say.

6         A    No, this is not familiar to me.

7         Q    Fair enough.

8              I'm going to hand you what has

9    been marked as Exhibit 52.  And this, once

10   again, is an investigation from

11   Captain Galvin in regards to a complaint of

12   excessive force against Officer Lockett.  I'm

13   not sure if the CRB was involved in that

14   whatsoever.

15             The officer, Lockett,

16   L-O-C-K-E-T-T?  Yes, two T's.

17                  MR. SICKINGER:  On the

18             record.

19                  Is your question for the

20             witness if he recognizes this as

21             54?  Or 52.

22                  MR. RYDER:  Yes.  I'm just

23             going to have him read through

24             the brief facts as portrayed by

25             Captain Galvin, if he recognizes
```

```
 1                    J. Lipari                140
 2            that.  Because we don't have
 3            anything from the CRB so we don't
 4            -- the CRB -- we were asking him
 5            if he has knowledge.  If he
 6            doesn't, we're not going to
 7            further ask about it.  That's
 8            not --
 9                 MR. SICKINGER:  I'm just
10            trying to save time.  So your
11            question is just does he
12            recognize the document?
13                 MR. RYDER:  Does he
14            recognize -- well, no.
15                 MR. SICKINGER:  Or the
16            scenario.
17                 MR. RYDER:  The scenario
18            contained in the document.  And
19            if he does, then we'll have
20            follow-up questions.
21       A    No, this one isn't familiar to me
22    either.
23       Q    Okay.  So it's fair to say you're
24    unaware of any complaint of the CRB,
25    investigation of the CRB, sustained findings
```

```
1                    J. Lipari              141

2     of the CRB, et cetera, et cetera in regards

3     to the facts as you read them there?

4          A     In regards to these two cases you

5     just showed me, yes.

6          Q     Fair enough.

7                Okay.  This is a -- another

8     report generated -- Police Department in

9     regards to a complaint of excessive force and

10    investigated by Captain Galvin in regards to

11    Officer Damon Lockett.  I'm going to have you

12    take a quick look.  You can read on the front

13    page here a little bit on handwritten

14    civilian form and then there's about four

15    pages back, see if there's -- see if you

16    recognize any of the facts associated with

17    that case.

18         A     No, this is not familiar either.

19         Q     I'm going to hand you what is

20    marked as Exhibit 54.  Now, this is a

21    document -- series of documents dated

22    throughout 2012.  And these documents are in

23    regard to an investigation of excessive force

24    against Brian Novitsky.  I'm going to hand

25    you this document -- compiled documents
```

```
1                    J. Lipari                    142

2    marked as Exhibit 54.  Do you recognize those

3    documents, any of those documents?

4         A     The content?

5         Q     The content, yes.

6         A     This one I definitely recognize,

7    yeah.  I recognize my handwriting too.  This

8    was probably one from a justice center inmate

9    so sometimes they wouldn't want to write it

10   themselves.  Sometimes they couldn't read or

11   write so I would fill it out as they were

12   telling me.  Yeah, this is my handwriting on

13   the complaint, so.  And we acknowledge that,

14   that I assisted in completing the form.

15        Q     I'm going to ask you to go ahead

16   and take a little time to refresh your

17   recollection by flipping through that

18   document.

19        A     Okay, yeah.  I got a statement

20   here that I took from the person.

21        Q     Tell us briefly what you recall.

22        A     Let me just finish skimming real

23   quick.  Sorry.  There's a lot of details --

24   the rest of the details.

25        Q     Go ahead.
```

```
1                    J. Lipari                    143

2              Okay, thanks, Joe.

3              Tell me briefly what the packet

4    of documents contained in Exhibit 54 entails.

5         A    So it's a number of different

6    documents.  It's the chief's final decision,

7    a memo documented his final decision in this

8    case.  The letter that went out to the

9    complainant, complainant's original complaint

10   form.  Statement that I typed up as

11   investigator for the case after receiving the

12   statement from the -- directly from the

13   complainant after he was in jail.  Then it's

14   Captain Galvin's report, the Office of

15   Professional Standards report for the case.

16   It's the 10-1 statements which are the F10.1

17   which are the written responses from the

18   officer, then use of force report and the

19   police reports, the narrative sections, some

20   evidence technician photos, some booking

21   photos, redacted, and the CAD report, which

22   is a -- CAD, C-A-D, computer-assisted

23   dispatch.  It's the CAD reports for the case,

24   for the incident.  That's it.  Oh, wait.  And

25   then a letter, another copy of a letter from
```

```
1                        J. Lipari                    144

2      the chief, looks like to the complainant.

3             Q      Okay.  Do you recall the facts of

4      that case?

5             A      The general outlines of it, yep.

6             Q      Tell me a little bit about that.

7                    MR. SICKINGER:  Object to

8                    form.

9             A      A young man fled from police, a

10     foreigner because he had a warrant out, ran

11     through some backyards, attempted to scale a

12     fence, got caught at the top of the fence, an

13     officer caught him at that point and they all

14     ended up -- I can't remember if they went

15     over the fence or fell back down to the

16     ground, but either way, they all ended up on

17     the ground.  The complainant alleged that the

18     officer struck him several times, I think

19     about the body and maybe the head and face.

20     And then the other detail I remember about

21     this case is the complainant alleged that the

22     officer stuffed dirt in his mouth while they

23     were on the ground and pulled him behind a

24     fence.  And the complainant was sort of

25     implying that he pulled him behind the fence
```

```
 1                    J. Lipari                145

 2     so he would be more hidden while he struck

 3     him.  And then there was something about his

 4     pants being pulled down, I think as he was

 5     being escorted from the scene to the car,

 6     maybe right there at the scene.  I think

 7     during the initial search of his person, he

 8     alleged that the officer pulled his pants

 9     down to his knees or to his ankle, something

10     like that.  So that's the basic outline of

11     the case.

12          Q     So did you do an investigation?

13          A     I did, yes.

14          Q     Okay, and did your investigation

15     find that there was a warrant for the

16     hearing?

17          A     So the way our process would work

18     is I would conduct the investigation, put the

19     report together, and recommend whether there

20     is a hearing or not, whether there -- the

21     panel should vote for a hearing or not -- or

22     the board should vote for a hearing.  And

23     then the board decides to send it to a

24     hearing.  It's not -- it's not my decision.

25     It's a recommendation from me.
```

```
1                         J. Lipari                146

2        Q      Understood.

3        A      I would defer to the written

4    record on this one.  I don't believe this one

5    went to a hearing and I don't remember what I

6    recommended, if I recommended it go to a

7    hearing or not.  Most of the time, the board

8    would follow my recommendation but not

9    always, so they could have -- I'm pretty sure

10   this did not go to a hearing.  I kind of

11   remember having a phone call with his mom,

12   explaining it to her.

13            So yeah, pretty sure it didn't go

14   to a hearing but I don't remember which way I

15   recommended it, but there's a record of that

16   to document that, that would tell us that.

17       Q      There would be but we hadn't

18   received anything and we were curious as to

19   why.

20       A      Right.

21       Q      And that very well could explain

22   that, right?

23                     MR. SICKINGER:  Object to

24            form.

25       A      I wouldn't speculate as to why it
```

```
 1                    J. Lipari                147

 2   wasn't provided.

 3        Q    I'm going to hand you what has

 4   been marked as Exhibit 55.  This one's a

 5   little longer.  Just take your time and see

 6   if you can recognize that document, series of

 7   documents.

 8                    MR. SICKINGER:  Off the

 9              record.

10                    (Whereupon, a discussion was

11              held off the record.)

12        A    Okay, I remember now.  I do

13   remember the very basic outlines of this

14   case.  I don't remember the outcome of this

15   one.

16        Q    Okay.  I think to save time, I

17   mean, had you -- do you recall recommending a

18   hearing in this particular case?

19                    MR. SICKINGER:  Object to

20              form.

21        A    I don't recall either way.

22   There's a document of that that would tell us

23   that, but I just don't remember.

24        Q    So in kind, you wouldn't recall

25   any disciplinary recommendation as well?
```

```
1                    J. Lipari                  148

2                    MR. SICKINGER:  Object to

3            form.

4       A       Yeah, I just don't remember.  I

5   remember the guy, I remember dealing with

6   him, I just don't remember what happened.

7       Q       Do you remember the particular

8   facts surrounding the case?

9       A       The very basics of it.

10      Q       Tell us --

11      A       I think this guy had, I think he

12  had more than one complaint or he had

13  initiated another complaint at some point

14  down the road, so that's why I'm having

15  trouble remembering exactly what happened in

16  this one.  The basic outline was he fled from

17  police.  As he was running -- he alleged that

18  as he was running one of the police vehicles

19  rammed him, the driver of the vehicle rammed

20  him, injuring his leg.  I remember the injury

21  to the leg.  It turned out not to be as

22  serious as it sort of appeared in the first

23  initial complaint.  But he did have an injury

24  to his knee.  Then after he's arrested,

25  oh, yeah, this is -- that's right.  This is
```

```
1                    J. Lipari                149

2   one that involved an offer to eliminate

3   charges in exchange for information, so there

4   was a discussion.  I think it was -- there

5   was a discussion in the lockup area at the

6   justice center before he brought him into

7   booking.

8            Hope I'm not getting confused.  I

9   think it's the right one, where the officer

10  was trying to get some information out of

11  him, out of the complainant and so we

12  investigated that angle of it as well as the

13  use of force.  Whether there was some kind of

14  quid pro quo exchange for his information in

15  exchange for some kind of drop the charges

16  or -- so that's -- we talked about that whole

17  situation, that issue earlier.  That's why it

18  came on our radar.

19            So yeah, that's about all I

20  remember.

21              *MR. RYDER:  For the record,

22              you know, we're going to request

23              if there's any CRB documents

24              associated with it because he

25              can't recall.  On the other ones
```

```
1                    J. Lipari              150
2              he could recall if he had not
3              made a recommendation.  On that
4              one he can't recall whether he
5              made a recommendation so we're
6              going -- he can recall that --
7              this one, Exhibit 54, he can
8              recall that he did not make a
9              recommendation.
10       A     Just to correct, I can recall
11   that it did not go to a hearing, that the
12   board didn't send it to a hearing.  I don't
13   recall if I recommended it went -- to go to a
14   hearing or not.
15              MR. SICKINGER:  That was
16              number 54?
17              THE WITNESS:  That was --
18              yeah.  I remember the guy's --
19              the kid's name.
20       Q     Hand me 55, please.
21              So for the record, I do want to
22   identify this.  So this would have been an
23   allegation of misconduct against
24   Brian Novitsky.  The complaint was false
25   arrest and it was investigated by Thomas
```

```
 1                    J. Lipari              151

 2     Galvin and the case report 13-105, is -- for

 3     the Syracuse Police Department was dated

 4     August 19, 2013.

 5                 So it's your testimony that you

 6     cannot recall whether you had recommended a

 7     hearing on this, whether or not there was a

 8     hearing, what any outcome would have been?

 9          A      Correct.

10          Q      Okay.

11                    *MR. RYDER:  So just because

12                    of that, I would ask that your

13                    people -- that your office

14                    produce the CRB report, if any.

15                    Okay.

16          Q      I'm going to back up real quick.

17     This will be the last thing.  This is back in

18     regards to Exhibit 20, which was the annual

19     report for 2014.  I'm going to also hand you

20     in regards to that document what has been

21     previously marked as Exhibit 17.  See if you

22     recognize that document.

23          A      So Exhibit 17 is a newspaper

24     report or media report on -- our annual

25     report for looks like 20 -- yeah, 2014.  Just
```

```
1                    J. Lipari              152

2    noting that the Citizen Review Board

3    recommended discipline in twenty-one cases,

4    chief imposed sanctions of discipline on one.

5    Give some of the numbers that I gave earlier

6    about half of the twenty-one cases

7    resulted -- that result in the CRB

8    recommendations involved complaints about

9    untruthfulness and more than seventy percent

10   involved claims of excessive force.  It

11   quotes a person from the NYCLU, then it

12   references our -- CRB's desire to see a more

13   consistent scale of discipline.  That's the

14   disciplinary matrix I was referring to

15   earlier.

16             It goes on to talk a little bit

17   about cases with video, body cameras.

18        Q    Do you recall when this document

19   was published?

20        A    I mean, the date on it says it

21   was published March 24, 2015.  That would

22   have been timed with the release of our

23   annual report which was due on March 31st

24   every year.  I don't -- I mean, I've read a

25   lot of media reports about our work so I
```

```
1                      J. Lipari                153

2      don't recall this one in particular, but it

3      says it was published on March 24, so I'm

4      presuming that was accurate.  It fits with

5      the release of our reports.

6           Q    Okay.  So in response to this

7      document or any other document that was

8      published by the media in Syracuse, you just

9      mentioned that you had been aware of several

10     media reports, correct?

11          A    Yes.

12          Q    In response to those media

13     reports, had you ever been reached --

14     contacted by either somebody at the mayor's

15     office or somebody at the Police Department,

16     particularly the police chief, in regards to

17     any of the findings or any of the comments

18     that were made or quotes of you that were

19     involved in any of these media reports?

20                    MR. SICKINGER:  Object to

21              form.

22          A    No, I don't think I've ever been

23     contacted about any of my quotes in the media

24     or the contents of the annual reports.

25                    MR. RYDER:  All right,
```

```
1                        J. Lipari                154
2              that's it.  We're out of here.
3              Let's get out.
4                   MR. SICKINGER:  Just a few
5              questions.
6                   MR. RYDER:  Okay, sorry.  I
7              didn't mean to interrupt you.
8    EXAMINATION BY
9    MR. SICKINGER:
10        Q    Mr. Lipari, I will try to keep
11   this brief.  I know you've answered a lot of
12   questions and been here a long time already.
13             Part of why I'm here today, did
14   you speak to anybody about being subpoenaed?
15        A    Just my general counsel at my new
16   office, just to give them a heads up that I'm
17   going to give a deposition, ask them if there
18   is any policies that I need to be aware of
19   and just told me the only thing that I
20   shouldn't talk about is anything that relates
21   to any of the projects that I'm working on
22   for the office.
23        Q    Mr. Lipari, I should have asked a
24   foundational question.  You did receive a
25   subpoena?
```

1

2          A       I did, yes.

3          Q       And did you receive a witness fee

4     with that subpoena?

5          A       Oh, like money for me?  No.

6          Q       Did you receive any communication

7     about coming to a deposition prior to

8     receiving the subpoena?

9          A       Phone calls and a piece of

10    follow-up e-mails, just trying to figure out

11    the dates of it from Mr. Bonner's office,

12    Calvin, so just logistically.

13         Q       Scheduling type of issues?

14         A       Right.

15         Q       Then after you agreed on the

16    date, then you received the subpoena?

17         A       I don't remember if we agreed on

18    the date, and then I received -- I must have.

19    We must have agreed on the date.  I think

20    there was a period we were talking about, the

21    25th and the 26th.  They weren't sure which

22    day it was going to be.  I think I said

23    either one would work.  And at some point I

24    received a subpoena.

25         Q       Did you speak to any of the

```
 1                     J. Lipari                 156

 2      attorneys involved in this case prior to

 3      coming here today?

 4           A      Well, back when I was

 5      investigating the case, they were with the --

 6      with the complainant in my office at some

 7      point, I think Mr. Bonner was.  I'm sure as I

 8      was collecting evidence, I'm sure I talked to

 9      them both on the phone at one point during

10      the course of the investigation.

11           Q      When you say Mr. Bonner?

12           A      Mr. Bonner, I think -- I'm sorry,

13      remind me again?

14                     MR. RYDER:  Attorney Jesse

15                Ryder.

16           A      Jesse Ryder.  Yeah, I think Jesse

17      and I probably spoke on the phone during that

18      period as well, but it was more to collect --

19      I think they had these videos of the

20      interviews that they did so we were trying to

21      get copies of those, so it was around that

22      stuff.

23           Q      And I won't make you go through

24      it all again in part in the interest of time,

25      but I know you put your educational
```

```
 1                    J. Lipari                  157
 2     background on the record.  Have you received
 3     any legal training?
 4          A      No, not anything that I would
 5     call formal.
 6          Q      Have you received any law
 7     enforcement or police training?
 8          A      Yes.
 9          Q      What training did you receive?
10          A      So I had training in use of force
11     policies and practices, Internal Affairs
12     investigations, these were like -- those were
13     like week-long trainings.  You attend the
14     training for like -- usually like a week or
15     so and then you would get a certificate at
16     the end saying that you -- you attended this
17     training.
18          Q      Where did you go for that?
19          A      The use of force one was Eric
20     Daigle's law firm.  He's a former Connecticut
21     State trooper and now does -- an attorney now
22     who does trainings and sort of helps
23     departments rewrite their policies.  But he
24     has this annual summit called Use of Force.
25     I attended that in 2014.  I tried to get an
```

1                      J. Lipari                    158

2     attorney from the Corporation Counsel's

3     office -- an attorney from the Corporation

4     Counsel's office to come with me because I

5     was trying to get a -- change his use of

6     force policy but they didn't send anyone with

7     me.  So that was Eric Daigle, use of force

8     conference, D-A-I-G-L-E.

9               Then the training on Internal

10    Affairs, that was at University of North

11    Florida, in Jacksonville.  I want to say that

12    was 2013.  That was like a week-long training

13    seminar on conducting Internal Affairs.  That

14    was actually mostly law enforcement; I was

15    the only civilian.

16               And then I had our National

17    Association of Civilian Oversight of Law

18    Enforcement, our national organization for

19    the field, we have a conference every year.

20    It talks about -- presented at those

21    conferences and each of those panels.  There

22    is a lot of legal training, a lot of

23    training.  It's a lot of presentations and

24    legal topics, other areas of the field, so we

25    get a lot of new information each year at

J. Lipari                         159

2   this conference.

3        Q     Mr. Lipari, do you have any

4   training with regard to conducting

5   investigations?

6        A     At the Internal Affairs training

7   that we did at the University of North

8   Florida in Jacksonville, that essentially is

9   what the training was, how to conduct

10  investigations, how to conduct interviews,

11  how to assess credibility, all sorts of

12  things.

13       Q     You said that was a week-long

14  training?

15       A     Yes.

16       Q     And the entire week was devoted

17  to that topic?

18       A     It was essentially devoted to --

19  it was about two years ago so I'm trying to

20  remember -- all aspects of Internal Affairs

21  investigation, so, you know, it was like a --

22  what I was just saying, it -- you know, how

23  to conduct interviews, how to gather

24  evidence, how credibility -- how to set up

25  investigations in terms of if there's

1

2  criminal charges, then you need to bifurcate

3  the investigation so that there is an

4  administrative investigation and a criminal

5  investigation, the timing of those, when does

6  it make sense to do the criminal

7  investigation versus opposed to the

8  administrative investigation.  So it's

9  basically everything that you need to know to

10  run an Internal Affairs operation.

11      Q     Other than the training you just

12  described, have you received any other

13  training on how to conduct investigations?

14      A     Before I started in the field, as

15  a historian, we did historical investigations

16  in terms -- so, you know, it was a lot of

17  skills, sort of transfer in tracking down

18  documents, conducting interviews, so I had

19  some of that, you know, in grad school.

20            In terms of formal training it

21  would mostly be that training conference that

22  I discussed at the University of North

23  Florida.

24      Q     You said it was about two years

25  ago?

```
1                    J. Lipari                161

2        A     I have the certificate in my

3    office.  I could get the date for you, but I

4    want to say it was 2013.  I think it was

5    2013.  But I would have to double check.

6        Q     So it was after you had already

7    ended your employment with the City of

8    Syracuse?

9        A     Correct, yes.

10       Q     Other than the training you

11   already described, Mr. Lipari, do you have

12   any -- strike that.

13             Mr. Lipari, the incident that is

14   the subject of this lawsuit, the allegation

15   by Mr. Grant that this officer used excessive

16   force on him, do you have any personal

17   knowledge of the incident itself other than

18   what witnesses have told you?

19       A     I mean, I was not there when it

20   happened, so no, I wasn't a witness, but

21   that's true for all of the cases.

22       Q     Sure.  So your knowledge is then

23   based on what witnesses have told you and

24   what documents you've reviewed?

25       A     Correct, yeah, what the witnesses
```

```
1                    J. Lipari                 162

2    told us, what the police reports reported,

3    what the police officer reported in their

4    reports, use of force investigations, that

5    form, evidence technician photos, so yeah,

6    all the documents that have been provided to

7    us.

8         Q     Were there any other sources of

9    information that you would have used or

10   obtained as part of your investigation of

11   Mr. Grant's allegations?

12        A     I can't think of anything outside

13   of testimony documents from the department.

14   I'd have to check the file just to be sure

15   but I don't think there was anything else.

16        Q     You mentioned earlier something

17   about some videos I think you reviewed that

18   Mr. Bonner might have conducted some

19   interviews?

20        A     Those were interviews, yeah.  Not

21   a video of the incident but interviews that

22   he had conducted with the complainant and his

23   wife, I guess shortly after the incident or

24   right about the time he was filing a

25   complaint.
```

```
 1                    J. Lipari              163

 2        Q    So your review of those, that was

 3   part of your investigation as well?

 4        A    Sure, yeah.

 5        Q    Do you know, did you make copies

 6   of those for your file or anything like that?

 7        A    They -- were these -- I think --

 8   I forget how they were provided to me.  You

 9   know, if they were provided to me on a disc

10   then they would still be in the file.

11   Something is making me think that these were

12   on YouTube.  Were these on -- I don't know

13   if -- yeah.

14             So I might have had some YouTube

15   links and then I might have gotten some on

16   disc, so yeah, I'd have to see the file to

17   see.  Typically they're not given to us by

18   the YouTube link.  They are given to us on a

19   disc or a phone or something, so there will

20   be a hard disc inside the file.

21             But I just -- because this one, I

22   remember there were YouTube links, I think I

23   would have put the YouTube links in the

24   report if I didn't actually burn them onto a

25   disc and put the disc in the file.
```

J. Lipari                    164

1

2      Q      I apologize if you've already

3  stated this, Mr. Lipari.  So I just want to

4  be clear, for this particular investigation,

5  you would have relied on police reports, the

6  witness statements, the videos that you

7  reviewed of Mr. Bonner's interviews, then any

8  interviews that you might have conducted as

9  well?

10     A      Correct.  And then photographs

11 from the evidence technician that showed

12 injuries, you know, after the incident.  And

13 then, you know, some other documents from the

14 department like the CAD reports, the

15 computer-assisted dispatch stuff, just sort

16 of routine records we would include in that

17 as well.

18     Q      Do you recall how many witnesses

19 you interviewed as part of your investigation

20 of Mr. Grant's claims?

21     A      At least four but it was probably

22 more like five or six.  That would all be in

23 my report, though, everyone that I

24 interviewed.

25     Q      Did you interview any employees

```
1                      J. Lipari                    165
2    of the City of Syracuse as part of your
3    investigation?  Of Mr. Grant's claim I should
4    say?
5         A      Right, right.  I don't believe we
6    did.  That was typical.  In terms of the
7    people we would want to interview would be
8    the police officers, but we never had the
9    opportunity to do that.
10              So other than that, it wouldn't
11   really be any other employees.  Unless it was
12   a City employee who was somehow involved in
13   the incident, it would just be the officers
14   that we would like to talk to.
15        Q      In that meeting you described
16   earlier with Mr. Bonner sometime previous to
17   this day, was that when you were interviewing
18   Mr. Grant?
19        A      No.  He was not present when I
20   interviewed Mr. Grant.  They came in -- I
21   don't remember if it was to file the
22   complaint or just to -- it must have been
23   what it was.  I don't know if Mr. Bonner
24   recalls, but I just remember having them in
25   my office at one point, both of them sitting
```

```
 1                    J. Lipari                 166

 2     in front of me.  I think it was sort of the

 3     very early stages, kind of initiated -- they

 4     may have just been picking up the forms or

 5     turning in the forms, something to that

 6     effect.

 7          Q    And the witnesses that were

 8     interviewed by Mr. Bonner in those videos

 9     that you reviewed, did you subsequently

10     interview them yourself?

11          A    I think I -- I don't want to say

12     I got all of them but most of them, yes, I

13     interviewed myself.

14          Q    So most of the witnesses that you

15     reviewed the videos of you think you

16     personally interviewed as well?

17          A    I believe so, yeah.

18          Q    Did you do any background

19     investigation or any criminal history

20     investigation of any of the witnesses that

21     you interviewed?

22          A    We would typically get those

23     kinds of documents from the department, from

24     the Office of Professional Standards.  If it

25     was the complainant, as part of the CAD
```

J. Lipari                    167

report, the computer-aided dispatch, it would

include their whole record of arrest.  So we

would typically have that for our complainant

in any case, so I presume we would have had

it for this case; it would be in the file.

So that's something, you know,

that we typically got from the Police

Department.  We don't have any direct access

to databases that would provide that

information to us so we would be relying on

the police report to provide that to us.

Q    What about like, how I use the

term is third parties or just kind of witness

bystanders who might happen to be interviewed

by you, do you conduct sort of a criminal

background investigation or ask the police to

do that for you?

A    If it's -- if it's sort of

tangential to the case or like a key witness?

Q    Either.

A    We would submit what the witness

provided to us, to the department and they --

I think I remember them saying -- coming back

having run a -- either run a report on the

J. Lipari                          168

1
2      complainant or -- or on the witness or in
3      their report that they would give to us, they
4      would mention sometimes if the person had
5      a -- had a criminal record, but I did not
6      have access to that -- those databases so I
7      can't check it myself.
8              Q      Do you recall if you obtained
9      that information about the witnesses you
10     interviewed in Mr. Grant's case?
11             A      I don't recall.  I kind of want
12     to say the young man who gave -- who was a
13     witness, the police -- I don't remember if
14     the Police Department provided information on
15     him or not.  It was like two sisters of the
16     family, two daughters of the family, you
17     know, Stephanie, Alonzo, and then the young
18     man, so, yeah.
19             Q      And you think of those witnesses
20     you might have gotten the background
21     information on the young man?
22             A      I'd have to double check the
23     file.
24             Q      Sure.  Best of your recollection?
25             A      Anyone would have any kind of

```
1                      J. Lipari                 169

2    record, it would have been -- most likely

3    would have been him.

4         Q     Did you ever speak to anyone at

5    the district attorney's office, the Onondaga

6    district attorney's office about Mr. Grant's

7    case or claims?

8         A     I would occasionally check in

9    with the DA's office if I thought they had

10   some testimony we might want or if I needed

11   to know what stages some charges were at for

12   our complainant or for a witness.  And I know

13   we were following, or I was following, you

14   know, whether the charges were going to occur

15   in this case or whether they were going to

16   remain or be dropped.  My contact over there

17   I can tell you was Rick Trunfio, the

18   assistant -- first assistant DA.  Trunfio,

19   T-R-U-N-F-I-O.  I don't remember if I reached

20   out to him particularly on this case to ask

21   where the charges were.

22              The benefit of this case was it

23   was all being reported on in the media so I

24   think as soon as the charges were dropped,

25   there was an article in the paper on it.  I
```

J. Lipari                    170

```
 1
 2   don't remember if I had a conversation with
 3   the DA's office or not about the charges or
 4   where it was going.  We would just have to
 5   check the file to see if I made any just kind
 6   of note of that.  But I did do that in some
 7   cases.
 8        Q     You just stated a minute ago that
 9   you were following some of the news accounts
10   of Mr. Grant's case?
11        A     Sure.
12        Q     Was that before or after you
13   received complaints from him?
14        A     Well, what I've been -- reference
15   I just made about the charges being dropped,
16   that would have had to have been after he
17   filed the complaint with us, make sure the
18   complaint was filed and the charges were
19   dropped.
20              I don't remember how I first
21   learned about the case, if it was from the
22   complainant coming to me or if I read about
23   it in the paper, but certainly there were
24   multiple media reports along the way and I
25   kept up with it, sure.
```

J. Lipari                    171

1

2      Q      As part of those media reports,

3   do you recall whether or not the district

4   attorney's office made any statements that

5   were included in those reports?

6      A      I do remember them making a

7   statement when they dropped the charges.  I

8   can't quote it back to you, but yeah, I

9   remember they made a statement kind of

10  explaining the logic of why they dropped the

11  charges.  I don't really remember what that

12  was.

13     Q      Did you consider or use any of

14  those newspaper articles in your

15  investigation?

16     A      I don't think I cited any in my

17  report or anything.  I wouldn't -- I don't

18  think I would usually cite newspaper articles

19  unless it was a piece of information that we

20  didn't have elsewhere and it was relevant,

21  but in my reports I wouldn't typically put

22  into the reports sort of the development of

23  the media narrative or anything because I was

24  writing these reports for the panel members,

25  for the board members.  So it's possible that

J. Lipari                    172

1
2    if there was a piece of evidence that was

3    relevant to the decision they had to make,

4    occasionally I would include a media report

5    in that -- and reference it and provide a

6    copy of it for them, but if it wasn't some

7    new piece of information, if it was just a

8    general story kind of repeating the incident

9    and that we had all of this information, I

10   would not include because I would not want to

11   use -- have the media narrative shape the

12   board members' or panel members' view of the

13   case.  I try to keep it as clean as possible.

14       Q    Do you recall in Mr. Grant's case

15   whether or not you obtained any information

16   from any of the newspaper reports that you

17   did subsequently use to your investigation?

18       A    That, like, that I wouldn't have

19   had otherwise?

20       Q    Correct.  You know, for instance,

21   like the district attorney's office, they

22   dropped the charges, I know that was --

23       A    That would have been -- yeah.

24   Now in terms of like witness statements and

25   accounts, I would not have cited anything.  I

```
1                    J. Lipari              173

2    would have gone directly to the witnesses and

3    interviewed them, broke down -- report it to

4    my board members what they told me.

5         Q    I see.  Okay, but in this

6    particular case with Mr. Grant you don't

7    recall what you did?

8         A    I don't recall.  I don't think I

9    cited anything from the media reports, but

10   there's a document there.  We could check

11   that.

12        Q    Sure.  Very briefly, Mr. Lipari,

13   I just want to ask you about the hearing

14   process itself.  You testified earlier about

15   the hearing but I just have a few questions

16   about the actual hearing itself.

17        A    Sure.

18        Q    Are the witnesses that come

19   before the panel, are they placed under oath

20   before testifying?

21        A    No.  The reason why not is

22   because in the ordinance, it says the --

23   there can be no verbatim transcript or record

24   of the hearing.  And so when we started

25   creating these hearings after I first came,
```

```
1                         J. Lipari                    174

2      we were advised, I think by Bob Stanic

3      (phonetic) -- no, I don't want to say that

4      because I'm not sure about that.  We

5      decided -- it was decided that because you

6      couldn't get a verbatim transcript of what

7      was said, you wouldn't be able to make an

8      assessment of perjury in the hearing.

9                   So -- so therefore, there was no

10     purpose in swearing people in, putting them

11     under oath.  But we did convey to the -- all

12     the witnesses at the hearings that we would

13     convey to them basically that they were

14     expected to tell the truth, you know, answer

15     the question honestly and directly.  But the

16     real test is the board members' and the panel

17     members' reading of the person giving the

18     testimony.  People can swear in all they

19     want, but it's still a lie.

20                  So the real purpose of those

21     hearings was obviously to assess the

22     credibility of the complainants, of the

23     witnesses, whether or not they were sworn in.

24     So we did not swear them in because it was

25     irrelevant to our process in that you
```

```
 1                    J. Lipari                175

 2    couldn't check the record -- you couldn't go

 3    back to the record and say, well, this is

 4    exactly what you said.  Now this is -- now

 5    you're contradicting it with this statement

 6    so we decided that there was no purpose to

 7    swear people in if you couldn't hold them to

 8    that testimony.

 9         Q    But there was nothing that

10    actually precluded you?

11         A    I don't think the ordinance

12    precluded us, correct.

13         Q    And you mentioned earlier

14    credibility determinations.  Who would make

15    those credibility determinations about

16    witnesses that come forward for a hearing?

17         A    The panel members.

18         Q    Would you play any part in those

19    credibility determinations?

20         A    Other than reporting what was

21    told to me or what other evidence was

22    gathered, no.

23         Q    As part of your recommendations

24    to the panel, did you ever include any

25    information about credibility determinations?
```

```
 1                  J. Lipari                 176

 2        A     I think typically what I would do

 3   is identify it as a credibility issue that

 4   needs to be decided and then say, so I'm

 5   recommending it go to a hearing so that the

 6   panel can evaluate the credibility of the

 7   officer and the complainant.  So that's how

 8   it would be handled.

 9        Q     Do you know how the panel makes a

10   credibility determination?

11        A     In the course of the hearing they

12   evaluate the testimony, the facts, the

13   evidence, how it compares to other facts that

14   were received, the person's demeanor, their

15   body language, you know, that can all be

16   considered.  But we had some training of the

17   board members on evaluating credibility,

18   assessing credibility.  We provided them

19   directions that the juries get for the county

20   on how to assess credibility which has some

21   really useful stuff in terms of accepting

22   every witness whether they are in law

23   enforcement or, you know, the defendant in

24   the case, or the, you know, person being

25   prosecuted to evaluate -- you know, how to
```

```
1                        J. Lipari                  177

2      evaluate their credibility.  So they were

3      provided that.

