*LAW OFFICES OF BONNER & BONNER*
475 GATE FIVE RD., SUITE 212
SAUSALITO, CA 94965

TEL: 415-331-3070
FAX: 415-331-2738

Charles@bonnerlaw.com
cabral@bonnerlaw.com

**September 18, 2018**

*Via CM/ECF*

Hon. David N. Hurd, U.S. District Judge
James T. Foley U.S. Courthouse
445 Broadway, Room 424
Albany, New York 12207-2926

   RE:  **Grant v. City of Syracuse, et al.**
       **Civil Action No.: 5:15-CV-445**

Dear Honorable Judge David N. Hurd,

## I. INTRODUCTION AND BACKGROUND

   This case arises out of an incident that occurred on June 28, 2014, where Plaintiff Alonzo grant was savagely beaten by Defendant Officers Damon Lockett and Paul Montalto.  Mr. Grant had committed no crime, had no weapons, and engaged in no violent conduct.  It was Mr. Grant who called the police for assistance with his adult daughter.

   On June 28, 2014 Plaintiff Alonzo Grant made a 911 call to request the assistance of law enforcement to address his adult daughter who refused to leave his home.  In response to a request from 911 dispatch, Defendant Officers Lockett and Montalto responded to Mr. Grant's request for assistance.  Prior to the beating, Defendant Officers Locket and Montalto only had the information provided by the 911 dispatch.  Neither defendant heard the 911 call, prior to arriving at the Grant's home.  Neither Defendant knew of or had prior experience with Mr. Grant.

   On arriving at the scene, Defendant Officer Lockett entered the Grant's home, without a warrant or invite, and ordered Mr. Grant to go outside to talk with Defendant Officer Montalto. As Mr. Grant descended the stairs leading to the sidewalk in front of his home, for no legal or justifiable reason, Defendant Officer Locket, grabbed Mr. Grant around his waist and with the

assistance of Defendant Officer Montalto, threw Mr. Grant over the railing and proceeded to punch, kick, and choke Mr. Grant.

In this action, Plaintiffs Alonzo and Stephanie Grant bring causes of action under 42 U.S.C. 1983 and other state laws for this heinous violation of Mr. Grant's Fourth Amendment rights.

At issue in this case is weather the Defendant Officers acted reasonably based on the information they had at the time they responded.  This *in limine* motion seeks and order to prevent the defendants from introducing evidence that was not known to the Defendant Officers at the time they arrived on the scene.

**MR. GRANT'S 911 CALL**

During the course of trial, Plaintiffs anticipate that Defendants will attempt to introduce the audio recording or transcript of Mr. Grant's 911 call on June 28, 2014.  In this call, Mr. Grant asks for the cops to come to his home to help him deal with his daughter Alyssa Grant.  During the 911 call, in response to a question by the dispatcher asking what was going on, Mr. Grant states, "my daughter, she acting like a fucking asshole and get the fuck away from my house."

The substance of Mr. Grant's call was relayed by the dispatcher as "M911 OPEN LINE W/ ARGUMENT – MALE REQUESTING OFFICERS BE SENT TO ADDRESS RE: DAUGHTER ALYSSA GRAHAM – COMPL[AINANT] UNCOOPERATIVE – DISC." The only information Defendant Officers Lockett and Montalto had at they arrived at the Grant's home was the information from dispatch.  Neither of the Defendant Officers heard the 911 call prior to arriving on the scene. See Exhibit 1 Locket Depo pg 27-28; Exhibit 2 Montalto Depo pg 28.

