## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ALONZO GRANT and STEPHANIE GRANT,

Plaintiffs,

vs.

CITY OF SYRACUSE; POLICE OFFICERS DAMON
LOCKETT and PAUL MONTALTO, POLICE OFFICER
BRIAN NOVITSKY, CHIEF OF POLICE FRANK
FOWLER,

Defendants.

Civil Action No.:
5:15-CV-445 (DNH/TWD)

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR POST-TRIAL MOTIONS
## PURSUANT TO FED. R. CIV. P. 50(B) AND 59

OFFICE OF CORPORATION COUNSEL
CITY OF SYRACUSE
Todd M. Long, Esq.
Assistant Corporation Counsel,
City of Syracuse
233 E. Washington Street, Suite 300
Syracuse, New York 13202
Tel. (315) 448-8400

HANCOCK ESTABROOK LLP
John G. Powers, Esq. (508934)
1500 AXA Tower I
100 Madison St.
Syracuse, NY 13202
(315) 565-4500

COUNSEL FOR DEFENDANTS

{H3480948.2}

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 1

ARGUMENT ....................................................................................................... 6

I.    THE COURT SHOULD REDUCE THE VERDICT VIA RULE 59
REMITTITUR. ............................................................................................ 6

    A.    The loss of consortium award was excessive and should be reduced.................... 7

    B.    Mr. Grant's damages award was excessive and should be reduced. .................. 12

II.    THE COURT SHOULD OTHERWISE ORDER A NEW TRIAL UNDER RULE
59.......................................................................................................... 25

    A.    The admission of the Citizen Review Board findings *relevant to this incident* was
a substantial error that prejudiced the jury and warrants a new trial. .................. 25

    B.    The Court's jury instruction on handcuffing warrants a new trial. ...................... 34

    C.    The Court erred refusing to submit qualified immunity *via* special interrogatories.
.......................................................................................................... 38

III.    THE COURT SHOULD GRANT DEFENDANTS' JUDGMENT AS A
MATTER OF LAW UNDER RULE 50........................................................... 44

    A.    A reasonable jury could not have found in favor of Plaintiffs on Mr. Grant's false
arrest claim under § 1983 and false imprisonment claim under New York law
because there was probable cause to arrest Mr. Grant........................................ 44

CONCLUSION.................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aranda v City of McMinnville*,
942 F. Supp. 2d 1096 (D. Or. 2013) ................................................................32, 33

*Armstrong ex rel. Armstrong v. Brookdale University Hospital & Medical Center*,
425 F.3d 126 (2d Cir. 2005)..........................................................................25

*Atkins v. New York City*,
143 F.3d 100 (2d Cir. 1998).........................................................................13

*Bender v. City of New York*,
78 F.3d 787 (2d Cir. 1996)...................................................................22, 23, 24

*Biswas v. City of New York*,
973 F. Supp. 2d 504 (S.D.N.Y. 2013) ................................................................37

*Bonanno v. Port Auth. of N.Y. & N.J.*,
14 A.D.3d 377 (1st Dep't 2005) .......................................................................7

*Bradley v. Jusino*,
No. 04 Civ. 8411, 2008 WL 417753 (S.D.N.Y. Feb. 14, 2008) ................................43, 44

*Callahan v. Wilson*,
863 F.3d 144 (2d Cir. 2017)..........................................................................38

*Canjura v. Laschet*,
No. 12 Civ. 1524 (JCM), 2016 WL 2755920 (S.D.N.Y. May 10, 2016) ..............45, 46, 48, 49

*Capobianco v, City of New York*,
422 F.3d 47 (2d Cir. 2005)..........................................................................31

*Crenshaw v. City of Mount Vernon*,
372 F. App'x 202 (2d Cir. 2010) .....................................................................40

*Cuevas v. St. Luke's Roosevelt Hospital Center*,
95 A.D.3d 580 (1st Dep't 2012) ......................................................................11

*D.C. v. Wesby*,
138 S. Ct. 577 (2018)...........................................................................39, 40

*Dancy v. McGinley*,
843 F.3d 93 (2d Cir. 2016)......................................................................22, 24

*Dancy v. McGinley*,
   No. 11CV7952 (LMS), 2015 WL 13214324 (S.D.N.Y. May 11, 2015), *aff'd*,
   843 F.3d 93 (2d Cir. 2016) ........................................................................................20

*DeLeonibus v. Scognamillo*,
   238 A.D.2d 301 (2d Dep't 1997) ............................................................................10

*DeSena v. Pavel*,
   289 F. App'x 426 (2d Cir. 2008) ............................................................................10

*DiSorbo v. Hoy*,
   343 F.3d 172 (2d Cir. 2003) ..............................................................................21, 24

*DLC Mgmt. Corp. v. Town of Hyde Park*,
   163 F.3d 124 (2d Cir. 1998) ....................................................................................25

*Doran v. Colvin*,
   No. 6:14-CV-01669-JE, 2016 WL 4942001 (D. Or. Sept. 15, 2016) ......................16

*Fields v. City University of New York*,
   216 A.D.2d 87 (1st Dep't 1995) ..............................................................................10

*Figueroa v. Mazza*,
   825 F.3d 89 (2d Cir. 2016) ................................................................................40, 45

*Fly v. Astrue*,
   No. 4:09CV3194, 2011 WL 3861343 (D. Neb. Aug. 31, 2011) ..............................16

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
   136 F.3d 276 (2d Cir. 1998) ....................................................................................44

*Garcia v. Spira*,
   273 A.D.2d 57 (1st Dep't 2000) ..............................................................................10

*Gardner v. Federated Department Stores, Inc.*,
   907 F.2d 1348 (2d Cir. 1990) ............................................................................22, 24

*Garenani v. County of Clinton*,
   552 F. Supp. 2d 328 (N.D.N.Y. 2008) ....................................................................44

*Gasperini v. Ctr. for Humanities, Inc.*,
   518 U.S. 415 (1996) ..............................................................................................6, 7

*Gissinger v. Yung*,
   Nos. 04–CV–0534 (BMC)(JO), 04–CV–5406 (BMC)(JO), 2007 WL 2228153
   (E.D.N.Y. July 31, 2007) ........................................................................................18

*Graham v. Connor*,
  490 U.S. 386 (1989)........................................................................................29

*Griffin v. City of New York*,
  287 F. Supp. 2d 392 (S.D.N.Y. 2003)...........................................................31

*Gutierrez v. City of New York*,
  288 A.D.2d 86 (1st Dep't 2001) ...................................................................11

*Guzman v. Jay*,
  303 F.R.D. 186 (S.D.N.Y. 2014) ..................................................................28

*Hernandez v. N.Y.C. Transit Auth.*,
  52 A.D.3d 367 (1st Dep't 2008) .....................................................................7

*Hester v. BIC Corp.*,
  225 F.3d 178 (2d Cir. 2000)....................................................................27, 34

*Hiraldo v. Khan*,
  267 A.D.2d 205 (2d Dep't 1999) ..................................................................10

*Hutchinson v. Groskin*,
  927 F.2d 722 (2d Cir. 1991)..........................................................................19

*Jaegly v. Couch*,
  439 F.3d 149 (2d Cir. 2006).......................................................39, 45, 48, 50

*Jenkins v. City of New York*,
  478 F.3d 76 (2d Cir. 2007)......................................................................38, 44

*Karney by Karney v. Arnot-Ogden Mem'l Hosp.*,
  251 A.D.2d 780 (3d Dep't 1988) ................................................................7, 9

*Kelly v. Las Vegas Metro. Police Dep't*,
  No. 2:12–cv–02074–LRH–CWH, 2014 WL 3725927 (D. Nev. Jul. 25, 2014) ....................33

*Keo v. Comm'r of Soc. Sec.*,
  No. CIV S-09-2019-CMK, 2010 WL 4905283 (E.D. Cal. Nov. 24, 2010)............................15

*Kerman v. City of New York*,
  374 F.3d 93 (2d Cir. 2004)............................................................................39

*Kirsch v. Fleet St., Ltd.*,
  148 F.3d 149 (2d Cir. 1998)............................................................................6

*Lewis v. City of Albany Police Department*,
  547 F. Supp. 2d 191 (N.D.N.Y. 2008)......................................................23, 24

*Linde v. Arab Bank, PLC,*
No. 04 Civ. 2799 (BMC) (VVP), 2014 WL 12558572 (E.D.N.Y. Aug. 1,
2014) ................................................................................................................................18

*LNC Invs., Inc. v. First Fid. Bank,*
173 F.3d 454 (2d Cir. 1999)..........................................................................................18, 34

*Maddox v. City of Los Angeles.,*
792 F.2d 1408 (9th Cir. 1986) ............................................................................................32

*Manley v. AmBase Corp.,*
337 F.3d 237 (2d Cir. 2003)................................................................................................25

*Manning v. Comm'r of Soc. Sec.,*
No. 2:16-CV-1458-DMC, 2018 WL 5800789 (E.D. Cal. Nov. 2, 2018) ..............................16

*Martinez v. Port Auth. of N.Y. & N.J.,*
No. 01 CIV. 721 (PKC), 2005 WL 2143333 (S.D.N.Y. Sept. 2, 2005), *aff'd,*
445 F.3d 158 (2d Cir. 2006)..........................................................................................21, 22, 24

*Martinez v. Port Authority of New York & New Jersey,*
445 F.3d 158 (2d Cir. 2006)..........................................................................................21, 24

*Mendoza v. City of Rome,*
872 F. Supp. 1110 (N.D.N.Y. 1994) (Hurd, J.) ..................................................................23

*Merancy v. Astrue,*
No. 3:10CV1982(MRK)(WIG), 2012 WL 3727262 (D. Conn. May 3, 2012)......................15

*Morales v. City of New York,*
No. 99 CIV. 10004 (DLC), 2001 WL 8594 (S.D.N.Y. Jan. 2, 2001) ..............................27, 28

*Nimely v. City of New York,*
414 F.3d 381 (2d Cir. 2005)..........................................................................................30, 31

*Okraynets v. Metro. Transp. Auth.,*
555 F. Supp. 2d 420 (S.D.N.Y. 2008)..................................................................................9

*Palmer v. Nassan,*
No. 10cv0922, 2011 WL 578764 (W.D. Pa. Feb. 9, 2011), *aff'd,* 454 F. App'x
123 (3d Cir. 2011)................................................................................................................28

*Pappas v. Middle Earth Condominium Ass'n,*
963 F.2d 534 (2d Cir. 1992)................................................................................................25

*Patrolmen's Benevolent Ass'n v. City of New York,*
310 F.3d 43 (2d Cir. 2002)..................................................................................................13

*Patton v. City of New York*,
  No. 00 CIV. 8875(AJP), 2002 WL 1428855 (S.D.N.Y. June 27, 2002) ................................28

*Plagianos v. Am. Airlines, Inc.*,
  912 F.2d 57 (2d Cir. 1990)...........................................................................................34, 38

*Poulos v. City of New York*,
  No. 14-CV-03023 (LTS) (BCM), 2018 WL 3750508 (S.D.N.Y. July 13, 2018)...................20

*Provost v. City of Newburgh*,
  262 F.3d 146 (2d Cir. 2001).....................................................................................................49

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012)......................................................................................................25

*Rivera v. City of New York*,
  40 A.D.3d 334 (1st Dep't 2007) ..............................................................................................12

*Rivera v. Metro. Tr. Auth.*,
  750 F. Supp. 2d 456 (S.D.N.Y. 2010)......................................................................................31

*Rosales v. Kelly*,
  No. 07 CIV. 10554 LAP, 2011 WL 5873374 (S.D.N.Y. Nov. 14, 2011)................................19

*Russell v. Journal News*,
  No. 12-CV-8013 (CS), 2015 WL 13203928 (S.D.N.Y. Dec. 10, 2015)............................41, 42

*Sanders v. New York City Human Resources Administration*,
  361 F.3d 749 (2d Cir. 2004)......................................................................................................25

*Stampf v. Long Island R. Co.*,
  761 F.3d 192 (2d Cir. 2014)..........................................................................................6, 13, 25

*Stephenson v. Doe*,
  332 F.3d 68 (2d Cir. 2003)..........................................................................................38, 42, 43

*United States v. Bailey*,
  743 F.3d 322 (2d Cir. 2014)................................................................................................34, 36

*United States v. Cruz*,
  894 F.2d 41 (2d Cir. 1990)........................................................................................................31

*United States v. Fiseku*,
  906 F.2d 65 (2d Cir. 2018)................................................................................................35, 36

*United States v. MacDonald*,
  916 F.2d 766 (2d Cir. 1990)......................................................................................................47