4                 And we had our outside legal

5      counsel -- no, I'm sorry.  We had one of our

6      former board members who was a police officer

7      and a former chief of police also give

8      accreditation, sort of training presentation

9      in one of the training days to our board

10     members on assessing credibility.

11          Q     You mentioned at the beginning of

12     your answer that the board members have

13     training on making credibility

14     determinations.  Was that like a formal

15     seminar they went to or?

16          A     That's what I was just saying

17     about the -- giving them the instructions

18     from the -- that the juries get in assessing

19     credibility in the county and then having

20     the -- so we had this annual training day

21     where we brought in people from the DA's

22     office, other experts in various areas, and

23     one of our presenters in one of our training

24     days was our -- one of our board member who

25     was a former police officer and chief of
```

```
 1                    J. Lipari                    178

 2    police in Syracuse and he -- he gave a

 3    presentation on assessing credibility he had

 4    developed during his time as an officer.

 5          Q      Do you know if board members

 6    received any other training on making

 7    credibility determinations as part of their

 8    work for the CRB, I guess part of

 9    volunteering for the CRB?

10          A      I think those two that I just --

11    I think there was sort of an ongoing

12    discussion that we always had about assessing

13    credibility, but in terms of formal

14    instructions, it was the jury instructions

15    and the training from our board member who

16    was a former police officer, and I -- now

17    that I think about it, there was another

18    training we had prior to that one where our

19    outside legal counsel before he was outside

20    legal counsel put together a document for us

21    on how to conduct hearings, and in part of

22    that document included assessing credibility.

23                  And so he presented that document

24    at one of our training days.  We discussed

25    assessing credibility.  That was always the
```

```
1                    J. Lipari              179
2    issue with every -- not everyone but, you
3    know, most of the cases resolved around
4    credibility issues so it was a sort of
5    central focus for us throughout that period,
6    either with training or just ongoing
7    discussions.
8         Q    Is that because most of the cases
9    were on -- and I'll use the phrase, you know,
10   just colloquially, but he said/she said
11   allegations?
12        A    A lot of them were, yeah.
13             And that's how we refer to them
14   too.  When there's no -- you know, the
15   officer gives an account of -- the
16   complainant gives an account and the officer
17   gives an account that's different and there's
18   no physical evidence, there's no video either
19   way, and then, yeah, we would consider those
20   he said/she said.
21             But that doesn't mean you can't
22   assess credibility in those or you can't look
23   at evidence, some evidence that may be
24   relevant to the case.  It just may not be
25   enough to -- to make a decision based solely
```

```
1                          J. Lipari                    180
2    on the documentary evidence.
3         Q    Who determines what witnesses
4    would testify at Mr. Grant's hearing or the
5    hearing regarding Mr. Grant's claim?
6         A    For all cases, Mr. Grant or
7    anyone else, any witness I'd come across in
8    the course of my investigation, we would want
9    to have testify.  We would occasionally
10   subpoena.  If the witness was uncooperative
11   we would occasionally subpoena them, although
12   that wasn't that common to have to subpoena a
13   witness.
14             So it would be sort of a decision
15   made by me as the administrator deciding
16   essentially the same decision that I had to
17   make what goes into the report, what's
18   relevant for the panel members to read or,
19   you know, be aware of.  I could tell the
20   panel members, we had witnesses A, B, and C
21   that you received in that report.  A says
22   this and then B says this and then C says
23   this, but when the C wasn't there, and you
24   know, you sort of -- hearsay issues with the
25   C, and do you guys want that witness to be
```

```
1                        J. Lipari                    181

2    there as well?  And so the panel would

3    typically beforehand decide based upon what I

4    was telling them whether they wanted

5    witnesses -- whether they thought a

6    witness -- was relevant to have a witness

7    there or not.

8              If I -- usually if I identified

9    the witness, it was because they were

10   relevant, so I'm trying to answer your

11   question as directly as possible, but it was

12   essentially a blend of who I identified and

13   who the panel members felt was necessary to

14   have in there.  And then I would schedule it

15   with the witnesses and, you know, try to get

16   them there at the scheduled time.

17        Q    Do you recall who testified at

18   Mr. Grant's hearing?

19        A    Mr. Grant, Stephanie, I believe

20   it was two daughters, two of their daughters,

21   and then the young man.  There might have

22   been one or two others.

23        Q    Were there any witnesses that you

24   interviewed or that you discovered during the

25   course of your investigation that did not
```

```
 1                J. Lipari                    182
 2      testify at Mr. Grant's hearing?
 3           A     I don't think so.  I think
 4      everyone who I got statements from for this
 5      case were able to get to the hearing.
 6           Q     Were any of the police officers
 7      present for the hearing?
 8           A     No.
 9           Q     Were any City employees other
10      than yourself present for the hearing?
11           A     No.
12           Q     Who questions the witnesses?
13           A     The panel members.
14           Q     Did anyone ask questions of the
15      witnesses at Mr. Grant's hearing on police
16      officers' behalf?
17           A     They don't ask questions on
18      behalf of anyone.  They ask their own
19      questions for their own decisionmaking
20      process so it's not set up where -- you know,
21      and each side can bring attorneys.  The
22      officers can bring an attorney, the
23      complainant can bring an attorney where their
24      legal representation could ask those
25      questions on their behalf.
```

```
 1                    J. Lipari                183

 2              But that's the role of the panel

 3     members to argue the case one side or

 4     another.  They're asking for their own

 5     knowledge on -- for their own purposes of

 6     making a decision in the case.

 7          Q     Do you recall, did Mr. Grant have

 8     an attorney present for his hearing?

 9          A     Yeah, Jesse, Mr. Ryder was there.

10          Q     Did Mr. Ryder ask any questions

11     of any witness at the hearing?

12          A     I don't remember Jesse being that

13     active, you know, in terms of interrupting or

14     anything.  I don't recall if he asked the

15     witnesses any questions.  When we've had

16     attorneys before who ask more questions and

17     then take a more active role and stick out in

18     my mind, Jesse didn't stick out in my mind

19     that Jesse was interrupting a lot or -- but I

20     would think at some point he probably asked

21     some kind of question or posed something.

22              But, yeah, that was two years

23     ago, so I don't know exactly.

24          Q     You said earlier that there might

25     have been one or two other witnesses who you
```

```
 1                      J. Lipari                184
 2    didn't recall.  Was anyone from the district
 3    attorney's office present for the hearing?
 4         A    No.
 5         Q    Did anyone from the district
 6    attorney's office submit any documents that
 7    were considered at the hearing?
 8         A    I don't recall if we had any
 9    official documents from the DA's office.  If
10    we did, they would be in the file.
11         Q    And Mr. Grant's hearing was not
12    open to the public, correct?
13         A    Correct.  No hearings were open
14    to the public.
15         Q    And there's no transcript or
16    recording made of the hearing; is that
17    correct?
18         A    Pertinent to the CRB ordinance,
19    correct.
20         Q    What standard of proof is used by
21    the -- or panel members to actually make a
22    hearing determination?
23         A    Substantial evidence.
24         Q    And is there a specific
25    definition that the board uses to define
```

```
1                      J. Lipari                    185
2    substantial evidence?
3         A     The standard legal definition.
4    And I should say the substantial burden of
5    proof standard is in the CRB ordinance.
6    That's what we're required to use.
7         Q     So the definition that the panel
8    uses is the definition of substantial
9    evidence that's contained in the enabling
10   legislation?
11        A     The legislation doesn't contain a
12   definition of substantial evidence but it
13   does cite substantial evidence as the
14   standard proof.
15        Q     I guess what it's -- I'm just
16   trying to cut to the chase and save some
17   time.  Mr. Lipari, how do the panel members
18   get that definition of substantial evidence?
19        A     I'm sure I defined it for them
20   based on, you know, my research and looking
21   up what the -- how you define substantial
22   evidence.  You know, you have substantial
23   evidence and then you have -- top one is
24   beyond any reasonable doubt, the middle one
25   is preponderance of evidence.  So I explained
```

1                    J. Lipari                    186

2    to them those different levels and how

3    substantial evidence is not fifty percent

4    plus one; that's preponderance.  But it's

5    just evidence that you feel that the panel

6    members feel is compelling and substantial.

7    It doesn't mean that it has to be 100 percent

8    sure, doesn't mean that there can't be other

9    evidence that goes the other way, but it

10   could -- but it essentially means there's a

11   substantial amount of evidence the panel

12   found or what everybody found evidence of

13   whatever was being investigated in the that

14   case, so.

15        Q     So, I guess just to understand

16   then what you were saying, so the way you

17   defined substantial evidence to the board

18   members or the panel member was that it's not

19   as high as preponderance of the evidence; is

20   that correct?

21        A     Correct, yeah.

22        Q     Did you put in -- you mentioned

23   just now that preponderance of the evidence

24   is fifty percent plus one or something to

25   that effect?

```
1                    J. Lipari                   187

2        A     It's typically how it's defined.

3        Q     Did you put any sort of number on

4   substantial evidence when you defined it?

5        A     No.

6        Q     And so was that up to each board

7   member then or panel member to determine what

8   was substantial in their particular mind?

9        A     I mean, they all had the same

10  explanation, that it's something that they

11  find compelling and relevant, but it didn't

12  have to reach that fifty percent plus one

13  threshold.  So I think they all had that

14  standard definition, but I can't speak to

15  what was in their minds in terms of -- you

16  know, they all understood they had to make

17  their own credibility assessment in each

18  case.

19       Q     Just in terms of procedure

20  itself, are there any rules of evidence that

21  are followed during the hearing?

22       A     No, there is no evidence

23  typically submitted at the hearing.  The

24  evidence is all gathered prior to the

25  hearing.  If there's any evidence of, you
```

```
1                          J. Lipari                    188
2      know, photographs, that sort of thing, I
3      provide that to the board members prior to
4      the hearing.
5           Q     So I guess what I'm getting at
6      though, is hearsay is allowed at these
7      hearings?
8           A     Well, people can say anything
9      they want but we have discussed with the
10     board members about, you know, hearsay and
11     how unreliable that as.  And so, you know, I
12     would be careful with that.  If someone's
13     testifying and they say, so and so told me
14     this, we don't stop them from saying it, we
15     just, you know, take it with a grain of salt.
16          Q     So the panel members can consider
17     it, it's up to them what weight to give to
18     it?
19          A     Exactly.
20          Q     So there's no formal rule then on
21     what they can and cannot consider?
22          A     No formal rule, right.
23          Q     That's just up to their
24     discretion?
25          A     And, you know, some of the
```

J. Lipari                    189

2    training and discussions we have, yeah.

3         Q    Your investigation in terms of

4    Mr. Grant's claim indicated that the police

5    officers involved intentionally

6    misrepresented some facts in the report; is

7    that correct?

8         A    I would have to have my report in

9    front of me to say -- to tell you exactly

10   what I said.  I think what I would have

11   probably done in the report was say that the

12   complainant and the officer -- witness and

13   the officers, both of those in some cases,

14   didn't -- were contradictory.  I would've

15   pointed out inconsistencies between the

16   testimony, but I don't, you know, I leave the

17   credibility assessments to the panel members.

18   So I would kind of present what was said and

19   then they would have -- what was said and

20   then whatever evidence there is and they

21   would have to weigh all that to make a

22   decision.

23        Q    In Mr. Grant's case, do you know

24   if the panel members make a determination as

25   to the intent of someone's -- the intent

```
1                      J. Lipari                    190

2    behind someone's statement?  And let me

3    explain more clearly.  What I mean by that is

4    if someone makes a statement which the panel

5    then later believes is inaccurate, how does

6    the panel determine whether that was

7    intentionally a misstatement or just

8    something that they forgot or overlooked or

9    didn't see or something like that?

10        A     That would be a part of their

11   deliberative discussion, that the board

12   members would discuss it after the

13   complainant witness left the room and, you

14   know, they would, you know, using their

15   own -- which I think this is directly from

16   the assessing credibility, hand out from the

17   County, the jurors.  You know, you use your

18   own background, your own knowledge, you --

19   you know, your understanding of people's body

20   language, you -- you know, whatever

21   experience you have, you bring to the table

22   and make a credibility assessment.

23        Q     Do you know how that was done in

24   Mr. Grant's case?

25        A     No.  I mean, I can't really speak
```

```
1                      J. Lipari              191

2      to -- I would suspect that the -- the panel

3      had a discussion particularly because there

4      was a truthfulness issue at stake in this

5      case.  They would have discussed it and

6      decided, you know, what they thought was

7      credible, what they thought wasn't credible,

8      was this possible to do this, was it not

9      possible to do this.  And so that was

10     essentially assessing the credibility of the

11     complainants who were in front of them and

12     who just testified before them and who they

13     can ask questions of to test, you know, how

14     accurate their statements are.

15          Q     You were present in the room when

16     the panel members deliberated on Mr. Grant's

17     case?

18          A     Yeah.  Typically I should be.  I

19     would -- what we would typically do is once

20     all the testimony is done, all the

21     questioning was done, I would walk the

22     complainant and -- and/or witnesses if there

23     were any down -- you know, bring them down

24     the elevator, thank them for their time, you

25     know, ask them how they felt about the
```

```
                          J. Lipari                    192
```

 1
 2    process, try to get a little feedback.  You
 3    know, consumer feedback so to speak, just to
 4    see if there was areas that we need to
 5    improve in terms of outreach or explaining
 6    the process to people.  That would take me
 7    about five minutes and then I would go back
 8    up to the conference room where the hearing
 9    is being held, sit in and, you know, listen
10    to the deliberations while the panel is
11    deliberating.
12            I would -- typically I would miss
13    like the first four or five minutes as I was
14    walking the person down, but that's just them
15    sort of getting started.  I'd sit in and
16    listen.  I wouldn't intervene in their
17    deliberations unless there was a point of
18    fact where I had to point out, oh, no, it was
19    such and such date, and you know, because I
20    was the investigator I could point those
21    things out.
22            But other than that, they would
23    just deliberate until they made a decision.
24        Q    Do the panel members consult you
25    during the deliberations?

```
 1                    J. Lipari              193
 2        A     If it's a question of fact, like
 3   I was just saying, like they're unsure did --
 4   did this happen on such and such date or, you
 5   know, who said this, they could check with
 6   me.  I'd consult the record and tell them.
 7   If there was a policy question that would
 8   come up in their deliberations, they could
 9   ask me that kind of stuff.  But that's really
10   about it, you know.
11        Q     Are the witnesses that come
12   before the panel, are they cross-examined?
13        A     They could be.  If the officer
14   came to the hearing, the officer could
15   cross-examine the complainant or the
16   officer's attorney could, but without them
17   there, without the officer or the officer's
18   legal representation there, the only people
19   who ask questions are the panel members.
20        Q     So in Mr. Grant's case, there
21   would not have been any cross-examination of
22   the witnesses then?
23        A     By an opposing attorney, correct,
24   but they were certainly questioned by the
25   panel members.
```

```
1                      J. Lipari                194

2          Q      And you mentioned earlier that --

3     I just want to make sure I'm correct in this.

4     In Mr. Grant's case, all your information was

5     obtained from sources who were not the police

6     officers other than their reports?

7          A      Say that question again.

8          Q      The information you got during

9     the course of your investigation of Mr.

10    Grant's claim, the only information you got

11    from the police officers themselves was what

12    they submitted in their reports?

13         A      Correct, yeah.  So their police

14    reports, use of force reports, if they gave a

15    10-1 statement to the Office of Professional

16    Standards, we would have gotten that.  That

17    would all be in the file.

18         Q      Earlier today, probably about

19    three or four hours ago, I know it's going

20    back, you mentioned in regard to Chief Fowler

21    submitting letters to you in terms of what

22    actions you took or did not take with regard

23    to the panel findings, you used the term

24    incident.  That there was a point in time

25    when he was making submissions to the CRB and
```

```
1                    J. Lipari              195

2    then you said there was an incident, then he

3    stopped doing that.  Do you know what you

4    were referring to?

5         A    Yep.  You sure you want to ask

6    that question?

7         Q    It's going to come up in the --

8    I'm going to work it into the CRB lawsuit.

9    We will get there.

10        A    So, let me take you through the

11   whole sort of period or just that last

12   period.  I could try to do it fairly quickly.

13        Q    Let me do this, Mr. Lipari.

14   We're going to get to the CRB suit that's

15   pending against the City.  Maybe if you

16   haven't answered then, we'll come back to it.

17   How's that, to save some time?

18        A    Okay.

19        Q    You indicated that you had a

20   meeting with Chief Fowler and he indicated

21   something to you to the effect of making a

22   change like that would get officers killed?

23        A    Yeah, yeah, that use of force

24   policy.

25        Q    What change in particular was he
```

J. Lipari                    196

2    stating that about; do you recall?

3         A     I think it was just the general

4    use of force policy that we were -- at that

5    point we hadn't written our own use of force

6    policy.  We were recommending -- we were

7    bringing forward the Las Vegas Metropolitan

8    Police Department's use of force policy

9    saying this is a good one that Syracuse

10   should probably follow, should look at and,

11   you know, base their changes on this Las

12   Vegas use of force policy.

13              And that policy was floating

14   around in the media and, you know, was

15   available to people.  So that was -- that --

16   it was that policy in particular, the Las

17   Vegas Metropolitan Police Department's use of

18   force policy that I was suggesting we need to

19   go in the direction of and that's what he was

20   responding to.  So it's really the policy in

21   general, not one specific aspect of the

22   policy.

23        Q     So Chief Fowler, then, in words

24   of substance, expressed to you his concern

25   that making the change would endanger the

                        J. Lipari                    197

 1
 2   safety of officers?

 3        A     His comment that he made was,

 4   that won't happen on my watch, that's going

 5   to get officers killed.

 6        Q     And that was with regards to

 7   changing to what the Las Vegas Police

 8   Department was using?

 9        A     Correct.

10              And these are policies that are

11   used all across the country, so.  For the

12   record, I didn't think that response had any

13   merit to it.  I thought he was wrong on that,

14   but that's --

15        Q     And why was that?

16        A     Why did I think he was wrong?

17        Q     Yes.

18        A     Because the departments across

19   the country are using it and they didn't see

20   any increase in officers being harmed or

21   killed whenever they instituted those

22   policies.  That's what the Department of

23   Justice is recommending now and actually

24   these policies keep officers safer.

25        Q     You mentioned earlier, Mr.

```
1                    J. Lipari              198
2       Lipari, that the police chief serves at the
3       pleasure of the mayor.  With regard to that
4       statement, is it your understanding then that
5       all City employees with the exception of
6       those particular unions serve at the pleasure
7       of the mayor?
8            A    It's different, I think for
9       different employees.  You know, you have to
10      look at whatever ordinances or guidelines are
11      in place.  My understanding was that the
12      chief serves at the pleasure of the mayor,
13      being that the mayor hires and fires the
14      chief.  That's just sort of my -- sort of
15      common understanding of it.
16                But your question was?
17           Q    I was just trying to get -- was
18      trying to see if there was any meaning you
19      meant by that because it kind of threw me
20      when you said that because I serve at the
21      pleasure of the mayor; all City employees
22      except for those, in particular, unions serve
23      at the pleasure of the mayor.  So I was just
24      wondering if there was something else behind
25      it.
```

```
 1                    J. Lipari                    199

 2        A      No, no.  I just meant the common

 3   uses of the phrase.

 4        Q      Okay.  So there's no reason that

 5   you have to believe that Chief Fowler

 6   situation is any different in terms of

 7   serving at the pleasure of the mayor than all

 8   the other City employees who serve at her

 9   pleasure?

10        A      I don't think so.  I think in the

11   charter that, you know, the relationship

12   between the chief and the mayor is

13   articulated in the charter, I believe.  I

14   want to say there are some -- no, I'm not an

15   expert in labor law so I will steer away from

16   that.  Just a common understanding that --

17        Q      Sure.  And I might be reading too

18   much into it, Mr. Lipari.  I'm --

19        A      I didn't mean anything other than

20   that she hires and fires the chief.

21        Q      You said -- and I know I'm

22   skipping around here.  Just trying to hit

23   some of the points of your prior testimony.

24   You mentioned in response to one of Mr.

25   Ryder's questions that you may have had some
```

```
 1                    J. Lipari                200
 2    follow-up calls with witnesses in Mr. Grant's
 3    case regarding some inconsistencies or things
 4    you noticed that looked like inconsistencies.
 5    Do you recall those conversations?
 6         A     No.  I think I was just saying
 7    that in general.  I do that occasionally,
 8    like say I've interviewed witnesses and then
 9    I go back and look at the records and
10    something an officer said is different from
11    the complainant, that it's not uncommon for
12    me or wouldn't be uncommon for me to go back
13    and call someone and say, can you clarify
14    this or send the request to Office of
15    Professional Standards asking them to clarify
16    some of the things they said.
17              I don't remember if I had to do
18    that in this case.  We might be able to tell
19    from the file if we have a file in front of
20    us.
21         Q     Mr. Lipari, I will show you
22    what's previously been marked as Plaintiff's
23    Exhibit 41.  I know you answered some
24    questions about that document earlier today.
25              Do you recall if the subject
```

```
1                     J. Lipari              201
2     described in that report, the individual, do
3     you recall if he received some psychological
4     care after that incident?
5           A    I don't recall.  And that may not
6     necessarily be disclosed to me unless they
7     volunteer that information.
8           Q    I see.
9                So if you were told that that
10    particular subject was taken to the
11    psychological emergency room in Syracuse
12    after that incident, you wouldn't have
13    knowledge of that unless they shared it?
14          A    Yeah.  I mean, we always got
15    documents and then this person was
16    transported to CPAP.  If he was transported
17    to CPAP from the scene, that would have been
18    in the police report and so we would have
19    seen that.  I don't know -- remember in this
20    case what happened to the individual after --
21    after it happened.
22          Q    That's the only question I had on
23    41.
24          A    Okay.
25          Q    You talked earlier in response to
```

```
1                    J. Lipari              202

2      Mr. Ryder's questions about officers, and I

3      was unclear, was it just dropping charges

4      against witnesses or defendants or was it

5      just reducing them or both?

6           A      Both.

7           Q      Was it that officers -- and I'm

8      sorry, was part of this issue was that

9      officers were just choosing to not charge

10     witnesses or they would say, I won't charge

11     you if you cooperate or something like that?

12          A      Yeah, it could happen in a number

13     of ways.  It could happen saying, look, so --

14     and it was usually something fairly minor,

15     you know, you find a small amount of drugs in

16     the car or something, and said, look, we

17     won't give you a citation for this dope here

18     if you can get me an illegal gun off the

19     street, which is a lot of a goal if -- we all

20     want to get illegal guns off the street.

21                    MR. BONNER:  NRA doesn't.

22          A      Or it could happen where, you

23     know, while I got to write you up for this

24     one, but I won't include this one.  So it was

25     just, it could be -- happen in a variety of
```

```
1                    J. Lipari                203

2      different ways.  It just depended on that --

3      the specifics of that particular instance.

4            Q      So in this instance you just, you

5      know, were just describing, and I know

6      generally that was I guess, I'm trying to

7      understand was that just the officer then

8      saying, I'll exercise my discretion here and

9      not charge you if you help us with something

10     else?

11           A      Well, that was the question.  So

12     officers have discretion not to charge

13     someone when they observe a law -- a

14     violation of the law.  So it went to the DA's

15     office and I asked them that question.  They

16     said no, they're -- they have to -- if they

17     see a law violation, the person has to be

18     charged.  Now, they could come to the DA's

19     office and say, you know, based on A, B, and

20     C we would recommend that the charges be

21     reduced to this or drop the charges, but

22     ultimately the DA has to make that decision

23     if there is going to be any protection

24     involved in the person giving information on

25     crimes or whatever.  You know, you want the
```

```
1                        J. Lipari                    204
2      DA's office involved in that.
3           Q    Was -- did the DA's office issue
4      some sort of paper or statement or document
5      about that issue?
6           A    Rick may have put that in writing
7      for me, I don't know.  I know we had a phone
8      call about it.  I don't recall whether he put
9      that in like a letter for me with the formal
10     finding or anything, or if it was just a
11     verbal confirmation over the phone.  But
12     either way, you know, that came from the DA's
13     office.
14          Q    From Mr. Trunfio?
15          A    Yeah, correct.
16          Q    And did that apply to all methods
17     of charges; felonies, misdemeanors and
18     violations?
19          A    It would not apply to violations.
20     Officers can use discretion for violations.
21     This would be misdemeanors and higher.
22          Q    So the violations, they have
23     discretion?
24          A    That, yeah.
25          Q    According to Mr. Trunfio?
```

```
 1                    J. Lipari                205

 2        A      Correct.

 3        Q      I just wanted to clarify that

 4   because it kind of threw me when you said

 5   that.  Like it was prosecuting every single

 6   speeding ticket they get --

 7        A      Yeah, right, for stuff like that

 8   there.  Yes, there is discretion.

 9        Q      And you said the CRB issued a

10   recommendation then based on Mr. Trunfio's

11   advice or statements to the CRB?

12        A      Yeah, that as either our 2012 or

13   2013 annual report where we sort of laid out

14   the issue that this is what we have been

15   seeing, this is what the complainant had been

16   telling us, this is what the DA's office has

17   reported to us, this is what we're

18   recommending which is essentially to remind

19   officers that, you know, in -- either in

20   service training or roll calls, something,

21   that you -- if it's -- that a crime was

22   committed, you have to document it and check

23   with the DA's office before -- you're not

24   authorized to make any sort of informal deals

25   with people when a crime is involved.  That's
```

J. Lipari                           206

1    the gist of it, but it's in the report.

2         Q    You testified earlier that the

3    Syracuse Police Department did, in fact,

4    adopt your recommendation or did take action

5    based on your recommendation?

6         A    We saw no evidence that they

7    formally adopted it or took action.  What I

8    said earlier was that we saw a decline in

9    that happening where -- so we would still get

10   complainants saying, after we made this

11   recommendation, we would still get

12   complainants saying, your officer tried to

13   make a deal with me.  He offered me, or, you

14   know, the officer asked if I could get him an

15   illegal gun.  So we said okay.  Our minds --

16   we've seen that before.

17              Our next question would be, did

18   they mention anything about the DA's office?

19   And then what we would start -- we started

20   getting -- the response we started getting

21   after we made that recommendation was, oh,

22   yeah, they did mention the DA's office.  They

23   said we'd have to go before the DA and do

24   this in writing.  So I was saying that to

```
 1                    J. Lipari              207

 2    make a point that I think us, by raising the

 3    issue, even though it may not have been

 4    formally adopted, there was no new policy or

 5    training instituted as far as I know, the

 6    media report had gone on our recommendation.

 7              And so, logically, some officers

 8    read it, some sergeants read it, so maybe

 9    it's trickled up as a positive benefit.

10         Q    Thank you.

11              And you testified earlier about

12    Syracuse Police Department following or

13    adopting the CRB's recommendation on felony

14    stops; is that correct?

15         A    Same situation.  So we raised the

16    issue.  As far as we're aware, they didn't

17    change.  Their policy was actually good;

18    there was no problem with the existing

19    policy.  It was just that we're seeing

20    officers following -- we were seeing officer

21    running up to the cars in these dangerous

22    situations.  So after we made that

23    recommendation and the media reported on it,

24    we started getting cases where we saw them

25    actually following the felony stop policy.
```

```
 1                  J. Lipari                208
 2    So that's another situation where I think we
 3    raised the issue.  Didn't necessarily see any
 4    formal training or new policy development
 5    just because we raised the issue, put it on
 6    the radar of some of the officers, maybe a
 7    sergeant, and they just became more aware of
 8    it, so.
 9          Q     You testified earlier about there
10    not being a -- I guess a clear definition of
11    pattern or practice.  Was there a particular
12    definition that you used for those terms
13    during while you were employed by CRB?
14          A     My approach to that whole
15    question is, are you seeing an activity
16    occur, are the people in charge being made of
17    aware of it, at least the allegations of it,
18    and are they taking remedial action,
19    corrective action, or at least investigative
20    action to address it.  So that's kind of how
21    I, you know, applied the -- the pattern and
22    practice sort of standard.  Do I see it
23    happening more than once of those in charge,
24    the command staff being made aware of it, and
25    are they doing anything about it?  If they're
```

```
 1                  J. Lipari              209

 2    doing something about it, I think you can

 3    argue that it's not a pattern and practice.

 4    Behavior can exist and you want -- and you're

 5    taking actions to stop it.  On the other

 6    hand, you can have a situation where behavior

 7    is occurring and no action is being taken to

 8    stop it from continuing.  And then if that's

 9    the case, then that's where I would feel you

10    would have a pattern and practice.

11         Q    So just to clarify there, Mr.

12    Lipari, your understanding of pattern and

13    practice, is that based on any sort of legal

14    definition of pattern and practice?

15         A    That's the problem.  In 14-141,

16    it's not -- the pattern and practice is not

17    specifically defined as a term.  The phrase

18    is used.  So, you know, DOJ, when they apply

19    pattern and practice to a department, they

20    conduct investigation, they look at lots of

21    documents, and they try to assess whether a

22    behavior is occurring and whether there are

23    systems in place to catch it and to stop it.

24    And so it's -- for us -- for those of us in

25    this field, it's more about do you have --
```

```
 1                    J. Lipari              210

 2    have you been made aware of it and are you

 3    putting systems in place to try to stop it

 4    from continuing.

 5         Q    I just want to clarify though, so

 6    when you say your understanding of the

 7    definition of pattern and practice -- and

 8    also, I should add the word custom as well

 9    because I know that's commonly used by you as

10    well, if that's something that you're taking

11    from some sort of case law or statute or

12    something or is it just as you understand in

13    the field?

14         A    That's how I understand in the

15    field following the Department of

16    Justice's lead.

17         Q    I see.

18              Mr. Lipari, I just placed in

19    front of you what's previously been marked as

20    Plaintiff's Exhibit 55.  Could you just take

21    a quick second to just look that over again?

22         A    Sure.

23         Q    You made a statement in response

24    to one of Mr. Ryder's questions about Exhibit

25    55, about a knee injury to the complainant in
```

```
 1                J. Lipari              211

 2    that.  And I believe you said something along

 3    the lines of you hoped it didn't turn out to

 4    be as involved or serious as originally was

 5    stated or thought.  Do you recall any further

 6    detail about that?

 7         A    I hope I was not going beyond the

 8    evidence there.  No, I just remember

 9    something with his knee, either car struck

10    his knee or that was claimed, and in his

11    report he sort of described his injury, then

12    we got the medical records and it didn't show

13    any serious injury to his knee.  Something

14    like that.  But I'd really have to look at

15    the file to be sure what the nature was.  I

16    do remember there was something with a knee

17    injury involved in this case -- or an alleged

18    knee injury.

19         Q    You said you were employed by

20    Syracuse up until May of this year?

21         A    Correct, yeah, first or second

22    week of May that I left.  I used some

23    vacation days at the end of the process.

24         Q    You testified earlier about the

25    powers of the CRB.  Do all the powers of the
```

```
 1                    J. Lipari                 212
 2      CRB at Syracuse CRB, do those arise from the
 3      enabling legislation, which I believe, as you
 4      mentioned, was local law 11 of 1993 and then
 5      number 1 of 2012?
 6           A      Correct.
 7           Q      I'm sorry, just so it's on the
 8      record, so that's your understanding, that's
 9      what powers of the CRB comes from?
10           A      The core powers.  Yeah.
11           Q      Are there any other powers that
12      come from somewhere else?
13           A      The only reason I'm sort of
14      thinking about that and hesitating is I can
15      imagine a situation where the ordinance
16      doesn't speak to something, like in a
17      particular case or, you know, something
18      arises and the ordinance just doesn't speak
19      to it, and then you have to go to court and
20      ask the judge to interpret it, and then the
21      judge would tell you, you do have the power
22      to do that or you don't.  So the -- that's
23      why I say the core powers and the central
24      sort of powers of the CRB and its mechanism
25      of functioning day to day is in the
```

```
 1                    J. Lipari              213

 2      ordinance, but I can imagine the situation

 3      where a court could extend it outside of the

 4      ordinance or something that's just not spoken

 5      to in the ordinance.

 6           Q    Right.  And I know that's what

 7      I'm getting at was obviously, the situation,

 8      we don't have to imagine, has arisen.  The

 9      litigation that the CRB has filed against the

10      City of Syracuse, that was something that was

11      filed while you were the administrator of the

12      CRB?

13           A    Yes, correct.

14           Q    And I'm going to state this just

15      because I'm handling the litigation for the

16      City so I'm aware of this, there's two

17      separate actions that were filed by the CRB

18      against the City based on the issue of powers

19      of the CRB?

20           A    So my question at this point

21      is --

22           Q    Is that correct?

23           A    No, well, my question is -- is --

24      are we having a deposition about --

25           Q    No, I'm not going to --
```

```
1                      J. Lipari                 214

2         A     I ask because of that -- I would

3    need legal counsel.

4         Q     No, no.  That's what I want to

5    understand, your role in whether or not

6    you'll still be the CRB advisor when that's

7    filed.  I'm not going to ask you substantive

8    questions about that.

9         A     I was the CRB administrator when

10   the lawsuit filed, correct.

11        Q     And did you verify the complaint

12   that was filed?

13                  MR. BONNER:  I'm going to

14             object.