**SHOVEL INCIDENT**

During the course of trial, Plaintiffs anticipate that Defendants will attempt to introduce evidence of an incident that occurred sometime prior to the June 28, 2014 beating where Mr. Grant again called 911 for police assistance.  Defendant Sgt. Novitsky alleged during his deposition that during this incident, Mr. Grant was wielding a shovel in his front yard.  The only information provided to Plaintiffs regarding this incident was from Defendant Sgt. Novitsky during his Deposition.  Novitsky stated that during the course of the litigation, in an attempt to find information helpful for his defense and without any direction from his supervisors, Defendant Sgt. Novitsky violated Mr. Grant's privacy and used department computers to

research Mr. Grant's criminal history. See Exhibit 3 Novitsky Depo pg 53-55.  During this investigation he reviewed this prior incident but had no memory of any details.  Defendant Sgt. Novitsky was not present during the alleged incident.

**OPEN CONTAINER TICKET**

Also during his investigation, Defendant Sgt. Novitsky found what he called an "open container arrest" from 1970. See Exhibit 3 Novitsky Depo pg 53. Plaintiffs anticipate that Defendants will attempt to introduce evidence of this open container issue during the course of the trial.

### III.   ANALYSIS

A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*. See *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). Indeed, "[t]he purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted); see also *Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.,* No. 01 Civ, 3796, 2005 U.S. Dist. LEXIS 7902 at *9, 2005 WL 1026515 at *3 (S.D.N.Y. May 2, 2005) (Leisure, J.) ("The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence.").

Rule 402 of the Federal Rules of Evidence provides that "[a]ll relevant evidence is admissible, except as otherwise provided by . . . Act of Congress, [or] by these rules. . . *Evidence which is not relevant is not admissible*." Fed. R. Evid. 402.  (emphasis added)  The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp*., 760 F.2d 1366, 1375 (2. Cir. 1985) (Friendly, J.). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Fed. R. Evid. 401.

Under Rule 403 of the Federal Rules of Evidence, the trial court has "broad discretion to exclude even relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issue or if it would be needlessly cumulative." *United States v. Beech-Nut Nutrition Corp*., 871 F.2d 1181, 1193 (2d Cir. 1989) (citing Fed. R. Evid. 403; United States v.

Carter, 801 F.2d 78, 83 (2d Cir. 1986); *United States v. Martinez*, 775 F 2d 31, 37 (2d Cir. 1985)). Rule 403 also provides for the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Evidence is prejudicial under Rule 403 if it "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2nd. Cir. 1995). The Court will exclude such evidence if it as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, advisory committee's notes.  The "district court regains broad discretion to balance the evidence's potential prejudice . . . against its probative value." *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002).

## 911 Call

In this case, the defendant officers did not hear the 911 call prior to responding to the Grant's home.  Whatever Mr. Grant said or how he said it was not known to the officers and therefore could not have impacted their decisions at the time of the incident.  For this reason, the evidence is not relevant to justifying the Officers' decision to grab Mr. Grant and throw him over the railing and proceed to beat him in the face and body.

Assuming it is relevant, the profanity used by Mr. Grant creates a risk of unfair prejudice. The jury could be swayed by Mr. Grant's language and make a decisions based on this improper basis.  Since the language used was not known to the Officers, a jury making an inference that the Officers conduct was appropriate because Mr. Grant used bad language would be improper. Additionally, a juror's personal dislike of profanity could cause them to make a decision against Mr. Grant for words the Defendant Officers did not hear.

For these reasons, Plaintiffs respectfully request an order preventing the Defendants from playing the audio of the 911 call or introducing into evidence a transcript of the 911 call.

## Shovel Incident and Open Container Ticket

Neither the shovel incident nor the Open Container ticket were known the officers at the time they responded to the Grant's home and therefore the facts of these incidents could not have informed or motivated the Defendant Officers conduct.  There conduct cannot be justified by any prior history of interactions with Mr. Grant, because neither of the officers knew Mr. Grant prior

to the incident where they savagely beat him.   See Exhibit 1 Locket Depo pg 76; Exhibit 2 Montalto Depo pg 35-36.