*United States v. Nelson,*
  No. 10 Cr. 414 (PKC), 2011 U.S. Dist. LEXIS 60873 (S.D.N.Y. June 2, 2011) ...................28

*United States v. Scop,*
  846 F.2d 135 (2d Cir. 1988)............................................................................31

*United States v. Smith,*
  No. 06 Cr. 203(RJH), 2007 WL 188734 (S.D.N.Y. Jan. 24, 2007)..........................................28

*United States v. Zabare,*
  871 F.2d 282 (2d Cir. 1989)..........................................................................47

*Uzoukwu v. City of New York,*
  805 F.3d 409 (2d Cir. 2015)..........................................................................38

*Walls v. Astrue,*
  No. 4:09CV00734 JTR, 2011 WL 1193498 (E.D. Ark. Mar. 29, 2011) ...............................15

*Walsh v. State,*
  232 A.D.2d 939 (3d Dep't 1996) ...................................................................11

*Watts v. N.Y.C. Police Dep't,*
  100 F. Supp. 3d 314 (S.D.N.Y. 2015)..................................................................31

*Wild v. Catholic Health System,*
  85 A.D.3d 1715 (4th Dep't 2011), *aff'd*, 21 N.Y.3d 951 (2013)..............................................9

*Zavurov v. City of New York,*
  241 A.D.2d 491 (2d Dep't 1997) ....................................................................9

*Zellner v. Summerlin,*
  494 F.3d 344 (2d Cir. 2007)..........................................................................39

**Statutes**

42 U.S.C. § 1983...........................................................................................1, 44

N.Y. C.P.L.R. § 5501(c) ...............................................................................7

N.Y. Crim. Procedure Law § 530.11 ........................................................3, 47, 49

N.Y. Penal Law § 205.30................................................................................4, 49, 50

N.Y. Penal Law § 240.20...............................................................................3, 47

N.Y. Penal Law § 240.26(1) ..........................................................................4, 49

**Other Authorities**

Fed. R. Civ. P. 50 ............................................................................................................1, 4

Fed. R. Civ. P. 59 ........................................................................................... *passim*

Fed. R. Evid. 403 ............................................................................................................27

Fed. R. Evid. 608(b) ......................................................................................................28

Fed. R. Evid. 407 .............................................................................................32, 33, 34

Fed. R. Evid. 701 ............................................................................................................29

Fed. R. Evid. 703 .......................................................................................................18, 19

Fed. R. Evid. 803(6) ......................................................................................................19

Fed. R. Evid. 805 ............................................................................................................31

## PRELIMINARY STATEMENT

Plaintiffs Alonzo Grant ("Mr. Grant") and Stephanie Grant ("Mrs. Grant") (collectively, "Plaintiffs") brought this action pursuant to 42 U.S.C. § 1983 and New York law against defendants the City of Syracuse ("the City"), Police Officer Damon Lockett ("Officer Lockett"), Police Officer Paul Montalto ("Officer Montalto"), Sergeant Brian Novitsky ("Sergeant Novitsky"), and Chief of Police Frank Fowler ("Chief Fowler").  The Court dismissed Chief from the lawsuit before trial, *see* Dkt. 147, and granted judgment as a matter of law, dismissing all claims against Sergeant Novitsky as well as Plaintiffs' unlawful entry claim against Officer Lockett at the close of Plaintiffs' proof.  *See* Dkt. 151.[1]  Following the jury trial, the jury found against Plaintiffs on their claims against the City, found in favor of Plaintiffs on all their remaining claims against Defendants Lockett and Montalto, and awarded compensatory damages to Mr. Grant and damages for loss of consortium to Mrs. Grant.

Defendants now move to set aside the verdict pursuant to Fed. R. Civ. P. 50 and 59. Specifically, Defendants contend that the Court should grant judgment as a matter of law under Rule 50(b) as to Plaintiffs' false arrest and false imprisonment claims and order a new trial and remittitur pursuant to Rule 59.

## STATEMENT OF FACTS

As is relevant to this post trial motion, the matter submitted to the Jury involved co-extensive questions of state and federal constitutional law as to whether the conduct of Officers Lockett and Montalto occurring on June 28, 2014 at the Plaintiffs' residence amounted to

---

[1] The Court granted Defendants judgment as a matter of law (1) dismissing Plaintiffs' claims for unlawful entry under 42 U.S.C. §1983 and trespass under New York State law; (2) dismissing the false arrest and false imprisonment claims against Defendant Novitsky; and (3) dismissing Mrs. Grant's § 1983 claim for false imprisonment against Officer Lockett.

actionable false arrest and excessive force.  Derivatively, the Jury also considered whether the state law causes of action justified an award of damages to Mrs. Grant for loss of consortium.

*Citizen Review Board Findings*

Before trial, Plaintiffs filed a series of motions *in limine* seeking, *in relevant part*, to prevent Plaintiffs from offering Citizen Review Board ("CRB") reports into evidence—including CRB findings regarding matters in dispute *in this case* being decided by the Jury.  Dkt. 124 at 7-12; Dkt. 135 at 19-22.  In a Decision dated October 3, 2018, the Court denied Defendants' request, concluding that the CRB reports were "directly relevant to plaintiffs' *Monell* claim." Dkt. 145 at 9, 20 (denying Defendants' request to preclude CRB reports involving unnamed officers for the same reason).  At trial, much testimony was devoted to—on both direct and cross examination—CRB reporting, which included multiple CRB investigative reports, three CRB annual reports, and letters and recommendations sent to Chief Fowler.  The primary individual to testify as to matters related to the CRB was Joseph Lipari ("Mr. Lipari"), the former administrator of the CRB.

*Importantly*, for purposes of this motion, Mr. Lipari was also asked to relate to the Jury the CRB's findings relative to Mr. and Mrs. Grant's complaint stemming from the incident that occurred on June 28, 2014.  Specifically, counsel for Plaintiffs elicited the CRB's findings on false arrest and excessive force—the very issues in front of the Jury.  Moreover, Chief Fowler, Lt. David Brown, Sergeant Novitsky, Officer Lockett, and Officer Montalto were all cross-examined with respect to the CRB findings relating *to this case*.

*Evidence regarding probable cause*

At trial, Plaintiffs offered the testimony of an expert witness, John R. (Rick) Brown ("Mr. Brown"), who offered an opinion regarding the use of force.  *See* Ex. E (Rick Brown Tr.).[2]  Mr. Brown admitted that he was not familiar with, nor an expert on, New York Penal law, and that he sought advice about the application of New York Penal law in this case from a Pennsylvania area law firm.  *See id.* at 23-25.  Although admittedly not an expert in the New York Penal law, Mr. Brown was permitted to offer an opinion that Officer Lockett and Officer Montalto lacked probable cause to arrest Mr. Grant.  *See id.* at 95.  His testimony was Plaintiffs' only evidence that the arresting officers lacked probable cause to arrest Mr. Grant.

Defendants offered testimony from multiple witnesses explaining how the arresting officers had probable cause to arrest of Mr. Grant, including the testimony of Officers Lockett and Montalto, as well as documentary evidence.  In sum, Officer Lockett testified that Mr. Grant's tumultuous and potentially violent argument with his wife, as well as his physical mannerisms (flailing his arms toward his wife), and his violence toward an inanimate object were all consistent with established pre-assault threat assessment indicators sufficient to establish probable cause for domestic disorderly conduct under N.Y. Penal Law § 240.20 and N.Y. Crim. Proc. Law § 530.11.

While Officer Lockett concluded there was probable cause to arrest Mr. Grant at that moment, he subjectively determined that he would just temporarily detain him via handcuffing to de-escalate his threatening behavior.  Upon beginning the handcuffing process on the stairway in front of the Grants' home, Officer Lockett testified that Mr. Grant turned around and grabbed him around the waist in a "bear hug."  Officer Montalto corroborated that Mr. Grant initiated a

---

[2] Citations to "Ex. __" are to the exhibits attached to the Declaration of John G. Powers submitted in connection with this motion.

struggle with Officer Lockett.  This conduct constituted probable cause for both harassment in the second degree under N.Y. Penal Law § 240.26(1) and the charge of resisting arrest under N.Y. Penal Law § 205.30.

Mr. Grant, for his part, admitted to yelling at his wife in front of the officers, acknowledged that he sometimes gesticulated his hands while arguing, and admitted that, while still upset, he shoved the front door open so hard it slammed into the railing.  Contrary to the testimony of the Officers, he testified that he never resisted being handcuffed and in fact never resisted at any point in time—indicating that all points in time he was inert and "loose and limp," not moving at all.  *See* Ex. A (Alonzo Grant Tr.) at 78-79.

*Testimony regarding damages*

At trial, Mr. Grant alleged that he had the following injuries due to the events on June 28, 2014: a fractured nose, post-concussive disorder, post-traumatic stress disorder ("PTSD"), a "deformed" left elbow, and spinal column cervical stenosis.  However, both the documentary evidence and expert witness testimony contravened those allegations.  Objective evidence indicated that he had neither permanent, nor serious, physical injuries.  For example, he went back to working manual labor within two weeks with no limitations.  Videotape of him on July 2, 2014 by his counsel reveals him to be active, spry and seemingly unaffected by his injuries.

| | |
|---|---|
|  | Alonzo Grant lying on the ground listening to his attorney on July 2, 2014—just four days after the incident (from Ex. P-73). |

Similarly the booking video—D-28—taken the night of the incident reveals an physically unimpeded Mr. Grant, showing no signs of physical or mental limitations.

The undisputed testimony revealed that he had a one-centimeter laceration on his face that required two stitches, swelling on the left side of his face, and a broken nose, that may have been an old injury.  Mr. Grant's neurologist—having seen him only one time—testified that Mr. Grant experienced a concussion and was suffering from subjective symptoms associated with that concussion in 2014.  But Mr. Grant received no further treatment from Dr. Shukri.

Dr. John Charles, Mr. Grant's primary family care physician, also opined that Mr. Grant experienced a concussion.  Dr. Charles agreed that the nasal bone fracture, according to contemporaneous reporting by SUNY Upstate Hospital on June 28, 2014, showed that the injury could have been "chronic," meaning pre-existing.  *See* Ex. C (Dr. Charles Tr.) at 123.  Dr. Charles further conceded that Mr. Grant's left elbow injury was more than likely from chronic onset of osteoarthritis.  *See id.* at 127-28.

Further, Defendants' neurological expert, Dr. Robert Knapp, M.D., testified that Mr. Grant, after a comprehensive medical record review, did not suffer from any type mild traumatic brain injury, and in fact was not concussed quite simply because he experienced no loss of consciousness. *See also* Ex. A at 88.

Mrs. Grant, with respect to her loss of consortium claim, testified that after the incident she and Mr. Grant no longer eat dinner at a restaurant or go to the movies on a weekly basis.  *See* Ex. B (Stephanie Grant Tr.) at 12-13, 59.  She further testified that they had "intimate relations" three to four times a week before the incident, but afterwards they are "not very intimate anymore," without further qualification.  *See id.* at 13, 61-62.

*The verdict*

On October 23, 2018, the jury returned a verdict in favor of Plaintiffs on Mr. Grant's false arrest, false imprisonment, excessive force, and assault and battery claims, as well as Mrs. Grant's loss of consortium claim. *Id.* at 2-3, 5-6, 8. The jury determined that Officer Lockett and Officer Montalto were not entitled to qualified immunity. *See id.* at 9. The jury awarded $1,130,000 in compensatory damages to Mr. Grant and $450,000 for loss of consortium to Mrs. Grant. *See id.* at 7, 8. Judgment was entered against Defendants on October 23, 2018. Dkt. 156.

## ARGUMENT

I. **THE COURT SHOULD REDUCE THE VERDICT VIA RULE 59 REMITTITUR.**

Under Fed. R. Civ. P. 59, the trial court's discretion to order a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)). Remittitur may be granted in at least two different kinds of cases:

> (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and
>
> (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).

A.        **The loss of consortium award was excessive and should be reduced.**

The Jury awarded Ms. Grant $450,000 in damages for her New York State claim for loss of consortium.  This Court charged the jury that loss of consortium purported to compensate Ms. Grant for the "reasonable value of the *services, aid, comfort, society, companionship*, and *affection* from her husband, plaintiff Alonzo Grant, of which she had been deprived due to his injuries . . . ." Dkt. 158-1 at 32 (emphasis added).