15                  MR. SICKINGER:  This is a

16             different topic.

17                  MR. BONNER:  This is outside

18             the scope of this deposition.

19                  MR. SICKINGER:  That's fine.

20             The record will be clear on that.

21                  MR. BONNER:  Yes.  Do you

22             want to call the judge?

23                  MR. SICKINGER:  No.  I'm

24             saying the record's clear that he

25             verified it.
```

```
1                        J. Lipari              215
2               MR. BONNER:  Verified what?
3               MR. SICKINGER:  The
4          complaint.
5               MR. BONNER:  That's outside
6          of the scope of this.
7               MR. RYDER:  As much as we'd
8          love to hear the facts of that
9          case, it's not relevant to our
10         case.
11              MR. BONNER:  Yes, this is
12         irrelevant to Mr. Grant's case.
13     A     I just wanted to go on the record
14   that I wasn't clear what he was saying, I
15   just verified.  And my understanding, I
16   didn't verify anything.  I'm not sure what he
17   was talking about when he said, you verified
18   that.  So I didn't verify anything as far as
19   I'm concerned.
20     Q     That's fine.  You signed a
21   verification.  That's all I was saying.  You
22   don't have to answer that.
23              Just so you were clear, you
24   signed a verification, it's public record and
25   now --
```

```
1                      J. Lipari                216

2        A      That we filed a lawsuit, right.

3        Q      Got you.  That's all I'm trying

4    to say.

5        A      Okay.  I didn't know what -- the

6    word verification threw me off.  I didn't

7    know what you were referring to then.

8        Q      So litigation was brought against

9    the City of Syracuse by the CRB while you

10   were the administrator of the CRB?

11       A      The board initiated a lawsuit to

12   force the chief of police -- again I think

13   this is outside --

14                  MR. BONNER:  Yes.

15       Q      All I want to know is, you were

16   the administrator?

17       A      I was the administrator when the

18   board initiated a lawsuit against the chief,

19   correct.

20       Q      That's all I was looking for.

21              You testified earlier about some

22   timeframes or deadlines?

23       A      I did, yes.

24       Q      I'm sorry, was there an

25   objection?
```

```
1                      J. Lipari                217
2                 MR. BONNER:  No.
3          Q     Mr. Lipari, with regard to --
4     with regard to the deadlines, I guess I'm
5     just trying to find the quickest way to do
6     this.  You testified as to sort of a
7     timeframe?
8          A     Uh-huh, yes.
9          Q     With regard to when the CRB was
10    supposed to get a complaint, and how many
11    days they have to respond, et cetera, were
12    those the timeframes that were in place when
13    you assumed the position in 2012 of
14    administrator of the CRB?
15         A     Again, I think this is about a
16    different topic.  This is about a lawsuit and
17    I had legal counsel.
18         Q     I'm asking you about your
19    testimony this morning.
20         A     Fair enough, but that was in a
21    context when we were talking about this case.
22                 MR. BONNER:  Exactly.
23         Q     Right.  With the guidelines that
24    were used in Mr. Grant's case, were those the
25    guidelines that were in place when you
```

```
1                       J. Lipari                 218

2      assumed the position?

3           A      Were the guidelines --

4           Q      Timeframes I should say, I'm

5      sorry.

6           A      Say it again now.

7           Q      Were the timeframes for CRB

8      action that were in place when you handled

9      Mr. Grant's claim, were those the timelines

10     that were in place throughout your tenure as

11     CRB administrator?

12          A      Yes.

13          Q      All I'm trying to find out is,

14     have they changed?  That's all I'm trying to

15     get to.

16          A      Okay, no, they did not change

17     within the ordinance.  We did, as you know --

18     never mind.

19          Q      I'm trying to keep you on point,

20     Mr. Lipari.

21          A      Sorry.

22          Q      So then your dates of tenure I

23     think were 2012 to 2016?

24          A      May 16, 2012 to I don't know the

25     exact date that I just ended, but it was
```

```
1                      J. Lipari                219

2    May -- first or second week of May, 2016.

3         Q    And the dates were -- timeframes

4    were all the same during that four-year

5    period?

6         A    Correct.

7                   MR. BONNER:  And just for

8              clarification, I think you said

9              you started in May of 2012.

10                  THE WITNESS:  Correct.

11                  MR. BONNER:  And you ended

12             in May of 2016?

13                  THE WITNESS:  Correct.

14                  MR. SICKINGER:  Just off the

15             record.

16                  (Whereupon, a discussion was

17             held off the record.)

18        Q    I just have one more question,

19   Mr. Lipari.  It's really just a clarification

20   of your earlier testimony.

21                  I was asking you about your

22   understanding of the definitions of pattern

23   and practice and how you apply them, and I

24   also mentioned that you used the word custom

25   a lot in your -- the word custom is used a
```

J. Lipari                    220

1
2      lot.
3          A     I know the word custom is used a
4      lot but I don't think I used the word custom.
5          Q     And I guess I'm just trying to
6      clarify for the same question, basically, I
7      asked you with pattern and practice.  Is
8      that -- do you have a legal definition of the
9      word custom that is used in processing CRB
10     complaints, or do you not use that word?
11         A     We would use -- I don't use that
12     word as much as pattern and practice.  In our
13     field, we typically use the phrase pattern
14     and practice even though I know the legal --
15     in the monell language, it says pattern and
16     practice or custom.  But in our field, we use
17     -- just use pattern and practice.
18         Q     So custom is not something that
19     you would use in the CRB reports or in your
20     investigation?
21         A     I don't think I typically use
22     custom in -- in my reports just because in
23     our field, like I said, that's the phrase we
24     use, but we all recognize that it refers to
25     the monell language as pattern and practice

```
 1                      J. Lipari                221

 2     and custom.

 3              It just gets so many words.  It's

 4     a mouthful.

 5         Q     So then your understanding of

 6     custom, that is the same as your answer for

 7     pattern and practice?

 8         A     Yes.

 9                 MR. SICKINGER:  That's all I

10              have for you, Mr. Lipari.  I

11              appreciate your time.

12                 I am ordering a copy of

13              today's transcript.

14                      -o0o-

15                 (Whereupon, the deposition

16              of JOSEPH LEO LIPARI was

17              concluded at 3:25 p.m.)

18

19                      _____

20                      JOSEPH LEO LIPARI

21

22     Subscribed and sworn to
       before me this _____ day
23     of _____, 2016

24
       _____
25     NOTARY PUBLIC
```

222

I N D E X

WITNESS                    EXAMINATION BY        PAGE

JOSEPH LEO LIPARI    Mr. Ryder             4

                     Mr. Sickinger         154


                     EXHIBITS

PLAINTIFF'S        DESCRIPTION            PAGE

41          Syracuse Citizen Review
            Board case report:
            CRB #12-059                   53

42          Finding letter from chief    53

43          Syracuse Citizen Review
            Board case report:
            CRB #13-020 and 13-021        57

44          Finding letter for
            Case #13-020 and #13-021      66

45          Case report: CRB #13-100      76

46          Finding letter for
            CRB #13-100                   79

47          Case number 13-111
            dated January 30, 2014        84

48          Finding letter for 13-111     87

49          Investigative report
            for case 14-018               94

50          Finding letter for
            case 14-018                   98

51-54       Documents                     122

223

I N D E X (CONTINUED)


EXHIBITS

PLAINTIFF'S          DESCRIPTION                    PAGE

55          Document                        138

(Exhibits were retained by court reporter and
returned to counsel.)


REQUESTS FOR PRODUCTION

DESCRIPTION                                    PAGE

Any CRB documents associated with it    149

CRB report, if any                      151

224

C E R T I F I C A T E

     I, Jennifer M. Juliani, a reporter
and Notary Public within and for the
State of New York, do hereby certify:

     That the witness(es) whose
testimony is hereinbefore set forth was
duly sworn by me, and the foregoing
transcript is a true record of the
testimony given by such witness(es).

     I further certify that I am not
related to any of the parties to this
action by blood or marriage, and that I
am in no way interested in the outcome
of this matter.

_____

JENNIFER M. JULIANI

```
1                                                    225

2                        ERRATA SHEET

3

4       The following are my corrections to the

5       attached transcript:

6

7       PAGE     LINE     SHOULD READ

8       _____  *  _____   _____

9       _____  *  _____   _____

10      _____  *  _____   _____

11      _____  *  _____   _____

12      _____  *  _____   _____

13      _____  *  _____   _____

14      _____  *  _____   _____

15      _____  *  _____   _____

16      _____  *  _____   _____

17      _____  *  _____   _____

18      _____  *  _____   _____

19      _____  *  _____   _____

20      _____  *  _____   _____

21      _____  *  _____   _____

22      _____  *  _____   _____

23      _____  *  _____   _____

24      _____  *  _____   _____

25
```

1

**#**

**#12-059** [2] - 53:16, 222:11
**#13-020** [3] - 66:5, 222:14, 222:15
**#13-021** [2] - 66:5, 222:15
**#13-100** [3] - 79:3, 222:16, 222:18
**#212** [1] - 2:10

**'**

**-**

**'13** [1] - 105:15
**'14** [1] - 105:15
**'93** [1] - 8:5

**1**

**1** [3] - 62:16, 90:19, 212:5
**10-1** [3] - 15:10, 143:16, 194:15
**10-100** [1] - 1:8
**100** [1] - 186:7
**10028** [1] - 4:17
**107** [2] - 115:11, 115:14
**10:45** [1] - 1:13
**11** [2] - 8:5, 212:4
**111** [2] - 108:21, 100:9
**12** [1] - 34:23
**12-059** [2] - 54:6, 54:19
**122** [1] - 222:24
**13-020** [2] - 62:15, 66:10
**13-021** [4] - 57:18, 62:15, 66:11, 222:14
**13-100** [2] - 76:23, 79:8
**13-105** [1] - 151:2
**13-111** [6] - 84:17, 84:22, 87:22, 88:3, 222:19, 222:20
**13057** [1] - 2:5
**13202** [1] - 2:16
**138** [1] - 223:6
**14-018** [7] - 94:17, 95:10, 98:10, 98:12, 98:16, 222:22, 222:23
**14-141** [1] - 209:15
**149** [1] - 223:11
**14th** [1] - 5:25
**151** [1] - 223:12
**154** [1] - 222:6

**16** [2] - 6:10, 218:24
**160** [1] - 1:11
**17** [3] - 54:15, 151:21, 151:23
**18** [3] - 104:9, 123:14, 124:25
**19** [4] - 108:3, 123:14, 124:25, 151:4
**1986** [1] - 103:15
**1993** [2] - 8:5, 212:4
**1st** [1] - 110:20

**2**

**20** [5] - 114:21, 123:14, 124:25, 151:18, 151:25
**2000** [2] - 6:16, 97:3
**2000s** [1] - 97:4
**2005** [1] - 6:18
**2008** [1] - 118:9
**2012** [24] - 6:10, 8:4, 20:16, 54:8, 90:19, 91:24, 104:13, 105:11, 105:12, 105:18, 105:21, 112:18, 118:13, 123:15, 141:22, 205:12, 212:5, 217:13, 218:23, 218:24, 219:9
**2013** [15] - 54:15, 62:16, 72:19, 76:24, 108:7, 108:21, 110:21, 110:22, 123:15, 151:4, 158:12, 161:4, 161:5, 205:13
**2014** [13] - 73:4, 84:18, 84:22, 98:10, 114:24, 115:11, 115:13, 116:24, 123:16, 151:19, 151:25, 157:25, 222:19
**2015** [7] - 73:17, 73:23, 94:4, 114:10, 130:23, 152:21
**2016** [8] - 1:13, 6:10, 30:4, 112:19, 218:23, 219:2, 219:12, 221:23
**233** [1] - 2:15
**24** [2] - 152:21, 153:3
**25th** [1] - 155:21
**26** [1] - 1:13
**26th** [1] - 155:21
**27** [1] - 54:8
**28th** [4] - 29:9, 30:4,

**75**:12, 83:14

**3**

**3** [1] - 76:24
**30** [4] - 84:18, 84:22, 98:10, 222:19
**300** [1] - 2:15
**31st** [2] - 110:20, 152:23
**3:25** [1] - 221:17

**4**

**4** [1] - 222:5
**41** [8] - 53:10, 53:12, 53:18, 58:9, 58:10, 200:23, 201:23, 222:10
**42** [5] - 53:10, 53:22, 54:14, 103:14, 222:12
**43** [5] - 57:19, 57:22, 61:21, 61:23, 222:13
**44** [3] - 66:3, 66:6, 222:15
**45** [3] - 76:14, 76:17, 222:16
**46** [3] - 78:25, 79:4, 222:17
**47** [3] - 84:16, 84:19, 222:19
**475** [1] - 2:10
**48** [3] - 87:19, 87:24, 222:20
**49** [5] - 94:15, 94:18, 95:3, 98:9, 222:21

**5**

**5-W** [1] - 4:16
**50** [4] - 98:5, 98:13, 98:15, 222:23
**51** [3] - 122:2, 122:6, 138:8
**51-54** [1] - 222:24
**52** [2] - 139:9, 139:21
**527** [1] - 4:16
**53** [2] - 222:11, 222:12
**54** [7] - 122:7, 139:21, 141:20, 142:2, 143:4, 150:7, 150:16
**55** [7] - 138:3, 138:5, 147:4, 150:20, 210:20, 210:25, 223:6
**57** [1] - 222:14

**6**

**66** [1] - 222:15
**6739** [1] - 2:5

**7**

**76** [1] - 222:16
**79** [1] - 222:18

**8**

**80** [1] - 5:22
**83rd** [1] - 4:16
**84** [1] - 222:19
**87** [1] - 222:20

**9**

**94** [1] - 222:22
**94965** [1] - 2:10
**98** [1] - 222:23

**A**

**a.m** [1] - 1:13
**abbreviated** [1] - 115:7
**ABD** [1] - 6:21
**ability** [2] - 35:17, 37:20
**able** [8] - 16:4, 17:14, 24:24, 114:8, 123:2, 174:7, 182:5, 200:18
**above-entitled** [1] - 1:16
**absolutely** [3] - 15:5, 28:15, 46:11
**accepting** [1] - 176:21
**access** [5] - 37:21, 38:25, 134:24, 167:9, 168:6
**accordance** [3] - 30:12, 30:15, 43:2
**according** [4] - 45:6, 66:17, 85:14, 204:25
**account** [9] - 36:14, 40:2, 85:14, 86:15, 137:11, 137:12, 179:15, 179:16, 179:17
**accounts** [6] - 12:19, 39:16, 40:5, 85:10, 170:9, 172:25
**accreditation** [1] - 177:8

**accurate** [3] - 126:17, 153:4, 191:14
**acknowledge** [1] - 142:13
**acknowledged** [1] - 85:13
**acquire** [1] - 8:9
**acquired** [1] - 89:7
**acquiring** [1] - 89:9
**act** [13] - 90:22, 106:8, 106:9, 106:13, 110:16, 111:6, 111:21, 128:25, 131:20, 132:2, 132:8, 132:19, 134:2
**acted** [2] - 67:16, 73:3
**action** [13] - 1:16, 44:23, 74:5, 109:11, 116:16, 206:5, 206:8, 208:18, 208:19, 208:20, 209:7, 218:8, 224:14
**actions** [4] - 77:13, 194:22, 209:5, 213:17
**active** [9] - 91:6, 105:18, 106:7, 106:9, 106:11, 108:22, 136:16, 183:13, 183:17
**actively** [1] - 92:18
**activity** [3] - 38:21, 38:22, 208:15
**actual** [2] - 42:12, 173:16
**add** [2] - 73:10, 210:8
**added** [1] - 73:14
**addition** [3] - 42:20, 101:3, 135:16
**additional** [2] - 11:15, 11:17
**additionally** [1] - 30:13
**address** [11] - 4:14, 4:18, 5:19, 5:20, 70:19, 91:8, 113:10, 132:20, 136:8, 136:22, 208:20
**addressed** [6] - 30:24, 113:10, 126:7, 129:24, 131:23, 136:20
**addressing** [1] - 129:9
**adhere** [2] - 13:25, 71:9
**administer** [1] - 3:18
**administrative** [5] - 7:13, 8:23, 18:19, 160:4, 160:8
**administrator** [49] -

2

6:6, 7:2, 7:6, 7:9, 7:11, 8:24, 9:8, 9:15, 11:21, 12:7, 12:13, 13:2, 13:6, 18:11, 18:18, 19:9, 19:10, 19:11, 19:13, 19:14, 24:12, 25:8, 25:24, 33:4, 33:18, 54:11, 62:17, 64:7, 66:13, 69:18, 70:24, 77:2, 90:25, 98:20, 112:17, 114:4, 117:22, 121:13, 124:11, 133:24, 180:15, 213:11, 214:9, 216:10, 216:16, 216:17, 217:14, 218:11

**administrators** [1] - 134:15

**adopt** [4] - 73:21, 100:14, 102:7, 206:5

**adopted** [4] - 65:23, 73:16, 206:8, 207:4

**adopting** [1] - 207:13

**adoption** [1] - 101:8

**adversarial** [1] - 16:20

**advice** [1] - 205:11

**advised** [1] - 174:2

**advisor** [1] - 214:6

**Affairs** [6] - 157:11, 158:10, 158:13, 159:6, 159:20, 160:10

**African** [1] - 22:24

**African-American** [1] - 22:24

**agencies** [4] - 13:21, 13:25, 80:14, 121:22

**agency** [2] - 5:16, 113:19

**agenda** [1] - 19:7

**ages** [1] - 22:17

**ago** [6] - 130:15, 159:19, 160:25, 170:8, 183:23, 194:19

**agreed** [3] - 155:15, 155:17, 155:19

**AGREED** [3] - 3:4, 3:10, 3:15

**agreement** [2] - 91:11, 107:12

**ahead** [11] - 32:6, 58:7, 61:19, 122:25, 123:7, 123:19, 124:5, 124:11, 125:2, 142:15, 142:25

**aided** [1] - 167:2

**aim** [1] - 45:11

**allegation** [9] - 8:19, 27:12, 32:14, 77:9, 97:18, 116:22, 125:4, 150:23, 161:14

**allegations** [18] - 27:15, 28:8, 28:17, 32:18, 35:2, 42:10, 42:13, 61:15, 69:25, 108:21, 119:7, 124:2, 124:7, 125:11, 128:10, 162:11, 179:11, 208:17

**allege** [1] - 78:5

**alleged** [16] - 36:7, 36:8, 59:3, 78:4, 78:10, 95:18, 95:19, 115:4, 119:20, 124:13, 125:25, 144:17, 144:21, 145:8, 148:17, 211:17

**alleges** [2] - 78:20, 95:15

**allow** [2] - 31:22, 131:5

**allowed** [2] - 96:19, 188:6

**allows** [1] - 114:14

**almost** [3] - 6:9, 45:19, 94:13

**ALONZO** [1] - 1:4

**Alonzo** [5] - 34:24, 40:16, 45:17, 48:17, 168:17

**ALSO** [1] - 2:18

**Amendment** [1] - 16:9

**American** [1] - 22:24

**amount** [3] - 20:17, 186:11, 202:15

**AND** [4] - 1:7, 3:4, 3:10, 3:15

**angle** [1] - 149:12

**ankle** [1] - 145:9

**announced** [1] - 109:19

**annual** [25] - 64:9, 64:22, 67:18, 72:20, 73:4, 73:13, 73:23, 76:11, 101:19, 104:12, 104:23, 105:8, 108:6, 114:23, 123:15, 130:23, 132:17, 135:7, 151:18, 151:24, 152:23, 153:24, 157:24, 177:20, 205:13

**answer** [9] - 5:6, 9:18, 29:6, 76:9, 174:14, 177:12, 181:10, 215:22, 221:6

**answered** [3] - 154:11, 195:16, 200:23

**answering** [1] - 5:4

**answers** [2] - 74:8, 131:19

**anthropology** [1] - 6:14

**apart** [1] - 18:8

**Apartment** [1] - 4:16

**apologize** [1] - 164:2

**appeared** [4] - 85:6, 119:22, 120:3, 148:22

**application** [1] - 21:2

**applications** [1] - 21:5

**applied** [1] - 208:7

**apply** [5] - 126:12, 204:16, 204:19, 209:18, 219:23

**appointed** [7] - 18:22, 18:24, 19:2, 21:21, 23:3, 92:12

**appointment** [3] - 19:25, 21:7, 21:11

**appointments** [2] - 19:23, 19:24

**appointors** [1] - 21:9

**appreciate** [1] - 221:11

**appreciated** [2] - 81:8

**appreciates** [1] - 80:5

**approach** [2] - 16:12, 208:14

**April** [2] - 62:16, 98:10

**area** [5] - 95:22, 127:19, 128:2, 135:18, 149:5

**areas** [9] - 127:9, 127:11, 127:18, 127:25, 128:20, 136:17, 158:24, 177:22, 192:4

**argue** [4] - 31:9, 47:23, 183:3, 209:3

**arise** [1] - 212:2

**arisen** [1] - 213:8

**arises** [1] - 212:18

**arrest** [22] - 27:13, 28:5, 28:6, 28:18, 30:8, 30:20, 32:16, 35:3, 36:20, 42:14, 42:15, 63:9, 71:6, 110:16, 111:8, 111:25, 128:6, 128:7, 128:9,

**136:15, 150:25, 167:3

**arrested** [1] - 148:24

**arrestees** [2] - 71:4, 71:5

**arrived** [1] - 36:3

**article** [2] - 101:4, 169:25

**articles** [2] - 171:14, 171:18

**articulated** [1] - 199:13

**aspect** [4] - 15:12, 36:22, 96:21, 196:21

**aspects** [3] - 74:9, 93:8, 159:20

**assess** [5] - 159:11, 174:21, 176:20, 179:22, 209:21

**assessing** [10] - 118:5, 176:18, 177:10, 177:18, 178:3, 178:12, 178:22, 178:25, 190:16, 191:10

**assessment** [4] - 114:14, 174:8, 187:17, 190:22

**assessments** [1] - 189:17

**assigned** [1] - 80:3

**assist** [2] - 80:7, 90:25

**assistance** [3] - 21:9, 21:13, 130:3

**assistant** [3] - 18:19, 169:18

**assisted** [3] - 142:14, 143:22, 164:15

**associated** [3] - 141:16, 149:24, 223:11

**Association** [1] - 158:17

**assumed** [2] - 217:13, 218:2

**assumption** [1] - 51:15

**at-large** [1] - 19:2

**attached** [2] - 108:9, 225:5

**attempted** [2] - 18:6, 144:11

**attend** [7] - 14:18, 14:21, 15:25, 17:5, 18:3, 18:6, 157:13

**attended** [3] - 16:7, 157:16, 157:25

**attention** [1] - 127:25

**Attorney** [1] - 32:7

**attorney** [14] - 4:20,

**16:10, 101:5, 127:2, 130:13, 156:14, 157:21, 158:2, 158:3, 182:22, 182:23, 183:8, 193:16, 193:23

**attorney's** [6] - 169:5, 169:6, 171:4, 172:21, 184:3, 184:6

**Attorneys** [3] - 2:4, 2:9, 2:14

**attorneys** [7] - 3:5, 23:18, 23:24, 23:25, 156:2, 182:21, 183:16

**audio** [1] - 11:18

**August** [1] - 151:4

**authority** [1] - 50:11

**authorize** [1] - 8:8

**authorized** [2] - 3:18, 205:24

**authorizes** [1] - 8:8

**available** [2] - 40:3, 196:15

**avoid** [2] - 74:20, 83:16

**aware** [21] - 27:4, 27:11, 39:6, 49:6, 52:4, 52:20, 56:6, 69:19, 73:2, 75:23, 102:13, 124:12, 153:9, 154:18, 180:19, 207:16, 208:7, 208:17, 208:24, 210:2, 213:16

**B**

**baby** [1] - 97:16

**bachelor's** [1] - 6:13

**background** [10] - 6:12, 22:21, 22:22, 23:4, 157:2, 166:18, 167:17, 168:20, 190:18

**backyards** [1] - 144:11

**badly** [1] - 87:7

**bag** [2] - 95:17, 95:23

**bailed** [1] - 86:10

**base** [1] - 196:11

**based** [12] - 54:2, 119:10, 127:6, 161:23, 179:25, 181:3, 185:20, 203:19, 205:10, 206:6, 209:13, 213:18

3

**basic** [5] - 54:4, 85:3, 145:10, 147:13, 148:16
**basics** [3] - 5:6, 59:10, 148:9
**basis** [1] - 102:17
**beat** [1] - 78:18
**became** [6] - 56:6, 65:17, 72:11, 133:9, 133:10, 208:7
**become** [1] - 102:13
**becoming** [1] - 7:5
**beer** [1] - 77:17
**beforehand** [1] - 181:3
**began** [2] - 47:22, 47:23
**begin** [1] - 11:4, 11:10, 90:16
**beginning** [3] - 80:25, 112:19, 177:11
**begun** [1] - 80:6
**behalf** [6] - 24:5, 32:15, 104:3, 182:16, 182:18, 182:25
**behavior** [5] - 31:2, 33:19, 209:4, 209:6, 209:22
**behind** [7] - 80:8, 80:19, 93:22, 144:23, 144:25, 190:2, 198:24
**believes** [1] - 190:5
**bench** [1] - 83:10
**beneficial** [1] - 16:2
**benefit** [3] - 15:17, 169:22, 207:9
**best** [5] - 35:16, 36:21, 121:7, 121:21, 168:24
**better** [3] - 90:9, 90:13, 127:6
**between** [16] - 3:5, 13:21, 13:22, 21:19, 23:7, 34:7, 39:16, 44:17, 55:20, 58:25, 63:23, 91:12, 133:22, 189:15, 199:12
**beyond** [5] - 45:13, 100:17, 135:5, 185:24, 211:7
**bias** [5] - 110:16, 111:7, 111:10, 111:24, 112:9
**bifurcate** [1] - 160:2
**big** [2] - 117:2, 121:15
**biggest** [1] - 129:2
**bit** [9] - 9:17, 23:11,

58:7, 85:11, 95:7, 122:2, 141:13, 144:6, 152:16
**bitch** [1] - 97:14
**blend** [1] - 181:12
**blood** [3] - 96:6, 96:8, 224:14
**Board** [6] - 6:6, 9:21, 35:5, 53:16, 57:17, 152:2
**board** [80] - 7:15, 7:17, 8:6, 8:11, 8:17, 11:22, 11:23, 11:24, 12:3, 12:4, 15:9, 15:24, 18:13, 18:21, 18:23, 19:16, 19:7, 19:12, 19:13, 19:16, 19:20, 20:4, 20:5, 20:6, 20:13, 20:14, 20:15, 20:19, 21:11, 21:22, 22:20, 23:14, 23:18, 23:23, 24:3, 40:8, 47:6, 73:18, 90:22, 91:3, 91:8, 93:6, 93:12, 94:7, 94:8, 94:9, 94:12, 104:4, 118:7, 121:2, 121:8, 121:14, 134:9, 145:22, 145:23, 146:7, 150:12, 171:25, 172:12, 173:4, 174:16, 176:17, 177:6, 177:9, 177:12, 177:24, 178:5, 178:15, 184:25, 186:17, 187:6, 188:3, 188:10, 190:11, 216:11, 216:18, 222:10, 222:13
**Bob** [1] - 174:2
**body** [7] - 15:19, 36:12, 95:21, 144:19, 152:17, 176:15, 190:19
**bold** [4] - 79:25, 90:5, 90:10, 100:2
**bolded** [1] - 90:20
**BONNER** [21] - 2:9, 2:11, 29:22, 31:4, 84:9, 84:13, 103:13, 103:18, 202:21, 214:13, 214:17, 214:21, 215:2, 215:5, 215:11, 216:14, 217:2, 217:22, 219:7, 219:11
**Bonner** [8] - 37:17,

156:7, 156:11, 156:12, 162:18, 165:16, 165:23, 166:8
**Bonner's** [2] - 155:11, 164:7
**booking** [2] - 143:20, 149:7
**bottle** [2] - 77:17, 77:18
**bottom** [4] - 35:11, 54:23, 54:24, 55:2
**bound** [1] - 13:25
**bowel** [1] - 96:15
**break** [4] - 106:6, 110:17, 110:21, 123:6
**breakdown** [3] - 104:20, 105:22, 106:2
**breathe** [1] - 78:6
**BRIAN** [1] - 1:8
**Brian** [2] - 141:24, 150:24
**brief** [4] - 84:23, 101:4, 139:24, 154:11
**briefly** [10] - 37:8, 58:17, 77:6, 79:6, 95:8, 128:18, 137:22, 142:21, 143:3, 173:12
**bring** [8] - 16:10, 69:2, 96:17, 182:21, 182:22, 182:23, 190:21, 191:23
**bringing** [1] - 196:7
**broad** [1] - 9:17
**broadly** [1] - 70:14
**Broadway** [1] - 1:11
**broke** [2] - 95:24, 173:3
**broken** [1] - 87:3
**brought** [5] - 102:15, 117:14, 149:6, 177:21, 216:8
**brown** [1] - 95:17
**buckled** [1] - 86:3
**burden** [1] - 185:4
**burn** [1] - 163:24
**business** [5] - 26:13, 43:7, 44:4, 44:9, 44:15
**BY** [6] - 2:6, 2:11, 2:16, 4:7, 154:8, 222:4
**bystanders** [1] - 167:15

### C

**CAD** [6] - 143:21, 143:22, 143:23, 164:14, 166:25
**calculate** [1] - 109:22
**California** [1] - 2:10
**Calvin** [1] - 155:12
**cameras** [1] - 152:17
**cannot** [2] - 151:6, 188:21
**capital** [1] - 23:6
**Captain** [4] - 139:11, 139:25, 141:10, 143:14
**capturing** [1] - 63:13
**car** [8] - 71:12, 71:14, 85:17, 95:24, 145:5, 202:16, 211:9
**care** [1] - 201:4
**career** [2] - 64:6, 131:13
**careful** [1] - 188:12
**carefully** [4] - 28:3, 39:3, 44:2, 123:25
**carried** [1] - 107:11
**carry** [1] - 121:18
**cars** [1] - 207:21
**case** [149] - 8:12, 8:14, 9:4, 11:9, 12:5, 14:7, 14:8, 25:7, 26:20, 28:4, 29:19, 35:14, 37:4, 39:19, 39:24, 40:10, 40:14, 41:18, 43:9, 43:13, 44:5, 45:3, 45:17, 45:23, 48:18, 49:14, 49:16, 49:19, 50:21, 52:19, 52:20, 53:6, 53:16, 53:24, 54:2, 54:3, 54:5, 54:18, 54:20, 56:11, 56:15, 56:20, 57:3, 57:17, 58:14, 58:17, 59:10, 59:18, 62:12, 62:15, 64:18, 64:20, 66:4, 66:10, 66:15, 76:15, 77:5, 78:23, 79:8, 81:4, 84:17, 84:21, 87:17, 88:3, 88:6, 88:9, 89:2, 89:5, 94:17, 95:10, 95:11, 96:21, 97:7, 98:11, 98:16, 98:17, 102:22, 117:22, 117:23, 118:15, 118:18, 119:10, 119:11, 120:2, 120:9, 122:24, 137:8,

137:16, 139:2, 141:17, 143:8, 143:11, 143:15, 143:23, 144:4, 144:21, 145:11, 147:14, 147:18, 148:8, 151:2, 156:2, 156:5, 167:5, 167:6, 167:20, 168:10, 169:7, 169:15, 169:20, 169:22, 170:10, 170:21, 172:13, 172:14, 173:6, 176:24, 179:24, 182:5, 183:3, 183:6, 186:14, 187:18, 189:23, 190:24, 191:5, 191:17, 193:20, 194:4, 200:3, 200:18, 201:20, 209:9, 210:11, 211:17, 212:17, 215:9, 215:10, 215:12, 217:21, 217:24, 222:10, 222:13, 222:15, 222:22, 222:23
**Case** [2] - 222:16, 222:19
**cases** [31] - 10:5, 15:4, 34:20, 60:10, 60:11, 62:5, 63:4, 71:11, 71:20, 82:10, 89:10, 104:18, 106:20, 107:2, 109:9, 111:18, 111:20, 111:22, 113:16, 125:23, 141:4, 152:3, 152:6, 152:17, 161:21, 170:7, 179:3, 179:8, 180:6, 189:13, 207:24
**cataloged** [1] - 117:24
**catch** [2] - 31:18, 209:23
**categories** [7] - 27:22, 108:21, 110:14, 110:19, 110:23, 125:24, 129:3
**category** [7] - 33:11, 33:14, 82:16, 82:18, 82:20, 106:9, 113:8
**caught** [5] - 77:21, 78:22, 86:11, 144:12, 144:13
**ceased** [1] - 78:15
**center** [3] - 97:10,

4

142:8, 149:6
**central** [2] - 179:5,
212:23
**CEO** [1] - 23:6
**certain** [6] - 22:18,
24:17, 38:3, 73:13,
92:19, 104:22
**certainly** [10] - 15:3,
51:24, 64:18, 75:18,
76:5, 78:2, 125:15,
125:22, 170:23,
193:24
**certificate** [2] -
157:15, 161:2
**certification** [1] - 3:7
**certify** [3] - 31:8,
224:6, 224:12
**cetera** [8] - 110:17,
124:4, 141:2, 217:11
**chain** [2] - 68:2,
103:12
**chair** [3] - 12:15, 19:4
**chairman** [2] - 18:12,
19:5, 19:6
**chairperson** [1] -
18:12
**chambers** [1] - 83:11
**change** [7] - 19:17,
158:5, 195:22,
195:25, 196:25,
207:17, 218:16
**changed** [5] - 18:6,
19:18, 73:16, 73:17,
218:14
**changes** [1] - 196:11
**changing** [2] - 129:8,
197:7
**channel** [2] - 93:21,
93:22
**channels** [1] - 68:22
**chapter** [1] - 6:22
**chapter-and-a-half** [1]
- 6:22
**characterize** [1] -
108:11
**charge** [9] - 62:6,
92:13, 92:14, 202:9,
202:10, 203:9,
203:12, 208:16,
208:23
**charged** [8] - 36:17,
36:18, 40:16, 40:18,
41:2, 68:8, 68:9,
203:18
**charges** [28] - 36:17,
40:21, 40:24, 41:4,
66:20, 67:5, 68:16,
68:17, 68:20,
111:12, 112:11,
149:3, 149:15,

160:2, 169:11,
169:14, 169:21,
169:24, 170:3,
170:15, 170:18,
171:7, 171:11,
172:22, 202:3,
203:20, 203:21,
204:17
**CHARLES** [1] - 2:11
**chart** [2] - 24:20,
24:24
**charter** [5] - 51:11,
51:12, 51:24,
199:11, 199:13
**chase** [1] - 185:16
**check** [13] - 51:11,
51:24, 88:18, 161:5,
162:14, 168:7,
168:22, 169:8,
170:5, 173:10,
175:2, 193:5, 205:22
**Chicago** [2] - 6:17,
6:19
**CHIEF** [1] - 1:8
**chief** [103] - 8:22, 8:25,
9:7, 13:7, 14:13,
26:2, 26:12, 26:16,
26:17, 33:25, 34:15,
34:16, 43:5, 43:19,
44:8, 44:14, 44:17,
46:8, 46:17, 46:24,
47:3, 47:8, 47:14,
47:17, 47:23, 48:7,
48:14, 49:7, 49:16,
49:18, 50:13, 50:18,
50:19, 51:2, 51:4,
51:9, 51:13, 51:16,
51:18, 51:19, 51:21,
51:25, 52:23, 53:20,
54:17, 55:20, 56:4,
56:6, 57:9, 57:11,
60:15, 63:19, 64:15,
64:24, 65:5, 67:10,
79:20, 80:4, 80:22,
81:19, 81:22, 82:5,
82:14, 82:19, 82:23,
88:22, 89:3, 91:18,
92:23, 93:11, 93:24,
99:18, 103:21,
106:23, 107:2,
109:14, 109:21,
116:17, 116:21,
116:25, 129:6,
129:16, 129:17,
129:21, 131:21,
135:14, 136:3,
137:5, 144:2, 152:4,
153:16, 177:7,
177:25, 198:2,
198:12, 198:14,

199:12, 199:20,
216:12, 216:18,
222:12
**Chief** [6] - 9:6, 55:11,
194:20, 195:20,
196:23, 199:5
**chief's** [5] - 53:5,
59:18, 59:25,
136:19, 143:6
**chime** [1] - 25:12
**choosing** [1] - 202:9
**choroid** [1] - 87:9
**chunk** [1] - 117:2
**church** [1] - 134:20
**circumstances** [1] -
100:19
**citation** [2] - 63:10,
202:17
**cite** [2] - 171:18,
185:13
**cited** [3] - 171:16,
172:25, 173:9
**cities** [1] - 72:2
**citizen** [3] - 10:9, 24:5,
138:17
**Citizen** [8] - 6:6, 9:20,
35:4, 53:15, 57:16,
152:2, 222:10,
222:13
**citizen's** [2] - 28:20,
32:19
**citizens** [5] - 27:16,
52:4, 52:13, 52:20,
53:4
**citizens'** [1] - 28:8
**City** [33] - 2:15, 5:18,
6:5, 10:7, 21:23,
22:4, 22:12, 22:16,
23:10, 24:6, 27:17,
51:12, 70:2, 72:15,
72:20, 73:5, 73:21,
74:7, 93:23, 102:7,
131:10, 161:7,
165:2, 165:12,
182:9, 195:15,
198:5, 198:21,
199:8, 213:10,
213:16, 213:18,
216:9
**CITY** [1] - 1:7
**City's** [1] - 72:4
**Civilian** [1] - 158:17
**civilian** [4] - 70:13,
124:19, 141:14,
158:15
**claim** [5] - 165:3,
180:5, 189:4,
194:10, 218:9
**claimed** [1] - 211:10
**claims** [4] - 30:19,

152:10, 164:20,
169:7
**clarification** [2] -
219:8, 219:19
**clarify** [8] - 39:21,
107:17, 200:13,
200:15, 205:3,
209:11, 210:5, 220:6
**clause** [1] - 101:21
**clean** [2] - 96:19,
172:13
**clear** [11] - 68:18,
120:13, 120:14,
126:9, 164:4,
208:10, 214:20,
214:24, 215:14,
215:23
**cleared** [1] - 69:8
**clearly** [4] - 5:3,
100:17, 126:18,
190:3
**closer** [1] - 89:12
**coat** [1] - 87:9
**code** [1] - 4:16
**collect** [1] - 156:18
**collecting** [1] - 156:8
**colloquially** [1] -
179:10
**comfortable** [1] -
126:12
**coming** [7] - 17:3,
96:6, 133:8, 155:7,
156:3, 167:24,
170:22
**comma** [1] - 100:7
**command** [3] - 67:5,
103:12, 208:24
**comment** [2] - 103:19,
197:3
**comments** [3] - 53:5,
107:19, 153:17
**commitment** [1] -
23:10
**committed** [1] -
205:22
**committee** [7] - 90:21,
91:6, 92:2, 92:12,
92:24, 93:19, 94:10
**common** [13] - 18:22,
19:23, 20:25, 21:15,
27:24, 82:22, 93:23,
117:11, 135:13,
180:12, 198:15,
199:2, 199:16
**commonly** [1] - 210:9
**communicate** [4] -
13:2, 13:4, 24:12,
25:23
**communicated** [1] -
129:6

**communication** [1] -
155:6
**community** [3] - 7:15,
20:20, 23:9
**compares** [1] - 176:13
**compel** [1] - 8:9
**compelling** [4] -
42:23, 137:11,
186:6, 187:11
**compiled** [2] - 123:20,
141:25
**compiling** [1] - 112:21
**complainant** [49] -
10:17, 12:8, 12:18,
12:21, 12:23, 13:8,
26:6, 26:17, 39:14,
43:16, 77:14, 77:17,
77:20, 78:2, 78:9,
78:15, 78:19, 85:13,
86:15, 95:14, 97:13,
118:8, 118:15,
118:21, 137:18,
143:9, 143:13,
144:2, 144:17,
144:21, 144:24,
149:11, 156:6,
162:22, 166:25,
167:4, 168:2,
169:12, 170:22,
176:7, 179:16,
182:23, 189:12,
190:13, 191:22,
193:15, 200:11,
205:15, 210:25
**complainant's** [2] -
77:13, 143:9
**complainants** [7] -
9:2, 67:20, 68:25,
174:22, 191:11,
206:11, 206:13
**complained** [1] - 78:2
**complaining** [1] -
36:20
**complaint** [42] - 10:10,
10:16, 10:17, 10:18,
11:3, 14:10, 15:13,
27:24, 33:12, 35:21,
36:8, 36:9, 36:15,
36:23, 55:9, 56:5,
59:16, 60:15, 72:3,
97:10, 117:16,
117:25, 118:9,
134:22, 138:13,
138:18, 139:11,
140:24, 141:9,
142:13, 143:9,
148:12, 148:13,
148:23, 150:24,
162:25, 165:22,
170:17, 170:18,

5

214:11, 215:4, 217:10

**complaints** [42] - 10:2, 10:13, 13:13, 13:21, 25:17, 25:18, 30:18, 30:24, 33:15, 35:18, 69:10, 96:24, 97:2, 97:6, 97:25, 105:5, 105:20, 105:22, 106:3, 106:12, 106:14, 106:19, 108:20, 110:14, 110:19, 113:6, 113:20, 114:8, 114:16, 115:11, 115:14, 115:17, 115:20, 115:24, 120:12, 122:16, 125:6, 125:16, 152:8, 170:13, 220:10

**complete** [5] - 10:17, 14:9, 45:3, 45:6, 48:2

**completed** [5] - 6:18, 26:10, 56:10, 56:20, 95:10

**completely** [1] - 58:19

**completing** [3] - 6:22, 10:15, 142:14

**complicated** [1] - 43:20

**complied** [1] - 49:7

**component** [2] - 103:5, 113:11

**components** [2] - 36:22, 73:10

**compose** [2] - 11:20, 13:7

**comprehensive** [1] - 73:19

**computer** [3] - 143:22, 164:15, 167:2

**computer-aided** [1] - 167:2

**computer-assisted** [2] - 143:22, 164:15

**conceivably** [1] - 51:17

**concepts** [1] - 126:25

**concern** [16] - 72:12, 75:4, 114:6, 127:9, 127:11, 127:19, 128:2, 128:20, 130:4, 131:24, 132:19, 133:25, 135:20, 136:17, 137:15, 196:24

**concerned** [2] - 72:4, 215:19

**concerning** [1] - 31:2

**concerns** [5] - 71:16, 74:25, 126:18, 130:11, 136:8

**conclude** [3] - 5:5, 66:16, 75:14

**concluded** [2] - 76:21, 221:17

**concludes** [1] - 116:14

**concluding** [1] - 114:3

**conclusion** [1] - 35:9

**conclusions** [2] - 113:21, 114:18

**concrete** [2] - 86:23

**conduct** [22] - 8:7, 11:10, 11:15, 37:3, 55:15, 59:22, 60:6, 60:19, 60:25, 61:13, 61:15, 61:18, 72:21, 136:16, 145:18, 156:9, 159:10, 159:23, 160:13, 167:16, 178:21, 209:20

**conducted** [4] - 100:19, 162:18, 162:22, 164:8

**conducting** [5] - 7:12, 7:14, 158:13, 159:4, 160:18

**conference** [6] - 17:7, 158:8, 158:19, 159:2, 160:21, 192:8

**conferences** [1] - 158:21

**confidence** [1] - 131:3

**confirmation** [2] - 65:21, 204:11

**confused** [1] - 149:8

**confusion** [1] - 85:11

**Congregates** [1] - 134:20

**Connecticut** [1] - 157:20

**consensus** [1] - 121:12

**consent** [4] - 72:24, 73:7, 73:9, 103:7

**consequence** [3] - 45:13, 45:14, 62:23

**consequences** [1] - 44:22

**consider** [7] - 37:4, 107:12, 124:21, 171:13, 179:19, 188:16, 188:21

**consideration** [2] - 25:19, 119:23

**considered** [5] -

70:17, 107:13, 127:19, 176:16, 184:7

**consisted** [2] - 35:22, 105:23

**consistent** [6] - 24:24, 24:25, 25:6, 25:14, 73:7, 152:13

**consistently** [1] - 128:25

**constituents** [2] - 134:19

**constitution** [2] - 27:6, 28:12

**constitutional** [11] - 24:5, 27:16, 28:9, 28:21, 32:20, 93:8, 103:10, 106:15, 108:25, 111:14, 112:12

**consult** [3] - 25:7, 192:24, 193:6

**consulting** [1] - 87:8

**consumer** [1] - 192:3

**contact** [4] - 83:9, 83:11, 133:4, 169:16

**contacted** [5] - 49:17, 49:23, 50:5, 153:14, 153:23

**contacting** [1] - 83:16

**contain** [1] - 185:11

**contained** [3] - 140:18, 143:4, 185:9

**content** [2] - 142:4, 142:5

**contents** [2] - 134:6, 153:24

**context** [2] - 126:4, 217:21

**continue** [3] - 29:10, 74:18, 83:17

**continued** [1] - 68:25

**CONTINUED** [1] - 223:2

**continuing** [5] - 32:10, 80:10, 81:9, 209:8, 210:4

**contradicting** [1] - 175:5

**contradictory** [1] - 189:14

**contrary** [1] - 56:12

**contribute** [1] - 80:11

**convergence** [1] - 80:12

**conversation** [3] - 121:6, 121:23, 170:2

**conversations** [3] - 39:20, 121:16, 200:5

**convey** [3] - 93:3,

174:11, 174:13