Further, Fed.R.Evid. 404(b) provides the following: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   Accordingly, evidence of prior acts may not be received unless it is relevant to an actual issue in the case and unless its probative value on that issue is not outweighed by its unfair prejudice to the defendant. *United States v. Manafzadeh*, 592 F.2d 81, 86 (2d Cir. 1979).   Since neither of the Defendant Officers knew about the prior incidents, the facts related to those incidents could only be used to argue character.   This is improper and the evidence of these prior to incidents is inadmissible for this purpose.   Further, since Defendant Sgt Novitsky was not present for either incident, any testimony related to the incidents would be hearsay.

Based on the foregoing, Plaintiffs respectfully request an order preventing the Defendants from providing testimony or evidence related to the shovel incident and the open container ticket.

## IV. CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion barring Defendants from putting on evidence or testimony regarding 1) the transcript or recording of Mr. Grant's 911 call; 2) the shovel incident; and 3) the open container ticket.


Very truly yours,

/s/ *Charles A. Bonner*
Charles A. Bonner



# EXHIBIT 1

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------x
ALONZO GRANT and STEPHANIE GRANT,

                           Plaintiffs,

vs.                  Civil Action No. 5:15-CV-445

CITY OF SYRACUSE, SYRACUSE POLICE DEPARTMENT,
POLICE OFFICERS DAMON LOCKETT and PAUL MONTALTO,
POLICE OFFICER BRIAN NOVITSKY, CHIEF OF
POLICE FRANK FOWLER and Does 1-100,

                           Defendants.

----------------------------------------------x

      Videotaped Deposition of DAMON R. LOCKETT, held on

January 12, 2016, at the Offices of Precision Reporters,

P.C., One Lincoln Center, Suite 310, Syracuse, New York,

before Amanda L. Theleman, Registered Professional Reporter,

Certified Realtime Reporter, and Notary Public in and for the

State of New York.

A P P E A R A N C E S

For Plaintiffs:    THE LAW OFFICES OF BONNER & BONNER
Attorneys at Law
475 Gate Dive Road
#212
Sausalito, California  94965
  BY:  CHARLES A. BONNER, ESQ.
      CABRAL BONNER, ESQ.

RYDER LAW FIRM
Attorney at Law
121 East Water Street
Syracuse, New York  13202
  BY:  JESSE RYDER, ESQ.

For Defendants:    CORPORATION COUNSEL
Attorneys at Law
Department of Law
233 East Washington Street
Syracuse, New York  13202
  BY:  AIMEE M. PAQUETTE, ESQ.

Also Present:    Alonzo Grant
Stephanie Grant
Ilse Wolf

Litigraphics, LLC
26 Sunset Terrace
Baldwinsville, New York 13027
  By:  Mark Whalen, Videographer

LOCKETT - CHARLES BONNER

1    sorry.   I didn't mean to cut you off, but 1930 is 7:30.

2           Q    And that's military time; isn't it?

3           A    Yes.

4           Q    You're in the military; right?

5           A    Yep.

6           Q    So you're accustom to military time?

7           A    Yes.

8           Q    Okay.   So 1931 is 7:31; true?

9           A    Yes.

10           Q    Okay.   Now, how was your attention directed to

11    this particular incident?

12           A    I was dispatched.

13           Q    Okay.   By whom?

14           A    911 Center.

15           Q    And what -- what did the -- how does that

16    happen?   Give us -- tell the jury how you got dispatched.

17    Was there -- did a call come over the radio to go to this

18    address?

19           A    Yes, sir.

20           Q    And what did to your best recollection the

21    call said?

22           A    Sir, I don't -- I'm not really understanding

23    what you're trying to get to.

24           Q    Fair enough.   When you received a call, you

25    received it from your -- your police officer dispatcher?

LOCKETT - CHARLES BONNER

1          A    Yes, sir, 911 Center.

2          Q    Okay.  And that was a man or woman to say go

3   to 105 Hudson?

4          A    Yes, sir, in -- in -- in reference to a

5   domestic complaint.

6          Q    Okay.  Did they tell you that Mr. Grant had

7   called to have the police come and remove his then adult

8   pregnant daughter from his front yard?