In *Gasperini,* 518 U.S. at 419, the Supreme Court held that federal trial and appellate courts sitting in diversity over state law claims are obliged to review verdicts under the standard set forth New York Civil Practice Law and Rules § 5501(c), which defines an award as excessive if it "deviates materially from what would be reasonable compensation."  *Gasperini*, 518 U.S. at 425 (quoting C.P.L.R. § 5501(c)).  The "'deviates materially' standard calls for closer surveillance [of a jury's verdict] than 'shock the conscience' oversight" applied to Rule 59 motions in non-diversity cases.  *Id.* at 424.  This assessment necessarily requires the court to measure the verdict "alongside awards allowed in cases involving plaintiffs with comparable . . . injuries and . . . prognoses." *Bonanno v. Port Auth. of N.Y. & N.J.*, 14 A.D.3d 377, 378 (1st Dep't 2005); *see, e.g.*, *Hernandez v. N.Y.C. Transit Auth.*, 52 A.D.3d 367, 369 (1st Dep't 2008) (considering whether an award constitutes reasonable compensation for comparable injuries in other cases); *Karney by Karney v. Arnot-Ogden Mem'l Hosp.*, 251 A.D.2d 780, 782 (3d Dep't 1988) ("[W]e look to comparable cases to determine at what point an award 'deviates materially' from what is considered reasonable compensation.").

1.        *The evidence supporting the loss of consortium award was conclusory*

It was clear from the testimony of both Mr. and Mrs. Grant that their relationship was neither permanently nor seriously interrupted by Mr. Grant's arrest.  They continued to live with

each other in much the same way as they did prior to the events of June 28, 2014.  Indeed, the videotape of Mr. and Mrs. Grant taken by their counsel on July 2, 2014—Ex. P-73—four days after the incident, depicts an ordinary married couple interacting with each other and communicating with the camera in a very typical way.

There was no testimony regarding any ongoing physical injury preventing Mr. Grant from providing his household "services."  He testified that he continued to do yard work, mow lawns the same way he had before the incident.  *See* Ex. A (Alonzo Grant Tr.) at 106.  Ms. Grant testified that Mr. Grant would be up at night vacuuming and doing dishes, indicating his continuing ability to perform domestic chores.  *See* Ex. B (Stephanie Grant Tr.) at 60; *see also* Ex. A. at 75-76.  There was no testimony adduced of any tangible change in Mrs. Grant's domestic responsibilities because of the incident.  In fact, all of the Grant witnesses testified that Mr. Grant worked seven days a week prior to the incident.  He went right back to that schedule within two weeks of his accident without restriction and continues his work at the sawmill to this day.  *See* Ex. B at 74-75; *see also* Ex. A at 103, 106.

With respect any change in the companionship, comfort, or affection, sexual or otherwise, Ms. Grant's testimony about what *changed* in her relationship with her husband after the arrest amounted to generic statements that they do not have family barbecues as often, *see* Ex. B at 59, do not go on date nights, *see id.* at 60, do not have as many conversations because Mr. Grant gets anxious, *see id.* at 61, and do not have sexual relations as often, *see id.* at 61-62.  Mr. Grant, on his part, merely testified that he is "not in the mood."  *See* Ex. A at 39-40.  However, there was no testimony that there was any physical impediment or disability preventing Mr. Grant from showing affection, giving comfort, or engaging in sexual activity.  In fact, he admitted he does not "know why," acknowledging, by explanation, that he is "not a

spring chicken or anything." *See id.*  None of the physicians at trial testified that lack of affection or desire was a manifestation of any of his physical conditions, or that his conditions were permanent.  If anything, his transition from working seven days a week to being retired and now spending the day with his wife would lead to a conclusion that the amount of quality time the two would spend together was going to increase rather than decrease.

In short, the loss of consortium testimony was conclusory, non-specific, and unsubstantiated—almost as if the witnesses had been told the relevant considerations for such a claim and then recited rotely and woodenly that such matters had in fact changed.

### 2.    *The loss of consortium award "deviates materially" from like cases*

A review of loss of consortium awards approved in other cases reveals that the jury's award of $450,000 to Mrs. Grant is excessive under CPLR § 5501(c).  "[A]wards for loss of consortium in New York, after review under § 5501(c), often fall within a low six-figure range, if not lower." *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 440 (S.D.N.Y. 2008) (collecting cases).  Higher six figure amounts are typically justified *only* where the loss of services, companionship or affection is either permanent and/or physically impossible as a result of serious physical injuries.

For example, in *Wild v. Catholic Health System*, 85 A.D.3d 1715, 1718 (4th Dep't 2011), *aff'd*, 21 N.Y.3d 951 (2013), a medical malpractice case, the court reduced an award of $500,000 for loss of consortium to $200,000 where the plaintiff's esophagus had been perforated during an intubation procedure, the perforation could not be repaired, and the plaintiff was never again able to consume solid foods or liquids normally.

In *Zavurov v. City of New York*, 241 A.D.2d 491, 491 (2d Dep't 1997), the court reduced a $105,000 loss of consortium award to $25,000 for to the wife of a pedestrian who suffered a fractured tibia and fibula when he stepped into pothole in crosswalk, had to have metal plates

and screws inserted to fix the fractured bones, underwent rehabilitation and physical therapy, and gave up his profession as a barber.

In *DeSena v. Pavel*, 289 F. App'x 426, 429 (2d Cir. 2008), the Second Circuit found reasonable a $25,000 award to a wife who suffered a loss of consortium lasting five months after her husband, the plaintiff, suffered injuries in a motor vehicle accident and had a prognosis of multiple hip replacements.

In *Garcia v. Spira*, 273 A.D.2d 57, 57 (1st Dep't 2000), a $50,000 loss of consortium award was reduced to $10,000 via remittitur where the spouse presented "only some evidence of changes in his life caused by" his wife's injury—a fracture to her wrist.

In *Fields v. City University of New York*, 216 A.D.2d 87 (1st Dep't 1995), the court reduced an award of $25,000 for loss of services to the father for loss of his daughter's services, arising out of the amputation of her ring finger by a circular saw, decreased sensation in two other fingers, and emotional and mental suffering due to her injuries. The court reduced the award to $7,500 due to only "slight" evidence in support of the father's derivative claim. *Id.*

In *Hiraldo v. Khan*, 267 A.D.2d 205, 207 (2d Dep't 1999), the court reduced an award in the amount of $300,000 for loss of consortium awarded to the mother of her son, who was exposed to lead paint at age three, to $55,000. The plaintiff's exposure to lead paint caused him to suffer from permanent hyperactivity, learning problems, and memory difficulties. *See id.*

In *DeLeonibus v. Scognamillo*, 238 A.D.2d 301, 302 (2d Dep't 1997), the court sustained a $275,000 for loss of consortium award to the wife of a plaintiff who was seriously injured in accident with numerous "severe and permanent" orthopedic and neurological injuries. Plaintiff's "condition was 'very disabling', his prognosis 'awful' and 'dismal', because the chronic pain was 'absolutely' permanent, and '[t]he chances of him getting better are practically zero'." *Id.*

In *Walsh v. State*, 232 A.D.2d 939, 940 (3d Dep't 1996), the court concluded that an award of $185,000 to the wife of a plaintiff who suffered permanent nerve damage, loss of function in his back and lower extremities, limb disfigurement, and ongoing pain, was not excessive "given the severity of [the plaintiff's] injuries, as a consequence of which he was required to undergo a spinal fusion and bone graft, as well as two other operations to correct problems caused by loss of nerve function in his foot and leg." *Id.* The plaintiff was formerly active and had only diminished ability to participate in household chores and childcare. *Id.*

In *Cuevas v. St. Luke's Roosevelt Hospital Center*, 95 A.D.3d 580, 581 (1st Dep't 2012), a medical malpractice case, the court upheld an award of future loss of services in the amount of $100,000 to the husband of a 27-year-old plaintiff who was improperly intubated during a surgery, resulting in TMJ dysfunction; the inability to open her mouth more than 15 millimeters without pain, eat without pain or cutting food into very small pieces, or kiss her husband normally; and the need to wear a mouth guard at all times, which caused her to have a lisp.

Mrs. Grant's testimony does not support the verdict in comparison with these cases—each of which reduced or affirmed jury verdicts that were originally *less than* the one issued here. Mr. Grant is not physically prohibited from withholding services, comfort, or affection, and he suffers no permanent disabling physical injuries; thus setting this case well below the amounts discussed in the case law set forth *supra*. Rather, Mrs. Grant's testimony of non-permanent, generic, and non-medically corroborated loss of companionship, society, and affection is consistent with lower five-figure amounts, consistent with the case law cited above.

The minimal testimony to support Mrs. Grant's loss of consortium claim was insufficient to establish damages for a loss of consortium claim at all. For example, in *Gutierrez v. City of New York*, 288 A.D.2d 86 (1st Dep't 2001), involving claims of false arrest and malicious

prosecution, a state court affirmed the jury's decision not to award damages for a loss of consortium claim where the plaintiff's wife "failed to establish even minimal damages for the tangible or intangible components of her loss of consortium claim."  Likewise, in *Rivera v. City of New York*, 40 A.D.3d 334, 344 (1st Dep't 2007), the state court concluded that "vague and conclusory testimony, simply that her husband would not touch her for 'some months' after the incident and that she had to stop working for 'a while,' failed to establish even minimal damages for a loss of consortium claim."  Thus, the Court could appropriately eliminate the loss of consortium award altogether.

At best, Mrs. Grant's testimony was minimal, lacking in specificity with no indication of permanence.  To the extent that Mr. Grant's embarrassment over being arrested and his superficial injuries made him temporarily "not in the mood," there is no indication or explanation, medically or otherwise, for how that might be a permanent fixture of the parties' relationship.  Thus, because the factual record adduced in this case put this case more in line with those cases upholding a jury's decision to award no damages for loss of consortium at all, the Court should order a remittitur of the damages awarded to Mrs. Grant on her loss of consortium claim to *no more than* $10,000.

**B.**      **Mr. Grant's damages award was excessive and should be reduced.**

To the extent the jury believed Mr. Grant's witnesses, his damages should have been fairly limited to his subjective complaints regarding his temporary physical ailments, the testimony of his family care physician, and the neurologist who saw him once, each of whom testified that he had a non-permanent concussion because of the incident.  It was also undisputed that Mr. Grant had a one-centimeter laceration above his eye that required two stitches, temporary swelling on the left side of his face, some range of motion limitations on his left arm, and tender "charley horse" on his right leg.  *See* Ex. C (Dr. Charles Tr.) at 91, 108; *see also* Ex.

A (Alonzo Grant Tr.) at 39 (testifying he suffered a concussion, stitches over his eye, a scar on his lip).  Dr. Charles conceded that any nasal fracture could have been chronic, as opposed to acute.  *See* Ex. C at 123.  Dr. Charles further conceded that any range of motion loss to the elbow could have been attributed to osteoarthritis with his left elbow.  *See id.* at 127.

However, over Defendants' objection, the Court allowed into evidence medical records of medical professionals who did not testify at trial.  The records were admitted at the request of Plaintiffs' counsel after Plaintiffs' case had concluded.  Having these records improperly in evidence allowed Plaintiffs' counsel to argue in closing that the contents of the records supported a whole slew of additional injuries to which no medical witness ever testified, opined, or explained.  This evidentiary error led to an excessive damages verdict.  *Cf. Stampf*, 761 F.3d at 202 (observing that a new trial may be warranted under Rule 59 "if substantial errors were made in admitting or excluding evidence").

### 1.    *Mr. Grant's damages were inflated by inadmissible evidence*

As an initial matter, the jury's award of compensatory damages to Mr. Grant was supported by incompetent evidence.  A plaintiff subjected to the use of excessive force is not entitled to compensatory damages as a matter of law.  *See Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998).  Rather, "[t]o recover compensatory damages plaintiff must prove that his injuries were proximately caused by the constitutional violation."  *Id.*  "The damage award 'must be supported by competent evidence concerning the injury.'"  *Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002) (citation omitted).

### a)    *No orthopedic diagnosis was offered*

Plaintiffs failed to call Dr. Murphy, an orthopedic doctor who treated Mr. Grant for his complaint of pain in his left elbow, despite identifying Dr. Murphy on their witness list.  *See* Dkt. 121.  Defendants asked for a missing witness charge on Dr. Murphy, which was denied.  *See*

Dkt. 152 at 3-5.  Other witnesses, like Dr. Charles, admitted there was no objective evidence via x-ray of a permanent injury to Mr. Grant's arm and that the medical records also indicated the injury might be arthritic.  Neither Dr. Charles, nor any qualified orthopedist, testified that Mr. Grant had a permanent injury to his left arm or that that injury was caused by the incident on June 28, 2014.   Nonetheless, Mr. Bonner requested $1.5 million in damages solely based on his contention that Mr. Grant had a permanently injured left arm.