**cooperate** [1] - 202:11

**cooperation** [3] - 8:10, 44:17, 50:6

**copies** [2] - 156:21, 163:5

**copy** [11] - 10:23, 10:25, 26:3, 46:16, 46:17, 46:20, 100:23, 135:15, 143:25, 172:6, 221:12

**core** [2] - 212:10, 212:23

**CORPORATION** [1] - 2:14

**Corporation** [8] - 46:18, 46:22, 46:24, 47:23, 130:13, 135:3, 158:2, 158:3

**correct** [83] - 7:2, 7:3, 13:16, 13:18, 13:19, 18:9, 22:5, 28:12, 36:25, 43:5, 47:5, 54:6, 54:7, 54:9, 54:11, 54:25, 61:22, 61:23, 62:17, 62:18, 63:19, 63:20, 65:20, 76:25, 77:4, 92:7, 98:21, 103:22, 104:7, 105:5, 105:6, 105:23, 105:24, 106:19, 106:20, 112:19, 115:5, 117:9, 117:10, 123:17, 123:21, 123:22, 124:7, 124:8, 124:14, 125:6, 125:7, 125:12, 134:24, 135:6, 135:21, 135:24, 150:10, 151:9, 153:10, 161:9, 161:25, 164:10, 172:20, 175:12, 184:12, 184:13, 184:17, 184:19, 186:20, 186:21, 189:7, 193:23, 194:3, 194:13, 197:9, 204:15, 205:2, 207:14, 211:21, 212:6, 213:13, 213:22, 214:10, 216:19, 219:6, 219:10, 219:13

**correctional** [1] - 17:8

**corrections** [1] - 225:4

**corrective** [1] - 208:19

**correctly** [3] - 56:17, 61:11, 89:17

**council** [2] - 7:18, 19:23

**councilor** [2] - 93:23, 93:24

**councilors** [6] - 18:23, 18:25, 19:3, 20:25, 21:15, 135:13

**counsel** [8] - 45:4, 154:15, 177:5, 178:19, 178:20, 214:3, 217:17, 223:7

**Counsel** [3] - 46:22, 46:24, 47:23

**COUNSEL** [2] - 2:14

**Counsel's** [5] - 46:18, 130:14, 135:4, 158:2, 158:4

**counseling** [1] - 34:8

**counted** [1] - 107:16

**counting** [1] - 107:7

**country** [2] - 72:25, 101:2, 103:6, 121:23, 197:11, 197:19

**counts** [1] - 77:11

**County** [1] - 190:17

**county** [3] - 21:24, 176:19, 177:19

**couple** [5] - 11:4, 33:16, 38:19, 41:16, 41:22

**course** [13] - 17:21, 28:19, 37:9, 41:24, 67:25, 117:4, 123:24, 125:8, 156:10, 176:11, 180:8, 181:25, 194:9

**court** [3] - 212:19, 213:3, 223:7

**COURT** [1] - 1:1

**Court** [2] - 3:20, 31:10

**Court's** [2] - 29:9, 75:12

**coverage** [1] - 67:19

**covered** [1] - 23:16

**covers** [1] - 23:15

**CPAP** [2] - 201:16, 201:17

**crack** [1] - 95:16

**CRB** [166] - 6:25, 7:5, 7:10, 7:21, 8:8, 9:9, 9:15, 9:20, 10:10, 10:14, 10:19, 10:24, 10:25, 13:15, 13:23, 14:8, 14:9, 14:12, 14:19, 14:20, 16:15, 16:25, 17:23, 18:15, 24:3, 26:10, 27:12,

27:21, 30:8, 30:18, 33:5, 33:24, 34:2, 44:17, 45:6, 48:2, 48:24, 49:8, 49:19, 50:7, 50:11, 50:16, 50:21, 52:8, 52:24, 53:16, 54:6, 54:10, 55:8, 55:14, 55:15, 55:20, 56:15, 59:12, 62:15, 62:16, 63:17, 64:6, 66:15, 66:21, 66:22, 69:12, 69:19, 69:23, 70:17, 70:23, 73:20, 77:2, 79:2, 80:5, 80:7, 88:8, 90:18, 90:25, 91:6, 91:10, 96:24, 98:9, 100:23, 101:7, 102:7, 104:22, 105:2, 105:5, 106:21, 112:18, 115:20, 116:8, 116:18, 116:19, 117:5, 117:8, 117:12, 117:14, 118:19, 119:2, 119:22, 120:4, 120:20, 122:12, 123:15, 123:24, 124:11, 124:14, 125:9, 126:6, 126:18, 128:21, 130:5, 131:13, 131:25, 133:17, 133:24, 134:13, 134:17, 134:21, 134:24, 135:20, 136:6, 136:23, 138:16, 138:23, 139:13, 140:3, 140:4, 140:24, 140:25, 141:2, 149:23, 151:14, 152:7, 178:8, 178:9, 184:18, 185:5, 194:25, 195:8, 195:14, 205:9, 205:11, 208:13, 211:25, 212:2, 212:9, 212:24, 213:9, 213:12, 213:17, 213:19, 214:6, 214:9, 216:9, 216:10, 217:9, 217:14, 218:7, 218:11, 220:9, 220:19, 222:11, 222:14, 222:16, 222:18, 223:11, 223:12
**CRB#13-020** [1] -

57:17
**CRB#13-100** [1] - 76:15
**CRB's** [4] - 14:15, 16:12, 152:12, 207:13
**create** [1] - 44:16
**created** [1] - 20:13
**creating** [1] - 173:25
**credibility** [29] - 159:11, 159:24, 174:22, 175:14, 175:15, 175:19, 175:25, 176:3, 176:6, 176:10, 176:17, 176:18, 176:20, 177:2, 177:10, 177:13, 177:19, 178:3, 178:7, 178:13, 178:22, 178:25, 179:4, 179:22, 187:17, 189:17, 190:16, 190:22, 191:10
**credible** [2] - 191:7
**crime** [3] - 62:6, 205:21, 205:25
**crimes** [1] - 203:25
**criminal** [6] - 160:2, 160:4, 160:6, 166:19, 167:16, 168:5
**criminals** [1] - 68:3
**criteria** [1] - 22:18
**cross** [3] - 193:12, 193:15, 193:21
**cross-examination** [1] - 193:21
**cross-examine** [1] - 193:15
**cross-examined** [1] - 193:12
**curb** [1] - 95:25, 130:4, 133:23
**curious** [1] - 146:18
**current** [2] - 4:14, 8:6
**custody** [1] - 97:3
**custom** [11] - 210:8, 219:24, 219:25, 220:3, 220:4, 220:9, 220:16, 220:18, 220:22, 221:2, 221:6
**cut** [1] - 185:16

# D

**D-A-I-G-L-E** [1] - 158:8
**DA** [8] - 41:3, 68:7,

68:16, 68:17, 69:11, 169:18, 203:22, 206:24
**DA's** [21] - 67:23, 68:6, 68:7, 68:11, 68:15, 68:20, 69:5, 69:9, 169:9, 170:3, 177:21, 184:9, 203:14, 203:18, 204:2, 204:3, 204:12, 205:16, 205:23, 206:19, 206:23
**daddy** [1] - 97:16
**Daigle** [1] - 158:7
**Daigle's** [1] - 157:20
**damage** [2] - 106:14, 108:23
**Damon** [1] - 141:11
**DAMON** [1] - 1:7
**dangerous** [2] - 71:15, 207:21
**Danks'** [1] - 30:3
**data** [1] - 105:14
**databases** [2] - 167:10, 168:6
**date** [22] - 44:7, 53:19, 53:23, 57:20, 76:7, 76:18, 79:5, 84:20, 87:25, 94:19, 98:14, 152:20, 155:16, 155:18, 155:19, 161:3, 192:19, 193:4, 218:25
**dated** [9] - 54:8, 54:14, 62:16, 76:24, 84:17, 84:22, 141:21, 151:3, 222:19
**dates** [5] - 44:6, 45:12, 155:11, 218:22, 219:3
**daughter** [4] - 35:23, 35:25, 36:3, 41:21
**daughters** [4] - 41:22, 168:16, 181:20
**day-to-day** [1] - 19:8
**daylight** [1] - 38:5
**days** [16] - 14:8, 14:10, 14:16, 26:18, 43:11, 45:24, 47:3, 56:16, 56:23, 88:22, 89:15, 177:9, 177:24, 178:24, 211:23, 217:11
**deadline** [4] - 44:24, 44:25, 47:2
**deadlines** [6] - 26:9, 44:23, 45:15, 45:16,

216:22, 217:4
**deal** [1] - 206:14
**dealing** [1] - 148:5
**deals** [1] - 205:24
**debate** [1] - 32:25
**December** [4] - 54:8, 76:24, 105:17, 110:20
**decide** [2] - 8:13, 181:3
**decided** [13] - 16:14, 16:19, 17:15, 24:14, 61:17, 85:15, 119:10, 121:19, 174:5, 175:6, 176:4, 191:6
**decides** [2] - 68:8, 145:23
**deciding** [1] - 180:15
**decision** [33] - 21:18, 25:22, 26:20, 51:2, 51:4, 51:5, 51:16, 53:6, 55:13, 57:2, 57:4, 59:18, 59:21, 59:24, 68:12, 68:19, 88:21, 89:4, 119:4, 119:6, 121:17, 121:18, 143:6, 143:7, 145:24, 172:3, 179:25, 180:14, 180:16, 183:6, 189:22, 192:23, 203:22
**decisionmaking** [1] - 182:19
**decisions** [4] - 51:10, 80:9, 80:13, 121:10
**decline** [1] - 206:9
**declined** [1] - 114:10, 133:8
**decrees** [4] - 72:24, 73:7, 73:9, 103:7
**deep** [1] - 72:11
**defendant** [1] - 176:23
**defendants** [2] - 30:22, 202:4
**Defendants** [2] - 1:9, 2:14
**defer** [3] - 82:7, 82:21, 146:3
**define** [3] - 125:13, 184:25, 185:21
**defined** [6] - 126:15, 185:19, 186:17, 187:2, 187:4, 209:17
**definitely** [1] - 142:6
**definition** [15] - 126:8, 126:10, 126:11, 184:25, 185:3, 185:7, 185:8,

185:12, 185:18, 187:14, 208:10, 208:12, 209:14, 210:7, 220:8
**definitions** [1] - 219:22
**degree** [4] - 6:13, 6:16, 113:13
**delay** [1] - 92:8
**deliberate** [5] - 12:24, 24:11, 25:12, 118:22, 192:23
**deliberated** [1] - 191:16
**deliberating** [1] - 192:11
**deliberations** [4] - 192:10, 192:17, 192:25, 193:8
**deliberative** [1] - 190:11
**delineate** [1] - 84:3
**demeanor** [12] - 66:18, 67:3, 99:7, 110:15, 111:6, 111:18, 129:2, 134:2, 135:18, 136:2, 136:9, 176:14
**demonstrate** [1] - 16:21
**demotions** [1] - 34:11
**denial** [2] - 106:15, 108:24
**depart** [1] - 12:23
**department** [26] - 10:6, 11:5, 11:9, 11:13, 15:8, 16:22, 25:2, 47:22, 56:8, 56:25, 61:7, 61:17, 72:7, 73:3, 74:6, 93:4, 93:6, 97:6, 100:22, 107:8, 107:14, 162:13, 164:14, 166:23, 167:23, 209:19
**Department** [32] - 5:18, 10:21, 13:14, 13:22, 22:13, 24:22, 52:7, 72:23, 90:24, 92:20, 101:11, 103:7, 115:5, 129:5, 129:10, 131:11, 131:21, 131:22, 132:18, 136:3, 136:4, 136:20, 141:8, 151:3, 153:15, 167:9, 168:14, 197:8, 197:22, 206:4, 207:12, 210:15

7

**DEPARTMENT** [2] -
1:7, 2:14
**department's** [1] -
90:14
**Department's** [2] -
196:8, 196:17
**departments** [3] -
103:5, 157:23,
197:18
**depended** [1] - 203:2
**DEPOSITION** [1] -
1:15
**deposition** [9] - 3:16,
4:23, 30:5, 75:14,
154:17, 155:7,
213:24, 214:18,
221:15
**Deputy** [1] - 55:11
**deputy** [5] - 56:4,
56:6, 57:9, 57:10,
60:15
**descent** [1] - 23:2
**described** [7] - 96:5,
96:7, 160:12,
161:11, 165:15,
201:2, 211:11
**describing** [1] - 203:5
**DESCRIPTION** [3] -
222:9, 223:5, 223:10
**description** [2] - 59:6,
84:23
**desire** [1] - 152:12
**desired** [1] - 86:4
**detail** [2] - 144:20,
211:6
**detailed** [1] - 77:23
**details** [3] - 85:16,
142:23, 142:24
**determination** [3] -
176:10, 184:22,
189:24
**determinations** [6] -
175:14, 175:15,
175:19, 175:25,
177:14, 178:7
**determine** [3] - 8:18,
187:7, 190:6
**determines** [1] - 180:3
**develop** [5] - 19:7,
24:15, 24:17, 25:20,
73:19
**developed** [3] - 25:4,
37:23, 178:4
**developing** [1] - 91:2
**development** [3] -
23:9, 171:22, 208:4
**devoted** [2] - 159:16,
159:18
**die** [1] - 78:7
**died** [1] - 97:3

**different** [16] - 20:12,
56:3, 106:2, 107:10,
115:3, 132:12,
143:5, 179:17,
186:2, 198:8, 198:9,
199:6, 200:10,
203:2, 214:16,
217:16
**difficult** [1] - 47:16
**direct** [4] - 28:20,
51:22, 137:2, 167:9
**directed** [6] - 14:9,
26:11, 36:5, 43:7,
48:2, 73:18
**direction** [1] - 196:19
**directions** [1] - 176:19
**directly** [13] - 10:14,
10:19, 16:4, 16:9,
46:21, 56:4, 135:13,
135:15, 143:12,
173:2, 174:15,
181:11, 190:15
**director** [1] - 101:6
**directory** [1] - 45:8
**dirt** [1] - 144:22
**disagree** [1] - 114:14
**disagreeing** [1] -
114:18
**disc** [6] - 163:9,
163:16, 163:19,
163:20, 163:25
**discharge** [2] - 111:9,
112:5
**disciplinary** [30] -
8:21, 10:4, 13:5,
24:16, 24:19, 24:23,
25:3, 25:5, 25:10,
25:20, 26:20, 51:13,
51:17, 55:13, 79:9,
80:9, 80:13, 99:9,
106:22, 109:10,
116:8, 116:9,
116:15, 116:16,
118:23, 119:18,
119:24, 120:8,
147:25, 152:14
**discipline** [42] - 24:21,
24:25, 25:15, 26:21,
26:22, 26:24, 26:25,
48:24, 49:14, 49:15,
50:25, 51:23, 57:7,
60:7, 60:10, 60:12,
64:2, 82:6, 82:10,
82:14, 82:15, 82:16,
82:18, 82:20, 82:22,
88:11, 89:17, 99:23,
107:8, 107:9,
107:10, 107:11,
107:12, 107:14,
107:17, 109:7,

116:18, 118:25,
120:6, 152:3, 152:4,
152:13
**disciplined** [1] - 119:9
**disclose** [3] - 118:18,
118:24, 119:4
**disclosed** [1] - 201:6
**disclosing** [1] -
120:11
**discouraged** [1] -
17:22
**discouragement** [1] -
17:25
**discovered** [1] -
181:24
**discretion** [6] -
188:24, 203:8,
203:12, 204:20,
204:23, 205:8
**discretionary** [1] -
67:6
**discuss** [3] - 25:9,
25:12, 190:12
**discussed** [5] - 134:7,
160:22, 178:24,
188:9, 191:5
**discussing** [2] -
62:15, 79:8
**discussion** [14] -
29:24, 36:4, 58:2,
84:11, 94:23, 121:9,
133:22, 147:10,
149:4, 149:5,
178:12, 190:11,
191:3, 219:16
**discussions** [4] -
93:20, 120:25,
179:7, 189:2
**dispatch** [3] - 143:23,
164:15, 167:2
**disposition** [1] -
104:18
**dispositions** [1] -
113:16
**dispute** [3] - 35:23,
36:2, 77:12
**dissertation** [2] - 6:21,
6:23
**district** [7] - 18:25,
169:5, 169:6, 171:3,
172:21, 184:2, 184:5
**DISTRICT** [2] - 1:1, 1:2
**disturbed** [1] - 87:15
**diverge** [1] - 85:10
**diverse** [1] - 22:23
**diversity** [2] - 22:19,
23:3
**division** [2] - 90:18,
91:8
**doctor** [2] - 87:11

**document** [64] -
34:22, 34:24, 35:4,
35:6, 35:11, 43:20,
44:14, 53:11, 53:13,
53:14, 53:25, 54:15,
57:15, 58:13, 61:25,
66:2, 66:13, 66:22,
76:19, 77:7, 79:6,
84:25, 89:20, 89:22,
91:20, 94:14, 95:5,
98:6, 98:8, 104:10,
107:20, 108:5,
108:8, 114:22,
115:2, 122:3, 123:4,
123:25, 124:5,
124:12, 138:4,
138:9, 138:20,
139:4, 140:12,
140:18, 141:21,
141:25, 142:18,
146:16, 147:6,
147:22, 151:20,
151:22, 152:18,
153:7, 173:10,
178:20, 178:22,
178:23, 200:24,
204:4, 205:22
**Document** [1] - 223:6
**documentary** [1] -
180:2
**documentation** [5] -
64:14, 105:4, 109:5,
109:12, 122:17
**documented** [2] -
125:3, 143:7
**documents** [42] - 8:9,
11:5, 11:8, 11:13,
15:7, 30:6, 30:11,
30:14, 30:25, 46:3,
80:16, 98:19,
114:25, 122:5,
122:11, 122:14,
122:19, 123:13,
123:18, 124:23,
138:24, 141:21,
141:22, 141:25,
142:3, 143:4, 143:6,
147:7, 149:23,
160:18, 161:24,
162:6, 162:13,
164:13, 166:23,
164:6, 184:9,
201:15, 209:21,
223:11
**Documents** [1] -
222:24
**DOJ** [3] - 73:7, 73:9,
209:18
**done** [15] - 4:23,
36:13, 37:17, 45:24,

63:15, 65:2, 70:11,
76:3, 94:13, 97:20,
133:23, 189:11,
190:23, 191:20,
191:21
**door** [2] - 36:7, 36:13
**dope** [3] - 95:15,
95:23, 202:17
**double** [2] - 161:5,
168:22
**doubt** [1] - 185:24
**down** [29] - 22:16,
27:25, 31:19, 36:10,
38:2, 39:22, 42:17,
69:15, 77:17, 83:18,
86:2, 86:12, 89:21,
100:2, 110:17,
110:21, 123:19,
127:23, 133:5,
144:15, 145:4,
145:9, 148:14,
160:17, 173:3,
191:23, 192:14
**draw** [2] - 113:20,
114:17
**drawn** [1] - 71:13
**driver** [1] - 148:19
**drop** [4] - 68:16,
68:20, 149:15,
203:21
**dropped** [9] - 40:25,
41:3, 169:16,
169:24, 170:15,
170:19, 171:7,
171:10, 172:22
**dropping** [1] - 202:3
**drug** [1] - 62:8
**drugs** [2] - 67:7,
202:15
**due** [2] - 20:2, 152:23
**duly** [2] - 4:3, 224:9
**during** [25] - 9:7, 9:14,
14:23, 19:15, 23:17,
27:21, 34:18, 52:3,
70:16, 86:6, 96:16,
108:20, 112:18,
118:20, 131:24,
145:7, 156:9,
156:17, 178:4,
181:24, 187:21,
192:25, 194:8,
208:13, 219:4
**duty** [4] - 101:20,
102:8, 103:4, 103:9

## E

**e-mails** [1] - 155:10
**early** [9] - 20:8, 33:3,

47:16, 94:2, 97:4,
113:9, 114:8,
133:18, 166:3
**East** [2] - 2:5, 4:16
**easy** [1] - 76:9
**educated** [1] - 126:25
**education** [2] - 64:8,
127:5
**educational** [3] - 6:11,
22:21, 156:25
**effect** [7] - 3:19,
78:19, 86:4, 114:13,
166:6, 186:25,
195:21
**efficiently** [1] - 118:5
**effort** [1] - 137:3
**eight** [4] - 104:12,
104:14, 111:5, 112:2
**eight-page** [1] -
104:14
**eighteen** [3] - 22:5,
111:21, 115:18
**either** [32] - 10:14,
10:22, 13:14, 18:2,
20:24, 23:18, 50:13,
62:7, 67:10, 74:7,
77:19, 79:20, 85:18,
99:18, 109:14,
117:14, 124:13,
131:9, 140:22,
141:18, 144:16,
147:21, 153:14,
155:23, 167:21,
167:25, 179:6,
179:18, 204:12,
205:12, 205:19,
211:9
**elected** [3] - 21:14,
21:20, 22:9
**elects** [1] - 19:4
**elevator** [1] - 191:24
**eleven** [2] - 18:21,
112:3
**eliminate** [3] - 111:12,
112:11, 149:2
**Elmhurst** [1] - 58:21
**elsewhere** [1] - 171:20
**embodies** [1] - 77:7
**emergency** [1] -
201:11
**employed** [4] - 9:6,
23:19, 208:13,
211:19
**employee** [1] - 165:12
**employees** [8] - 18:20,
164:25, 165:11,
182:9, 198:5, 198:9,
198:21, 199:8
**employer** [2] - 5:21,
6:4

**employment** [3] -
28:19, 123:24, 161:7
**empower** [1] - 34:2
**empowered** [2] - 7:21,
63:18
**empowers** [1] - 8:6
**enabled** [1] - 112:21
**enabling** [3] - 13:24,
185:9, 212:3
**enact** [1] - 50:6
**enclosed** [2] - 100:25,
101:4
**encourage** [2] -
100:13, 102:7
**end** [10] - 20:5, 27:25,
50:20, 51:8, 91:4,
109:24, 115:8,
157:16, 211:23
**endanger** [1] - 196:25
**ended** [8] - 86:5, 88:7,
118:12, 144:14,
144:16, 161:7,
218:25, 219:11
**enforced** [1] - 52:23
**Enforcement** [1] -
158:18
**enforcement** [7] -
22:8, 67:6, 93:9,
124:20, 157:7,
158:14, 176:23
**engaged** [2] - 92:19,
100:16
**ensure** [1] - 72:22
**entailed** [1] - 58:17
**entails** [1] - 143:4
**entire** [8] - 7:12, 9:11,
9:12, 9:14, 14:7,
34:19, 56:15, 159:16
**entitled** [4] - 1:16,
34:24, 35:4, 123:14
**equivalent** [1] - 16:8
**Eric** [2] - 157:19,
158:6
**ERRATA** [1] - 225:2
**escorted** [1] - 145:5
**ESQ** [3] - 2:6, 2:11,
2:16
**essentially** [5] - 7:11,
16:8, 20:10, 20:23,
34:14, 35:21, 36:9,
36:15, 56:5, 57:8,
70:12, 71:24, 97:19,
97:22, 103:8,
105:13, 106:8,
115:9, 159:8,
159:18, 180:16,
181:12, 186:10,
191:10, 205:18
**et** [8] - 110:17, 124:4,
141:2, 217:11

**ethnic** [1] - 22:20
**evaluate** [5] - 11:19,
176:6, 176:12,
176:25, 177:2
**evaluating** [1] -
176:17
**evening** [1] - 38:5
**eventually** [6] - 47:20,
48:6, 63:6, 86:9,
87:2, 92:9
**evidence** [47] - 11:6,
11:17, 11:19, 11:25,
89:7, 99:6, 111:11,
112:9, 119:11,
143:20, 156:8,
159:24, 162:5,
164:11, 172:2,
175:21, 176:13,
179:18, 179:23,
180:2, 184:23,
185:2, 185:9,
185:12, 185:13,
185:18, 185:22,
185:23, 185:25,
186:3, 186:5, 186:9,
186:11, 186:12,
186:17, 186:19,
186:23, 187:4,
187:20, 187:22,
187:24, 187:25,
189:20, 206:7, 211:8
**exact** [5] - 56:18,
110:4, 110:7,
119:17, 218:25
**exactly** [5] - 6:9,
35:24, 37:9, 58:22,
62:11, 75:2, 85:12,
104:21, 107:15,
148:15, 175:4,
183:23, 188:19,
189:9, 217:22
**EXAMINATION** [3] -
4:7, 154:8, 222:4
**examination** [1] -
193:21
**examine** [1] - 193:15
**examined** [2] - 4:5,
193:12
**example** [3] - 70:21,
71:4, 128:11
**examples** [2] - 28:7,
101:2
**except** [3] - 3:11,
106:8, 198:22
**exception** [1] - 198:5
**excess** [1] - 28:7
**excessive** [48] - 27:13,
27:23, 28:17, 30:20,
32:15, 33:3, 33:10,
35:2, 36:15, 42:13,

42:15, 60:11, 60:24,
61:6, 61:12, 66:19,
67:3, 72:3, 77:9,
79:12, 83:3, 88:9,
93:7, 99:5, 99:12,
110:15, 111:5,
111:16, 114:6,
114:7, 114:16,
115:16, 115:19,
115:23, 116:5,
124:3, 127:10,
128:10, 128:25,
129:9, 129:25,
131:12, 133:25,
139:12, 141:9,
141:23, 152:10,
161:15
**exchange** [9] - 62:7,
63:7, 63:12, 63:15,
67:6, 111:12, 149:3,
149:14, 149:15
**exchanged** [1] - 59:9
**excited** [1] - 89:6
**excludes** [1] - 22:18
**executive** [2] - 12:4,
115:10
**exercise** [1] - 203:8
**Exhibit** [46] - 34:23,
53:12, 53:17, 53:21,
54:14, 57:19, 57:22,
58:9, 61:21, 66:2,
66:6, 76:14, 76:16,
78:25, 79:4, 84:16,
84:19, 87:19, 87:23,
94:14, 94:18, 95:3,
98:5, 98:13, 98:15,
104:9, 108:3,
114:21, 122:2,
123:14, 124:25,
138:3, 138:5, 138:8,
139:9, 141:20,
142:2, 143:4, 147:4,
150:7, 151:18,
151:21, 151:23,
200:23, 210:20,
210:24
**exhibit** [3] - 61:20,
108:10, 138:2
**EXHIBITS** [2] - 222:8,
223:4
**Exhibits** [2] - 122:6,
223:7
**exhibits** [2] - 53:10,
137:21
**exist** [1] - 209:4
**existed** [2] - 126:13,
126:14
**existing** [1] - 207:18
**expect** [1] - 122:12
**expected** [1] - 174:14

**experience** [3] - 23:4,
80:15, 190:21
**expert** [1] - 199:15
**experts** [1] - 177:22
**explain** [10] - 7:8,
7:20, 10:8, 18:14,
80:18, 91:19, 113:4,
134:13, 146:21,
190:3
**explained** [1] - 185:25
**explaining** [6] - 9:2,
13:8, 38:16, 146:12,
171:10, 192:5
**explanation** [1] -
187:10
**expressed** [1] -
196:24
**expressing** [1] - 52:5
**extend** [1] - 213:3
**external** [2] - 113:2,
113:11
**eye** [7] - 87:6, 87:11,
87:14, 87:17, 89:13,
128:14
**eyes** [2] - 85:6, 86:13

## F

**F10.1** [1] - 143:16
**face** [11] - 36:11, 59:7,
77:25, 78:3, 78:8,
85:22, 86:2, 86:13,
95:21, 96:10, 144:19
**facilitate** [4] - 89:23,
90:9, 90:13, 121:16
**facilitates** [2] - 7:12,
12:13
**facility** [1] - 17:8
**fact** [6] - 27:4, 27:11,
60:14, 192:18,
193:2, 206:4
**facts** [11] - 58:14,
139:2, 139:24,
141:3, 141:16,
144:3, 148:8,
176:12, 176:13,
189:6, 215:8
**failing** [1] - 71:9
**failure** [12] - 106:8,
106:9, 106:13,
110:15, 111:6,
111:21, 128:25,
131:20, 131:25,
132:8, 132:19, 134:2
**fair** [18] - 16:22, 20:17,
25:13, 46:6, 60:18,
69:20, 125:9, 126:5,
126:20, 126:22,
127:10, 127:17,

128:12, 128:15,
139:7, 140:23,
141:6, 217:20
**fairest** [1] - 121:7
**fairly** [5] - 43:20,
77:21, 87:16,
195:12, 202:14
**fall** [1] - 82:17
**fallen** [1] - 18:7
**falls** [1] - 82:15
**false** [21] - 27:13,
28:4, 28:6, 28:18,
30:20, 30:21, 32:16,
35:3, 36:20, 42:13,
42:15, 110:16,
111:7, 111:25,
127:24, 128:5,
128:6, 128:7, 128:8,
136:14, 150:24
**falsifying** [1] - 109:2
**familiar** [8] - 5:2,
58:13, 61:24, 62:11,
98:18, 139:6,
140:21, 141:18
**family** [6] - 20:7, 22:6,
22:9, 22:11, 168:16
**far** [9] - 22:20, 73:2,
74:5, 74:16, 75:11,
127:4, 207:5,
207:16, 215:18
**fashion** [1] - 55:17
**faster** [1] - 78:21
**fee** [1] - 155:3
**feedback** [2] - 192:2,
192:3
**feelings** [2] - 52:5,
52:22
**fell** [2] - 25:13, 144:15
**felon** [1] - 71:14
**felonies** [1] - 204:17
**felony** [4] - 71:10,
71:18, 207:13,
207:25
**felt** [11] - 16:2, 25:13,
39:25, 52:6, 59:19,
69:9, 69:11, 114:11,
137:10, 181:13,
191:25
**female** [1] - 22:25
**fence** [5] - 144:12,
144:15, 144:24,
144:25
**few** [5] - 89:15, 101:2,
134:8, 154:4, 173:15
**field** [15] - 23:20,
70:13, 113:24,
124:19, 126:23,
158:19, 158:24,
160:14, 209:25,
210:13, 210:15,

220:13, 220:16,
220:23
**fifteen** [2] - 79:14,
79:15
**fifteen-day** [2] - 79:14,
79:15
**Fifth** [1] - 16:9
**fifty** [5] - 106:12,
116:2, 186:3,
186:24, 187:12
**fifty-seven** [1] -
106:12
**fifty-two** [1] - 116:2
**figure** [2] - 86:21,
155:10
**figured** [2] - 60:16,
87:2
**file** [32] - 12:2, 14:7,
34:10, 37:14, 39:12,
39:13, 48:13, 56:9,
56:15, 81:18, 88:14,
118:2, 118:10,
134:21, 138:11,
138:23, 162:14,
163:6, 163:10,
163:16, 163:20,
163:25, 165:21,
167:6, 168:23,
170:5, 184:10,
194:17, 200:19,
211:15
**filed** [21] - 10:20,
13:13, 14:11, 56:5,
57:8, 79:19, 96:24,
97:10, 113:14,
118:9, 138:17,
170:17, 170:18,
213:9, 213:11,
213:17, 214:7,
214:10, 214:12,
216:2
**files** [5] - 117:12,
117:22, 117:23,
118:4, 138:22
**filing** [4] - 3:6, 60:15,
97:25, 162:24
**fill** [1] - 142:11
**final** [6] - 51:2, 51:4,
51:5, 51:16, 143:6,
143:7
**findings** [32] - 14:15,
26:11, 42:5, 43:4,
46:7, 46:20, 47:15,
48:3, 48:8, 48:16,
54:21, 59:12, 64:24,
66:16, 80:12, 88:5,
91:12, 99:3, 109:5,
109:6, 115:15,
115:22, 115:25,
124:6, 125:3,

125:12, 125:19,
132:16, 134:6,
140:25, 153:17,
194:23
**fine** [4] - 29:13, 84:6,
214:19, 215:20
**finish** [1] - 142:22
**fire** [2] - 19:13, 51:18
**fires** [2] - 198:13,
199:20
**firm** [2] - 23:6, 157:20
**FIRM** [1] - 2:4
**first** [30] - 4:3, 8:13,
10:16, 19:24, 20:16,
27:23, 33:16, 79:24,
80:2, 91:24, 91:25,
102:21, 105:11,
107:6, 107:18,
110:10, 114:19,
119:19, 119:21,
129:13, 130:16,
133:3, 148:22,
169:18, 170:20,
173:25, 192:13,
211:21, 219:2
**fits** [1] - 153:4
**five** [15] - 18:24, 42:2,
79:16, 110:6,
111:23, 111:24,
112:5, 112:6,
115:12, 164:22,
192:7, 192:13
**Five** [1] - 2:10
**five-day** [1] - 79:16
**flashlight** [1] - 85:24
**fled** [2] - 144:9, 148:16
**flight** [1] - 31:18
**flipping** [1] - 142:17
**floating** [1] - 196:13
**Floor** [1] - 5:25
**Florida** [3] - 158:11,
159:8, 160:23
**focus** [1] - 179:5
**follow** [12] - 39:20,
43:8, 84:8, 114:20,
120:16, 136:13,
137:24, 140:20,
146:8, 155:10,
196:10, 200:2
**follow-up** [8] - 39:20,
84:8, 120:16,
136:13, 137:24,
140:20, 155:10,
200:2
**followed** [15] - 50:12,
52:7, 52:23, 65:6,
67:9, 71:20, 81:24,
83:21, 83:24, 88:15,
99:17, 104:4, 107:2,
109:13, 187:21

**following** [9] - 76:7,
169:13, 170:9,
207:12, 207:20,
207:25, 210:15,
225:4
**follows** [1] - 4:6
**food** [1] - 68:2
**foot** [1] - 96:9
**FOR** [1] - 223:9
**force** [97] - 3:19, 11:7,
27:13, 27:23, 28:7,
28:18, 30:20, 32:15,
33:3, 33:10, 35:2,
36:15, 42:13, 42:15,
42:17, 42:22, 60:11,
60:24, 61:6, 61:13,
66:19, 67:3, 71:25,
72:3, 72:5, 72:8,
72:11, 72:16, 72:21,
73:6, 73:11, 73:19,
73:24, 74:10, 76:10,
77:9, 77:22, 78:15,
79:12, 83:3, 88:9,
90:17, 93:7, 96:4,
96:16, 99:5, 99:13,
100:17, 101:18,
101:24, 102:3,
110:15, 111:5,
111:16, 114:6,
114:7, 114:16,
115:16, 115:20,
115:23, 116:5,
124:3, 126:21,
127:10, 128:10,
128:25, 129:9,
129:15, 129:25,
130:10, 130:18,
130:19, 130:22,
130:24, 131:12,
134:2, 139:12,
141:9, 141:23,
143:18, 149:13,
152:10, 157:10,
157:19, 158:6,
158:7, 161:16,
162:4, 194:14,
195:23, 196:4,
196:5, 196:8,
196:12, 196:18,
216:12
**Force** [1] - 157:24
**forced** [1] - 16:4
**foregoing** [1] - 224:9
**foreigner** [1] - 144:10
**forget** [7] - 35:23,
36:17, 58:22, 60:5,
85:4, 130:12, 163:8
**forgot** [3] - 26:9,
26:13, 190:8
**form** [99] - 3:12, 8:3,

9:23, 10:12, 10:16,
10:17, 10:18, 14:4,
14:25, 18:17, 20:22,
23:22, 24:9, 27:9,
27:19, 28:14, 28:24,
33:8, 33:21, 34:4,
35:20, 37:6, 37:12,
40:12, 40:23, 42:8,
43:17, 44:20, 46:10,
46:15, 47:11, 48:20,
49:3, 49:10, 49:21,
50:2, 50:9, 50:15,
51:7, 52:10, 53:3,
56:2, 59:14, 60:4,
60:21, 61:10, 63:2,
63:25, 65:9, 67:13,
70:4, 71:2, 72:18,
74:4, 74:15, 79:22,
82:3, 83:2, 88:24,
91:22, 93:16, 99:20,
101:15, 102:20,
104:6, 107:24,
109:17, 110:3,
112:24, 117:19,
120:19, 120:23,
124:16, 125:21,
127:14, 127:21,
128:4, 128:23,
129:12, 130:7,
131:15, 132:4,
132:22, 133:2,
133:14, 134:4,
135:2, 135:23,
136:11, 136:25,
141:14, 142:14,
143:10, 144:8,
146:24, 147:20,
148:3, 153:21, 162:5
**formal** [12] - 25:25,
67:15, 68:21, 69:10,
157:5, 160:20,
177:14, 178:13,
188:20, 188:22,
204:9, 208:4
**formally** [3] - 70:12,
206:8, 207:4
**former** [7] - 96:25,
97:2, 157:20, 177:6,
177:7, 177:25,
178:16
**forms** [2] - 166:4,
166:5
**forth** [3] - 13:23,
48:24, 224:8
**forty** [6] - 111:17,
115:17, 115:18,
115:19, 115:23
**forty-four** [1] - 111:17
**forty-nine** [1] - 111:17
**forty-three** [2] -

10

115:18, 115:19
**forty-two** [1] - 115:23
**forward** [6] - 31:11,
   61:19, 80:9, 81:9,
   175:16, 196:7
**fought** [1] - 16:16
**foundational** [1] -
   154:24
**four** [25] - 6:9, 16:13,
   17:22, 18:5, 19:16,
   24:18, 28:2, 34:18,
   41:25, 92:10,
   111:17, 111:19,
   111:23, 111:24,
   112:5, 112:6,
   112:11, 112:15,
   116:9, 129:3,
   141:14, 164:21,
   192:13, 194:19,
   219:4
**four-year** [1] - 219:4
**fourteen** [1] - 118:4
**fourth** [1] - 120:2
**Fowler** [6] - 9:6,
   30:23, 194:20,
   195:20, 196:23,
   199:5
**FOWLER** [1] - 1:8
**Frank** [1] - 9:6
**FRANK** [1] - 1:8
**frequently** [1] - 118:6
**front** [10] - 15:18,
   37:14, 42:11,
   105:17, 141:12,
   166:2, 189:9,
   191:11, 200:19,
   210:19
**full** [7] - 4:9, 18:20,
   37:4, 56:21, 73:19,