9          A    I don't know.  I would have to look at the --

10  I would have to look at the call notes to be able to tell you

11  exactly what my 911 dispatcher told me.

12         Q    Do you -- have you seen the call notes?

13         A    Not since that day.

14         Q    Okay.  Did you make any reference in any of

15  your written reports regarding what the call notes said?

16         A    No, sir.

17         Q    Okay.  Well, what is your best recollection?

18  You went there.  Were you aware that you were going to remove

19  Mr. Grant's adult daughter who was at that time pregnant from

20  his front yard as he had requested?

21         A    Your question was was I aware that I was going

22  to remove her --

23         Q    Yes.

24         A    -- or that he -- that he asked that police --

25  that she be removed?

LOCKETT - CHARLES BONNER

1   police department?

2           A    Just because someone tells me that they don't

3   need me does not necessarily mean that a situation is not

4   occurring.  Unfortunately people lie to us every day.  I'm

5   not sitting here saying that Mr. Grant is a liar.  I'm not

6   calling him a liar.  However, people do lie to me every day,

7   and just because he said that one instance is gone unlike --

8   just because he said that she left does not -- that is not

9   the final determination in whether or not I can finish or

10  I've concluded conducting my -- conducting a preliminary

11  investigation.

12          Q    In your police car, you had a computer; true?

13          A    Yes, sir.

14          Q    Did you run a criminal background on Mr. Grant

15  before you got to his 105 Hudson Street address?

16          A    No, sir.

17          Q    Did you -- did anyone tell you that he's never

18  been arrested in his life with handcuffs for any crime in his

19  then 53 years of life?

20              MS. PAQUETTE:  Objection to relevance.

21              Go ahead.

22          A    The day in question was the first time I ever

23  met Mr. Hudson.

24          Q    Mr. Grant?

25          A    I'm sorry.  Mr. Grant.

LOCKETT - CHARLES BONNER

1      Q    I understand that.  My question is part of
2  your investigation when you're trying to find out -- to make
3  a determination if domestic violence is occurring as you must
4  do according to your policy --
5      A    Okay.
6      Q    -- I'm trying to understand what you do with
7  your computer.  Did you try to understand who Mr. Grant was
8  before you went inside of his house?
9      A    You completely confused me.  Can you please --
10     Q    Certainly.
11     A    Yeah.  Break -- can you break that question
12  down --
13     Q    Certainly.
14     A    -- a little bit?
15     Q    I think you've answered.  You did not look on
16  your computer to determine whether Mr. Grant had committed
17  any prior crimes before you entered his house; is that true?
18     A    There was no need to, sir.
19     Q    That's not my question.
20     A    Okay.  Yes.
21     Q    Did you do that?
22     A    No, no, no.
23     Q    Okay.  That's all I want you to do.  If you --
24  we'll get through this much faster if you just answer my
25  question, and typically my question will be very short.  It



COPY

# EXHIBIT 2

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------x
ALONZO GRANT and STEPHANIE GRANT,

                              Plaintiffs,

vs.                    Civil Action No. 5:15-CV-445

CITY OF SYRACUSE, SYRACUSE POLICE DEPARTMENT,
POLICE OFFICERS DAMON LOCKETT and PAUL MONTALTO,
POLICE OFFICER BRIAN NOVITSKY, CHIEF OF
POLICE FRANK FOWLER and Does 1-100,

                              Defendants.

--------------------------------------------x

        Videotaped Deposition of PAUL MONTALTO, held on

January 13, 2016, at the Offices of Precision Reporters,

P.C., One Lincoln Center, Suite 310, Syracuse, New York,

before Amanda L. Theleman, Registered Professional Reporter,

Certified Realtime Reporter, and Notary Public in and for the

State of New York.