> b)      *Mr. Grant's purported neurological injuries*

Plaintiffs failed to call witnesses to corroborate Mr. Grant's claimed neurological injuries arising out of the events of June 28, 2014.  Plaintiffs also failed to produce any expert witness to corroborate Mr. Grant's claimed injury of PTSD.  Nor was there any testimony from a psychiatrist or a licensed clinical social worker concerning Mr. Grant's purported emotional injuries and mental suffering.  Neither Dr. Verma, who provided limited psychiatric care to Mr. Grant, nor Abbe Cotter, a licensed clinical social worker who treated Mr. Grant, testified at trial, despite being identified on Plaintiffs' witness list.  *See* Dkt. 121.  Those of Plaintiffs' witnesses who did testify did not actually corroborate Mr. Grant's claimed injuries.

> c)      *Dr. Covington never diagnosed Alonzo Grant with anything*

Dr. Covington, a neuropsychologist, did testify that after the initial (and only) interview with Mr. Grant she listed in her report three "*provisional*" diagnoses—mild neurocognitive disorder due to traumatic brain injury; acute traumatic stress disorder; and major depressive disorder, *see* Ex. C at 148-49—each of which appeared next to the acronym "R/O."

| | |
|---|---|
| **PROVISIONAL** DIAGNOSIS:<br>    R/O Mild Neurocognitive disorder due to traumatic brain injury<br>    R/O Acute Traumatic Stress Disorder<br>    R/O Major Depressive Disorder | Ex. I (Pl. Ex. 124) |

Dr. Covington acknowledged that the acronym "R/O" means "*rule out*"; meaning that those conditions were provisional diagnoses, not yet established, that she needed to rule out with further testing. *See id.* at 149, 157-58. Dr. Covington acknowledged that because she had only seen Mr. Grant that one day and was unable to obtain the information she needed to "rule out" the listed provisional conditions that she was unable to make any definitive diagnosis. *See id*. at 157. Dr. Covington testified that "she couldn't at that point" make final determinative diagnosis of PTSD or depressive disorder. *See id.* at 159, lns 1 -15.

Defendants' counsel objected to Plaintiffs' counsel's questioning Dr. Covington regarding the causation for her "diagnoses" because she had not, in fact, given any opinions regarding actual diagnoses. *See id*. at 152, lns. 23 – 25. The Court overruled that objection. This was an error of law. Plaintiffs' counsel seemed to know the weakness of his position, never asking Dr. Covington to confirm any diagnosis or otherwise opine regarding causation to a reasonable degree of medical certainty. Yet, Plaintiffs' counsel asked for millions in damages during his closing based on PTSD and the other purported neurological "diagnoses" of Dr. Covington.

A "provisional" diagnosis is not a diagnosis at all. *See, e.g.*, *Walls v. Astrue*, No. 4:09CV00734 JTR, 2011 WL 1193498, at *3 (E.D. Ark. Mar. 29, 2011) ("Rather, pseudotumor cerebi was only a provisional diagnosis or a possibility that needed to be ruled out."); *Keo v. Comm'r of Soc. Sec.*, No. CIV S-09-2019-CMK, 2010 WL 4905283, at *7 (E.D. Cal. Nov. 24, 2010) ("The court must agree with defendant that a provisional diagnosis is not the same thing as a diagnosis . . . ." (internal quotation marks omitted));

Similarly, as a matter of law, a condition in a medical report qualified by "R/O" is also *not* a diagnosis. *See Merancy v. Astrue*, No. 3:10CV1982(MRK)(WIG), 2012 WL 3727262, at

\*7 (D. Conn. May 3, 2012) ("In medicine, the phrase 'rule out' means to eliminate or exclude something from consideration. It does not constitute a diagnosis."); *Manning v. Comm'r of Soc. Sec.*, No. 2:16-CV-1458-DMC, 2018 WL 5800789, at \*6 n.4 (E.D. Cal. Nov. 2, 2018) (concluding, where a report indicated "R/O Mood disorder NOS," that "R/O is the medical abbreviation for 'Rule out' *and thus is not, in fact, a diagnosis* of Mood disorder") (emphasis added); *Doran v. Colvin*, No. 6:14-CV-01669-JE, 2016 WL 4942001, at \*11 (D. Or. Sept. 15, 2016) ("A 'rule-out' diagnosis *does not constitute an actual diagnosis . . . .* " (emphasis added)); *Fly v. Astrue*, No. 4:09CV3194, 2011 WL 3861343, at \*6, n.10 (D. Neb. Aug. 31, 2011) ("A 'rule-out' diagnosis is not a diagnosis").

As a result, Dr. Covington never offered competent expert medical testimony regarding *any* permanent or temporary neurological injury or condition.

### d)   Dr. Shukri—the neurologist—offered only limited testimony

Dr. Shukri met with the Plaintiff on November 11, 2014 for an initial evaluation approximately four years before trial.  He diagnosed Mr. Grant only with post-concussion syndrome.  *See* Ex. C at 18.  Dr. Shukri acknowledged that post-concussion syndrome is not a "severe brain injury."  *See id.* at 60, lns. 8-15.  Dr. Shukri admitted that a CT scan is taken to detect "severe head trauma" and acknowledged that the CT scan of Mr. Grant's head was normal, *see id.* at 61, lns. 11-25; *see id.* at 62, lns 1-14, and, that the CT scan had indicated no evidence of bleeding or trauma.  *See id.* at 62, lns. 15-16.  He also acknowledged that the "*most important*" consideration for measuring the severity of a concussion was loss of consciousness. *See id.* at 65, lns. 11-15 (emphasis added).  He acknowledged that the medical records he reviewed indicated that Mr. Grant did not lose consciousness after the incident.  *See id.* at 65, lns. 19-25; *see id.* at 66, lns. 1-4; *see also* Ex. A (Alonzo Grant Tr.) at 88.  He also indicated that post-concussion syndrome typically requires measurement of amnesia, but that he was unable to

collect information on that symptom because Mr. Grant never obtained the neuropsychological testing he recommended, so he was never able to "confirm" the diagnosis of post-concussion syndrome. *See id*. at 69-70.

Dr. Shukri also testified regarding some degenerative changes in Mr. Grant's spinal column that virtually every adult suffers from at some point in their lives indicating Mr. Grant may need surgery in the future. *See id*. at 73. He could not, and did not, testify that the degenerative condition in Mr. Grant's spine was, to a reasonable degree of medical certainty, caused by the force used on Mr. Grant on June 28, 2014. *See id*. at 77, lns. 19-25; *see id*. at 78, lns. 1-3. Nor could he testify that it was permanent. *See id*. at 46.

Notwithstanding Dr. Shukri's testimony that was essentially limited to treatment of Mr. Grant once in 2014 for subjective symptoms of a concussion, Mr. Bonner argued to the jury for large amounts damages related to paralysis and other permanent neurological conditions not supported by Shukri's testimony.

> e) *The Court erroneously allowed medical reports from Dr. Verma, Abbe Cotter, LCSW, and the Upstate Concussion Clinic without authentication and without the testimony of those medical professionals testifying as to their diagnosis, treatment, or opinions*

All throughout trial, Defendants' counsel maintained that they would not stipulate to medical records from medical professionals who were not testifying at trial. The Court sustained Defendants' objections when Plaintiffs' counsel attempted to introduce such records as part of the files of other testifying physicians, such as Dr. Charles. After Plaintiffs' case had concluded, however, while Plaintiffs' counsel was cross examining Dr. Knapp, counsel began asking Dr. Knapp which records he "reviewed" prior to forming his opinions. At a certain point during his leading cross-examination questions, he switched the word "reviewed" for the phrase "relied

upon."  Once Dr. Knapp affirmed, for example, that he had relied upon Dr. Verma's report in

forming his opinions, counsel immediately moved to admit Dr. Verma's report into evidence—

notwithstanding that Dr. Verma never testified as to his opinions and was never subject to cross

examination.  Counsel repeated this process with respect to other medical records that similarly

had been previously precluded for lack of authentication and foundation.   The Court, over

Defendants' objections, admitted the documents—which were then featured in Plaintiffs' closing

argument to support a wildly excessive damages request.

The Court's assumption—that merely by Dr. Knapp stating that he "relied upon"[3] the

records made them admissible—is not correct under Fed. R. Evid. 703.  *See* Fed. R. Evid. 703

advisory committee's note (2000) ("[W]hen an expert reasonably relies on inadmissible

information to form an opinion or inference, ***the underlying information is not admissible***

***simply because the opinion or inference is admitted***." (emphasis added)); *see also Linde v. Arab*

*Bank, PLC*, No. 04 Civ. 2799 (BMC) (VVP), 2014 WL 12558572, at *2 (E.D.N.Y. Aug. 1,

2014) ("Federal Rule of Evidence 703 does not give plaintiffs *carte blanche* to admit otherwise

inadmissible evidence simply because their experts rely upon it."); *Gissinger v. Yung*, Nos. 04–

CV–0534 (BMC)(JO), 04–CV–5406 (BMC)(JO), 2007 WL 2228153, at *5 (E.D.N.Y. July 31,

2007) (Doctor "explicitly stated that he relied on the medical records at issue" however, his

"testimony cannot form a basis for admitting into evidence the records themselves, because such

records are hearsay").

*First*, the naked, unauthenticated, medical reports of medical professionals who never

testify at trial are inadmissible as hearsay.  *See Gissinger*, 2007 WL 2228153, at *4 (medical

---

[3] This section assumes for the sake of argument that Dr. Knapp actually meant that he relied upon the
records rather than merely reviewed them.  To this end, there was *no* basis in his testimony to conclude
that he relied upon Dr. Verma's reports because Dr. Knapp's opinions were *diametrically opposed* to
those of Dr. Verma.

records must be properly authenticated as business records to avoid exclusion on hearsay grounds); *Rosales v. Kelly*, No. 07 CIV. 10554 LAP, 2011 WL 5873374, at *3 n.4 (S.D.N.Y. Nov. 14, 2011) ("[S]ince Defendants have not identified the author of the [medical records] or how it came about, the Court has no basis to treat it as a reliable business record under Rule 803(6)."). *Second*, the reports are also inadmissible under FRE 703 to the extent they purport convey medical diagnosis—which would otherwise constitute expert opinion—without allowing for cross examination regarding the physician's or author's credentials or opinions. *See Hutchinson v. Groskin*, 927 F.2d 722, 725 (2d Cir. 1991) (finding that the admission of reports by doctors who did not testify, merely because another doctor relied upon them, was "plain error").

Thus, it is apparent that opposing counsel—via evidentiary errors—was permitted to argue a scope and extent of physical injury that was unsupported by the proper, admissible, evidentiary record. Indeed, the purported opinions of Dr. Verma, Ms. Cotter, and Mr. Necsi were: (i) never presented under oath to the jury; (ii) never subject to the laying of any required foundation; (iii) never subject to the Court's gatekeeping responsibility; and (iv) never subject to cross examination to establish the basis, limitations, and permanence of any reported conclusions. Counsel capitalized on this unduly expanded scope of potential medical ailments by presenting a hyperbolic and unrealistic view of Mr. Grant's injuries during closing. These factors undoubtedly led to an excessive assessment of damages during deliberations, once the jury determined that liability was appropriate. This is seemingly confirmed in the Jury's third question to the Court during deliberations. *See* Dkt. 157 at 7.

2. ***Mr. Grant's compensatory damages were excessive in comparison to compensatory damages awarded in similar cases.***

In light of the actual, authenticated extent of Mr. Grant's excessive force injuries, his award of $1,130,000 in damages is clearly excessive.  Similarly, relative to his false arrest claim, Mr. Grant acknowledged that he only spent 12 hours in the County Justice Center.  *See* Ex. A at 91.  As established during Deputy McCarty's testimony, he was not in a cell during this time period but was free to move around a large carpeted room with televisions.  While he was embarrassed during arraignment, that embarrassment was temporary, fleeting, and brief.

In the excessive force context, "awards in the middle to higher end on the spectrum of compensatory damages (totaling over $200,000) for excessive force claims have involved cases in which plaintiffs suffered permanent injuries" whereas "[a]t the low end of the spectrum are the cases that typically involve non-permanent injuries."  *Dancy v. McGinley*, No. 11CV7952 (LMS), 2015 WL 13214324, at *6, 7 (S.D.N.Y. May 11, 2015) (collecting cases), *aff'd*, 843 F.3d 93 (2d Cir. 2016).  Like here, "[c]ompensatory damage awards for single incidents involving strikes by police officers that result in loss of consciousness and associated lacerations—but do not cause further injuries requiring surgery, or broken bones—frequently run between $50,000 and $100,000."  *Poulos v. City of New York*, No. 14-CV-03023 (LTS) (BCM), 2018 WL 3750508, at *7 (S.D.N.Y. July 13, 2018), *report and recommendation adopted*, No. 14 CV 3023-LTS-BCM, 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018).  Moreover, "[i]n cases involving verdicts for physical injuries and emotional damages, 'absent permanent physical injuries or serious psychological injuries, such awards generally *result in less than $100,000*.'"  *Dancy*, 2015 WL 13214324, at *8 (emphasis added) (quoting *Hightower v. Nassau Cty. Sheriff's Dep't*, 325 F. Supp. 2d 199, 207 (E.D.N.Y. 2004)).