   105:16, 130:24
**full-time** [1] - 18:20
**fully** [1] - 69:18
**functioning** [1] -
   212:25
**functions** [2] - 69:19,
   69:23
**FURTHER** [2] - 3:10,
   3:15
**future** [2] - 55:13,
   81:10

## G

**Galvin** [4] - 139:11,
   139:25, 141:10,
   151:2
**Galvin's** [1] - 143:14
**Gate** [1] - 2:10
**gather** [2] - 11:18,

159:23
**gathered** [2] - 175:22,
   187:24
**gay** [1] - 22:25
**gender** [2] - 111:10,
   112:8
**general** [9] - 5:3, 9:5,
   134:16, 144:5,
   154:15, 172:8,
   196:3, 196:21, 200:7
**General** [1] - 5:16
**generally** [12] - 7:8,
   9:19, 9:21, 14:18,
   14:22, 15:2, 15:23,
   16:2, 52:18, 53:24,
   124:18, 203:6
**generated** [2] - 98:19,
   141:8
**Gentlemen** [1] - 84:15
**gist** [5] - 78:23, 85:3,
   87:17, 95:18, 206:2
**given** [4] - 59:21,
   163:17, 163:18,
   224:11
**glass** [1] - 77:18
**goal** [1] - 202:19
**grabbed** [1] - 59:4
**grad** [1] - 160:19
**grain** [1] - 188:15
**GRANT** [2] - 1:4
**Grant** [1] - 34:25,
   38:8, 40:16, 40:20,
   45:18, 52:17,
   165:18, 165:20,
   173:6, 181:19, 183:7
**grant** [6] - 35:8, 37:18,
   41:24, 42:17,
   161:15, 180:6
**grant's** [1] - 218:9
**Grant's** [26] - 35:17,
   48:18, 52:20,
   162:11, 164:20,
   165:3, 168:10,
   169:6, 170:10,
   172:14, 180:4,
   180:5, 181:18,
   182:2, 182:15,
   184:11, 189:4,
   189:23, 190:24,
   191:16, 193:20,
   194:4, 194:10,
   200:2, 215:12,
   217:24
**gravelly** [2] - 86:20,
   87:4
**great** [1] - 28:25
**greet** [1] - 134:11
**grievance** [1] - 107:9
**grinding** [1] - 86:16
**ground** [5] - 12:15,

96:6, 144:16,
   144:17, 144:23
**group** [3] - 22:24,
   58:21, 134:12
**guess** [16] - 19:11,
   51:8, 108:11,
   108:18, 110:10,
   113:3, 125:15,
   162:23, 178:8,
   185:15, 186:15,
   188:5, 203:6,
   208:10, 217:4, 220:5
**guidelines** [5] - 24:21,
   198:10, 217:23,
   217:25, 218:3
**gun** [4] - 69:4, 71:13,
   202:18, 206:16
**guns** [5] - 62:8, 67:7,
   71:12, 202:20
**guy** [3] - 86:5, 148:5,
   148:11
**guys** [2] - 92:25,
   180:25

## H

**half** [3] - 6:22, 105:14,
   152:6
**halfway** [1] - 89:21
**Hall** [1] - 2:15
**hand** [26] - 53:11,
   54:13, 57:15, 65:25,
   76:13, 78:24, 84:15,
   85:24, 87:18, 94:14,
   98:4, 104:8, 107:18,
   108:2, 119:25,
   121:25, 138:7,
   138:19, 139:8,
   141:19, 141:24,
   147:3, 150:20,
   151:19, 190:16,
   209:6
**handed** [4] - 54:19,
   95:3, 98:16, 107:20
**handful** [2] - 82:10,
   110:5
**handing** [1] - 34:22
**handled** [3] - 81:4,
   176:8, 218:8
**handling** [2] - 117:16,
   213:15
**handwriting** [2] -
   142:7, 142:12
**handwritten** [1] -
   141:13
**happy** [1] - 130:19
**harassment** [3] -
   110:16, 111:7,
   111:23

**hard** [4] - 15:2,
   125:25, 126:16,
   163:20
**harmed** [1] - 197:20
**head** [7] - 5:20, 49:4,
   90:15, 91:9, 93:2,
   93:3, 144:19
**headed** [1] - 104:17
**heads** [2] - 133:7,
   154:16
**hear** [4] - 16:23,
   92:25, 130:20, 215:8
**heard** [3] - 18:11,
   18:13, 41:20
**hearing** [83] - 8:14,
   8:15, 8:16, 8:17, 9:3,
   9:4, 12:5, 12:6, 12:7,
   12:10, 12:12, 12:13,
   12:17, 15:22, 15:25,
   17:6, 17:11, 17:13,
   17:15, 17:16, 18:3,
   18:7, 24:11, 26:10,
   35:9, 40:10, 40:14,
   41:6, 41:13, 41:23,
   42:6, 44:7, 46:7,
   47:24, 118:17,
   118:20, 145:16,
   145:20, 145:21,
   145:22, 145:24,
   146:5, 146:7,
   146:10, 146:14,
   147:18, 150:11,
   150:12, 150:14,
   151:7, 151:8,
   173:13, 173:15,
   173:16, 173:24,
   174:8, 175:16,
   176:5, 176:11,
   180:4, 180:5,
   181:18, 182:2,
   182:5, 182:7,
   182:10, 182:15,
   183:8, 183:11,
   184:3, 184:7,
   184:11, 184:16,
   184:22, 187:21,
   187:23, 187:25,
   188:4, 192:8, 193:14
**hearings** [17] - 7:16,
   14:19, 14:21, 14:23,
   16:15, 16:18, 17:3,
   45:23, 115:12,
   116:2, 116:21,
   173:25, 174:12,
   174:21, 178:21,
   184:13, 188:7
**hearsay** [3] - 180:24,
   188:6, 188:10
**heart** [1] - 27:15
**held** [11] - 1:17, 7:4,

29:25, 58:3, 84:12,
   94:24, 115:12,
   118:17, 147:11,
   192:9, 219:17
**hello** [1] - 4:19
**help** [2] - 68:13, 203:9
**helped** [1] - 69:15
**helpful** [3] - 14:20,
   113:17, 114:2
**helps** [3] - 19:6, 42:12,
   157:22
**hemorrhaged** [1] -
   87:15
**HEREBY** [1] - 3:4
**hereby** [2] - 3:8, 224:6
**herein** [2] - 3:6, 4:3
**hereinbefore** [1] -
   224:8
**hesitating** [1] - 212:14
**hidden** [1] - 145:2
**high** [8] - 71:10,
   71:19, 72:2, 111:15,
   112:14, 114:7,
   128:9, 186:19
**high-risk** [4] - 71:10,
   71:19, 111:15,
   112:14
**higher** [2] - 68:3,
   204:21
**highest** [1] - 33:11
**highlights** [1] - 96:3
**hired** [1] - 27:6
**hires** [3] - 19:12,
   198:13, 199:20
**historian** [1] - 160:15
**historical** [1] - 160:15
**history** [9] - 6:17,
   6:20, 118:16,
   118:19, 119:2,
   119:3, 120:11,
   121:4, 166:19
**hit** [1] - 199:22
**hold** [4] - 17:12,
   45:22, 119:12, 175:7
**holding** [1] - 47:24
**holds** [1] - 7:17
**home** [1] - 58:21
**homemaker** [1] - 23:7
**honestly** [1] - 174:15
**hope** [3] - 78:7, 149:8,
   211:7
**hoped** [1] - 211:3
**hopefully** [1] - 17:2
**hoping** [2] - 17:2,
   65:18
**hours** [2] - 38:19,
   194:19
**house** [3] - 37:25,
   96:17, 96:18
**hunt** [1] - 16:23

**I**

**idea** [2] - 37:8, 120:16
**identification** [12] -
53:18, 53:22, 57:20,
66:7, 76:17, 79:4,
84:20, 87:24, 94:19,
98:13, 122:7, 138:6
**identified** [11] - 70:23,
126:6, 127:9,
132:18, 133:24,
135:19, 136:9,
136:14, 138:23,
181:8, 181:12
**identify** [10] - 11:14,
39:15, 69:23, 113:9,
114:22, 128:2,
128:19, 138:10,
150:22, 176:3
**ignition** [1] - 85:9
**illegal** [4] - 62:8,
202:18, 202:20,
206:16
**Illinois** [1] - 6:17
**llse** [1] - 2:19
**imagine** [3] - 212:15,
213:2, 213:8
**immediate** [3] - 22:6,
22:8, 22:11
**immediately** [1] -
55:14
**impact** [1] - 114:13
**implying** [1] - 144:25
**import** [1] - 126:3
**important** [3] - 39:10,
92:25, 128:13
**impose** [9] - 24:21,
26:23, 51:22, 57:6,
60:7, 107:11,
107:14, 107:17,
116:17
**imposed** [20] - 26:21,
26:23, 26:25, 49:14,
49:15, 60:10, 60:13,
82:7, 82:11, 82:14,
82:16, 82:18, 82:20,
82:23, 89:18, 99:23,
106:22, 107:8,
116:17, 152:4
**impossible** [1] - 118:3
**imprisonment** [4] -
30:21, 124:3,
127:24, 128:5
**improper** [6] - 66:19,
67:4, 111:8, 111:11,
112:2, 112:10
**improve** [1] - 192:5
**inaccurate** [1] - 190:5
**inappropriate** [1] -

63:11
**incident** [23] - 11:8,
48:9, 54:4, 55:11,
56:6, 57:8, 58:20,
58:22, 78:14, 79:13,
139:4, 143:24,
161:13, 161:17,
162:21, 162:23,
164:12, 165:13,
172:8, 194:24,
195:2, 201:4, 201:12
**incidents** [1] - 97:7
**include** [8] - 15:8,
63:21, 164:16,
167:3, 172:4,
172:10, 175:24,
202:24
**included** [5] - 61:15,
73:23, 130:24,
171:5, 178:22
**includes** [1] - 31:5
**including** [1] - 103:8
**inconsistencies** [7] -
39:16, 39:21, 40:4,
40:6, 189:15, 200:3,
200:4
**increase** [1] - 197:20
**increased** [1] - 91:11
**increasingly** [1] -
103:6
**incriminating** [2] -
63:7, 111:13
**independent** [2] - 8:7,
9:25
**indicate** [2] - 100:24,
137:10
**indicated** [7] - 81:8,
110:11, 130:14,
138:12, 189:4,
195:19, 195:20
**indicates** [1] - 116:23
**individual** [12] - 10:4,
21:18, 64:18, 77:10,
77:22, 77:24, 95:13,
96:15, 96:23, 97:9,
201:2, 201:20
**individually** [2] -
133:15, 136:21
**individuals** [5] - 38:2,
39:23, 62:4, 62:12,
68:18
**Indonesian** [1] - 23:2
**informal** [1] - 17:25,
67:15, 70:11, 205:24
**information** [38] -
14:2, 39:11, 40:3,
62:7, 63:7, 63:12,
63:16, 67:7, 67:21,
68:14, 69:3, 71:7,
90:23, 102:17,

111:13, 113:18,
113:22, 113:25,
118:11, 149:3,
149:10, 149:14,
158:25, 162:9,
167:11, 168:9,
168:14, 168:21,
171:19, 172:7,
172:9, 172:15,
175:25, 194:4,
194:8, 194:10,
201:7, 203:24
**informed** [1] - 55:9
**initial** [5] - 36:22, 85:5,
91:2, 145:7, 148:23
**initiate** [1] - 121:16
**initiated** [6] - 13:18,
120:17, 148:13,
166:3, 216:11,
216:18
**injunction** [1] - 16:17
**injured** [1] - 87:7
**injuries** [1] - 148:2
**injuring** [1] - 148:20
**injury** [9] - 87:16,
89:14, 148:20,
148:23, 210:25,
211:11, 211:13,
211:17, 211:18
**inmate** [2] - 17:7,
142:8
**input** [1] - 16:3
**inside** [1] - 163:20
**insist** [1] - 50:24
**Inspector** [1] - 5:15
**instance** [3] - 172:20,
203:3, 203:4
**Institute** [1] - 101:7
**instituted** [2] - 65:24,
197:21, 207:5
**instruct** [1] - 29:5
**instructed** [1] - 85:7
**instructions** [3] -
177:17, 178:14
**instructs** [1] - 56:13
**insufficient** [1] - 99:6
**intake** [2] - 33:12,
104:17
**intent** [2] - 189:25
**intentionally** [2] -
189:5, 190:7
**interaction** [4] - 19:8,
19:10, 58:25, 130:12
**intercede** [1] - 100:15
**interest** [2] - 31:11,
156:24
**interested** [1] - 224:15
**interesting** [1] -
121:11
**interjected** [1] - 38:18

**internal** [2] - 113:2,
113:5
**Internal** [6] - 157:11,
158:9, 158:13,
159:6, 159:20,
160:10
**interpret** [1] - 212:20
**interrupt** [1] - 154:7
**interrupting** [2] -
183:13, 183:19
**intervene** [9] - 100:15,
101:21, 101:25,
102:3, 102:8, 103:3,
103:4, 103:9, 192:16
**interview** [4] - 11:14,
164:25, 165:7,
166:10
**interviewed** [13] -
39:13, 164:19,
164:24, 165:20,
166:8, 166:13,
166:16, 166:21,
167:15, 168:10,
173:3, 181:24, 200:8
**interviewing** [1] -
165:17
**interviews** [12] -
37:17, 38:23, 38:24,
156:20, 159:10,
159:23, 160:18,
162:19, 162:20,
162:21, 164:7, 164:8
**intoxicated** [1] - 86:17
**introducing** [1] -
12:14
**introduction** [1] -
134:10
**investigated** [6] -
62:16, 77:2, 141:10,
149:12, 150:25,
186:13
**investigates** [1] - 10:2
**investigating** [2] -
71:21, 156:5
**investigation** [43] -
11:11, 13:17, 30:8,
36:25, 37:4, 37:10,
41:5, 54:10, 55:16,
56:22, 59:22, 62:21,
95:12, 134:6,
139:10, 140:25,
141:23, 145:12,
145:14, 145:18,
156:10, 159:21,
160:3, 160:4, 160:5,
160:7, 160:8,
162:10, 163:3,
164:4, 164:19,
165:3, 166:19,
166:20, 167:17,

171:15, 172:17,
180:8, 181:25,
189:3, 194:9,
209:20, 220:20
**Investigations** [1] -
5:18
**investigations** [12] -
7:13, 8:7, 113:17,
114:3, 117:5,
157:12, 159:5,
159:10, 159:25,
160:13, 160:15,
162:4
**Investigative** [1] -
222:21
**investigative** [12] -
9:25, 11:20, 40:7,
53:25, 54:18, 62:3,
76:20, 77:8, 80:12,
94:16, 95:9, 208:19
**investigator** [2] -
143:11, 192:20
**invited** [2] - 12:11,
14:19
**inviting** [1] - 41:12
**involve** [1] - 30:16
**involved** [26] - 13:8,
15:15, 17:7, 23:8,
38:2, 50:22, 62:5,
79:13, 97:7, 117:25,
122:23, 137:9,
138:13, 139:13,
149:2, 152:8,
152:10, 153:19,
156:2, 165:12,
189:5, 203:24,
204:2, 205:25,
211:4, 211:17
**involving** [5] - 30:18,
35:23, 96:25, 120:3
**irrelevant** [2] - 174:25,
215:12
**IS** [3] - 3:4, 3:10, 3:15
**issue** [29] - 28:3, 45:2,
48:6, 64:21, 69:2,
72:11, 100:22,
128:13, 129:9,
129:14, 129:25,
130:9, 131:25,
132:19, 135:17,
135:25, 149:17,
176:3, 179:2, 191:4,
202:8, 204:3, 204:5,
205:14, 207:3,
207:16, 208:3,
208:5, 213:18
**issued** [1] - 205:9
**issues** [17] - 44:16,
65:15, 75:17,
124:18, 126:6,

126:18, 127:5,
131:23, 133:25,
136:2, 136:8,
136:15, 136:21,
136:23, 155:13,
179:4, 180:24
**IT** [3] - 3:4, 3:10, 3:15
**it'd** [1] - 125:9
**it'll** [1] - 129:20
**itself** [6] - 12:12, 19:3,
161:17, 173:14,
173:16, 187:20

**J**

**Jacksonville** [2] -
158:11, 159:8
**jail** [2] - 97:11, 143:13
**January** [5] - 54:14,
84:18, 84:22,
105:17, 222:19
**Jennifer** [2] - 1:18,
224:4
**Jesse** [9] - 4:20, 32:7,
156:14, 156:16,
183:9, 183:12,
183:18, 183:19
**JESSE** [1] - 2:6
**job** [4] - 33:4, 33:17,
124:10, 127:12
**Joe** [9] - 4:19, 6:8,
6:12, 32:13, 58:6,
95:5, 123:13,
136:14, 143:2
**jogged** [1] - 58:20
**JOHN** [1] - 2:16
**JOSEPH** [6] - 1:15,
4:11, 5:11, 221:16,
221:20, 222:5
**Joseph** [6] - 4:11,
5:12, 54:11, 54:25,
62:17, 77:3
**judge** [4] - 16:17,
212:20, 212:21,
214:22
**Judge** [1] - 30:3
**judges** [1] - 23:19
**Juliani** [2] - 1:18,
224:4
**July** [1] - 1:13
**June** [5] - 29:9, 30:4,
75:12, 83:14, 105:18
**juries** [2] - 176:19,
177:18
**jurors** [1] - 190:17
**jury** [1] - 178:14
**justice** [3] - 97:10,
142:8, 149:6
**Justice** [2] - 72:23,

197:23
**Justice's** [2] - 103:7,
210:16

**K**

**keen** [1] - 94:12
**keep** [7] - 25:5, 93:5,
131:3, 154:10,
172:13, 197:24,
218:19
**keeping** [1] - 61:21
**kept** [4] - 81:17, 94:8,
128:14, 170:25
**key** [1] - 167:20
**kick** [1] - 96:9
**kicked** [2] - 78:4, 78:8
**kid's** [1] - 150:19
**kids** [2] - 97:2, 97:8
**killed** [4] - 129:22,
195:22, 197:5,
197:21
**kind** [48] - 12:14, 18:7,
19:8, 19:9, 22:7,
24:20, 25:11, 38:14,
38:16, 47:19, 65:21,
75:21, 82:11, 89:6,
93:24, 95:15, 95:19,
98:22, 101:17,
104:19, 108:11,
113:19, 122:9,
123:3, 125:14,
130:14, 131:17,
133:7, 134:10,
134:13, 146:10,
147:24, 149:13,
149:15, 166:3,
167:14, 168:11,
168:25, 170:5,
171:9, 172:8,
183:21, 189:18,
193:9, 198:19,
205:4, 208:20
**kinds** [1] - 166:23
**knee** [7] - 148:24,
210:25, 211:9,
211:10, 211:13,
211:16, 211:18
**knees** [1] - 145:9
**knowing** [1] - 114:18
**knowledge** [14] - 9:19,
29:19, 67:8, 74:2,
102:18, 122:13,
134:23, 136:7,
140:5, 161:17,
161:22, 183:5,
190:18, 201:13
**known** [1] - 52:22

**L**

**L-I-P-A-R-I** [2] - 4:12,
5:11
**labeled** [2] - 60:23,
61:14
**labor** [1] - 199:15
**lack** [3] - 106:16,
108:25, 127:17
**laid** [2] - 44:22, 205:13
**Lane** [1] - 5:22
**language** [8] - 15:19,
45:8, 80:17, 80:19,
176:15, 190:20,
220:15, 220:25
**larceny** [2] - 77:10,
112:4
**large** [2] - 19:2, 33:14
**largest** [1] - 33:14
**Las** [4] - 196:7,
196:11, 196:16,
197:7
**last** [7] - 31:12, 61:20,
108:10, 108:15,
114:25, 151:17,
195:11
**lastly** [2] - 100:7,
100:12
**late** [1] - 55:9
**LAW** [3] - 2:4, 2:9,
2:14
**Law** [1] - 158:17
**law** [19] - 7:21, 8:4,
8:5, 8:6, 22:7, 90:19,
93:8, 112:22,
124:20, 157:6,
157:20, 158:14,
176:22, 199:15,
203:13, 203:14,
203:17, 210:11,
212:4
**laws** [1] - 43:23
**lawsuit** [9] - 22:11,
30:10, 161:14,
195:8, 214:10,
216:2, 216:11,
216:18, 217:16
**layer** [2] - 87:10, 87:14
**laying** [2] - 12:14, 96:5
**lays** [1] - 59:24
**lead** [1] - 210:16
**leading** [1] - 75:21
**learned** [2] - 17:21,
170:21
**lease** [1] - 4:15
**least** [8] - 20:3, 38:9,
41:22, 114:11,
114:15, 164:21,
208:17, 208:19

**leave** [3] - 20:6, 72:12,
189:16
**leeway** [1] - 29:2
**left** [4] - 17:13, 94:7,
190:13, 211:22
**leg** [2] - 148:20,
148:21
**legal** [18] - 23:19,
43:20, 45:4, 45:7,
157:3, 158:22,
158:24, 177:4,
178:19, 178:20,
182:24, 185:3,
193:18, 209:13,
214:3, 217:17,
220:8, 220:14
**Legal** [1] - 101:6
**legislation** [4] - 13:24,
185:10, 185:11,
212:3
**lengthy** [2] - 100:9,
122:3
**Leo** [1] - 4:11
**LEO** [6] - 1:15, 4:12,
5:11, 221:16,
221:20, 222:5
**less** [4] - 65:17, 110:6,
114:15, 128:8
**letter** [52] - 8:25, 13:7,
25:25, 26:3, 26:4,
26:5, 26:12, 26:19,
34:9, 34:10, 35:7,
41:11, 42:11, 43:16,
43:17, 43:18, 44:8,
49:11, 49:12, 49:13,
53:20, 54:16, 54:17,
56:24, 66:4, 66:9,
66:18, 79:2, 79:7,
80:3, 80:25, 81:7,
81:12, 81:18, 81:22,
82:5, 87:22, 88:2,
93:19, 98:11, 98:17,
99:22, 103:25,
143:8, 143:25,
204:9, 222:12,
222:15, 222:17,
222:20, 222:23
**letters** [8] - 43:25,
47:17, 48:12, 50:22,
80:23, 81:17,
135:10, 137:5,
194:21
**level** [3] - 67:5, 68:2,
68:3
**levels** [1] - 186:2
**LEX#118593** [1] - 1:22
**Liability** [1] - 101:6
**liaison** [10] - 90:21,
91:5, 92:2, 92:12,
92:21, 92:23, 93:19,

93:25, 94:5, 94:10
**lie** [1] - 174:19
**likely** [3] - 80:11, 91:8,
169:2
**limit** [1] - 83:15
**limited** [3] - 30:6,
43:3, 107:21
**limiting** [1] - 52:16
**line** [2] - 29:10, 72:22
**LINE** [1] - 225:7
**lines** [3] - 18:13,
63:13, 211:3
**link** [1] - 163:18
**links** [3] - 163:15,
163:22, 163:23
**Lipari** [24] - 4:11,
30:14, 54:11, 54:25,
62:17, 77:3, 154:10,
154:23, 159:3,
161:11, 161:13,
164:3, 173:12,
185:17, 195:13,
198:2, 199:18,
200:21, 209:12,
210:18, 217:3,
218:20, 219:19,
221:10
**LIPARI** [4] - 1:15,
221:16, 221:20,
222:5
**Lipari's** [1] - 30:5
**list** [1] - 31:21
**listen** [2] - 192:9,
192:16
**lists** [1] - 115:10
**litigation** [3] - 213:9,
213:15, 216:8
**living** [2] - 4:17, 5:13
**local** [4] - 8:4, 8:5,
90:19, 212:4
**Lockett** [4] - 138:11,
139:12, 139:15,
141:11
**LOCKETT** [2] - 1:7,
139:16
**lockup** [1] - 149:5
**logic** [4] - 24:13,
43:25, 120:10,
171:10
**logically** [1] - 207:7
**logistically** [1] -
155:12
**look** [42] - 11:17,
33:18, 44:6, 45:4,
58:8, 61:14, 66:8,
68:13, 70:15, 70:18,
76:11, 80:9, 81:9,
84:16, 87:20, 89:12,
98:23, 99:25, 103:2,
110:9, 110:11,

13

117:6, 117:12,
118:16, 122:4,
122:10, 123:2,
124:17, 124:20,
126:8, 138:9,
138:25, 141:12,
179:22, 196:10,
198:10, 200:9,
202:13, 202:16,
209:20, 210:21,
211:14
**looked** [2] - 28:3,
200:4
**looking** [9] - 66:10,
70:9, 70:10, 77:15,
80:15, 98:22, 100:6,
185:20, 216:20
**looks** [2] - 144:2,
151:25
**lost** [1] - 108:23
**Louisiana** [1] - 6:15
**love** [1] - 215:8
**lower** [2] - 68:2, 68:16

## M

**magistrate** [4] - 29:12,
31:25, 74:19, 83:9
**Maiden** [1] - 5:22
**mails** [1] - 155:10
**main** [2] - 7:19, 14:11
**maintain** [1] - 9:24
**makeup** [1] - 23:14
**male** [2] - 22:24, 59:8
**man** [15] - 23:2, 38:11,
41:19, 58:24, 58:25,
59:3, 59:5, 85:4,
96:23, 97:14, 144:9,
168:12, 168:18,
168:21, 181:21
**man's** [1] - 59:7
**Management** [1] -
101:7
**management** [1] -
23:6
**manager** [1] - 5:15
**managing** [2] - 7:13,
7:15
**mandatory** [1] - 45:9
**Manhattan** [3] - 5:23,
5:24, 6:3
**manner** [1] - 16:20
**manners** [1] - 51:17
**manual** [1] - 100:21
**March** [1] - 152:21,
152:23, 153:3
**marked** [35] - 34:23,
53:12, 53:17, 53:21,
54:14, 57:18, 57:21,

66:2, 66:5, 76:14,
76:16, 78:25, 79:3,
84:18, 87:19, 87:23,
94:14, 94:17, 98:5,
98:9, 98:12, 104:9,
108:3, 114:21,
121:25, 122:5,
138:4, 138:8, 139:9,
141:20, 142:2,
147:4, 151:21,
200:22, 210:19
**marriage** [1] - 224:14
**master's** [1] - 6:16
**material** [2] - 87:13,
92:5
**matrix** [8] - 24:19,
24:23, 24:24, 25:3,
25:5, 25:8, 25:14,
152:14
**matter** [3] - 34:24,
51:14, 224:16
**matters** [1] - 90:22
**mayor** [43] - 9:13,
18:22, 18:24, 20:24,
21:15, 46:13, 46:21,
46:23, 49:24, 50:15,
51:5, 51:9, 51:11,
51:12, 51:18, 51:19,
51:20, 52:2, 52:7,
52:25, 67:10, 79:20,
82:23, 99:18,
109:14, 133:6,
133:8, 133:12,
133:20, 133:21,
133:22, 134:7,
134:11, 134:23,
135:13, 198:3,
198:7, 198:12,
198:13, 198:21,
198:23, 199:7,
199:12
**mayor's** [111] - 50:4,
101:12, 129:16,
129:24, 130:8,
131:10, 132:24,
133:4, 136:5,
136:20, 153:14
**mean** [24] - 27:20,
55:23, 72:10, 76:9,
82:9, 95:18, 112:25,
114:5, 125:22,
126:2, 132:5,
147:17, 152:20,
152:24, 154:7,
161:19, 179:21,
186:7, 186:8, 187:9,
190:3, 190:25,
199:19, 201:14
**meaning** [6] - 63:8,
78:21, 99:6, 101:21,

115:13, 198:18
**means** [3] - 45:10,
116:16, 186:10
**meant** [4] - 45:4,
82:19, 198:19, 199:2
**mechanism** [2] -
50:23, 212:24
**media** [19] - 39:4,
67:19, 151:24,
152:25, 153:8,
153:10, 153:12,
153:19, 153:23,
169:23, 170:24,
171:2, 171:23,
172:4, 172:11,
173:9, 196:14,
207:6, 207:23
**medical** [4] - 89:5,
89:9, 89:11, 211:12
**meet** [4] - 45:11,
45:15, 133:8, 134:11
**meeting** [9] - 11:23,
12:3, 19:7, 94:5,
94:9, 129:15,
133:19, 165:15,
195:20
**meetings** [12] - 7:16,
19:6, 20:9, 92:11,
92:16, 92:18, 92:21,
92:24, 93:25,
133:16, 133:20,
134:8
**member** [11] - 19:20,
22:6, 22:9, 22:11,
94:8, 117:5, 177:24,
178:15, 186:18,
187:7
**members** [69] - 7:16,
8:11, 8:15, 8:16,
11:22, 11:24, 12:4,
12:21, 12:24, 15:4,
15:6, 18:14, 18:21,
18:23, 19:16, 20:4,
20:5, 20:15, 20:19,
21:23, 22:20, 23:18,
23:23, 24:3, 40:8,
43:25, 73:18, 90:18,
91:3, 91:7, 91:9,
91:10, 93:7, 94:8,
94:12, 102:23,
118:19, 119:13,
121:3, 121:14,
134:9, 171:24,
171:25, 173:4,
175:17, 176:17,
177:6, 177:10,
177:12, 178:5,
180:18, 180:20,
181:13, 182:13,
183:3, 184:21,

185:17, 186:6,
186:18, 188:3,
188:10, 188:16,
189:17, 189:24,
190:12, 191:16,
192:24, 193:19,
193:25
**members'** [4] -
172:12, 174:16,
174:17
**membership** [2] -
12:16, 19:3
**memo** [2] - 15:12,
143:7
**memory** [1] - 58:20
**mention** [6] - 18:13,
26:9, 69:5, 168:4,
206:19, 206:23
**mentioned** [27] -
13:12, 14:17, 18:4,
18:10, 32:24, 33:2,
36:24, 40:15, 47:2,
55:19, 58:12, 60:17,
62:19, 63:17, 69:11,
124:9, 153:9,
162:16, 175:13,
177:11, 186:22,
194:2, 194:20,
197:25, 199:24,
212:4, 219:24
**merit** [1] - 197:13
**merits** [1] - 119:11
**met** [6] - 38:3, 44:24,
45:17, 50:12, 92:10,
133:12
**methods** [1] - 204:16
**Metropolitan** [2] -
196:7, 196:17
**mid** [1] - 6:10
**middle** [1] - 185:24
**might** [13] - 43:11,
45:21, 162:18,
163:14, 163:15,
164:8, 167:15,
168:20, 169:10,
181:21, 183:24,
199:17, 200:18
**mind** [10] - 18:7,
60:12, 61:2, 82:9,
82:13, 96:14,
183:18, 187:8,
218:18
**minds** [2] - 187:15,
206:16
**Miner** [1] - 9:13
**miner** [1] - 35:5
**ministers** [1] - 134:13
**minor** [2] - 6:14,
202:14
**minute** [1] - 170:8

**minutes** [2] - 192:7,
192:13
**misconduct** [13] -
8:19, 24:4, 33:6,
35:2, 54:21, 100:16,
106:7, 106:10,
106:11, 106:13,
108:22, 108:23,
150:23
**misdemeanors** [2] -
204:17, 204:21
**misrepresented** [1] -
189:6
**miss** [1] - 192:12
**misspeak** [1] - 17:20
**misstatement** [1] -
190:7
**mom** [1] - 146:11
**moment** [6] - 39:9,
53:14, 57:22, 66:8,
84:16, 87:19
**monell** [2] - 220:15,
220:25
**money** [1] - 155:5
**MONTALTO** [1] - 1:8
**month** [1] - 12:3
**month's** [1] - 11:23
**months** [3] - 47:18,
55:10, 88:14
**morning** [2] - 4:22,
217:19
**most** [15] - 19:10,
27:15, 27:24, 33:14,
38:21, 39:10,
104:24, 121:15,
126:16, 146:7,
166:12, 166:14,
169:2, 179:3, 179:8
**mostly** [3] - 38:21,
158:14, 160:21
**mouth** [9] - 86:16,
86:20, 86:22, 86:24,
86:25, 87:5, 96:6,
128:17, 144:22
**mouthful** [1] - 221:4
**move** [1] - 85:19
**movement** [1] - 96:15
**MR** [166] - 4:8, 8:2,
9:22, 10:11, 14:3,
14:24, 18:16, 20:21,
23:21, 24:8, 27:8,
27:18, 28:13, 28:23,
29:3, 29:7, 29:13,
29:15, 29:16, 29:18,
29:20, 29:22, 30:2,
31:4, 31:12, 31:16,
31:20, 31:22, 32:3,
32:9, 32:12, 32:22,
33:7, 33:20, 34:3,
35:19, 37:5, 37:11,

140

40:11, 40:22, 42:7,
44:19, 46:9, 46:14,
47:10, 48:19, 49:2,
49:9, 49:20, 49:25,
50:8, 50:14, 51:6,
52:9, 52:15, 53:2,
55:25, 57:24, 58:4,
59:13, 60:3, 60:20,
61:9, 62:25, 63:25,
65:8, 67:12, 70:3,
70:25, 72:17, 74:3,
74:14, 74:21, 74:22,
74:24, 75:4, 75:18,
75:24, 76:4, 79:21,
82:2, 82:25, 83:6,
83:20, 84:2, 84:4,
84:6, 84:9, 84:13,
88:23, 91:21, 93:15,
94:21, 94:25, 99:19,
101:14, 102:19,
103:13, 103:16,
103:18, 104:5,
107:23, 109:16,
110:2, 112:23,
117:18, 120:18,
120:22, 123:10,
124:15, 125:20,
127:13, 127:20,
128:3, 128:22,
129:11, 130:6,
131:14, 132:3,
132:21, 132:25,
133:13, 134:3,
134:25, 135:22,
136:10, 136:24,
137:25, 139:17,
139:22, 140:9,
140:13, 140:15,
140:17, 144:7,
146:23, 147:8,
147:19, 148:2,
149:21, 150:15,
151:11, 153:20,
153:25, 154:4,
154:6, 154:9,
156:14, 202:21,
214:13, 214:15,
214:17, 214:19,
214:21, 214:23,
215:2, 215:3, 215:5,
215:7, 215:11,
216:14, 217:2,
217:22, 219:7,
219:11, 219:14
**multiple** [9] - 25:17,
36:11, 72:6, 77:25,
78:3, 94:6, 96:24,
97:5, 170:24
**must** [8] - 56:22, 81:5,
81:6, 92:21, 119:8,
155:18, 155:19,

165:22
**Myers** [1] - 2:5

**N**

**name** [14] - 4:10, 4:19,
5:8, 35:10, 41:20,
54:24, 54:25, 66:13,
78:10, 78:12, 81:20,
119:14, 130:25,
150:19
**names** [2] - 38:8,
38:10
**narcotics** [1] - 95:12
**narrative** [3] - 143:19,
171:23, 172:11
**narrowed** [1] - 22:16
**National** [1] - 158:16
**national** [1] - 158:18
**nature** [3] - 25:6,
70:10, 211:15
**nearly** [1] - 6:18
**necessarily** [5] -
65:14, 122:13,
132:10, 201:6, 208:3
**necessary** [3] - 11:16,
25:16, 181:13
**neck** [1] - 59:5
**need** [14] - 12:25,
43:21, 92:25,
119:19, 120:7,
121:4, 134:21,
137:25, 154:18,
160:2, 160:9, 192:4,
196:18, 214:3
**needed** [5] - 31:15,
69:7, 101:20,
129:18, 169:10
**needs** [2] - 113:10,
176:4
**negative** [1] - 45:14
**nervous** [1] - 85:6
**never** [13] - 17:3, 18:2,
65:20, 69:9, 73:3,
85:18, 94:4, 129:20,
132:11, 133:18,
133:19, 165:8,
218:18
**NEW** [1] - 1:2
**new** [11] - 16:25, 17:9,
20:4, 72:9, 74:10,
81:6, 154:15,
158:25, 172:7,
207:4, 208:4
**New** [7] - 1:12, 1:20,
2:5, 2:16, 4:4, 224:6
**news** [1] - 170:9
**newspaper** [5] - 39:5,
151:23, 171:14,

171:18, 172:16
**next** [6] - 39:14, 81:7,
85:12, 90:11, 106:9,
206:18
**nine** [4] - 106:23,
111:17, 111:25,
112:13
**nineteen** [1] - 115:13
**ninety** [3] - 44:25,
108:22, 109:8
**ninety-day** [1] - 44:25
**ninety-six** [2] -
108:22, 109:8
**Non** [1] - 1:16
**Non-Party** [1] - 1:16
**none** [1] - 104:3
**nonfeasance** [1] -
63:6
**Nonfeasance** [1] -
63:8
**North** [3] - 158:10,
159:7, 160:22
**NORTHERN** [1] - 1:2
**NOTARY** [1] - 221:25
**Notary** [3] - 1:19, 4:4,
224:5
**note** [3] - 31:23, 32:9,
170:6
**nothing** [4] - 44:21,
50:25, 130:21, 175:9
**notice** [6] - 21:4,
33:13, 55:10, 65:22,
125:10, 125:18
**noticed** [4] - 33:2,
33:10, 131:12, 200:4
**notification** [2] -
67:15, 73:15
**notified** [1] - 55:14
**notify** [1] - 21:3
**noting** [2] - 116:14,
152:2
**NOVITSKY** [1] - 1:8
**Novitsky** [3] - 30:23,
141:24, 150:24
**NRA** [1] - 202:21
**number** [23] - 20:12,
54:6, 62:4, 71:11,
84:17, 84:22, 105:4,
105:19, 106:18,
106:20, 107:2,
107:5, 109:13,
109:22, 110:4,
110:7, 118:15,
143:5, 150:16,
187:3, 202:12,
212:5, 222:19
**Number** [1] - 66:2
**numbers** [13] - 72:3,
104:22, 105:13,
105:15, 106:5,

108:14, 109:7,
110:25, 114:7,
114:9, 128:9, 132:6,
152:5
**numerous** [1] - 86:18
**NYCLU** [1] - 152:11
**NYPD** [2] - 5:16, 6:3

**O**

**oath** [5] - 3:18, 27:5,
28:11, 173:19,
174:11
**object** [91] - 8:2, 9:22,
10:11, 14:3, 14:24,
18:16, 20:21, 23:21,