A P P E A R A N C E S

For Plaintiffs:     THE LAW OFFICES OF BONNER & BONNER
Attorneys at Law
475 Gate Dive Road
#212
Sausalito, California  94965
   BY:   CHARLES A. BONNER, ESQ.
        CABRAL BONNER, ESQ.

RYDER LAW FIRM
Attorney at Law
121 East Water Street
Syracuse, New York  13202
   BY:  JESSE RYDER, ESQ.

For Defendants:    CORPORATION COUNSEL
Attorneys at Law
Department of Law
233 East Washington Street
Syracuse, New York  13202
   BY:  AIMEE M. PAQUETTE, ESQ.

Also Present:      Alonzo Grant
Stephanie Grant
Ilse Wolf

Litigraphics, LLC
26 Sunset Terrace
Baldwinsville, New York 13027
   By:  Mark Whalen, Videographer

28

MONTALTO - CABRAL BONNER

1     out.  It said something to the fact he was having an argument

2     with his daughter and that he was -- and it said complainant

3     uncooperative which we get a lot.  It means he's not giving

4     the dispatcher all the information that they want.

5              Q     Did you ever hear the 911 call itself?

6              A     Yes.

7              Q     Prior to arriving at the scene, did you hear

8     the 911 call?

9              A     No, after the fact.

10             Q     And you understood when you got there that it

11    was a call where Mr. Grant was complaining about his

12    daughter?

13             A     Yes.

14             Q     Okay.  And when -- and there was no

15    information that you were provided about any type of actual

16    physical confrontation going on?

17             A     It was very limited.  That's all I had.

18             Q     And there was no discussion in what you had

19    about any kind of weapons?

20             A     I told you everything that I had.

21             Q     Well, it's true then there was no discussion

22    of weapons in the call -- in the information you received?

23             A     Right.

24             Q     No information about physical violence; true?

25             A     Not that -- no.

MONTALTO - CABRAL BONNER

1    affluent area of the city.

2            Q    Are you aware of the concept of community

3    policing?

4            A    Yes.

5            Q    What is that?

6            A    I think it's, like, when the police try to

7    make good ties with the community to -- so then the community

8    can in turn help the -- help the officers better patrol the

9    area because, you know, they -- we can't be everywhere.  We

10   need citizens to help us, to call us.  Without that, I mean,

11   it's extremely hard for us.

12           Q    Are you aware of any -- have you received any

13   trainings on community policing?

14           A    Not particularly.  We have a section that's

15   in -- completely of its own that deals with that aspect.

16           Q    Have you ever heard Chief Fowler stress this

17   concept of community policing?

18           A    I don't know directly if I have, no.

19           Q    Prior to this incident where you struck

20   Mr. Alonzo Grant several times in the face did you know him?

21                        MS. PAQUETTE:  Objection.

22                        Go ahead.

23           A    No.

24           Q    Had you ever talked to him before?

25           A    No.

MONTALTO - CABRAL BONNER

1        Q    Had you ever responded to a call involving

2   Mr. Alonzo Grant?

3        A    No.

4        Q    Were you aware that on this Hudson -- it

5   sounds like you understand that -- that there is potentially

6   drug dealing going on in this neighborhood?

7        A    Yes.

8        Q    Were you aware of a specific house on Hudson

9   where there was crack dealing going on?

10             MS. PAQUETTE:  Objection to the

11        relevance.

12             Go ahead.

13        A    I don't know specifically.  There was a house

14   a couple houses down from his house on the same side that

15   used to be a big problem that -- like, I think there was an

16   older male that lived there, and he would let a lot of the

17   younger, you know, gang-type individuals hang out at his

18   house, but I think it's subsequently been, like, boarded up

19   and shut down.

20        Q    At any time did you become aware of the steps

21   that Mr. and Mrs. Grant took to alert police of what was

22   going on at that house that resulted in the house being shut

23   down?