As for false arrest, courts in the Second Circuit have approved amounts that "vary widely" and range between "$10,000 and $300,000." *Martinez v. Port Auth. of N.Y. & N.J.*, No. 01 CIV. 721 (PKC), 2005 WL 2143333, at *20 (S.D.N.Y. Sept. 2, 2005) ("False arrest awards vary widely.  When adjusted to 2005 dollars, they generally ranged between $10,000 and $300,000."), *aff'd*, 445 F.3d 158 (2d Cir. 2006).

A review of other cases involving claims of false arrest, false imprisonment, excessive force, and assault and battery—as set forth below—reveals that the jury's award of compensatory damages in this case is excessive.

For example, in *DiSorbo v. Hoy*, 343 F.3d 172, 183-86 (2d Cir. 2003), the Second Circuit reduced an award of $400,000 in compensatory damages for the plaintiff's excessive force and battery claims to $250,000.  The plaintiff suffered bruises on her head, shoulder, hands, elbow, and spine.  *Id.* at 183.  She suffered large hematomas on her head and had been choked so forcefully that she could not breathe and temporarily lost vision.  *Id.* at 183-84.  She also claimed psychological harm.  *Id.* at 184.  However, the plaintiff did not require surgery or endure any permanent injuries.  *Id.* at 185.

In *Martinez v. Port Authority of New York & New Jersey*, 445 F.3d 158, 159-61 (2d Cir. 2006), the Second Circuit affirmed a remittitur of a jury verdict from $1,000,000 to $360,000. *Id.* at 160 (the award of $360,000 consisted of $200,000 for emotional distress and $160,000 for loss of liberty.).  In that case, the plaintiff had been arrested outside a men's bathroom for public lewdness, detained for 19 hours, and suffered humiliation.  *See Martinez v. Port Auth. of N.Y. & N.J.*, No. 01 Civ. 721 (PKC), 2005 WL 2143333, at *1, 17 (S.D.N.Y. Sept. 2, 2005).  After the arrest, the plaintiff experienced sleeplessness, loss of appetite, anxiety, and, for some time, had to stop working and attending church and sporting events.  *Id.* at *18.  He also contemplated

suicide, received therapy, and was diagnosed with post-traumatic stress syndrome, as confirmed by the testimony of his psychotherapist.  *Id.*

In *Dancy v. McGinley*, 843 F.3d 93, 113-15 (2d Cir. 2016), the Second Circuit affirmed an award of $81,500 for a 17-year-old plaintiff's excessive force claim and $115,000 for the plaintiff's false arrest claim.  As to the excessive force claim, the Second Circuit noted that the plaintiff had been "inexcusably beaten" by police officers, resulting in bruising and abrasions to his head, face, and torso, as well as soreness, swelling, and headaches that lasted for several weeks.  *Id.* at 114.  None of those injuries were permanent, however.  *Id.*  As to the false arrest claim, the Second Circuit was particularly influenced by the plaintiff's young age, which made the gravity of his emotional injuries greater than they would otherwise be for an older plaintiff.  *Id.* at 115.  The plaintiff had also been arrested, booked at the police station, fingerprinted, interrogated by detectives, and detained overnight.  *Id.*

In *Gardner v. Federated Department Stores, Inc.*, 907 F.2d 1348, 1350, 1353 (2d Cir. 1990), the Second Circuit reduced a compensatory damages award for deprivation of liberty to $50,000 but upheld an award of $150,000 for his pain and suffering up until the date of trial, arising out of the false imprisonment and battery of the plaintiff, who was accused of theft by store security guards, handed to police, and imprisoned for six hours.  The plaintiff suffered earaches, lockjaw, temporomandibular joint syndrome ("TMJ"), an atypical anxiety disorder, and a personality change as a result.  *Id.*  The plaintiff adduced evidence from a dental expert and a psychiatric expert to support of his claimed injuries.  *Id.* at 1351.

In *Bender v. City of New York*, 78 F.3d 787, 792 (2d Cir. 1996), the Second Circuit reduced an aggregate award of $300,700 for the plaintiff's false arrest, malicious prosecution,

battery, and intentional infliction of emotional distress claims against police officers to $150,000.

In that case, the police misconduct had caused plaintiff to sustain the following injuries:

> a physical blow to the mouth that resulted in no bruise or cut, much less any permanent injury; 24 hours' confinement in a cell under extremely unpleasant conditions; an additional five hours of custody prior to release at arraignment; the pendency of disorderly conduct and assault charges for six months, prior to their dismissal; and emotional distress to the plaintiff that was manifested by nightmares and occasional loss of sleep over a period lasting a year and a half.

*Id.* The plaintiff's "distress was sufficient to be diagnosed by her expert witness as post-traumatic distress syndrome." *Id.*

In *Mendoza v. City of Rome*, 872 F. Supp. 1110, 1126 (N.D.N.Y. 1994) (Hurd, J.), this Court reduced a $200,000 compensatory damages award, concluding that "the maximum amount for compensatory damages for the physical and mental injuries suffered by the plaintiff as a result of the false arrest, excessive use of force and assault which would have been upheld as not excessive is $62,500.00." In that case, the arresting officer slammed the plaintiff against a patrol car, struck his knee against the rear wheel well, struck his head against the police vehicle while putting him inside, and handcuffed him tightly. The plaintiff suffered bruises and swelling in his right knee (in which he had a preexisting medical issue), red marks on his wrists, headaches that required aspirin, bruises on his forehead, and numbness in his wrists and hands for a few days. *Id.* at 1120. The injuries healed within three weeks, without requiring medical attention. *Id.* Like here, the plaintiff incurred no medical expenses or loss of earnings as a result. *Id.*

In *Lewis v. City of Albany Police Department*, 547 F. Supp. 2d 191, 206-08 (N.D.N.Y. 2008), the court affirmed a jury's award of $65,000 in compensatory damages for an excessive force claim, where the police officer stood on the plaintiff's head and pushed his face into asphalt, causing pain and suffering for weeks thereafter. *Id.* at 206. The police officer ground pebbles and asphalt into his skin, causing skin abrasions, face swelling, and a contusion—

injuries that were documented by medical records and testimony from a treating physician.  *Id.*
The plaintiff was treated at the emergency room, where the treating emergency room physician
diagnosed him with a closed head injury.  *Id.*  He also had difficulty sleeping and nightmares for
months.  *Id.*

Based on the foregoing comparable cases, the Court should order remittitur of the
damages awarded to Mr. Grant on his false arrest, false imprisonment, excessive force, and
assault and battery claims.  In many ways, Mr. Grant's injuries lacked the severity of the injuries
suffered by the plaintiffs in the cases recounted above.  For example, Mr. Grant was detained for
far less time than the plaintiffs in *Martinez*, 445 F.3d at 159-61, and *Bender*, 78 F.3d at 792.  The
purported emotional distress he suffered was not as severe as those suffered by the plaintiff in
*Martinez*, 2005 WL 2143333, at *18, who, *inter alia*, contemplated suicide and was diagnosed
with PTSD, or the plaintiff in *Dancy*, 843 F.3d at 114, who was more vulnerable at only 17 years
old, or the plaintiff in *Gardner*, 907 F.2d at, 1351-53, who suffered an atypical anxiety disorder
and a personality change.  The physical harms suffered by the plaintiff in *DiSorbo*, 343 F.3d at
183-85, including hematomas and being choked forcefully enough to stop breathing and lose
vision, exceeded those suffered by Mr. Grant, as did those suffered by the plaintiff in *Lewis*, 547
F. Supp. 2d at 206-08, who suffered a closed head injury when a police officer stood on his face
and pushed it into asphalt.  Because the harms suffered by the plaintiffs in the foregoing cases
exceed those suffered by Mr. Grant, and the damages awards were only a fraction of that
awarded to Mr. Grant in this case, those cases make clear that the jury's award of compensatory
damages in the amount of $1,130,000 "deviates materially from what would be reasonable
compensation" and shocks the conscience.[4]

---

[4] This was undoubtedly the result of the unwarranted description of the scope of Mr. Grant's injuries by
Plaintiff's counsel during closing arguments.

Accordingly, if the Court is not inclined to order a new trial outright based on the evidentiary errors, the Court nonetheless reduce the award of damages to Mr. Grant to no more than $50,000 for the false arrest/false imprisonment and no more than $100,000 for the excessive force/assault and battery claim.

## II.   THE COURT SHOULD OTHERWISE ORDER A NEW TRIAL UNDER RULE 59

Generally, a motion for a new trial under Rule 59(a) should be granted "when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (internal quotation marks omitted).  Examples of grounds for a new trial include a verdict that is against the weight of the evidence, *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003), substantial errors in the admission or exclusion of evidence, *Stampf v. Long Island Railroad Co.*, 761 F.3d 192, 203 (2d Cir. 2014), prejudicial misconduct by counsel, *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992), and non-harmless errors in jury instructions, *Sanders v. New York City Human Resources Administration*, 361 F.3d 749, 758 (2d Cir. 2004), or verdict sheets, *Armstrong ex rel. Armstrong v. Brookdale University Hospital & Medical Center*, 425 F.3d 126, 136 (2d Cir. 2005).  "On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

### A.   The admission of the Citizen Review Board findings *relevant to this incident* was a substantial error that prejudiced the jury and warrants a new trial.

For purposes of this Rule 59 motion, Defendants are focusing only on the CRB findings relative *to this incident*, which were admitted into evidence over Defendants' objection.  *See* Ex.

F (P-12), Ex. G (P-20, 2014 CRB Annual Report) at 11-13.  Those findings purported to "sustain" findings of false arrest and excessive force against Officers Lockett and Montalto relative to Mr. Grant and importantly to also find that they were "untruthful" in their accounts of the events.  *See id*.

As it was represented in Defendants' *in limine* motions, the undisputed proof at trial was that CRB proceedings: (1) do not take testimony under oath; (2) did not apply the rules of evidence; (3) in this case, did not take testimony from Officers Lockett and Montalto; (4) did not cross examine or subject the complaining witnesses to cross examination; (5) did not keep a transcript of the proceedings; and (6) applied a *different, lower, standard* of proof to "sustain" a finding—one that allowed less than a preponderance (i.e., less that 50%).

As argued in Defendants' motions *in limine*, such findings on *the same ultimate issues* in front of the Jury by a different body, applying a different standard, and different rules of evidence was palpably and plainly inadmissible and prejudicial to Defendants Lockett and Montalto.  What is worse, to allow the reports of this same *ad hoc* body, with its *ad hoc* procedure, to comment on the truthfulness of the Defendants' police reports while those individuals are on trial and relying on those police reports is so abhorrent to the rule of fundamental fairness and the rules of evidence that it defies further commentary.

Without considering this particular danger, the Court ruled in its pre-trial decision that the CRB reports, in general, were relevant to the *Monell* claim against the City presumably under the theory that they could conceivably offer some evidence of a municipal pattern and practice.  When these documents were offered into evidence, Defendants' counsel objected.  The Court overruled the objections and allowed the admission of the exhibits *without limitation*.

Plaintiffs' counsel, however, did not just use the documents to support the *Monell* claim. In fact, he had Mr. Lipari, the CRB administrator, went through the entire two-page CRB report *on this case* contained with P-20 in detail, making sure Mr. Lipari confirmed for the Jury that the report related to Officers Lockett and Montalto. *See* Ex. G (P-20).  Plaintiffs' counsel repeatedly brought up the CRB findings—contained with P-12 and P-20—on this case during the examinations of Defendants Lockett, Montalto, Novitsky, and Chief Fowler, making sure to emphasize for the Jury each time that the CRB had found the Defendants to be untruthful.

The admission and use of this palpably prejudicial and inadmissible material going to the very issue being decided by the Jury constituted both serious error and a miscarriage of justice— warranting a new trial.  *Hester v. BIC Corp.*, 225 F.3d 178, 181 (2d Cir. 2000) (if a court finds that the erroneous admission of evidence "was so clearly prejudicial to the outcome of the trial" that it convinces the court that the "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," then a new trial should be ordered).