24:8, 27:8, 27:18,
28:13, 28:23, 33:7,
33:20, 34:3, 35:19,
37:5, 37:11, 40:11,
40:22, 42:7, 44:19,
46:9, 46:14, 47:10,
48:19, 49:2, 49:9,
49:20, 49:25, 50:8,
50:14, 51:6, 52:9,
53:2, 55:25, 59:13,
60:3, 60:20, 61:9,
62:25, 63:25, 65:8,
67:12, 70:3, 70:25,
72:17, 74:3, 74:14,
79:21, 82:2, 82:25,
88:23, 91:21, 93:15,
99:19, 101:14,
102:19, 104:5,
107:23, 109:16,
110:2, 112:23,
117:18, 120:18,
120:22, 124:15,
125:20, 127:13,
127:20, 128:3,
128:22, 129:11,
130:6, 131:14,
132:3, 132:21,
132:25, 133:13,
134:3, 134:25,
135:22, 136:10,
136:24, 144:7,
146:23, 147:19,
148:2, 153:20,
214:14
**objection** [3] - 31:24,
32:10, 216:25
**objections** [4] - 3:11,
29:4, 31:7, 102:11
**objectively** [1] -
100:18
**obligations** [1] - 103:2
**observe** [3] - 100:16,
103:11, 203:13
**obtained** [4] - 162:10,

168:8, 172:15, 194:5
**obviously** [6] - 116:3,
118:13, 126:2,
126:23, 174:21,
213:7
**occasionally** [5] -
169:8, 172:4, 180:9,
180:11, 200:7
**occur** [2] - 169:14,
208:16
**occurred** [1] - 130:12
**occurrence** [1] - 69:16
**occurring** [2] - 209:7,
209:22
**October** [2] - 55:10,
110:20
**OF** [5] - 1:2, 1:7, 1:8,
2:9, 2:14
**offenses** [2] - 40:17,
124:13
**offer** [6] - 21:12,
66:19, 67:4, 111:11,
112:10, 149:2
**offered** [2] - 41:6,
206:14
**offering** [2] - 62:5,
62:22
**offers** [1] - 63:11
**Office** [12] - 5:15,
10:20, 11:2, 14:5,
39:12, 56:7, 56:14,
56:19, 143:14,
166:24, 194:15,
200:14
**office** [58] - 7:14,
18:20, 21:6, 46:18,
50:5, 67:23, 68:6,
68:7, 68:11, 68:15,
68:20, 69:5, 71:16,
81:17, 91:12,
100:14, 101:12,
117:23, 129:24,
130:8, 130:14,
130:21, 131:10,
132:24, 133:5,
135:4, 136:5,
136:19, 136:20,
151:13, 153:15,
154:16, 154:22,
155:11, 156:6,
158:3, 158:4, 161:3,
165:25, 169:5,
169:6, 169:9, 170:3,
171:4, 172:21,
177:22, 184:3,
184:6, 184:9,
203:15, 203:19,
204:2, 204:3,
204:13, 205:16,
205:23, 206:19,

206:23
**Officer** [3] - 138:11, 139:12, 141:11
**officer** [94] - 3:17, 8:19, 8:25, 15:11, 15:16, 15:17, 16:6, 17:5, 17:12, 17:15, 18:5, 22:7, 25:16, 26:4, 26:16, 30:22, 32:16, 34:6, 36:6, 36:9, 57:7, 58:23, 59:2, 59:4, 59:8, 60:8, 67:21, 68:19, 71:17, 77:11, 77:15, 77:16, 77:21, 77:23, 78:6, 78:7, 78:11, 78:18, 79:16, 79:17, 85:4, 85:20, 85:23, 92:13, 92:14, 96:8, 100:16, 101:5, 101:22, 101:23, 117:7, 117:13, 118:6, 118:10, 118:14, 119:2, 119:8, 119:15, 119:20, 119:21, 120:2, 120:3, 120:5, 120:12, 121:4, 122:20, 129:22, 137:17, 139:3, 139:15, 143:18, 144:13, 144:18, 144:22, 145:8, 149:9, 161:15, 162:3, 176:7, 177:6, 177:25, 178:4, 178:16, 179:15, 179:16, 189:12, 193:13, 193:14, 193:17, 200:10, 203:7, 206:13, 206:15, 207:20
**OFFICER** [1] - 1:8
**officer's** [13] - 15:8, 15:14, 16:3, 34:10, 59:2, 78:10, 88:13, 118:16, 118:19, 119:14, 137:10, 193:16, 193:17
**officers** [73] - 8:20, 12:8, 12:10, 13:8, 14:18, 14:21, 15:5, 15:25, 16:14, 16:18, 16:21, 16:24, 17:22, 18:2, 26:4, 27:5, 27:7, 28:11, 33:19, 36:2, 41:7, 41:12, 42:16, 42:19, 42:25, 48:17, 48:25, 62:5, 62:21, 63:14, 68:9,

68:11, 68:12, 71:8, 71:12, 72:9, 79:12, 86:6, 86:11, 92:11, 95:19, 97:13, 97:25, 99:5, 99:7, 99:13, 100:15, 103:9, 117:24, 122:21, 122:23, 165:8, 165:13, 182:6, 182:22, 189:5, 189:13, 194:6, 194:11, 195:22, 197:2, 197:5, 197:20, 197:24, 202:2, 202:7, 202:9, 203:12, 204:20, 205:19, 207:7, 207:20, 208:6
**OFFICERS** [1] - 1:7
**officers'** [2] - 34:25, 182:16
**OFFICES** [1] - 2:9
**official** [5] - 21:20, 22:9, 65:21, 68:21, 184:9
**officially** [1] - 138:18
**officials** [1] - 21:14
**often** [4] - 39:18, 39:19, 70:10, 70:14
**old** [1] - 118:7
**once** [11] - 11:2, 14:12, 25:22, 39:11, 39:25, 50:17, 80:24, 118:13, 139:9, 191:19, 208:23
**one** [130] - 8:4, 10:13, 17:5, 17:19, 18:5, 20:3, 20:8, 26:9, 26:13, 26:23, 33:10, 38:11, 41:22, 42:2, 43:7, 43:21, 44:4, 44:9, 44:15, 48:15, 48:17, 48:25, 56:3, 57:8, 59:15, 60:11, 60:12, 62:2, 63:5, 68:4, 68:19, 69:15, 69:22, 70:22, 71:22, 71:23, 79:13, 79:14, 79:16, 81:5, 81:6, 81:22, 82:13, 84:10, 85:23, 88:7, 88:9, 88:12, 88:13, 89:12, 93:23, 94:8, 96:14, 99:22, 99:23, 102:23, 104:11, 107:6, 108:16, 108:25, 111:8, 111:9, 111:19, 112:13, 115:13, 116:12, 116:21,

117:2, 123:4, 123:20, 124:2, 124:6, 127:11, 127:18, 127:24, 130:8, 130:15, 130:16, 132:10, 133:19, 134:8, 135:19, 137:25, 140:21, 142:6, 142:8, 146:4, 147:15, 148:12, 148:16, 148:18, 149:2, 149:9, 150:4, 150:7, 152:3, 152:4, 152:6, 153:2, 155:23, 156:9, 157:19, 163:21, 165:25, 177:5, 177:9, 177:23, 177:24, 178:18, 178:24, 181:22, 183:3, 183:25, 185:23, 185:24, 186:4, 186:24, 187:12, 196:9, 196:21, 199:24, 202:24, 210:24, 219:18
**one's** [2] - 87:20, 147:4
**one-on-one** [1] - 133:19
**ones** [3] - 42:4, 87:21, 149:25
**ongoing** [4] - 91:3, 95:12, 178:11, 179:6
**Onondaga** [1] - 169:5
**open** [5] - 34:15, 36:14, 95:24, 184:12, 184:13
**operates** [1] - 134:18
**operating** [1] - 51:15
**operation** [1] - 160:10
**operations** [2] - 108:12, 113:19
**opportunity** [4] - 41:7, 59:22, 100:13, 165:9
**opposed** [1] - 160:7
**opposing** [1] - 193:23
**OPS** [4] - 55:11, 56:7, 59:17, 92:14
**options** [1] - 34:15
**order** [16] - 27:6, 29:9, 30:4, 30:12, 30:16, 31:6, 43:4, 50:6, 61:22, 74:17, 75:5, 75:12, 75:16, 83:14, 84:2, 134:20
**ordering** [1] - 221:12
**ordinance** [31] - 14:5,

27:3, 43:6, 44:22, 45:5, 46:19, 47:18, 47:25, 56:13, 59:24, 65:12, 70:6, 70:8, 92:3, 92:4, 104:21, 104:25, 106:6, 124:17, 135:15, 173:22, 175:11, 184:18, 185:5, 212:15, 212:18, 213:2, 213:4, 213:5, 218:17
**ordinances** [1] - 198:10
**organization** [2] - 5:17, 158:18
**orientation** [1] - 91:3
**original** [3] - 46:17, 123:3, 143:9
**originally** [3] - 46:3, 83:23, 211:4
**otherwise** [1] - 172:19
**outcome** [7] - 9:3, 9:4, 13:9, 73:25, 147:14, 151:8, 224:15
**outline** [4] - 54:4, 68:5, 145:10, 148:16
**outlined** [1] - 13:24
**outlines** [2] - 144:5, 147:13
**outreach** [2] - 7:15, 192:5
**outside** [16] - 36:6, 38:5, 38:12, 41:19, 45:4, 74:17, 75:11, 83:13, 162:12, 177:4, 178:19, 213:3, 214:17, 215:5, 216:13
**overlap** [1] - 116:4
**overlooked** [1] - 190:8
**oversight** [2] - 70:14, 124:20
**Oversight** [1] - 158:17
**overview** [16] - 11:10, 21:12, 25:5, 37:24, 55:15, 59:22, 113:21, 182:18, 182:19, 183:4, 183:5, 187:17, 190:15, 190:18, 196:5

**P**

**p.m** [1] - 221:17
**packet** [2] - 56:21, 143:3

page [18] - 66:12, 79:24, 99:24, 104:14, 104:15, 104:24, 105:3, 107:22, 108:9, 108:17, 108:19, 110:10, 110:12, 114:24, 116:14, 141:13
**PAGE** [5] - 222:4, 222:9, 223:5, 223:10, 225:7
**pages** [3] - 104:12, 141:15
**paid** [1] - 23:12
**panel** [70] - 8:16, 8:17, 12:15, 12:20, 12:24, 15:4, 15:6, 15:18, 25:7, 42:6, 42:9, 42:22, 43:25, 48:21, 48:22, 50:24, 64:19, 66:18, 79:11, 79:14, 88:8, 88:12, 99:4, 99:11, 100:12, 102:23, 106:21, 107:10, 109:10, 115:21, 116:22, 118:18, 119:12, 119:13, 120:13, 145:21, 171:24, 172:12, 173:19, 174:16, 175:17, 175:24, 176:6, 176:9, 180:18, 180:20, 181:2, 181:13, 182:13, 183:2, 184:21, 185:7, 185:17, 186:5, 186:11, 186:18, 187:7, 188:16, 189:17, 189:24, 190:4, 190:6, 191:2, 191:16, 192:10, 192:24, 193:12, 193:19, 193:25, 194:23
**panels** [1] - 158:21
**pants** [2] - 145:4, 145:8
**paper** [4] - 95:17, 169:25, 170:23, 204:4
**paragraph** [13] - 79:25, 89:22, 89:23, 90:4, 90:7, 90:8, 90:10, 90:11, 99:25, 100:2, 100:6, 100:9, 100:11
**paragraphs** [2] - 55:4,

16

80:2
**parameters** [1] - 83:13
**paraphrasing** [2] - 97:23, 137:19
**parsing** [1] - 107:15
**part** [26] - 33:4, 33:17, 41:5, 41:6, 97:22, 97:24, 108:8, 116:23, 124:10, 124:22, 138:11, 154:13, 156:24, 162:10, 163:3, 164:19, 165:2, 166:25, 171:2, 175:18, 175:23, 178:7, 178:8, 178:21, 190:10, 202:8
**participate** [3] - 12:10, 17:16, 41:13
**participating** [1] - 17:23
**particular** [39] - 22:17, 35:13, 44:5, 45:17, 48:18, 64:12, 64:20, 65:6, 69:24, 73:10, 88:6, 94:8, 107:22, 113:8, 117:17, 120:9, 122:20, 122:23, 124:2, 124:7, 124:12, 125:4, 125:11, 136:16, 137:16, 147:18, 148:7, 153:2, 164:4, 173:6, 187:8, 195:25, 196:16, 198:6, 198:22, 201:10, 203:3, 208:11, 212:17
**particularly** [7] - 124:25, 129:6, 133:25, 136:9, 153:16, 169:20, 191:3
**parties** [4] - 3:6, 50:22, 167:14, 224:13
**partner** [5] - 96:22, 96:25, 97:3, 97:11, 97:21
**parts** [1] - 36:12
**Party** [1] - 1:16
**pass** [1] - 44:4
**passive** [3] - 106:12, 108:22, 136:16
**past** [7] - 25:18, 45:22, 56:23, 117:6, 118:7, 120:6, 120:7
**pattern** [28] - 33:2,

33:13, 70:7, 70:12, 70:15, 71:8, 125:13, 126:8, 126:13, 126:14, 127:2, 208:11, 208:21, 209:3, 209:10, 209:12, 209:14, 209:16, 209:19, 210:7, 219:22, 220:7, 220:12, 220:13, 220:15, 220:17, 220:25, 221:7
**patterns** [13] - 33:5, 33:18, 69:24, 70:18, 70:22, 75:10, 124:12, 124:21, 125:11, 125:15, 125:19, 126:2, 131:12
**PAUL** [1] - 1:7
**pay** [6] - 34:12, 79:16, 79:17, 99:12, 99:14, 127:25
**pending** [1] - 195:15
**people** [20] - 21:4, 21:7, 23:5, 23:8, 38:6, 39:20, 53:6, 133:16, 151:13, 165:7, 174:10, 174:18, 175:7, 177:21, 188:8, 192:6, 193:18, 196:15, 205:25, 208:16
**people's** [1] - 190:19
**per** [1] - 70:8
**percent** [25] - 111:17, 111:20, 111:22, 111:24, 111:25, 112:2, 112:4, 112:5, 112:6, 112:8, 112:10, 112:12, 112:13, 112:16, 115:13, 115:17, 115:21, 115:23, 116:2, 116:19, 152:9, 186:3, 186:7, 186:24, 187:12
**percentage** [1] - 125:5
**percentages** [3] - 105:25, 106:4, 123:25
**perhaps** [1] - 11:14
**period** [15] - 43:10, 47:13, 47:21, 80:22, 81:2, 103:22, 105:20, 109:20, 112:18, 155:20, 156:18, 179:5,

195:11, 195:12, 219:5
**periods** [3] - 47:14, 48:11, 48:12
**perjury** [1] - 174:8
**permitted** [1] - 31:3
**person** [14] - 17:15, 21:20, 39:23, 63:9, 142:20, 145:7, 152:11, 168:4, 174:17, 176:24, 192:14, 201:15, 203:17, 203:24
**person's** [2] - 130:25, 176:14
**personal** [2] - 20:7, 161:16
**personally** [1] - 166:16
**personnel** [2] - 34:10, 88:14
**perspective** [4] - 12:20, 15:15, 38:17, 97:23
**pertaining** [1] - 30:17
**pertinent** [1] - 184:18
**petty** [1] - 77:10
**Ph.D** [1] - 6:19
**phase** [1] - 118:20
**phone** [10] - 10:15, 31:25, 39:20, 146:11, 155:9, 156:9, 156:17, 163:19, 204:7, 204:11
**phonetic** [2] - 30:4, 174:3
**photographs** [6] - 11:6, 11:16, 11:18, 39:2, 164:10, 188:2
**photos** [3] - 143:20, 143:21, 162:5
**phrase** [5] - 179:9, 199:3, 209:17, 220:13, 220:23
**physical** [1] - 179:18
**picking** [1] - 166:4
**piece** [4] - 155:9, 171:19, 172:2, 172:7
**pile** [1] - 57:14
**place** [11] - 1:17, 93:5, 120:21, 120:24, 198:11, 209:23, 210:3, 217:12, 217:25, 218:8, 218:10
**placed** [2] - 173:19, 210:18
**PLAINTIFF'S** [2] - 222:9, 223:5

**plaintiff's** [1] - 137:12
**Plaintiff's** [20] - 53:12, 53:17, 53:21, 54:14, 57:19, 57:21, 61:21, 66:2, 66:6, 76:14, 76:16, 79:3, 84:19, 87:23, 94:18, 98:12, 122:6, 138:5, 200:22, 210:20
**plaintiffs** [1] - 4:21
**Plaintiffs** [3] - 1:5, 2:4, 2:9
**planned** [1] - 92:17
**play** [4] - 21:25, 43:23, 43:24, 175:18
**played** [2] - 60:16, 121:24
**pleasure** [9] - 51:19, 51:25, 198:3, 198:6, 198:12, 198:21, 198:23, 199:7, 199:9
**plus** [3] - 186:4, 186:24, 187:12
**point** [58] - 17:19, 24:7, 36:5, 40:25, 41:4, 46:8, 48:7, 50:16, 56:22, 58:23, 59:4, 63:5, 76:16, 77:13, 80:21, 85:7, 85:10, 89:8, 91:23, 92:19, 92:22, 93:23, 95:23, 97:12, 105:10, 107:7, 107:13, 109:24, 111:19, 111:23, 111:24, 112:3, 112:5, 112:6, 112:8, 112:10, 112:12, 112:13, 112:15, 118:3, 130:15, 134:14, 137:13, 144:13, 148:13, 155:23, 156:7, 156:9, 165:25, 183:20, 192:17, 192:18, 192:20, 194:24, 196:5, 207:2, 213:20, 218:19
**pointed** [2] - 101:19, 189:15
**points** [2] - 24:17, 199:23
**police** [80] - 8:22, 9:7, 10:2, 11:5, 14:13, 15:9, 15:11, 22:7, 22:12, 26:2, 27:5, 27:7, 28:11, 32:16, 33:5, 33:19, 33:24, 34:15, 34:16, 34:25,

35:22, 35:24, 38:20, 38:25, 39:12, 43:5, 44:15, 44:18, 49:18, 55:21, 57:9, 57:11, 65:5, 67:10, 69:25, 79:20, 80:4, 90:20, 90:21, 92:2, 92:14, 97:3, 99:18, 101:5, 106:16, 106:23, 109:2, 112:7, 117:13, 131:22, 135:14, 136:4, 138:11, 143:19, 144:9, 148:17, 148:18, 153:16, 157:7, 162:2, 162:3, 164:5, 165:8, 167:12, 167:17, 168:13, 177:6, 177:7, 177:25, 178:2, 178:16, 182:6, 182:15, 189:4, 194:5, 194:11, 194:13, 198:2, 201:18, 216:12
**POLICE** [4] - 1:7, 1:7, 1:8, 1:8
**Police** [29] - 10:21, 13:14, 13:22, 22:13, 24:22, 52:6, 90:23, 92:20, 101:11, 115:4, 129:5, 129:10, 131:10, 131:21, 131:22, 132:18, 136:3, 136:4, 136:19, 141:8, 151:3, 153:15, 167:8, 168:14, 196:8, 196:17, 197:7, 206:4, 207:12
**policies** [14] - 43:24, 70:6, 70:9, 75:8, 90:24, 101:3, 103:5, 111:15, 154:18, 157:11, 157:23, 197:10, 197:22, 197:24
**policy** [68] - 5:14, 10:5, 17:24, 64:4, 64:8, 64:10, 64:13, 64:17, 64:20, 65:10, 65:13, 65:23, 69:13, 71:10, 71:11, 71:18, 71:21, 72:4, 72:8, 72:9, 72:14, 72:21, 73:6, 73:11, 73:14, 73:17, 73:20, 73:22, 73:24, 74:11, 76:10, 90:14, 100:14,

100:21, 100:22,
100:25, 101:9,
101:18, 101:21,
101:22, 101:23,
102:8, 112:15,
124:18, 129:15,
129:18, 130:18,
130:19, 130:22,
130:24, 132:7,
158:6, 193:7,
195:24, 196:4,
196:6, 196:8,
196:12, 196:13,
196:16, 196:18,
196:20, 196:22,
207:4, 207:17,
207:19, 207:25,
208:4
**political** [1] - 6:14
**pool** [1] - 22:16
**poor** [1] - 99:7
**portrayed** [2] - 139:3,
139:24
**posed** [1] - 183:21
**position** [5] - 6:2, 6:8,
6:25, 217:13, 218:2
**positions** [1] - 7:4
**positive** [5] - 45:20,
60:22, 81:16, 207:9
**possible** [8] - 21:13,
101:8, 113:9,
171:25, 172:13,
181:11, 191:8, 191:9
**potential** [1] - 71:5
**power** [2] - 8:9,
212:21
**powers** [8] - 211:25,
212:9, 212:10,
212:11, 212:23,
212:24, 213:18
**practice** [24] - 67:5,
70:8, 70:13, 71:4,
126:9, 126:14,
127:2, 208:11,
208:22, 209:3,
209:10, 209:13,
209:14, 209:16,
209:19, 210:7,
219:23, 220:7,
220:12, 220:14,
220:16, 220:17,
220:25, 221:7
**practices** [6] - 70:16,
70:18, 70:22, 75:10,
124:21, 157:11
**preceding** [2] - 90:7,
117:21
**precluded** [2] -
175:10, 175:12
**predate** [1] - 122:11,

138:20
**predated** [1] - 117:8
**preface** [1] - 117:8
**prefer** [1] - 32:2
**preliminary** [1] -
100:19
**prepare** [1] - 40:7
**preponderance** [4] -
185:25, 186:4,
186:19, 186:23
**PRESENT** [1] - 2:18
**present** [9] - 133:17,
133:21, 165:19,
182:7, 182:10,
183:8, 184:3,
189:18, 191:15
**presentation** [3] -
129:19, 177:8, 178:3
**presentations** [1] -
158:23
**presented** [3] - 42:10,
158:20, 178:23
**presenters** [1] -
177:23
**presenting** [1] - 97:19
**president** [2] - 17:18,
17:19
**pressure** [1] - 131:6
**presume** [1] - 167:5
**presuming** [1] - 153:4
**pretty** [12] - 22:23,
43:18, 49:15, 86:11,
92:15, 92:16, 98:23,
99:21, 113:24,
128:24, 146:9,
146:13
**prevail** [1] - 93:24
**prevailed** [1] - 47:19
**previous** [10] - 74:8,
97:20, 102:23,
117:15, 122:15,
122:16, 122:17,
125:10, 138:22,
165:16
**previously** [16] -
14:17, 30:7, 34:23,
90:18, 98:9, 102:15,
104:9, 114:21,
120:21, 120:24,
123:12, 124:24,
138:8, 151:21,
200:22, 210:19
**prison** [1] - 17:10
**privy** [1] - 122:16
**pro** [1] - 149:14
**problem** [4] - 65:17,
113:8, 207:18,
209:15
**problems** [2] - 18:8,
126:7

**procedure** [2] - 10:9,
187:19
**procedures** [1] - 90:24
**proceeded** [1] - 56:8
**process** [25] - 7:12,
7:22, 14:9, 16:3,
16:22, 17:23, 20:18,
20:20, 21:2, 24:2,
24:6, 24:11, 36:24,
48:2, 56:9, 68:5,
97:12, 113:2,
145:17, 173:14,
174:25, 182:20,
192:2, 192:6, 211:23
**processing** [2] - 10:9,
220:9
**produce** [1] - 151:14
**produced** [3] - 30:7,
30:11, 30:15
**PRODUCTION** [1] -
223:9
**productive** [1] - 92:16
**Professional** [11] -
10:20, 11:2, 14:6,
39:13, 56:8, 56:14,
56:19, 143:15,
166:24, 194:15,
200:15
**professional** [1] -
22:22
**progressive** [2] -
25:15, 118:25
**projects** [1] - 154:21
**prolong** [1] - 31:17
**proof** [3] - 184:20,
185:5, 185:14
**properly** [1] - 102:5
**property** [2] - 106:14,
108:24
**prosecuted** [2] -
40:21, 176:25
**prosecuting** [1] -
205:5
**protection** [1] -
203:23
**provide** [11] - 11:21,
14:7, 26:11, 26:15,
26:18, 40:8, 43:4,
46:12, 47:20, 50:17,
55:16, 56:14, 80:23,
93:11, 100:23,
126:10, 130:17,
135:15, 167:10,
167:12, 172:5, 188:3
**provided** [15] - 42:21,
46:2, 49:11, 55:11,
80:24, 89:14, 90:18,
147:2, 162:6, 163:8,
163:9, 167:23,
168:14, 176:18,

177:3
**provides** [3] - 11:22,
14:12, 50:19
**providing** [5] - 48:7,
48:10, 48:12, 50:21,
81:3
**psychological** [2] -
201:3, 201:11
**Public** [3] - 1:19, 4:4,
224:5
**public** [15] - 21:3,
52:12, 53:5, 113:11,
113:12, 113:15,
113:18, 113:23,
133:10, 133:11,
135:6, 135:11,
184:12, 184:14,
215:24
**PUBLIC** [1] - 221:25
**publicly** [3] - 104:23,
105:2
**published** [4] -
152:19, 152:21,
153:3, 153:8
**pull** [1] - 118:10
**pulled** [5] - 85:4,
144:23, 144:25,
145:4, 145:8
**punching** [1] - 95:20
**purpose** [9] - 9:20,
9:21, 9:24, 112:20,
113:2, 113:5,
174:10, 174:20,
175:6
**purposefully** [1] -
75:20
**purposes** [3] - 73:20,
118:25, 183:5
**pursuant** [1] - 1:17
**pursuit** [1] - 86:6
**purview** [2] - 70:18,
124:22
**push** [1] - 36:13
**pushing** [1] - 132:9
**put** [26] - 25:25, 29:3,
37:21, 40:6, 48:24,
62:22, 64:23, 91:19,
109:15, 109:18,
125:17, 125:24,
128:16, 134:18,
137:3, 145:18,
156:25, 163:23,
163:25, 171:21,
178:20, 186:22,
187:3, 204:6, 204:8,
208:5
**putting** [3] - 135:16,
174:10, 210:3

**Q**

**quarter** [6] - 105:6,
109:10, 110:18,
110:20, 111:2, 111:3
**quarterly** [2] - 104:23,
133:4
**questioned** [2] -
12:18, 193:24
**questioning** [8] -
15:21, 29:11, 30:13,
75:7, 86:21, 118:21,
122:15, 191:21
**questions** [32] - 12:21,
16:5, 16:10, 22:15,
29:6, 30:17, 37:24,
38:14, 38:18, 76:8,
83:8, 121:15,
137:24, 140:20,
154:5, 154:12,
173:15, 182:12,
182:14, 182:17,
182:19, 182:25,
183:10, 183:15,
183:16, 191:13,
193:19, 199:25,
200:24, 202:2,
210:24, 214:8
**quick** [7] - 98:23,
108:15, 123:2,
141:12, 142:23,
151:16, 210:21
**quickest** [1] - 217:5
**quickly** [8] - 86:12,
102:10, 122:10,
128:19, 131:18,
135:17, 139:2,
195:12
**quid** [1] - 149:14
**quo** [1] - 149:14
**quote** [1] - 171:8
**quoted** [3] - 90:20,
91:4, 92:5
**quotes** [4] - 96:9,
152:11, 153:18,
153:23

**R**

**racial** [3] - 110:16,
111:7, 111:24
**radar** [3] - 137:4,
149:18, 208:6
**raised** [12] - 56:24,
64:20, 65:16, 65:18,
129:13, 129:14,
130:9, 130:11,
136:17, 207:15,
208:3, 208:5

18

**raising** [3] - 69:12, 94:9, 207:2
**rammed** [2] - 148:19
**ran** [1] - 144:10
**range** [5] - 22:17, 33:25, 34:14, 34:20, 63:18
**rate** [4] - 91:11, 115:12, 116:16
**raw** [1] - 106:5
**reach** [2] - 72:24, 187:12
**reached** [8] - 95:20, 130:2, 131:23, 132:15, 136:6, 153:13, 169:19
**reactivating** [1] - 91:10
**READ** [1] - 225:7
**read** [25] - 15:19, 31:13, 53:17, 58:18, 66:25, 79:25, 89:19, 90:2, 91:14, 92:5, 100:10, 118:2, 123:19, 125:2, 133:10, 139:2, 139:23, 141:3, 141:12, 142:10, 152:24, 170:22, 180:18, 207:8
**reading** [5] - 30:3, 39:5, 87:9, 174:17, 199:17
**real** [8] - 92:11, 122:10, 126:9, 139:2, 142:22, 151:16, 174:16, 174:20
**really** [17] - 21:18, 75:22, 94:10, 102:10, 105:17, 108:15, 127:4, 132:9, 138:18, 165:11, 171:11, 176:21, 190:25, 193:9, 196:20, 211:14, 219:19
**reappointment** [1] - 20:2
**reason** [7] - 60:25, 88:21, 91:14, 96:13, 173:21, 199:4, 212:13
**reasonable** [3] - 100:18, 101:24, 185:24
**reasoning** [2] - 80:8, 80:18
**reasons** [4] - 20:7, 26:25, 46:4

**Rebecca** [1] - 57:12
**receive** [10] - 10:24, 11:9, 21:8, 73:15, 80:6, 80:10, 154:24, 155:3, 155:6, 157:9
**received** [36] - 6:13, 6:16, 11:3, 11:13, 59:16, 59:20, 67:14, 79:13, 81:11, 81:14, 105:5, 106:12, 106:14, 108:20, 109:9, 109:20, 110:19, 111:18, 111:20, 111:22, 115:11, 115:14, 115:18, 116:20, 146:18, 155:16, 155:18, 155:24, 157:2, 157:6, 160:12, 170:13, 176:14, 178:6, 180:21, 201:3
**receiving** [9] - 11:4, 33:15, 37:16, 88:20, 99:22, 116:24, 125:16, 143:11, 155:8
**recently** [1] - 23:2
**recess** [1] - 123:8
**recognize** [27] - 35:5, 35:6, 41:19, 53:13, 54:15, 58:12, 69:24, 76:19, 89:24, 95:4, 98:5, 104:10, 108:5, 119:14, 122:19, 123:4, 137:22, 139:4, 140:12, 140:14, 141:16, 142:2, 142:6, 142:7, 147:6, 151:22, 220:24
**recognizes** [2] - 139:20, 139:25
**recollection** [12] - 35:16, 36:21, 57:23, 59:11, 60:18, 84:24, 101:10, 103:20, 104:2, 109:23, 142:17, 168:24
**recommend** [7] - 24:25, 25:23, 34:17, 40:13, 73:21, 145:19, 203:20
**recommendation** [50] - 8:21, 13:5, 24:16, 25:11, 25:21, 50:18, 52:8, 55:16, 59:23, 64:11, 64:17, 64:23, 65:7, 65:14, 66:23, 67:16, 67:18, 67:24,

68:10, 68:24, 69:13, 69:14, 71:22, 71:23, 73:5, 81:15, 88:10, 91:15, 101:18, 109:6, 119:24, 120:8, 130:23, 132:7, 132:8, 145:25, 146:8, 147:25, 150:3, 150:5, 150:9, 205:10, 206:5, 206:6, 206:12, 206:22, 207:6, 207:13, 207:23
**recommendations** [46] - 10:4, 10:6, 14:16, 25:6, 33:24, 33:25, 34:19, 47:4, 48:23, 49:7, 49:19, 50:7, 50:12, 52:24, 63:19, 64:3, 64:7, 64:13, 65:11, 65:22, 67:2, 67:9, 72:7, 72:14, 73:8, 74:10, 79:10, 79:19, 81:24, 91:18, 99:10, 99:17, 104:3, 107:3, 109:13, 116:8, 116:9, 116:10, 116:11, 116:12, 116:13, 121:20, 130:17, 152:8, 175:23
**recommended** [21] - 40:10, 71:17, 72:20, 73:24, 79:15, 88:12, 99:11, 106:21, 106:23, 107:10, 107:16, 109:10, 116:18, 120:4, 120:6, 146:6, 146:15, 150:13, 151:6, 152:3
**recommending** [5] - 147:17, 176:5, 196:6, 197:23, 205:18
**recommends** [1] - 72:23
**reconvene** [1] - 90:16
**record** [54] - 4:10, 4:14, 5:9, 29:4, 29:23, 29:25, 30:2, 32:8, 32:23, 37:22, 54:5, 57:25, 58:3, 58:5, 62:14, 74:23, 82:8, 82:21, 84:9, 84:12, 84:14, 88:18, 90:3, 94:22, 94:24, 95:2, 98:8, 103:19,

119:17, 123:11, 138:10, 139:18, 146:4, 146:15, 147:9, 147:11, 149:21, 150:21, 157:2, 167:3, 168:5, 169:2, 173:23, 175:2, 175:3, 193:6, 197:12, 212:8, 214:20, 215:13, 215:24, 219:15, 219:17, 224:10
**record's** [1] - 214:24
**recording** [1] - 184:16
**records** [7] - 89:5, 89:9, 89:11, 123:13, 164:16, 200:9, 211:12
**recounted** [1] - 78:16
**recourse** [1] - 50:23
**red** [2] - 59:7, 85:7
**redacted** [6] - 30:10, 30:25, 55:12, 101:5, 122:22, 143:21
**reduced** [1] - 203:21
**reducing** [1] - 202:5
**reduction** [2] - 62:22, 62:23
**reenact** [1] - 38:15
**reenacted** [1] - 38:15
**refer** [2] - 67:22, 179:13
**reference** [3] - 87:13, 170:14, 172:5
**referenced** [1] - 74:9
**references** [1] - 152:12
**referencing** [2] - 87:12, 97:14
**referring** [5] - 63:5, 135:10, 152:14, 195:4, 216:7
**refers** [1] - 220:24
**refresh** [2] - 57:22, 142:16
**refused** [1] - 78:12
**regard** [8] - 141:23, 159:4, 194:20, 194:22, 198:3, 217:3, 217:4, 217:9
**regarding** [5] - 30:7, 30:14, 90:23, 180:5, 200:3
**regards** [23] - 49:18, 52:22, 54:20, 55:23, 72:15, 90:15, 101:12, 122:13, 125:5, 125:9, 129:7, 129:8, 132:16, 138:21, 139:11,

141:2, 141:4, 141:9, 141:10, 151:18, 151:20, 153:16, 197:6
**regulations** [2] - 100:20, 100:24
**related** [2] - 126:21, 224:13
**relates** [1] - 154:20
**relating** [1] - 91:9
**relationship** [1] - 199:11
**relative** [1] - 40:5
**release** [2] - 152:22, 153:5
**relevant** [10] - 11:8, 108:9, 171:20, 172:3, 179:24, 180:18, 181:6, 181:10, 187:11, 215:9
**relied** [1] - 164:5
**relying** [1] - 167:11
**remain** [1] - 169:16
**remedial** [1] - 208:18
**remember** [75] - 37:16, 38:7, 38:10, 38:11, 38:17, 39:17, 39:18, 39:24, 41:17, 43:9, 43:12, 53:24, 54:3, 56:17, 56:18, 59:6, 60:7, 60:8, 60:23, 61:11, 62:3, 62:11, 77:4, 78:4, 80:21, 81:20, 81:21, 81:23, 82:11, 84:21, 85:16, 86:14, 86:21, 87:6, 89:5, 89:17, 99:21, 103:25, 144:14, 144:20, 146:5, 146:11, 146:14, 147:12, 147:13, 147:14, 147:23, 148:4, 148:5, 148:6, 148:7, 148:20, 149:20, 150:18, 155:17, 159:20, 163:22, 165:21, 165:24, 167:24, 168:13, 169:19, 170:2, 170:20, 171:6, 171:9, 171:11, 183:12, 200:17, 201:19, 211:8, 211:16
**remembered** [2] - 86:16, 86:19
**remembering** [1] - 148:15

**remind** [3] - 68:11, 156:13, 205:18
**reminds** [1] - 61:16
**remove** [3] - 35:25, 66:20, 67:4
**removed** [1] - 20:10
**rep** [1] - 92:15
**repeating** [1] - 172:8
**report** [92] - 11:20, 11:21, 11:22, 11:25, 15:9, 40:7, 42:22, 53:16, 53:25, 54:6, 54:19, 57:17, 59:17, 62:15, 64:10, 64:22, 67:18, 72:20, 73:4, 73:18, 73:24, 76:11, 76:12, 76:15, 76:20, 77:8, 77:23, 78:11, 87:8, 87:10, 94:16, 95:10, 98:9, 101:19, 101:25, 103:11, 104:12, 104:22, 104:25, 105:8, 106:17, 108:6, 109:2, 109:3, 112:7, 113:24, 114:23, 115:9, 130:23, 132:6, 133:4, 133:6, 138:16, 141:8, 143:14, 143:15, 143:18, 143:21, 145:19, 151:2, 151:14, 151:19, 151:24, 151:25, 152:23, 163:24, 164:23, 167:2, 167:12, 167:25, 168:3, 171:17, 172:4, 173:3, 180:17, 180:21, 189:6, 189:8, 189:11, 201:2, 201:18, 205:13, 206:2, 207:6, 211:11, 222:10, 222:13, 222:16, 222:21, 223:12
**reported** [9] - 86:7, 96:10, 105:2, 132:5, 162:2, 162:3, 169:23, 205:17, 207:23
**reporter** [3] - 1:19, 223:7, 224:4
**reporting** [3] - 7:17, 39:4, 175:20
**reports** [38] - 11:6, 11:7, 19:12, 38:20, 38:25, 39:6, 62:3, 104:23, 123:15,

132:17, 134:24, 135:7, 143:19, 143:23, 152:25, 153:5, 153:10, 153:13, 153:19, 153:24, 162:2, 162:4, 164:5, 164:14, 170:24, 171:2, 171:5, 171:21, 171:22, 171:24, 172:16, 173:9, 194:6, 194:12, 194:14, 220:19, 220:22
**representation** [2] - 182:24, 193:18
**represented** [3] - 115:17, 115:21, 116:2
**representing** [1] - 84:5
**reprimand** [4] - 34:9, 67:4, 88:13, 116:11
**request** [6] - 93:14, 93:18, 100:2, 101:13, 149:22, 200:14
**requested** [4] - 46:4, 91:2, 94:5, 100:12
**REQUESTS** [1] - 223:9
**required** [11] - 14:6, 46:19, 46:22, 47:17, 65:11, 90:19, 92:2, 104:25, 135:12, 135:14, 185:6
**requirement** [2] - 103:14, 113:23
**requires** [2] - 100:14, 104:22
**rescheduled** [1] - 17:14
**research** [3] - 45:7, 103:3, 185:20
**reserved** [1] - 3:12
**residence** [1] - 21:25
**resident** [1] - 22:4
**residents** [2] - 21:24, 22:17
**resign** [1] - 20:6
**resigned** [1] - 20:11
**resolve** [1] - 35:25
**resolved** [3] - 40:3, 40:4, 179:3
**resource** [1] - 90:22
**respect** [1] - 131:4
**respective** [3] - 3:6, 80:13, 91:12
**respond** [12] - 14:14, 16:5, 16:9, 47:3,

48:3, 48:4, 65:12, 101:12, 103:21, 132:10, 137:7, 217:11