24             MS. PAQUETTE:  Objection.

25        A    Like I said, I have no idea.  A lot of times

EXHIBIT 3

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
ALONZO GRANT and STEPHANIE GRANT,

                        Plaintiffs,

vs.                    Civil Action No. 5:15-CV-445

CITY OF SYRACUSE, SYRACUSE POLICE DEPARTMENT,
POLICE OFFICERS DAMON LOCKETT and PAUL MONTALTO,
POLICE OFFICER BRIAN NOVITSKY, CHIEF OF
POLICE FRANK FOWLER and Does 1-100,

                        Defendants.

-------------------------------------------x

        Videotaped Deposition of BRIAN NOVITSKY, held on

January 14, 2016, at the Offices of Precision Reporters,

P.C., One Lincoln Center, Suite 310, Syracuse, New York,

before Amanda L. Theleman, Registered Professional Reporter,

Certified Realtime Reporter, and Notary Public in and for the

State of New York.

```
              A P P E A R A N C E S

For Plaintiffs:     THE LAW OFFICES OF BONNER & BONNER
                    Attorneys at Law
                    475 Gate Dive Road
                    #212
                    Sausalito, California  94965
                      BY:  CHARLES A. BONNER, ESQ.
                           CABRAL BONNER, ESQ.

                    RYDER LAW FIRM
                    Attorney at Law
                    121 East Water Street
                    Syracuse, New York  13202
                      BY:  JESSE RYDER, ESQ.

For Defendants:     CORPORATION COUNSEL
                    Attorneys at Law
                    Department of Law
                    233 East Washington Street
                    Syracuse, New York  13202
                      BY:  AIMEE M. PAQUETTE, ESQ.


Also Present:       Alonzo Grant
                    Stephanie Grant
                    Ilse Wolf

                    Litigraphics, LLC
                    26 Sunset Terrace
                    Baldwinsville, New York 13027
                      By:  Mark Whalen, Videographer
```

NOVITSKY - CABRAL BONNER

Page 52

1          Q    So in Syracuse, you've never experienced

2   people not wanting to speak with you for concern that -- that

3   they would be deemed -- they would be viewed as a snitch?

4          A    In Syracu -- okay.  No, I have not

5   experienced -- I've always been able to speak with people.

6          Q    Okay.

7          A    And -- and -- and, you know, people don't want

8   to talk to me just 'cause they don't want to talk to me, but

9   no one ever came up to me and outright said "I'm not talking

10  to you because I don't want to be" --

11                   THE REPORTER:  Can you just say that

12              again?  "No one ever ..."

13         A    No one -- people talk to me 'cause they want

14  to talk to me.  They've never outright said to me "I'm not

15  talking taking to you because I don't want to be labeled a

16  snitch."

17         Q    Okay.  Since the incident, have you had any

18  communication with anyone other than your attorney regarding

19  Mr. Grant?

20         A    No.

21         Q    Have you done any research on Mr. Grant?

22         A    No.

23         Q    Have you looked up any arrest history or

24  anything like that?

25         A    Yes, I did.

Electronically signed by Amanda Theleman (601-311-957-1089)                          1b4e0ade-6497-4efc-8fe4-38300463e8bd

NOVITSKY - CABRAL BONNER

Page 53

1    Q    Okay.  And --

2    A    Yes.

3    Q    -- what did you do?

4    A    After -- in preparation for the civil -- civil

5  lawsuit, I -- I just checked our reports.  I checked our

6  records, and that's it.

7    Q    What did you find?

8    A    I found an open container arrest from 1970

9  something, and I also found a police report that Mr. Grant

10  had called the police a few -- a few years or -- I don't know

11  the exact date, before 2014.

12    Q    And why did he call the police at that time?

13    A    The -- there was again a dispute with the

14  daughters -- one of the daughters, I don't know which, a

15  dispute with them and the -- and -- and one of the

16  boyfriends, ex-boyfriends, or something along those lines,

17  and the report was that the boy had put a gun in the trunk of

18  his vehicle.  Officers responded.  They actually quickly

19  located the vehicle and -- and were able to search it but

20  didn't find the -- didn't find a weapon.  But then when they

21  responded to the Grants' house, according to the report, they

22  were met by Mr. Grant wielding a shovel in the front yard.