### 1.     *The CRB reports regarding this case were inadmissible under FRE 401 and 403*

Citizen and/or Civilian Review Board determinations on the ultimate issue in a civil case are inadmissible under Fed. R. Evid. 403 because they will confuse the jury regarding the factual issues they have a responsibility for determining and the will necessarily place at issue the proceedings that led to the administrative determinations.  *See, e.g.*, *Morales v. City of New York*, No. 99 CIV. 10004 (DLC), 2001 WL 8594, at *6 n.4 (S.D.N.Y. Jan. 2, 2001) (excluding CRB evidence under Rule 403 based on its determination that the admission the findings would "confuse the jury by offering conclusions regarding the factual issues the jury was to determine, and prolong the proceedings by putting into issue the details of the investigation supporting the findings, and that these risks substantially outweighed the probative value of the [findings]"); *see*

*also Guzman v. Jay*, 303 F.R.D. 186, 193 (S.D.N.Y. 2014) (precluding the plaintiff's counsel from referring to the Civilian Complaint Review Board's investigation of the underlying matter at trial).

In addition, where the CRB findings apply different procedural and evidentiary standards, they are especially dangerous because the jury does not know how to translate their significance to the matters they are to decide. *See, e.g.*, *United States v. Smith*, No. 06 Cr. 203(RJH), 2007 WL 188734, at *1 (S.D.N.Y. Jan. 24, 2007) (precluding cross-examination of arresting officers regarding "a prior adverse credibility finding" by the Civilian Complaint Review Board because, in part, "[t]he proceedings before the CCRB lack formality," thus relevance was substantially outweighed by the danger of unfair prejudice and delay); *United States v. Nelson*, No. 10 Cr. 414 (PKC), 2011 U.S. Dist. LEXIS 60873, at *13-14 (S.D.N.Y. June 2, 2011) (precluded cross examination regarding substantiated Citizen Review Board Complaints because of the "informal and non-adversarial nature of CCRB proceedings")

Courts have precluded Citizen Review Board reports for the incident in question during litigation because of the undue prejudice to the jury that is inherent from findings or opinions rendered on the ultimate issues by a non-judicial body. *See, e.g.*, *Palmer v. Nassan*, No. 10cv0922, 2011 WL 578764, at *2 (W.D. Pa. Feb. 9, 2011), *aff'd*, 454 F. App'x 123 (3d Cir. 2011); *see also Patton v. City of New York*, No. 00 CIV. 8875(AJP), 2002 WL 1428855, at *1 (S.D.N.Y. June 27, 2002); *Morales*, 2001 WL 8594, at *6 n.4.

Moreover, a substantiated Citizen and/or Civilian Review Board complaint "cannot be the subject of cross examination under Rule 608(b) because a substantiated [Citizen and/or Civilian Review Board] complaint is not a criminal conviction." *See United States v. Lights*, 15 Cr. 721, 2016 WL 7098633, at *4 (S.D.N.Y. Dec. 5, 2016).

The CRB findings and recommendations with respect to Officer Lockett and Officer Montalto had no relevance to this case based on the issues being decided.  Excessive force, under *Graham v. Connor*, 490 U.S. 386 (1989), requires a jury to consider the totality of the circumstances known to the subject police officer at the time of the use of force.  The CRB panel—not ever hearing from Officers Lockett or Montalto—had none of the information necessary to them to make the appropriate evaluation.  Their decision in the absence of all the required information—especially in light of the other procedural shortcomings in the process— had zero value to the jury in deciding liability in this case.  Rather, it was used improperly and ubiquitously as a "bloody shirt" to waive in front of the jury.  Opposing counsel all but invited the Jury to substitute the CRB's findings for its own judgment.  The prejudice to the Defendants was palpable and self-evident.  In light of the admission of this evidence, Defendants were denied a fair trial.

### 2. *The CRB determinations were inadmissible under FRE 701 and 703*

Mr. Lipari's trial testimony and the CRB Reports related to the June 28, 2014 incident, constitute impermissible lay opinion testimony under Fed. R. Evid. 701, which permits a lay witness to give opinion testimony only if the opinion is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  The reports and findings of the CRB fail at least two of Rule 701's foundational requirements.

The Second Circuit has found an abuse of discretion by a district court in allowing a lay opinion witness to testify as to the personal perceptions of parties and offering opinions that create "unverifiable subjectivity" to connect those perceptions to ultimate factual conclusions, which in effect prejudice the jury.  *See Nimely v. City of New York*, 414 F.3d 381, 399-400 &

n.11 (2d Cir. 2005) (citing Fed. R. Evid. 702; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303

F.3d 256, 265 (2d Cir. 2002)).  The Second Circuit in *Nimely* noted that the court is "especially

loath to regard any error as harmless in a close case, since in such a case even the smallest error

may have been enough to tilt the balance."  *Id.* at 400 (quoting *Hester v. BIC Corp.*, 225 F.3d

178, 185 (2d Cir.2000)).  Particularly where "witness credibility was the central issue,"

erroneous admission of testimony that is outside the scope of opinion testimony could

cumulatively prejudice the jury to render a verdict that is "a miscarriage of justice."  *Id.* (quoting

*Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004)).

 The entirety of Mr. Lipari's testimony was unrelated to the any factual events that

occurred on June 28, 2014—for which he was not a witness—or any matter at issue for damages.

Any information he had about that incident, and indeed any information the CRB panel had, was

entirely secondhand.  Thus, the contents of the CRB report, purporting to give an opinion on

excessive force, false arrest, and truthfulness, was not rationally based on the perception of the

report's author.

 Nor was there any testimony that the members of the CRB panel deciding Mr. Grant's

CRB complaint were vested with any special expertise or qualifications to give such opinions.

Their names were not given, their credentials were not tendered, and they did not appear to be

cross-examined.

 Specifically, with respect to the CRB panel's assessment that Officers Lockett and

Montalto were untruthful in their reports, a clear miscarriage of justice occurred.  It is a well-

recognized principle that "determining the weight and credibility of [a witness's] testimony. . . .

belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their

practical knowledge of men and the ways of men . . . ."  *Nimely*, 414 F.3d at 397-98 (quoting

*Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891)); *see also United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." (internal citation omitted)).  By testifying to the officers' purported untruthfulness, Mr. Lipari and derivatively the CRB panel presumptively authoring the reports, usurped the role of the jury.

### 3.  The CRB reports regarding this case were inadmissible hearsay

Unsworn documents and unsworn statements within a document are generally considered inadmissible hearsay without an exception.  *Capobianco v, City of New York*, 422 F.3d 47, 55 (2d Cir. 2005); *see also Rivera v. Metro. Tr. Auth.*, 750 F. Supp. 2d 456, 461 (S.D.N.Y. 2010); *Griffin v. City of New York*, 287 F. Supp. 2d 392, 395 n.8 (S.D.N.Y. 2003).  Reports, like the CRB reports at issue have the additional hurdle of surmounting the "hearsay within hearsay" rule—that is, "each part of the combined statements" within the report must "conform with an exception to the rule [against hearsay]."  Fed. R. Evid. 805; *see also United States v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990) ("Each hearsay statement within multiple hearsay statements must have a hearsay exception in order to be admissible.").  Courts have determined that unsworn statements offered for the truth of the matter asserted set forth in reports created by Civilian Review Boards are inadmissible.  *See Watts v. N.Y.C. Police Dep't*, 100 F. Supp. 3d 314, 323 n.4 (S.D.N.Y. 2015) ("Nor do we consider the unsworn hearsay statements from the files created by the Civilian Complaint Review Board . . . recounting [the defendant's] version of the events.").

Here, the CRB reports in question are mired in layers of hearsay without an exception.  *See* Ex. F (P-12); Ex. G (P-20).  In particular, the CRB's 2014 Annual Report devotes two pages to their investigation of Plaintiffs' claims.  *See* Ex. G (P-20) at 11-13.  According to Mr. Lipari, the CRB conducts investigations by interviewing witnesses, who recount the statements of other

individuals involved in the incident (e.g., Officer Lockett); Mr. Lipari then reports on those statements in his investigation.  Mr. Lipari also testified that his investigative reports include information about photographs he had not taken and videos he did not record, without any attestation to their authenticity.  Furthermore, none of the witnesses at CRB hearings, where information is gathered to make a final determination, testify under oath, or are subject to cross-examination.  The reports are rife with double and triple hearsay.

#### 4.     *The CRB reports are inadmissible subsequent remedial measures*

Fed. R. Evid. 407 prohibits evidence of subsequent remedial measures—that is, measures that "would have made an earlier injury or harm less likely to occur"—if offered to prove "negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction."  Fed. R. Evid. 407.  Courts have applied this rule to reports and investigations by bodies that sit in review of police departments and or the actions of police officers, therefore making them inadmissible when intended to correct actions of those involved in the incident.  *See Maddox v. City of Los Angeles.*, 792 F.2d 1408, 1417 (9th Cir. 1986) (holding that after a police officer used a choke hold on a suspect, subsequent internal affairs investigation was an inadmissible remedial measure).

The rule does not apply to all post-incident reporting but is limited to those reports that go beyond analysis and recommend corrective action.  *Cf. Aranda v City of McMinnville*, 942 F. Supp. 2d 1096, 1104 (D. Or. 2013).  Courts have ruled that in order to be considered a subsequent remedial measure—and thus an inadmissible report—the report must go further than detailing facts and must recommend remedial procedures to prevent the event from occurring again—such as a policy recommendation or recommendation of discipline against the officers involved—with the intention that corrective action be taken.  *See id*. (citing *Wilson v. Beebe*, 770 F.2d 578, 590 (6th Cir. 1985) (Rule 407 does not exclude a post-shooting report prepared by

police department because "[t]he report did not recommend a change in procedures following the shooting; it was a report of that incident and nothing more"); *Specht v. Jensen*, 863 F.2d 700, 701-02 (10th Cir. 1988) (citing *Maddox* in applying Rule 407 to city's press release that acknowledged officers had exercised poor judgment and reported matters related to disciplinary action)); *see Kelly v. Las Vegas Metro. Police Dep't*, No. 2:12–cv–02074–LRH–CWH, 2014 WL 3725927, at *11 (D. Nev. Jul. 25, 2014) (precluding a report making corrective recommendations).  The essence of the rule hinges on whether there is an intent that action be taken because of the investigation and/or report.

Here, according to the CRB's enabling legislation, the CRB was and is intended to be a subsequent remedial measure to avoid litigation.  The CRB's expressed purpose is to "provide a non-exclusive alternative to civil litigation." Ex. H (P-102) at 1 ("Purpose").  The enabling legislation states that the CRB's purpose in investigating complaints, when approved by the panel, is to "issue its findings and recommendations to the Chief [of Police] and the Corporation Counsel."  *See id.* at 10 (Sec. 7(3)(a)).  By its very nature, the CRB is a statutory body whose express purpose is to recommend action be taken from complaints as subsequent remedial measures, requiring response by the Syracuse Police Department.  The CRB documents did in fact make recommendations regarding police changes and made disciplinary recommendations regarding the officers in question.  They were plainly inadmissible under Fed. R. Evid. 407.

### 5.    *A new trial is necessary and warranted*

As stated, the admission and use of this palpably prejudicial and inadmissible CRB material going to the very issues being decided by the Jury constituted both serious error and a miscarriage of justice—warranting a new trial.  *See Hester*, 225 F.3d at 181.

**B.     The Court's jury instruction on handcuffing warrants a new trial.**

The Court's jury instructions concerning handcuffing created prejudicial error, which necessarily affected the Jury's decision regarding the issue of excessive force.  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *LNC Invs., Inc. v. First Fid. Bank*, 173 F.3d 454, 460 (2d Cir. 1999) (quoting *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).  "A new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law."  *Plagianos v. Am. Airlines, Inc.*, 912 F.2d 57, 59 (2d Cir. 1990).

By way of background, with their original instructions for charge, Defendants requested that the Court instruct the Jury on the law regarding permissible handcuffing short of arrest—i.e., the permissible grounds for handcuffing even in the absence of probable cause.  *See* Dkt. 126 at 14.  This instruction was necessary because Officer Lockett testified that he attempted to put Mr. Grant in handcuffs because he viewed him as a threat to himself and others.  If the Jury chose to believe that Officer Lockett had "a reasonable basis to think that [Mr. Grant] posed a present physical threat and that handcuffing is the least intrusive means to protect against that threat," then Officer Lockett's handcuffing was lawful without regard to probable cause.  *See United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014).