**responded** [7] - 47:9, 47:12, 48:14, 78:14, 78:20, 81:5, 130:10
**responding** [9] - 15:12, 42:16, 42:20, 42:25, 47:15, 81:2, 89:3, 137:17, 196:20
**response** [27] - 26:19, 49:12, 50:19, 81:12, 81:14, 81:18, 81:21, 82:5, 88:21, 89:2, 89:16, 93:13, 93:18, 101:17, 103:17, 129:19, 137:2, 137:4, 137:8, 137:15, 153:6, 153:12, 197:12, 199:24, 201:25, 206:21, 210:23
**responses** [9] - 80:6, 80:7, 80:10, 80:24, 81:3, 109:21, 116:20, 116:25, 143:17
**responsibilities** [2] - 7:9, 7:14
**rest** [2] - 94:3, 142:24
**restroom** [1] - 123:5
**result** [2] - 91:11, 152:7
**resulted** [2] - 115:14, 152:7
**results** [1] - 109:25
**resumes** [1] - 21:8
**retained** [1] - 223:7
**retraining** [1] - 116:10
**retribution** [1] - 97:24
**returned** [1] - 223:7
**review** [10] - 11:24, 53:14, 67:5, 72:21, 73:5, 79:6, 94:20, 100:20, 137:22, 163:2
**Review** [8] - 6:6, 9:20, 35:5, 53:15, 57:16, 152:2, 222:10, 222:13
**reviewed** [10] - 37:18, 37:23, 38:20, 95:4, 115:2, 161:24, 162:17, 164:7, 166:9, 166:15
**reviewing** [2] - 11:12, 84:24
**rewrite** [1] - 157:23
**Rick** [2] - 169:17,

204:6
**rights** [6] - 24:5, 28:9, 28:21, 32:20, 106:15, 108:25
**Risk** [1] - 101:6
**risk** [4] - 71:10, 71:19, 111:15, 112:14
**road** [2] - 83:18, 148:14
**Road** [3] - 2:5, 2:10, 86:10
**role** [8] - 8:24, 50:16, 50:20, 112:17, 114:4, 183:2, 183:17, 214:5
**roll** [2] - 65:19, 205:20
**Room** [1] - 2:15
**room** [6] - 38:10, 58:24, 190:13, 191:15, 192:8, 201:11
**routine** [1] - 164:16
**rule** [2] - 188:20, 188:22
**rules** [6] - 5:3, 12:15, 100:20, 100:24, 120:11, 187:20
**run** [5] - 71:12, 78:21, 160:10, 167:25
**running** [6] - 77:14, 77:19, 77:20, 148:17, 148:18, 207:21
**runs** [2] - 12:16, 19:6
**RYDER** [31] - 2:4, 2:6, 4:8, 29:3, 29:13, 29:16, 29:20, 30:2, 31:12, 31:20, 32:3, 32:12, 32:22, 58:4, 74:21, 74:24, 75:18, 76:4, 83:20, 84:4, 123:10, 137:25, 139:22, 140:13, 140:17, 149:21, 151:11, 153:25, 154:6, 156:14, 215:7
**Ryder** [11] - 4:20, 28:25, 32:7, 74:16, 75:25, 83:7, 156:15, 156:16, 183:9, 183:10, 222:5
**Ryder's** [3] - 199:25, 202:2, 210:24

---

**S**

**safely** [1] - 102:5
**safer** [1] - 197:24
**safety** [2] - 71:17,

197:2
**said/she** [3] - 137:9, 179:10, 179:20
**Salt** [1] - 86:10
**salt** [1] - 188:15
**sanctions** [2] - 106:22, 152:4
**Sausalito** [1] - 2:10
**save** [4] - 140:10, 147:16, 185:16, 195:17
**saved** [1] - 81:20
**saw** [7] - 38:12, 65:16, 71:8, 71:24, 206:7, 206:9, 207:24
**scale** [2] - 144:11, 152:13
**scared** [1] - 85:14
**scenario** [4] - 15:21, 140:16, 140:17
**scene** [7] - 11:16, 36:4, 38:15, 42:17, 145:5, 145:6, 201:17
**scenes** [1] - 93:22
**schedule** [1] - 181:14
**scheduled** [3] - 17:11, 37:24, 181:16
**schedules** [1] - 12:7
**scheduling** [1] - 155:13
**school** [1] - 160:19
**science** [1] - 6:15
**scope** [5] - 74:17, 75:11, 75:15, 214:18, 215:6
**se** [1] - 70:8
**sealing** [1] - 3:7
**search** [3] - 111:8, 112:2, 145:7
**searched** [4] - 96:18, 96:19, 96:20
**second** [10] - 66:12, 79:24, 84:10, 99:24, 108:17, 110:9, 130:17, 210:21, 211:21, 219:2
**secretaries** [1] - 23:8
**section** [2] - 90:21, 91:5
**sections** [1] - 143:19
**see** [44] - 9:18, 12:2, 38:6, 48:13, 51:12, 60:9, 66:23, 68:15, 73:14, 74:25, 75:13, 83:15, 89:7, 89:22, 89:25, 91:17, 100:5, 101:22, 104:10, 114:10, 117:6, 123:4, 126:6, 137:22, 139:3,

141:15, 147:5,
151:21, 152:12,
163:16, 163:17,
170:5, 173:5, 190:9,
192:4, 197:19,
198:18, 201:8,
203:17, 208:3,
208:22, 210:17
**seeing** [6] - 71:19,
86:7, 205:15,
207:19, 207:20,
208:15
**seizure** [2] - 111:8,
112:2
**select** [1] - 21:10
**selected** [1] - 21:23
**selecting** [1] - 20:19
**selection** [1] - 21:16
**selector** [1] - 20:24
**seminar** [2] - 158:13,
177:15
**send** [12] - 8:13, 8:14,
12:5, 41:12, 46:20,
46:21, 46:23,
135:12, 145:23,
150:12, 158:6,
200:14
**senior** [1] - 5:14
**sensation** [1] - 87:4
**sense** [2] - 137:14,
160:6
**sent** [6] - 35:8, 41:11,
44:8, 57:3, 64:14,
91:18
**sentiments** [1] - 93:3
**separate** [3] - 11:11,
45:2, 213:17
**sergeant** [9] - 42:21,
42:25, 78:13, 78:16,
78:17, 78:20, 99:8,
99:15, 208:7
**sergeants** [1] - 207:8
**series** [2] - 141:21,
147:6
**serious** [4] - 27:14,
148:22, 211:4,
211:13
**seriously** [1] - 27:22
**serve** [5] - 19:21,
198:6, 198:20,
198:22, 199:8
**serves** [5] - 19:20,
51:19, 51:25, 198:2,
198:12
**service** [2] - 65:19,
205:20
**serving** [1] - 199:7
**session** [1] - 12:4
**set** [8] - 57:14, 91:25,
92:9, 92:10, 119:9,

159:24, 182:20,
224:8
**settled** [1] - 63:6
**seven** [4] - 106:12,
112:3, 112:8, 112:10
**seventy** [2] - 115:21,
152:9
**seventy-two** [1] -
115:21
**several** [9] - 41:18,
47:18, 62:13, 65:3,
73:13, 85:22,
130:15, 144:18,
153:9
**severe** [1] - 87:16
**shall** [6] - 3:12, 30:5,
30:16, 31:3, 45:6,
45:8
**shape** [1] - 172:11
**share** [1] - 14:2
**shared** [1] - 201:13
**sharing** [1] - 13:21
**shattered** [1] - 77:18
**SHEET** [1] - 225:2
**short** [1] - 89:23
**shorthand** [1] - 1:19
**shortly** [1] - 162:23
**SHOULD** [1] - 225:7
**show** [4] - 20:9,
108:10, 200:21,
211:12
**showed** [2] - 141:5,
164:11
**shows** [1] - 29:19
**Sickinger** [1] - 222:6
**SICKINGER** [121] -
2:16, 8:2, 9:22,
10:11, 14:3, 14:24,
18:16, 20:21, 23:21,
24:8, 27:8, 27:18,
28:13, 28:23, 29:7,
29:15, 29:18, 31:16,
31:22, 32:9, 33:7,
33:20, 34:3, 35:19,
37:5, 37:11, 40:11,
40:22, 42:7, 44:19,
46:9, 46:14, 47:10,
48:19, 49:2, 49:9,
49:20, 49:25, 50:8,
50:14, 51:6, 52:9,
52:15, 53:2, 55:25,
57:24, 59:13, 60:3,
60:20, 61:9, 62:25,
63:25, 65:8, 67:12,
70:3, 70:25, 72:17,
74:3, 74:14, 74:22,
75:4, 75:24, 79:21,
82:2, 82:25, 83:6,
84:2, 84:6, 88:23,
91:21, 93:15, 94:21,

94:25, 99:19,
101:14, 102:19,
103:16, 104:5,
107:23, 109:16,
110:2, 112:23,
117:18, 120:18,
120:22, 124:15,
125:20, 127:13,
127:20, 128:3,
128:22, 129:11,
130:6, 131:14,
132:3, 132:21,
132:25, 133:13,
134:3, 134:25,
135:22, 136:10,
136:24, 139:17,
140:9, 140:15,
144:7, 146:23,
147:8, 147:19,
148:2, 150:15,
153:20, 154:4,
154:9, 214:15,
214:19, 214:23,
215:3, 219:14, 221:9
**side** [3] - 14:22,
182:21, 183:3
**sides** [1] - 92:18
**sign** [1] - 10:18
**signature** [1] - 35:11
**signed** [5] - 3:16,
3:19, 4:15, 215:20,
215:24
**significant** [2] - 77:22,
96:22
**similar** [3] - 73:22,
97:20, 121:24
**simpler** [1] - 32:3
**simply** [2] - 32:13,
137:16
**single** [3] - 104:15,
118:2, 205:5
**sisters** [1] - 168:15
**sit** [7] - 8:16, 8:17,
37:25, 39:22, 133:5,
192:9, 192:15
**site** [2] - 11:15, 37:25
**sitting** [1] - 165:25
**situation** [11] - 62:10,
102:3, 137:9,
149:17, 199:6,
207:15, 208:2,
209:6, 212:15,
213:2, 213:7
**situations** [1] - 207:22
**six** [11] - 88:14,
108:22, 109:8,
109:11, 111:6,
111:19, 112:4,
112:12, 112:15,
116:19, 164:22

**sixteen** [3] - 116:10,
116:20, 117:2
**sixty** [6] - 14:10,
44:25, 45:2, 45:22,
45:24, 47:25
**sixty-day** [4] - 44:25,
45:2, 45:22, 47:25
**skills** [1] - 160:17
**skimmed** [2] - 58:19,
62:10
**skimming** [2] - 62:20,
142:22
**skin** [1] - 76:6
**skip** [1] - 61:19
**skipping** [1] - 199:22
**small** [2] - 85:24,
202:15
**snatched** [1] - 96:11
**solely** [1] - 179:25
**solicit** [1] - 102:11
**solution** [1] - 70:20
**someone** [9] - 21:11,
25:10, 37:20, 62:6,
126:10, 131:2,
190:4, 200:13,
203:13
**sometime** [1] - 165:16
**sometimes** [9] - 20:4,
39:22, 43:21, 75:21,
119:14, 121:19,
142:9, 142:10, 168:4
**somewhere** [2] -
63:23, 212:12
**soon** [1] - 169:24
**sorry** [16] - 22:3, 32:6,
48:22, 89:20,
100:10, 128:7,
135:9, 142:23,
154:6, 156:12,
177:5, 202:8, 212:7,
216:24, 218:5,
218:21
**sort** [51] - 17:24,
24:13, 26:8, 38:15,
47:13, 48:11, 54:2,
62:24, 63:3, 63:13,
95:21, 96:7, 96:15,
97:22, 97:24, 115:7,
118:5, 120:11,
121:9, 121:15,
137:3, 144:24,
148:22, 157:22,
160:17, 164:15,
166:2, 167:16,
167:19, 171:22,
177:8, 178:11,
179:4, 180:14,
180:24, 187:3,
188:2, 192:15,
195:11, 198:14,

204:4, 205:13,
205:24, 208:22,
209:13, 210:11,
211:11, 212:13,
212:24, 217:6
**sorts** [1] - 159:11
**sought** [1] - 130:3
**sources** [2] - 162:8,
194:5
**SPD** [7] - 67:5, 91:7,
100:20, 101:9,
111:15, 112:14,
116:20
**SPD's** [1] - 90:17
**speaking** [1] - 5:3
**specific** [5] - 42:4,
93:17, 113:16,
184:24, 196:21
**specifically** [4] -
48:15, 53:8, 75:5,
209:17
**specifics** [1] - 203:3
**speculate** [2] - 135:4,
146:25
**speeding** [1] - 205:6
**spell** [2] - 4:9, 5:9
**spirit** [2] - 50:5,
122:14
**spit** [1] - 96:9
**spitting** [1] - 96:7
**spoken** [1] - 213:4
**spotted** [1] - 77:11
**Springs** [1] - 86:10
**staff** [2] - 129:16,
208:24
**stage** [3] - 94:2,
118:24, 119:18
**stages** [3] - 20:8,
166:3, 169:11
**staggered** [2] - 19:19,
19:24
**stake** [2] - 67:24,
191:4
**standard** [9] - 41:11,
43:18, 113:24,
184:20, 185:3,
185:5, 185:14,
187:14, 208:22
**Standards** [11] -
10:21, 11:2, 14:6,
39:13, 56:8, 56:14,
56:19, 143:15,
166:24, 194:16,
200:15
**Stanic** [1] - 174:2
**start** [7] - 16:19, 17:3,
47:20, 72:2, 81:2,
85:17, 206:20
**started** [20] - 19:22,
20:16, 58:22, 68:24,

21

85:2, 89:10, 93:25,
95:20, 105:12,
118:13, 121:3,
121:5, 134:10,
160:14, 173:24,
192:15, 206:20,
206:21, 207:24,
219:9
**starts** [3] - 55:4,
89:23, 100:6
**State** [5] - 1:20, 4:4,
6:15, 157:21, 224:6
**state** [3] - 4:9, 4:13,
213:14
**statement** [16] - 37:19,
42:21, 55:24, 83:25,
142:19, 143:10,
143:12, 171:7,
171:9, 175:5, 190:2,
190:4, 194:15,
198:4, 204:4, 210:23
**statements** [8] -
15:10, 143:16,
164:6, 171:4,
172:24, 182:4,
191:14, 205:11
**states** [1] - 75:6
**STATES** [1] - 1:1
**stating** [1] - 196:2
**statistical** [1] - 104:20
**statistics** [5] - 108:12,
112:21, 115:3,
123:20, 125:2
**status** [1] - 6:20
**statute** [1] - 210:11
**steer** [1] - 199:15
**step** [2] - 39:15,
114:19
**Stephanie** [6] - 9:13,
35:5, 38:8, 41:24,
168:17, 181:19
**STEPHANIE** [1] - 1:4
**steps** [3] - 36:10, 39:8,
85:12
**stick** [3] - 82:12,
183:17, 183:18
**sticking** [2] - 60:25,
75:15
**sticks** [1] - 96:14
**still** [10] - 20:15, 38:5,
67:19, 85:21,
116:24, 163:10,
174:19, 206:10,
206:12, 214:6
**STIPULATED** [3] - 3:4,
3:10, 3:15
**stop** [18] - 16:17, 69:6,
71:10, 84:4, 85:3,
86:9, 101:25,
103:10, 111:15,

112:14, 127:16,
188:14, 207:25,
209:5, 209:8,
209:23, 210:3
**stopped** [4] - 48:10,
92:20, 95:14, 195:3
**stops** [3] - 71:18,
71:19, 207:14
**story** [2] - 14:22,
172:8
**straight** [1] - 22:25
**Street** [2] - 2:15, 4:16
**street** [4] - 69:17,
77:12, 202:19,
202:20
**strike** [1] - 161:12
**strikes** [6] - 86:3,
86:13, 90:15, 91:9,
93:2, 93:3
**striking** [2] - 77:24,
86:2
**struck** [8] - 36:11,
78:3, 85:22, 85:24,
86:18, 144:18,
145:2, 211:9
**structure** [1] - 18:15
**struggle** [1] - 55:20
**stuck** [3] - 60:11,
62:20, 86:25
**stuff** [6] - 68:3,
156:22, 164:15,
176:21, 193:9, 205:7
**stuffed** [1] - 144:22
**subject** [6] - 8:25,
15:15, 30:9, 161:14,
200:25, 201:10
**submissions** [1] -
194:25
**submit** [2] - 167:22,
184:6
**submitted** [2] -
187:23, 194:12
**submitting** [1] -
194:21
**Subpoena** [1] - 1:18
**subpoena** [10] - 8:8,
16:14, 154:25,
155:4, 155:8,
155:16, 155:24,
180:10, 180:11,
180:12
**subpoenaed** [2] -
16:18, 154:14
**subpoenaing** [1] -
16:20
**Subscribed** [1] -
221:22
**subsequently** [2] -
166:9, 172:17
**substance** [1] -

196:24
**substantial** [15] -
184:23, 185:2,
185:4, 185:8,
185:12, 185:13,
185:18, 185:21,
185:22, 186:3,
186:6, 186:11,
186:17, 187:4, 187:8
**substantiated** [1] -
30:19
**substantive** [1] -
214:7
**successfully** [1] - 18:3
**suggest** [1] - 25:10
**suggesting** [1] -
196:18
**suggestion** [1] -
102:25
**suit** [1] - 195:14
**summary** [4] - 108:12,
114:24, 115:10,
116:7
**summit** [1] - 157:24
**supersede** [1] - 51:13
**supervised** [1] - 30:22
**supply** [2] - 44:14,
46:7
**supposed** [5] - 26:18,
26:22, 26:24, 63:9,
217:10
**surprisingly** [1] - 97:5
**surrounding** [1] -
148:8
**suspect** [1] - 191:2
**suspension** [6] -
34:12, 79:15, 79:16,
99:12, 99:14, 116:12
**sustain** [9] - 8:18,
13:3, 24:3, 42:9,
66:16, 66:18,
116:22, 118:23,
119:5
**sustained** [32] - 24:15,
25:17, 30:19, 42:14,
42:18, 42:24, 48:16,
54:21, 59:12, 79:11,
88:5, 88:8, 99:4,
99:6, 99:8, 106:19,
115:12, 115:15,
115:20, 115:22,
115:24, 115:25,
116:3, 117:15,
119:7, 120:4, 120:5,
124:6, 124:14,
125:12, 125:19,
140:25
**swear** [3] - 174:18,
174:24, 175:7
**swearing** [1] - 174:10

**sworn** [6] - 3:17, 3:20,
4:3, 174:23, 221:22,
224:9
**SYRACUSE** [2] - 1:7
**Syracuse** [41] - 2:5,
2:16, 6:5, 6:25, 7:10,
9:14, 9:15, 21:24,
22:4, 22:10, 23:11,
24:6, 27:17, 34:25,
52:21, 53:15, 57:16,
64:6, 67:11, 70:2,
70:24, 72:15, 90:23,
101:11, 102:14,
128:21, 151:3,
153:8, 161:8, 165:2,
178:2, 196:9,
201:11, 206:4,
207:12, 211:20,
212:2, 213:10,
216:9, 222:10,
222:13
**system** [2] - 9:25, 17:9
**systems** [2] - 209:23,
210:3

---

## T

**T's** [1] - 139:16
**T-R-U-N-F-I-O** [1] -
169:19
**tab** [1] - 138:2
**table** [1] - 190:21
**taint** [1] - 119:6
**talks** [1] - 158:20
**tamp** [1] - 69:15
**tampering** [2] -
111:11, 112:9
**tangential** [1] - 167:20
**taper** [1] - 71:24
**targeted** [1] - 98:2
**tased** [1] - 85:20
**taser** [3] - 86:4, 111:9,
112:5
**tasks** [1] - 7:19
**TBA** [1] - 109:18
**technical** [1] - 18:8
**technically** [1] - 4:17
**technician** [4] - 11:6,
143:20, 162:5,
164:11
**technological** [1] -
17:9
**teenager** [1] - 58:21
**teeth** [1] - 87:3
**ten** [2] - 99:11, 99:13
**ten-day** [1] - 99:11,
99:13
**tenure** [18] - 9:14,
16:13, 18:5, 19:15,

23:17, 27:21, 33:3,
52:3, 64:5, 65:2,
65:4, 117:9, 117:21,
125:8, 131:25,
138:21, 218:10,
218:22
**tenured** [2] - 102:14,
128:21
**term** [5] - 19:20, 20:5,
167:14, 194:23,
209:17
**termination** [4] - 34:6,
34:13, 63:22, 116:13
**terminology** [1] -
102:12
**terms** [29] - 19:19,
19:21, 21:17, 23:3,
45:2, 63:24, 64:2,
64:4, 71:25, 75:15,
77:24, 125:24,
128:5, 130:21,
159:25, 160:16,
160:20, 165:6,
172:24, 176:21,
178:13, 183:13,
187:15, 187:19,
189:3, 192:5,
194:21, 199:6,
208:12
**test** [2] - 174:16,
191:13
**testified** [15] - 4:5,
41:14, 41:20, 41:23,
41:25, 42:3, 173:14,
181:17, 191:12,
206:3, 207:11,
208:9, 211:24,
216:21, 217:6
**testify** [4] - 41:7,
180:4, 180:9, 182:2
**testifying** [2] - 173:20,
188:13
**testimony** [19] - 38:12,
38:13, 55:18,
118:20, 124:10,
125:10, 151:5,
162:13, 169:10,
174:18, 175:8,
176:12, 189:16,
191:20, 199:23,
217:19, 219:20,
224:8, 224:11
**that'd** [1] - 51:23
**THE** [4] - 2:9, 150:17,
219:10, 219:13
**theft** [1] - 112:4
**theft/larceny** [1] -
111:9
**themselves** [3] - 25:9,
142:10, 194:11

**therefore** [1] - 174:9
**thinking** [2] - 43:24, 212:14
**third** [3] - 100:2, 120:2, 167:14
**thirteen** [2] - 112:3, 115:25
**thirty** [10] - 14:8, 14:16, 26:17, 44:24, 47:3, 56:16, 56:23, 88:22, 103:21, 103:24
**thirty-day** [3] - 44:24, 103:21, 103:24
**Thomas** [1] - 150:25
**Thompson** [3] - 57:12, 57:13
**threatening** [1] - 59:3
**three** [36] - 8:15, 8:16, 12:24, 18:23, 19:2, 19:20, 20:4, 20:14, 23:23, 23:25, 24:19, 27:22, 27:23, 38:9, 43:11, 44:10, 72:6, 92:10, 109:3, 111:6, 111:9, 112:7, 112:9, 112:11, 112:15, 114:16, 115:18, 115:19, 116:13, 119:7, 128:24, 129:2, 129:3, 135:19, 136:18, 194:19
**three-year** [1] - 19:20
**threshold** [1] - 187:13
**threw** [4] - 77:17, 198:19, 205:4, 216:6
**throughout** [7] - 19:16, 34:19, 64:5, 105:20, 141:22, 179:5, 218:10
**thrown** [1] - 86:7
**ticket** [1] - 205:6
**timed** [1] - 152:22
**timeframe** [6] - 13:20, 45:22, 47:25, 56:18, 103:24, 217:7
**timeframes** [10] - 13:23, 14:2, 14:11, 26:8, 45:12, 216:22, 217:12, 218:4, 218:7, 219:3
**timeline** [1] - 45:3
**timelines** [2] - 55:21, 218:9
**timely** [1] - 55:17
**timing** [1] - 160:5
**title** [4] - 18:10, 66:21, 66:22, 104:15
**today** [5] - 76:3,

154:13, 156:3, 194:18, 200:24
**today's** [1] - 221:13
**together** [4] - 39:11, 40:7, 145:19, 178:20
**took** [13] - 27:21, 36:9, 38:13, 39:8, 42:17, 77:14, 77:19, 77:20, 86:12, 124:5, 142:20, 194:22, 206:8
**top** [8] - 5:20, 35:4, 49:4, 128:24, 135:19, 136:18, 144:12, 185:23
**topic** [4] - 101:4, 159:17, 214:16, 216:13
**topics** [1] - 158:24
**total** [6] - 105:4, 105:19, 106:25, 108:20, 125:3, 125:5
**touch** [1] - 134:21
**towards** [2] - 27:25, 59:9
**track** [7] - 91:7, 92:24, 93:20, 94:10, 110:14, 113:6, 114:9
**tracking** [2] - 118:14, 160:17
**trade** [1] - 62:8
**traffic** [5] - 71:10, 71:19, 85:3, 111:15, 112:14
**train** [2] - 72:8, 93:2
**training** [68] - 10:5, 34:5, 34:7, 64:4, 64:9, 64:11, 64:13, 64:17, 64:20, 65:10, 65:13, 65:19, 65:23, 69:14, 70:6, 70:9, 71:22, 71:23, 72:5, 90:15, 90:17, 90:24, 91:4, 91:6, 91:7, 91:10, 92:13, 93:5, 93:8, 93:11, 102:4, 124:18, 132:7, 157:3, 157:7, 157:9, 157:10, 157:14, 157:17, 158:9, 158:12, 158:22, 158:23, 159:4, 159:6, 159:9, 159:14, 160:11, 160:13, 160:20, 160:21, 161:10, 176:16, 177:8, 177:9, 177:13, 177:20, 177:23, 178:6, 178:15,

178:18, 178:24, 179:6, 189:2, 205:20, 207:5, 208:4
**trainings** [2] - 157:13, 157:22
**transcript** [6] - 173:23, 174:6, 184:15, 221:13, 224:10, 225:5
**transfer** [1] - 160:17
**transgender** [1] - 22:25
**transparency** [3] - 113:12, 113:13, 113:23
**transported** [2] - 201:16
**trespassing** [1] - 77:11
**trial** [2] - 3:13, 41:3
**trickled** [1] - 207:9
**tricky** [2] - 102:2, 125:14
**tried** [6] - 16:21, 16:24, 67:21, 83:8, 157:25, 206:13
**trooper** [1] - 157:21
**trouble** [1] - 148:15
**true** [2] - 161:21, 224:10
**Trunfio** [4] - 169:17, 169:18, 204:14, 204:25
**Trunfio's** [1] - 205:10
**truth** [1] - 174:14
**truthful** [1] - 42:23
**truthfulness** [4] - 106:16, 109:2, 127:17, 191:4
**try** [15] - 68:2, 68:13, 68:15, 70:19, 102:11, 113:9, 136:7, 136:22, 154:10, 172:13, 181:15, 192:2, 195:12, 209:21, 210:3
**trying** [25] - 31:17, 69:2, 69:3, 74:20, 75:25, 86:21, 102:7, 140:10, 149:10, 155:10, 156:20, 158:5, 159:19, 181:10, 185:16, 198:17, 198:18, 199:22, 203:6, 216:3, 217:5, 218:13, 218:14, 218:19, 220:5
**turn** [4] - 21:5, 56:9,

85:8, 211:3
**turned** [3] - 56:20, 85:18, 148:21
**turning** [2] - 59:7, 166:5
**turnover** [2] - 20:13, 20:17
**twelve** [1] - 106:13
**twenty** [12] - 108:23, 109:11, 111:19, 111:21, 115:12, 115:13, 116:12, 116:21, 117:2, 152:3, 152:6
**twenty-five** [1] - 115:12
**twenty-four** [1] - 111:19
**twenty-one** [7] - 111:19, 115:13, 116:12, 116:21, 117:2, 152:3, 152:6
**twenty-six** [1] - 109:11
**twenty-two** [1] - 108:23
**twice** [1] - 134:12
**two** [47] - 10:14, 14:11, 16:25, 19:21, 20:3, 20:8, 24:18, 41:22, 41:23, 42:2, 42:15, 42:19, 42:24, 43:11, 44:9, 55:4, 99:5, 99:7, 99:13, 106:14, 106:16, 106:17, 108:23, 108:24, 111:10, 112:8, 112:10, 114:25, 115:21, 115:23, 116:2, 131:18, 134:8, 136:2, 139:16, 141:4, 159:19, 160:24, 168:15, 168:16, 178:10, 181:20, 181:22, 183:22, 183:25, 213:16
**type** [3] - 129:25, 138:13, 155:13
**typed** [1] - 143:10
**types** [2] - 106:2, 115:3
**typical** [3] - 15:20, 137:8, 165:6
**typically** [15] - 12:9, 163:17, 166:22, 167:4, 167:8, 171:21, 176:2, 181:3, 187:2, 187:23, 191:18,

191:19, 192:12, 220:13, 220:21

**U**

**U.S.C** [1] - 103:14
**ultimately** [10] - 8:10, 10:16, 19:11, 20:10, 21:14, 42:22, 51:10, 67:25, 68:8, 203:22
**umbrella** [1] - 5:17
**unaware** [1] - 140:24
**unbecoming** [5] - 60:6, 60:19, 60:25, 61:15, 61:18
**unbiased** [1] - 10:3
**unclear** [1] - 202:3
**uncommon** [5] - 37:19, 82:24, 83:5, 200:11, 200:12
**uncooperative** [1] - 180:10
**under** [11] - 5:17, 7:21, 16:13, 65:11, 76:6, 100:18, 103:14, 112:21, 135:14, 173:19, 174:11
**underneath** [2] - 66:21, 90:12
**understood** [4] - 17:17, 46:25, 146:2, 187:16
**unfamiliar** [1] - 102:12
**unfortunately** [4] - 17:6, 55:5, 55:8, 117:20
**union** [6] - 16:16, 17:19, 17:20, 17:24, 22:12, 92:14
**unions** [2] - 198:6, 198:22
**UNITED** [1] - 1:1
**University** [6] - 6:15, 6:17, 6:19, 158:10, 159:7, 160:22
**unlawful** [1] - 124:3
**unless** [6] - 118:8, 165:11, 171:19, 192:17, 201:6, 201:13
**unreliable** [1] - 188:11
**unsure** [1] - 193:3
**untruthfulness** [20] - 27:14, 28:2, 28:6, 28:18, 31:5, 32:17, 35:3, 42:14, 42:19, 42:24, 99:8, 99:14, 111:10, 112:7, 115:24, 116:5,

136:15, 137:6,
137:15, 152:9
**unusual** [2] - 60:14,
89:2
**up** [59] - 19:21, 19:25,
20:9, 20:23, 21:14,
39:20, 55:4, 58:7,
67:25, 68:17, 69:2,
71:12, 78:18, 84:8,
86:5, 88:7, 89:8,
91:25, 92:9, 92:10,
96:19, 98:7, 102:22,
103:11, 105:15,
114:20, 118:12,
119:9, 120:8,
120:16, 126:8,
132:17, 133:7,
134:14, 136:13,
137:24, 140:20,
143:10, 144:14,
144:16, 151:16,
154:16, 155:10,
159:24, 166:4,
170:25, 182:20,
185:21, 187:6,
188:17, 188:23,
192:8, 193:8, 195:7,
200:2, 202:23,
207:9, 207:21,
211:20
**update** [2] - 72:8,
129:18
**updating** [1] - 129:14
**uphold** [2] - 27:6,
28:11
**upper** [1] - 95:21
**useful** [1] - 176:21
**uses** [3] - 184:25,
185:8, 199:3

## V

**vacancy** [1] - 21:4
**vacation** [1] - 211:23
**vaguely** [1] - 54:3
**variety** [1] - 202:25
**various** [6] - 7:16,
34:20, 39:16, 40:16,
46:4, 177:22
**Vegas** [4] - 196:7,
196:12, 196:17,
197:7
**vehicle** [16] - 85:2,
85:8, 85:9, 85:15,
85:19, 85:21, 86:5,
86:10, 95:13, 95:14,
95:16, 95:20, 96:2,
96:12, 148:19
**vehicles** [1] - 148:18

**verbal** [3] - 34:8,
63:22, 204:11
**verbatim** [2] - 173:23,
174:6
**verification** [3] -
215:21, 215:24,
216:6
**verified** [4] - 214:25,
215:2, 215:15,
215:17
**verify** [3] - 214:11,
215:16, 215:18
**versed** [1] - 126:25
**version** [1] - 115:8
**versus** [2] - 34:25,
160:7
**vice** [2] - 19:4, 19:5
**video** [6] - 11:17, 17:7,
37:16, 152:17,
162:21, 179:18
**videos** [5] - 156:19,
162:17, 164:6,
166:8, 166:15
**view** [2] - 101:8,
172:12
**violating** [1] - 28:8,
101:23
**violation** [15] - 24:4,
28:20, 29:8, 32:19,
85:5, 103:10,
106:15, 108:24,
111:14, 112:12,
112:14, 115:4,
203:14, 203:17
**violations** [5] - 27:16,
204:18, 204:19,
204:20, 204:22
**visit** [1] - 11:15
**voluminous** [1] -
74:12
**volunteer** [4] - 18:21,
20:19, 23:13, 201:7
**volunteering** [1] -
178:9
**vote** [3] - 12:5, 145:21,
145:22

## W

**wait** [3] - 64:21, 133:9,
143:24
**waiting** [1] - 5:4
**waived** [1] - 3:8
**walk** [2] - 10:15,
191:21
**walk-in** [1] - 10:15
**walking** [1] - 192:14
**wants** [2] - 68:4, 89:6
**warning** [2] - 34:8,

63:22
**warrant** [2] - 144:10,
145:15
**Washington** [1] - 2:15
**watch** [1] - 197:4
**ways** [4] - 91:14,
20:13, 202:13, 203:2
**website** [2] - 135:8,
135:16
**week** [9] - 44:11,
89:15, 157:13,
157:14, 158:12,
159:13, 159:16,
211:22, 219:2
**week-long** [3] -
157:13, 158:12,
159:13
**weekend** [1] - 4:18
**weeks** [1] - 11:4
**weigh** [1] - 189:21
**weight** [1] - 188:17
**whatsoever** [1] -
139:14
**white** [1] - 22:24
**whole** [8] - 10:6, 10:7,
90:5, 110:21,
149:16, 167:3,
195:11, 208:14
**wide** [1] - 63:18
**wife** [3] - 38:8, 96:22,
162:23
**willing** [1] - 23:11
**window** [1] - 43:4,
85:25, 86:8
**witch** [1] - 16:23
**witness** [2] - 4:2,
12:22, 83:22,
103:12, 130:20,
155:3, 161:20,
164:6, 167:14,
167:20, 167:22,
168:2, 168:13,
169:12, 172:24,
176:22, 180:7,
180:10, 180:13,
180:25, 181:6,
181:9, 183:11,
189:12, 190:13
**Witness** [1] - 1:16
**WITNESS** [4] - 150:17,
219:10, 219:13,
222:4
**witness(es** [1] - 224:7
**witness(es)** [1] -
224:11
**witnesses** [41] - 8:10,
11:14, 11:15, 12:9,
12:18, 12:23, 38:3,
38:9, 39:14, 41:18,
42:3, 161:18,

161:23, 161:25,
164:18, 166:7,
166:14, 166:20,
168:9, 168:19,
173:2, 173:18,
174:12, 174:23,
175:16, 180:3,
180:20, 181:5,
181:15, 181:23,
182:12, 182:15,
183:15, 183:25,
191:22, 193:11,
193:22, 200:2,
200:8, 202:4, 202:10
**Wolfe** [1] - 2:19
**woman** [1] - 96:23
**wondering** [1] -
198:24
**word** [13] - 18:12,
33:13, 70:7, 126:3,
210:8, 216:6,
219:24, 219:25,
220:3, 220:4, 220:9,
220:10, 220:12
**worded** [1] - 70:5
**words** [7] - 59:2, 59:9,
96:11, 126:15,
128:16, 196:23,
221:3
**works** [3] - 51:9, 82:9,
121:14
**worth** [1] - 105:14
**would've** [1] - 189:14
**wrestled** [1] - 63:3
**write** [6] - 8:24, 26:18,
43:22, 142:9,
142:11, 202:23
**writing** [10] - 14:15,
15:15, 47:15, 81:6,
89:4, 91:16, 137:7,
171:24, 204:6,
206:25
**written** [22] - 15:7,
15:9, 15:11, 34:9,
44:2, 50:19, 67:4,
80:4, 80:5, 80:23,
80:24, 82:8, 82:21,
88:13, 88:18, 89:16,
109:21, 116:11,
116:25, 143:17,
146:3, 196:5
**wrote** [1] - 54:2

## Y

**year** [33] - 16:25,
19:20, 20:2, 20:4,
24:18, 47:19, 64:10,
105:7, 105:8, 105:9,
105:11, 105:12,

105:16, 105:21,
106:24, 107:6,
110:8, 110:22,
111:4, 111:16,
111:18, 111:20,
111:22, 115:16,
115:22, 116:19,
116:23, 130:20,
152:24, 158:19,
158:25, 211:20,
219:4
**year's** [1] - 105:14
**years** [22] - 6:9, 16:13,
17:22, 18:5, 19:17,
24:18, 27:23, 28:2,
33:16, 34:18, 41:16,
72:6, 114:8, 114:17,
117:21, 118:4,
123:21, 129:3,
130:15, 159:19,
160:24, 183:22
**YORK** [1] - 1:2
**York** [7] - 1:12, 1:20,
2:5, 2:16, 4:5, 224:6
**young** [13] - 23:2,
38:11, 41:19, 58:24,
58:25, 59:3, 59:5,
59:6, 144:9, 168:12,
168:17, 168:21,
181:21
**yourself** [4] - 98:19,
133:22, 166:10,
182:10
**YouTube** [5] - 163:12,
163:14, 163:18,
163:22, 163:23

## Z

**zero** [9] - 111:7,
111:10, 111:11,
111:13, 111:14,
111:15, 112:9
**zip** [1] - 4:16