23    Q    And he was wielding it at the cops?

24    A    I don't know.  He had -- I haven't -- I read

25  the report once, and I haven't read it since.

Electronically signed by Amanda Theleman (601-311-957-1089)                                        1b4e0ade-6497-4efc-8fe4-38300463e8bd

NOVITSKY - CABRAL BONNER

Page 54

1          Q     And why were you looking for the reports in

2     preparation for the civil -- of the civil action?

3               A     Knowledge base.

4          Q     You wanted to understand what Mr. Grant had

5     done in the past to help defend this case?

6          A     Just knowledge base, to understand -- just

7     understand the totality of the circumstances, just understand

8     everything.

9          Q     Okay.  After you reviewed those reports, did

10    you print them up?

11              A     I think I printed one.

12         Q     Okay.  And is it common practice for police

13    sergeants to be able to go into the police records and print

14    up reports for their own personal use?

15              A     It's departmental use.  It's not my personal

16    use.

17         Q     Now, departmental use, did someone -- well, I

18    don't want to ask about anything that you did with your

19    attorney, so if your attorney asked you to do this, we don't

20    have to talk about it.  But did someone ask you to review the

21    records and print up anything you found about

22    Officer Grant -- Mr. Grant?  Excuse me.

23              A     No.

24         Q     You did that on your own?

25              A     Yes.

PRECISION REPORTERS, P.C.
(315) 422-4280

Electronically signed by Amanda Theleman (601-311-957-1089)                    1b4e0ade-6497-4efc-8fe4-38300463e8bd

NOVITSKY - CABRAL BONNER

Page 55

1      Q     And you did that on your own in relation to a

2  lawsuit that you were personally named in; true?

3      A     Yes.

4      Q     Okay.  So the reason you were looking for this

5  information was for your own personal -- to defend your --

6  your -- a lawsuit brought against you personally; true?

7                 MS. PAQUETTE:  Objection to "defend."

8                 Go ahead.

9      A     Yeah, it's to build a knowledge base in -- in

10  this lawsuit.

11      Q     To defend a lawsuit brought against you

12  personally; true?

13                 MS. PAQUETTE:  Objection.

14                 Go ahead.

15      A     It's -- yeah, the lawsuit's against the City

16  of Syracuse.

17      Q     You didn't have any knowledge about Mr. Grant

18  when you responded to his house; true?

19      A     No.

20      Q     Okay.  So anything you learned after the fact

21  would be to try to create a character case against Mr. Grant;

22  true?

23                 MS. PAQUETTE:  Objection.

24                 Answer that if you can.

25      A     No.

PRECISION REPORTERS, P.C.
(315) 422-4280

Electronically signed by Amanda Theleman (601-311-957-1089)                    1b4e0ade-6497-4efc-8fe4-38300463e8bd

## CERTIFICATE  OF SERVICE

I, the undersigned, hereby certify that I am over the age of eighteen years, employed in Marin County California.  The business address is 475 Gate Five Road, Suite 212, Sausalito, California 94965.

**DOCUMENT(S) :**     **PLAINTIFFS' MOTIONS IN LIMINE**

I caused to be served a true copy of the above-named document(s) per the addressee(s) listed below or per the attached list.

### (X) BY ELECTRONIC SERVICE

**KRISTEN SMITH, ESQ.**
**H. J. HUBERT, ESQ.**
**CITY OF SYRACUSE**
**300 CITY HALL**
**SYRACUSE, NY 13202**

**PAUL J. TUCK, ESQ.**
**HANCOCK ESTABROOK LLP**
**100 MADISON STREET, SUITE 1500**
**SYRACUSE, NY 13202**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Served and executed this  18th  day of  September , 2018.


*/s/Charles A. Bonner*
Charles A. Bonner

6