That standard has recently been upheld by the Second Circuit in *United States v. Fiseku*, 906 F.2d 65, 75 (2d Cir. 2018) (officer lawfully placed detainee "in handcuffs at the outset of the investigatory stop so he could safely turn his attention to the two suspects in the vehicle").  In *Fiseku*, the Second Circuit held that under certain investigatory circumstances, "handcuffing was a less intimidating—and less dangerous—means of ensuring officer safety" and that handcuffing is only unlawful if the perception of the threat or the failure to use less intrusive means is

unreasonable.  *Id.*  (alteration and citation omitted).  The Court refused Defendants' requested charge.

While it was deliberating, in its second note, the Jury gave a clear indication that they collectively had honed in on this precise handcuffing issue relative to their deliberations, stating:

> Is it true that in the course of a domestic "incident" investigation, <u>before it is determined that a crime has been committed</u>, it is within the rights of an officer, under New York state law or SPD policy, to place handcuffs on an individual?

Dkt. 157 at 4 (Juror Note No. 2) (emphasis added).  In response to the note, the Court instructed the jury as follows:

> The police may lawfully handcuff an individual if they have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat.  To determine whether such act was more intrusive than necessary, you should look to several factors including, the amount of force used by the police, the need for such force, the number of police officers involved, whether the police suspected the suspect of being armed, the duration of the stop, the extent to which the freedom of movement was restrained and the physical treatment of the suspect.

*Id.* at 6 (Supplemental Jury Instruction).

That instruction was given over the objection of Defendants, who had proposed the following instruction regarding handcuffing:

> The police may lawfully handcuff an individual, *even in the absence of probable cause to arrest*, if they "have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat."  In the course of criminal investigations, police officers are entitled to make "quick decisions about how best to protect both [themselves] and the public" including through handcuffing a detainee.  Such a handcuffing only becomes unlawful where you determine that the either the police officer's perception of the threat or the failure to use less intrusive means of detention is "unreasonable" under the totality of the circumstances.

Dkt. 154-1 at 1 (emphasis added).  The language of the requested charge came directly from the Second Circuit decisions in *Bailey* and *Fiseku*.

The Court's instruction in response the jury's second note was inadequate because it failed to make clear that probable cause is not necessary for a police officer to handcuff an individual, where the officer has "a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *Bailey*, 743 F.3d at 340. As revealed by the jury's focus on the scope of permissible action by a police officer—i.e, inquiring whether handcuffing was permissible "*before it is determined that a crime has been committed*"—the jury was asking whether probable cause was necessary to handcuff an individual. *See* Dkt. 157 at 6 (emphasis added). The Court never answered that question directly. *See id.*

Both summations focused on the precise point in time when Officer Lockett decided to handcuff Mr. Grant, with Defendants correctly indicating that Lockett's decision regarding handcuffing was legally permissible based on his objective belief that Mr. Grant posed a threat to himself and others. The subsequent events, it was argued, such as probable cause for harassment and resisting, and the force necessarily to implement the eventual arrest necessarily flowed from the decision to place Mr. Grant in handcuffs. Defendants' counsel correctly advised the Jury in summation that probable cause was not required to handcuff if Mr. Grant if he posed a threat to himself or others. *Bailey*, 743 F.3d at 340. Plaintiffs' counsel on the other hand argued that the handcuffing was illegal because *no crime had been committed*. Recognizing the conflict between the two positions, and not being charged on the issue as originally requested by Defendants, the Jury sought to resolve the conflict with their second note to the Court. Unwittingly, by answering the question in the manner it did, the Court gave the exact *wrong* impression to the Jury.

The mistake was pivotal to the case because if it was misinformed on the correctness of the handcuffing, then the Jury's deliberations on the false arrest claim regarding harassment and resisting arrest turned on different factual issues, derivatively affecting the excessive force question as well (*i.e*, a certain amount of force is lawful during an arrest that may be unlawful otherwise).  Thus, if the Jury erroneously believed that an arrest was required in all instances for Officer Lockett and Officer Montalto to handcuff Mr. Grant, then the Jury may have mistakenly deemed the handcuffing an unlawful act—based on Officer Lockett's own testimony—and used that misinformation to reach a verdict against the arresting officers on Mr. Grant's false arrest and false imprisonment claims.

Such a flawed finding—that the handcuffing and subsequent arrests were unlawful— would, in turn, make it more likely that the jury would also conclude that use of force against Mr. Grant was excessive.  *Cf. Biswas v. City of New York*, 973 F. Supp. 2d 504, 530-31 (S.D.N.Y. 2013) ("If an arrest is unlawful, an arresting police officer commits a battery when he or she touches the arrestee, including during the application of handcuffs.").  Thus, the Court's failure to instruct the jury that probable cause is *not* necessary to handcuff an individual lawfully created a likelihood that the jury might believe that a handcuffing without probable cause is tantamount to a false arrest, thus giving the jury "a misleading impression or inadequate understanding of the law," *Plagianos*, 912 F.2d at 59, that prejudiced Defendants because it influenced the jury verdict.

Accordingly, the Court's failure to instruct the Jury regarding Defendants' requested handcuffing charge in the first instance, followed by the incomplete, and potentially misleading, handcuffing instruction given in response to Juror Note No. 2 did not adequately inform the jury on the law, and gave rise to the possibility that the jury found against Defendants on Mr. Grant's

claims based on a misinterpretation of the law, thus warranting a new trial. *Cf. Callahan v. Wilson*, 863 F.3d 144, 152 (2d Cir. 2017) (remanding for new trial where the court was not convinced that an error in jury charge on deadly force did not influence the verdict and therefore was not harmless); *Uzoukwu v. City of New York*, 805 F.3d 409, 419 (2d Cir. 2015) (remanding for new trial on false arrest claim where it was not clear that an erroneous supplemental jury instruction concerning a false arrest claim did not influence the verdict).

C.   **The Court erred refusing to submit qualified immunity *via* special interrogatories.**

A new trial is warranted because the Court did not follow the procedure for resolving the issue of qualified immunity set forth in *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003), as Defendants requested in their trial brief.  Because of the "no cause" on the *Monell* claim, had qualified immunity been found, no damages would have been awarded.

Before trial, Defendants asserted an affirmative defense of qualified immunity.  "Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir. 2007); *see also Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir. 2004).  "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.,* whether officers of reasonable competence could disagree as to the lawfulness of such conduct, *is to be decided by the court*." *Zellner,* 494 F.3d at 367 (emphasis added).  To clearly established, "a legal principle must have a sufficiently clear foundation in then-existing

precedent," *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018), and "the legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him," *id.* at 590. "If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court." *Zellner*, 494 F.3d at 368. "'[I]f there is such a dispute,' however, 'the factual questions must be resolved by the factfinder.'" *Id*. (quoting *Kerman*, 374 F.3d at 109).

### 1. *The false arrest determination*

The first key issue related to the objective reasonableness of Defendants' arrest of Mr. Grant is whether they had probable cause to arrest him for any crime—most importantly, domestic disorderly conduct. The arrest for harassment (placing hands on Officer Lockett) and resisting arrest (grabbing Officer Lockett around the waist) were follow-on defenses. Probable cause for arrest on any one of the charges eliminates the false arrest count altogether, even if the jury found that Officer Lockett lacked probable cause for the others. *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest.").

With respect to domestic disorderly conduct, the testimony of what Officers Lockett and Montalto observed relative to Mr. Grant's conduct was largely consistent with Mr. Grant's testimony himself. Lockett and Montalto witnessed Mr. Grant yelling at his wife in their presence, swearing, gesticulating with his hands, and ultimately punching the front door open. Mr. Grant admitted to yelling at his wife in the officers' presence, gesticulating, and "shoving" the door open so hard that it "slammed" into the rail. Thus, the critical question for qualified immunity purposes was under these *specific* circumstances, was it clearly established in the

relevant that no probable cause existed to arrest for domestic disorderly conduct. *D.C. v. Wesby*, 138 S. Ct. at 591. And, if the Court finds—which it should as a matter of law—that the officers "reasonably but mistakenly concluded that probable cause was present," then qualified immunity must be granted. *Id.* (citation and alterations omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

Here, there is no reasonable argument that the defendant officers were not entitled to qualified immunity with respect to the arrest for Domestic Disorderly Conduct. The facts were largely undisputed. Guy Rossi, an expert in New York Penal Law, testified that probable cause to arrest existed. Chief Fowler also testified that probable cause existed. The only witness of Plaintiff in a position to disagree—John R. Brown—could not disagree because he acknowledged he was not an expert in New York Penal Law. *See* Ex. E (John R. Brown Tr.) at 24-25. Thus, not only could "officers of reasonable competence disagree on whether the probable cause test was met," *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 205 (2d Cir. 2010) (citation omitted), there was no actual disagreement at all by reasonable officers regarding probable cause for domestic disorderly conduct. Thus, qualified immunity as to one of the charges underlying the arrest extends to all the other charges.[5] *See, e.g.*, *Russell v. Journal News*, No. 12-CV-8013 (CS), 2015 WL 13203928, at *6 n.3 (S.D.N.Y. Dec. 10, 2015) (concluding that "to obtain qualified immunity for the false arrest claims, the officers only

---

[5] Obviously, the Jury is entitled to disbelieve the factual account of Officers Lockett and Montalto relative to the events that followed—underlying the harassment and resisting charges—leading to a more difficult assessment by the Court of qualified immunity. This divergence of factual accounts all but mandates that the Court use special interrogatories to inform its qualified immunity assessment. This was requested by the Defendants and refused by the Court. *See* Subsection (3) *supra*.

needed to have had arguable probable cause to arrest for some criminal conduct," i.e., one of the charged offenses).

2.    ***Excessive force determination of qualified immunity***

Again, with excessive force qualified immunity, the critical question requires specific facts: was it objectively reasonable for Officers Lockett and Montalto to believe that ten collective hand strikes to the head and one peroneal knee strike was a reasonable and proportional use of force against an individual actively resisting arrest and was not otherwise clearly established as unlawful or prohibited conduct.  The documentary evidence in the record demonstrates that New York police officers are trained to use hand strikes and knee strikes against a suspect who is actively resisting arrest.  *See* Ex. J (D-40) at 3B23.  Expert Guy Rossi stated that such tactics are appropriate and taught at the Rochester Police Academy.   Plaintiffs' police expert acknowledged that he is not an expert in defensive police tactics. *See* Ex. E (John R. Brown Tr.) at 79-80.  While he indicated in his opinion that hand strikes should not be used to the head, absent deadly physical force, he admitted that this was not a national or constitutional standard:

| | |
|---|---|
| 18    Q.   But you can't cite for me a constitutional standard that <br> 19    states that you can't use a hand strike to the face or a punch <br> 20    to the face for an individual who is resisting arrest? <br> 21    A.   No, I can't cite anything like that. | *See* Ex. E at 78. |

Thus, if Mr. Grant was resisting arrest, the Court would be compelled to find that the Officers were entitled to qualified immunity.  But, the excessive force qualified immunity determination by the Court necessarily changes based on whether or not Mr. Grant was actively resisting arrest.  The Special Interrogatories requested by Defendants, *see* Dkt. 131, would have

provided the Court facts with which to guide its qualified immunity analysis.  *See id*. (questions 6, 7, 8, 17, 22, 23, 24).

>    **3.**      ***It was error to refuse to utilize special interrogatories to aid in the Court's qualified immunity analysis***

In *Stephenson*, the Second Circuit stated that "the ultimate legal determination of whether qualified immunity attaches to a law enforcement agent's actions is 'a question of law better left for the court to decide.'"  332 F.3d at 81 (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)).  The *Stephenson* court reasoned as follows:

> We have recognized that qualified immunity is in essence a legal decision whether on the basis of the law as it existed at the time of the particular incident, the lawfulness of the officer's conduct was reasonably clear or was a matter of doubt. Juries are hardly suited to make decisions that require an analysis of legal concepts and an understanding of the inevitable variability in the application of highly generalized legal principles. Moreover, such an analysis would seem to invite each jury to speculate on the predictability of its own verdict.

*Id.* (internal quotation marks omitted).  However, the jury still must resolve the factual disputes that are overlapping between the substantive claims against a police officer—in *Stephenson*, the claim at issue was excessive force—and qualified immunity issues.  *See id.*  Accordingly, in *Stephenson*, the Second Circuit approved the following procedure with respect to qualified immunity.  First, "[t]he court should charge the jury on excessive force, but not on qualified immunity.  If the jury returns a verdict of excessive force against [the police officer], the court should then decide the issue of qualified immunity."  *Id.* at 80.  In that case, the Second Circuit suggested that the special interrogatories on key factual disputes that may affect the resolution of the qualified immunity issue included, for example, "whether [the police officer] gave warnings to Stephenson, whether Stephenson was armed with a weapon, and whether [the police officer] actually believed Stephenson was armed."  *Id.* at 81.  Based on the procedure set forth in

*Stephenson*, Defendants requested that the Court submit to the jury special interrogatories related to key factual disputes that will permit the Court to resolve the question of qualified immunity.

Rather than use the procedure set forth in *Stephenson*, and over Defendants' objection, the Court instructed the jury on qualified immunity and submitted the issue to the jury to resolve. Because of this failure, the Court is now unable to fulfill its legal duty to assess the existence of qualified immunity, at least with respect to excessive force.

One court in this district has ordered a new trial because it did not follow the procedure outlined in *Stephenson*. *See Bradley v. Jusino*, No. 04 Civ. 8411, 2008 WL 417753, at *4-6 (S.D.N.Y. Feb. 14, 2008). In *Bradley*, following the jury's verdict which had granted the defendant qualified immunity with respect to a false arrest claim against him, the plaintiff moved for a new trial as to the false arrest and qualified immunity claims. *Id.* at *1. The *Bradley* court granted the motion for a new trial because the court had not used the procedure set forth in *Stephenson* and allowed the jury to resolve the issue qualified immunity. *Id.* at *5-6 ("Therefore, as a special interrogatory was not used in the initial trial in this case, and such factfinding by the jury is required in order for the Court to properly rule upon the qualified immunity issue, the Court must retry the false arrest claim in addition to the qualified immunity defense."). The court determined that, on retrial, the jury would be given special interrogatories for the resolution of any disputed facts pertaining to the false arrest claim, and, based on the jury's responses, the court would resolve the issue of qualified immunity. *Id.* at *6.

The same result is warranted here. Because the jury did not perform the necessary fact finding for the Court to properly rule on the qualified immunity issue, the Court must order a retrial of Mr. Grant's excessive force and assault and battery claims, as well as his false arrest

and false imprisonment claims in the event Defendants' motion for a judgment as a matter of law on those claims is denied.  *See id.* at *4-6.

## III.   THE COURT SHOULD GRANT DEFENDANTS' JUDGMENT AS A MATTER OF LAW UNDER RULE 50

Fed. R. Civ. P. 50(a) provides that a court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  The Court may grant a motion for judgment as a matter of law if the evidence, viewed in the light most favorable to the non-moving party, is insufficient to allow a reasonable juror to find in the non-moving party's favor.  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).

### A.   A reasonable jury could not have found in favor of Plaintiffs on Mr. Grant's false arrest claim under § 1983 and false imprisonment claim under New York law because there was probable cause to arrest Mr. Grant.

It is respectfully submitted that Defendants are entitled to judgment as a matter of law on Mr. Grant's false arrest claim under § 1983 as well as his false imprisonment claim under New York law. "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins*, 478 F.3d at 84.

"The existence of probable cause to arrest is a complete defense to a claim of false arrest and imprisonment; in other words, it renders the confinement privileged." *Garenani v. County of Clinton*, 552 F. Supp. 2d 328, 333 (N.D.N.Y. 2008) (quoting (*Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  "When determining

whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).  "Courts should look to the 'totality of the circumstances' and 'must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* (quoting *Caldarola*, 298 F.3d at 162)).  That is, probable cause is a "standard that 'does not demand hard certainties or mechanistic inquiries'; nor does it 'demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false.'" *Figueroa*, 825 F.3d at 99 (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 389-390 (2d Cir. 2013)).  Significantly, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."  *Jaegly*, 439 F.3d at 154; *see also Canjura v. Laschet*, No. 12 Civ. 1524 (JCM), 2016 WL 2755920, at *4 (S.D.N.Y. May 10, 2016) (concluding that police officers had probable cause to arrest the plaintiff for disorderly conduct, which was sufficient to deny the Rule 50(b) motion of the plaintiff, who had also been arrested for and charged with resisting arrest and harassment in the second degree).

In that regard, the undisputed evidence does not permit a the basis for the jury's verdict on his false arrest and false imprisonment claims, given that questions of fact previously held to preclude summary judgment dismissing Mr. Grant's false arrest claim were resolved at trial in favor of Officers Lockett and Montalto.[6]  In other words, Defendants established at trial there was probable cause to arrest Mr. Grant.

---

[6] *See Grant v. City of Syracuse*, 5:15-CV-445 (LEK/TWD), 2017 WL 5564605, at *5 (N.D.N.Y. Nov. 17, 2017).

Furthermore, at the close of Plaintiffs' proof, this Court dismissed Plaintiffs' unlawful entry claim, detailing the exigent circumstances that justified Officer Lockett's entry into their home.  More specifically, Mr. Grant testified that he was still "upset" when Officer Lockett arrived at his home less than three (3) minutes after he called 911 requesting police because his daughter was "acting like a fucking asshole." *See* Ex. A at 72. As Officer Lockett approached the Grant home, he heard "yelling" inside the house, which Mr. Grant described as "talking loudly" about the dirty dishes and mess in the house.  *See id.* at 23, 73.[7]  According to Plaintiffs, Mrs. Grant advised Officer Lockett "we don't need you anymore" as he walked up to the front door.  *Id.* at 22.  Officer Lockett similarly recalled hearing a female voice from an upstairs window call out something to the effect of "she's my daughter too." According to Mr. Grant, he then walked down the stairs, opened the front door, stuck his head out to tell Officer Lockett they did not need him anymore, then walked back up the stairs to continue "talking loudly" to his wife about the dirty dishes and condition of their home, which he obviously found unacceptable.[8] *Id.* at 22-23, 74.  Mr. Grant then realized Officer Lockett had entered his home and was standing on the landing near the front door.  *Id.* at 23.

Based on those facts, the Court determined as a matter of law that exigent circumstances existed to justify Officer Lockett's entry into the Grant home based on the then present domestic disturbance occurring directly in front of the defendant police officers and dismissed Plaintiffs' unlawful entry claim.  The core question, apparently considered by this Court and resolved in favor of Officer Lockett, was whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, *see United States v. Zabare,* 871 F.2d 282, 291, 292 (2d Cir.

[7] *Id.* at *11.
[8] *Id.*

1989), to believe that there was an "urgent need to render aid or take action," *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (internal quotation marks omitted).

Thus, the Court concluded, as a matter of law, that exigent circumstances existed in the Grant's home with respect to an escalating domestic incident justifying Officer Lockett's warrantless entry into Plaintiffs' home. As more fully set forth below, the same circumstances that justified Officer Lockett's entry into Plaintiffs' home also supplied probable cause for Mr. Grant's arrest for domestic disorderly conduct under N.Y. Penal Law § 240.20 and N.Y. Crim. Proc. Law § 530.11, which includes disorderly conduct not in a public space.

In that regard, the undisputed proof at trial revealed that Mr. Grant became increasingly agitated following Officer Lockett's entry. Upon Officer Lockett's entry into the Grant home, Mr. Grant was still upset, and continued to "talk loudly" to Mrs. Grant while using his hands as he complained about the dirty house and dirty dishes in the sink. *See* Ex. A at 73-75.[9] He acknowledged he did that in Officer Lockett's presence. *See id.* at 74. Officer Lockett then asked him to go outside and speak with his partner. *See id.* Mr. Grant was still upset as he walked down the stairs and "shoved" the front door open with his forearm, causing it to slam into the railing. *See id.* at 25, 74-75.[10]

The noise of the door slamming into the railing caused Sharon Hayes and Corey McMullin, who were sitting on Ms. Hayes' porch, to look up and take notice of the events transpiring at

---

[9] This testimony contradicts the "facts" Plaintiffs urged the court to consider in their motion for summary judgment, insofar as Plaintiffs alleged they had ceased arguing by the time Officers Lockett and Montalto arrived, and that Mr. Grant was not yelling when he expressed his desire for the house to be clean. *See Grant*, 2017 WL 5564605, at *5. Viewing those disputed facts in the light most favorable to Mr. Grant, it was held that his conduct did not necessarily evidence the *mens rea* that is required to violate Penal Law § 240.20 or Criminal Procedure Law ("CPL") § 530.11, and therefore, Defendants' motion for summary judgment dismissing Mr. Grant's false arrest claim was denied. *Id.* Because the undisputed evidence at trial resolved those issues in favor of Defendants, this court should enter judgment as a matter of law in favor of Defendants as to Mr. Grant's false arrest and false imprisonment claims pursuant to Rule 50(b).
[10] *Id.*

Plaintiffs' home. Upon seeing and hearing the door fling open and slam against the railing, Mr. McMullin testified he got up and walked toward Plaintiffs' home. Those undisputed facts established "the proximity of that altercation to neighbors or other members of the public such that [Mr. Grant's] actions could support a logical inference that [he] acted with intent or recklessness in regard to members of the public." *Grant,* 2017 WL 5564605, at *6.

After taking three steps down the stairs, Mr. Grant claims Officer Lockett grabbed him, but he specifically denied that Officer Lockett jumped on his back. *See* Ex. A at 76-77. While Officer Lockett testified he intended to place handcuffs on Mr. Grant for purposes of detaining him, it is respectfully submitted that his subjective intent is irrelevant and that the undisputed facts established probable cause. *See Jaegly*, 439 F.3d at 154. Although the law does not require probable cause to have existed with respect to each individual charge, or *any* charge actually invoked by the arresting officer at the time of arrest, *see id.*, it is respectfully submitted that probable cause existed to arrest Mr. Grant for domestic disorderly conduct.[11]

Under N.Y. Penal Law § 240.20, "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof" when that person engages in any of the following behavior:. . . ***He engages . . . in violent, tumultuous or threatening behavior;*** or . . . ***He makes unreasonable noise*** . . . ." (emphasis added); *see also Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001) (listing the elements of disorderly conduct under § 240.20).   As set forth in the Court's Jury Instructions, under New York Criminal Procedure Law section 530.11, a "Domestic Disorderly Conduct" need not be conduct that occurs in a public place.  *See* Dkt. 151-8 at 21.

---

[11] *Id*. at *5 (questions of fact as to whether Plaintiffs had ceased arguing and whether Mr. Grant was yelling in Officer Lockett's presence were resolved in Defendants' favor evidencing probable cause to arrest)

The evidence adduced at trial established that Defendants had probable cause to believe that Mr. Grant was engaging in "violent, tumultuous or threatening behavior" based on his behavior in the presence of the police, including yelling at his wife, using vulgarity to describe his daughter, Alyssa (calling her a "bitch"), exhibiting physical threat assessment indicators by flailing his arms angrily, and "shoving" his wrought iron door open, causing it to slam into the railing as he went outside. Similarly, Mr. Grant's behavior qualified as "unreasonable noise", particularly when his "shoving" the door open caused Ms. Hayes and Mr. McMillan to watch, and further caused Mr. McMillan to get up and walk toward the Grant residence to watch the events unfold.[12]

Based on the foregoing circumstances, Officer Lockett and Officer Montalto were reasonable in concluding that Mr. Grant had committed at least some—if not all—the crimes of domestic disorderly conduct under N.Y. Penal Law § 240.20; harassment in the second degree pursuant to N.Y. Penal Law § 240.26(1); and resisting arrest pursuant to New York Penal Law § 205.30.[13]  Since the Defendants only need to have probable cause on one of the charges in order to defeat the false arrest claim, *see Jaegly*, 439 F.3d at 154, any issues of fact which still remain as to harassment in the second degree and/or resisting arrest are immaterial.

---

[12] *See id.* at *6.

[13] As a result of his encounter with the police on the date in question, Mr. Grant was also charged with harassment in the second degree and resisting arrest. Under N.Y. Penal Law § 240.26(1), a person is guilty of harassment in the second degree when, "with intent to harass, annoy or alarm another person . . . [h]e . . . strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same."  Under N.Y. Penal Law § 205.30, "[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person."

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court (1) order

remittitur of the damages awarded to Plaintiffs; (2) grant Defendants a new trial; and (3) enter

judgment as a matter of law dismissing Mr. Grant's false arrest and false imprisonment claims

against Officer Lockett and Officer Montalto.

Dated:  November 20, 2018                    Respectfully submitted,
Syracuse, New York                    By:    s/ John G. Powers, Esq.

OFFICE OF CORPORATION COUNSEL        HANCOCK ESTABROOK LLP
CITY OF SYRACUSE                     John G. Powers, Esq. (508934)
Todd M. Long, Esq.                   1500 AXA Tower I
Assistant Corporation Counsel,       100 Madison St.
City of Syracuse                     Syracuse, NY 13202
233 E. Washington St., Suite 300     (315) 565-4500
Syracuse, NY 13202
(315) 448-8400

COUNSEL FOR DEFENDANTS